**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

BLOCKCHAIN MINING SUPPLY AND
SERVICES LTD.,

                    Plaintiff,

    –against–

SUPER CRYPTO MINING, INC. n/k/a
DIGITAL FARMS, INC., and DPW
HOLDINGS, INC. n/k/a AULT GLOBAL
HOLDINGS, INC.,

                    Defendants.

Civil Action No. 1:18-cv-11099-ALC

---

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE**
**FIRST AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(2) AND 12(b)(6)**

[**PUBLIC – REDACTED**]

Richard S. Mandel
Dasha Chestukhin
COWAN, LIEBOWITZ & LATMAN, P.C.
114 West 47th Street
New York, New York 10036
(212) 790-9251

*Attorneys for Plaintiff Blockchain Mining*
*Supply and Services Ltd.*

# **TABLE OF CONTENTS**

Table of Authorities ........................................................................................................... i

Preliminary Statement .......................................................................................................1

Relevant Facts from Complaint and Jurisdictional Discovery ..........................................2

    I.     SCM Is An Alter Ego and Mere Department of DPW ...........................2

    II.    Agreement's Terms and Defendants' Promises...................................10

Argument ..........................................................................................................................13

    I.     Plaintiff Has Averred Sufficient Facts Supporting Its Alter Ego
          Theory and Personal Jurisdiction over DPW ........................................13

          A.    Plaintiff Has Sufficiently Alleged That SCM Is a Mere
               Instrumentality or Department of DPW........................................13

          B.    Plaintiff Sufficiently Alleges That SCM Is DPW's Alter
               Ego .............................................................................................15

          C.    The Court Can Exercise Personal Jurisdiction Over DPW
               Based on SCM's Submission to Jurisdiction Because SCM
               Is a Mere Department of DPW ...................................................17

    II.    The Court Can Also Exercise Personal Jurisdiction Over DPW
           Based on DPW's Own Contacts with New York ..................................21

    III.   Plaintiff's Promissory Estoppel Claim Is Not Duplicative of Its
          Breach of Contract Claim at This Stage ...............................................23

    IV.   New York's Statute of Frauds Does Not Bar Plaintiff's Promissory
          Estoppel Claim Against DPW ...............................................................25

          A.    DPW's Promises to Plaintiff Were Not on Behalf of
               "Another Person"........................................................................25

          B.    In Any Case, DPW's Emailed Promises to Plaintiff Were
               Signed Writings Sufficient to Satisfy the Statute of Frauds .....26

    V.    Plaintiff Has Adequately Pled Promissory Estoppel as to DPW ...........28

          A.    DPW's Promises to Pay Were Clear and Unambiguous ...........28

          B.    Plaintiff's Reliance on DPW's Promises Was Reasonable.......29

          C.    Plaintiff Was Injured by Its Reasonable Reliance ....................29

Conclusion .......................................................................................................................30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ainette v. Market Basket, Inc.*,
   2021 WL 1022590 (S.D.N.Y. Mar. 16, 2021) ...........................................................................21

*Avant Capital Partners, LLC v. Strathmore Dev. Co. Mich., LLC*,
   2013 WL 5435083 (D. Conn. Sep. 30, 2013) ...........................................................................20

*Bagel Bros. Maple, Inc. v. Ohio Farmers, Inc.*,
   279 B.R. 55 (W.D.N.Y. 2002) ..................................................................................................26

*Bonsey v. Kates*,
   2013 WL 4494678 (S.D.N.Y. Aug. 17, 2013) ......................................................................21, 22

*Cairns & Assocs. v. Conopco, Inc.*,
   372 B.R. 637 (Bankr. S.D.N.Y. 2007) ......................................................................................30

*Castellotti v. Free*,
   138 A.D.3d 198, 27 N.Y.S.3d 507 (1st Dept. 2016) .................................................................28

*Chloe v. Queen Bee of Beverly Hills, LLC*,
   616 F.3d 158 (2d Cir. 2010) .....................................................................................................21

*CLP Toxicology, Inc. v. Casla Bio Holdings LLC*,
   2020 WL 3564622 (Del. Ch. June 29, 2020) ...........................................................................14

*CutCo Indus. v. Naughton*,
   806 F.2d 361 (2d Cir. 1986) .....................................................................................................22

*Dallas Aerospace, Inc. v. CIS Air Corp.*,
   352 F.3d 775 (2d Cir. 2003) .....................................................................................................25

*DDCLAB Ltd. v. E.I. du Pont de Nemours & Co.*,
   2005 WL 425495 (S.D.N.Y. Feb. 18, 2005) .............................................................................29

*Doe v. NYU*,
   2021 WL 1226384 (S.D.N.Y. Mar. 31, 2021) ...........................................................................29

*Dorfman v. Marriott Int'l Hotels, Inc.*,
   2002 WL 14363 (S.D.N.Y. Jan. 3, 2002) ...................................................................13, 19, 20

*ESI, Inc. v. Coastal Corp.*,
    61 F. Supp. 2d 35 (S.D.N.Y. 1999)..............................................................................18, 19

*Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co.*,
    804 F.2d 787 (2d Cir. 1986)..............................................................................................28

*Fischbarg v. Doucet*,
    38 A.D.3d 270, 832 N.Y.S.2d 164 (1st Dept. 2007)........................................................22

*Gabriel Capital, Ltd. P'ship v. NatWest Fin., Inc.*,
    122 F. Supp. 2d 407 (S.D.N.Y. 2000)..............................................................................16

*GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*,
    667 F. Supp. 2d 308 (S.D.N.Y. 2009)........................................................................17, 20

*Ginsberg v. Gov't Props. Tr., Inc.*,
    2007 WL 2981683 (S.D.N.Y. Oct. 10, 2007) ..................................................................13

*Hedspeth v. Citicorp Individual Bank Ret. Plan*,
    1993 WL 204808 (S.D.N.Y. June 3, 1993) .....................................................................29

*Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*,
    763 F.2d 55 (2d Cir. 1985).................................................................................................23

*Ion Audio, LLC v. Bed, Bath & Beyond, Inc.*,
    2019 WL 58913 (S.D.N.Y. Apr. 2, 2019)........................................................................25

*J&R Elecs., Inc. v. Business & Decision N. Am., Inc.*,
    2013 WL 5203134 (S.D.N.Y. Sep. 16, 2013)..................................................................25

*LaCourte v. JP Morgan Chase & Co.*,
    2013 WL 4830935 (S.D.N.Y. Sep. 4, 2013).....................................................................14

*Licci v. Lebanese Canadian Bank, SAL*,
    673 F.3d 50 (2d Cir. 2012)................................................................................................23

*Newmark & Co. Real Estate Inc. v. 2615 E. 17 Realty LLC*,
    80 A.D.3d 476, 914 N.Y.S.2d 162 (1st Dept. 2011)........................................................27

*Newmont Mining Corp. v. AngloGold Ashanti Ltd.*,
    344 F. Supp. 3d 724 (S.D.N.Y. 2018)..............................................................................23

*O'Grady v. BlueCrest Capital Mgmt. LLP*,
    111 F. Supp. 3d 494 (S.D.N.Y. 2015)..............................................................................23

*P&G Auditors & Consultants, LLC v. Mega Int'l Commer. Bank Co.*,
    2019 WL 4805862 (S.D.N.Y. Sep. 30, 2019)..................................................................24

*Personal Watercraft Prod. Sarl v. Robinson*,
    2017 WL 4329790 (S.D.N.Y. Sep. 1, 2017)................................................................23

*Philippou v. Photios Cougentakis*,
    2009 WL 1097542 (E.D.N.Y. Apr. 21, 2009) ..........................................................26

*SODEPAC, S.A. v. M/V Choyang Park*,
    2002 WL 3129634 (S.D.N.Y. Oct. 9, 2002) ............................................................17

*Standex Int'l Corp. v. QCP, Inc.*,
    2017 WL 481447 (S.D.N.Y. Feb. 6, 2017)................................................................14

*Sterling Nat'l Bank & Tr. Co. v. Fidelity Mortg. Inv'rs*,
    510 F.2d 870 (2d Cir. 1975)......................................................................................22

*Stevens v. Publicis, S.A.*,
    50 A.D.3d 253, 854 N.Y.S.2d 690............................................................................27

*Storm LLC v. Telenor Mobile Communs. AS*,
    2006 WL 3735657 (S.D.N.Y. Dec. 15, 2006) ...................................................14, 20

*Tchernichova Prods., Inc. v. Ballet Int'l N.A., Inc.*,
    1987 WL 16364 (S.D.N.Y. Aug. 25, 1987)..............................................................25

*Transcience Corp. v. Big Time Toys, LLC*,
    50 F. Supp. 3d 441 (S.D.N.Y. 2014).........................................................................24

*Zhi Zhong Qiu v. Diamond*,
    2020 WL 978352 (S.D.N.Y. Feb. 27, 2020)............................................................27

**Statutes**

N.Y. Gen. Oblig. Law § 5-701(a)(2) ...........................................................................25

**Other Authorities**

CPLR § 302(a)(1) .........................................................................................................21

Fed. R. Civ. P. 8(a) ......................................................................................................21

## PRELIMINARY STATEMENT

Defendants Super Crypto Mining, Inc. n/k/a Digital Farms, Inc. ("SCM") and DPW

Holdings, Inc. n/k/a Ault Global Holdings, Inc. ("DPW" and, together with SCM, "Defendants")

seek to avoid their clear breach of contract by hiding behind a phantom distinction between the

two entities.  As alleged in the First Amended Complaint ("FAC") and borne out by

jurisdictional discovery, SCM is an alter ego or mere department (not simply a wholly owned

subsidiary) of DPW.  Accordingly, although only SCM signed the Asset Purchase Agreement

(the "Agreement"), DPW is equally bound by its terms.  As a result, beyond its own contacts

with the forum, DPW is also subject to personal jurisdiction in New York because SCM

"irrevocably" submitted to the exclusive jurisdiction of this Court in the Agreement.[1]

Plaintiff's breach of contract claim does not preclude it from also alleging, in the

alternative, a promissory estoppel claim for the remaining balance due on the last 600 of 1,100

total machines.  Although SCM has admitted that the Agreement "is a valid contract," Answer

(ECF No. 36) ¶ 71, it has *not* admitted that the Agreement imposed any obligation on it beyond

payment for the first 500 machines.  It is thus unclear at this preliminary stage whether the

Agreement governs the parties' entire dispute, and Plaintiff's promissory estoppel claim is not

duplicative.  Indeed, dismissal at this early stage could potentially leave Plaintiff without a

remedy under either the Agreement or under the common law, despite Defendants' repeated

representations that they still wanted, and intended to pay for, the remaining 600 machines that

Plaintiff therefore refrained from reselling for months.

Nor is Plaintiff's promissory estoppel claim against DPW barred by the Statute of Frauds

or inadequately pled.  Plaintiff does not allege that DPW made a "special promise to answer for

---

[1] *See* Chestukhin Decl. Ex. A at 6 ¶ 12(h).  Defendants concede (or at least do not question) that this Court may assert personal jurisdiction over SCM based on its consent to the same in the Agreement.

the debt" of SCM.  Rather, Plaintiff alleges facts sufficient to permit an inference that *either* SCM's obligations under the Agreement were in fact DPW's own obligations based on SCM's status as DPW's alter ego *or* DPW made independent promises to pay to Plaintiff the purchase price stated in the Agreement for the remaining 600 machines.[2]  Accordingly, DPW's repeated written promises to pay the outstanding balance are not subject to the Statute of Frauds and, even if they were, DPW's emails suffice to satisfy it.  Further, Plaintiff sufficiently alleges all elements of a promissory estoppel claim against DPW.  The FAC quotes DPW's own "clear and unambiguous" promises to pay, alleges why Plaintiff's reliance on DPW's continued promises and partial payments was reasonable, and describes Plaintiff's exact injury.

Finally, to the extent any additional facts learned by Plaintiff during jurisdictional discovery and cited herein are necessary to cure any potential deficiencies in the FAC, Plaintiff respectfully asks that the Court grant it leave to amend the FAC to add these further allegations.

## RELEVANT FACTS FROM COMPLAINT AND JURISDICTIONAL DISCOVERY

### I.     SCM Is An Alter Ego and Mere Department of DPW

Although Plaintiff has only had access to limited jurisdictional discovery thus far, Defendants' preliminary productions buttress and enhance the FAC's allegations that SCM is both an alter ego and mere department of DPW.  Plaintiff alleged that "DPW and SCM are located at the same address, share common office space, and have the same attorneys." FAC ¶ 58.  SCM's corporate filings confirm that its directorate, executives and offices were intertwined with DPW's: at all relevant times, Milton C. "Todd" Ault III ("Ault" or "Todd") was the Chairman of SCM's Board of Directors as well as the Chairman and CEO of DPW, while

---

[2] If the Agreement is ultimately found to be void under its own terms with respect to any obligation to buy the final 600 machines, then DPW's promises to pay the remaining amount of the purchase price under the Agreement would be promises made independently of the Agreement, in exchange for the additional consideration of Plaintiff agreeing to deliver the remaining 600 machines to Super Crypto despite no longer being required to do so.

William B. Horne was a director and CFO of SCM as well as the Vice Chairman and CFO of DPW. Chestukhin Decl. Ex. B at 3, Ex. C at 53. Similarly, in 2018 and 2019, SCM and DPW listed the same Newport Beach, CA address for their principal offices. *Id.* Ex. B at 4, Ex. C at 1.

The FAC alleged that SCM "was incorporated in 2018, with no retained earnings, and was insufficiently capitalized to perform its obligations under the Agreement," FAC ¶ 59, and was "inadequately capitalized to fulfill its obligations to Plaintiff," *id.* ¶ 65, all of which was corroborated by Defendants' partial production. SCM's year-end balance sheets for 2018 (its year of incorporation) and 2019[3] show that, despite having fixed assets of ████████ in 2018 and a mere ████████ in 2019, SCM owed a whopping ████████ in 2018 and ████████ in 2019 ████████████████████████████████████ ████████. Chestukhin Decl. Ex. D. The evidence supports the inference that these "intercompany receivables" were not true loans, and that SCM was never required or expected to repay them; at most, these were interest-free loans. SCM also wrote down ████████ ████████████████ in 2018 before writing down, in 2019, a further ████████ ████████████ on top of ████████████████████████ *Id.* Moreover, there is no record that SCM ever paid a dividend to its sole shareholder, DPW. All these facts indicate that SCM was never adequately capitalized to conduct business on its own behalf.

Despite receiving large cash infusions from DPW and another related company, SCM was never solvent, not even in its first year of existence. In 2018, it had negative net assets of █ ████████, which by 2019 had ballooned to ████████. *Id.* Moreover, SCM maintained its own bank account ████████████████████████████

---

[3] Defendants only produced balance sheets for 2018 and 2019, and they provided no corroborating documentation or explanation.

███████████████████████████████. *Id.* Ex. E.  SCM's account was then closed and DPW

apparently took over SCM's finances entirely.  *See infra* at 4-5.  Moreover, DPW's 2020 10-K

indicates that, in March 2020, SCM ceased operations due to yet another year of losses,

confirming that SCM was insolvent for its entire existence.  Chestukhin Decl. Ex. F at 63.

Further, as alleged in the FAC, "DPW paid for and asserted its authority to pay the debts

of SCM," FAC ¶ 64, and "DPW and SCM made no distinction between themselves regarding

their obligations to Plaintiff," *id.* ¶ 60.  Emails sent from Darren Magot ("Magot"), the nominal

CEO of SCM, to Ault (seemingly in his capacity as DPW's CEO) show that SCM was

financially dependent upon DPW and that the two operated as a single entity.  For example, in an



April 19, 2018 email, ██████████████████████████████████

█████████████████████████████████████████ Chestukhin Decl. Ex. G

at 1.  On May 4, 2018, ████████████████████████████

█████████████████████████████████████████████

███████████████████████████ *Id.* at 2.  On May 18, 2018,

█████████████████████████████████████████

██████████████████████████████████████████████ *Id.*

at 3.  On June 18, 2018, █████████████████████████████

████████████████████████ *Id.* at 5.

Discovery supports the conclusion that DPW's payments on SCM's behalf were not

loans, as SCM did not even have a bank account from which to repay DPW and, moreover, there

is no indication that DPW ever demanded (or indeed expected) repayment.  These

communications strongly support the conclusion that SCM acted as a mere department of or

façade for DPW, not an independent subsidiary.  Also, although SCM had an insurance policy in

its name, that policy was apparently paid for by DPW, as by the policy's effective date of ███ ███, SCM's bank account was apparently already shut down. *See id.* Ex. H at 5; Ex. G at 1.

Tellingly, even limited discovery confirms that *all* payments made to Plaintiff under the Agreement were made *by DPW directly or with DPW's money*.[4] *Id.* Ex. I. While the first two deposit payments technically came from SCM's bank account, SCM made these payments only after DPW deposited funds into SCM's account.[5] *Id.* at 1-2. Similarly, the first of two escrow payments under the Agreement, which originated from Defendants' New York-based attorneys, was marked "DPW - DISBURSEMENT." *Id.* at 3. After these payments, *all* further Agreement-related payments came *directly* from DPW's account. *Id.* at 5-18.

As further alleged in the FAC and reflected in discovery, "SCM displayed no independent business judgment," FAC ¶ 61, and "made clear that the decisions with regard to the Agreement were made by Mr. Ault as President and CEO of DPW," *id.* ¶ 61. Emails from Magot confirm that DPW was behind the payments (or, at the very least, that there was no distinction made between DPW and SCM). Representative communications include: Todd Ault, "the CEO of DPW Holdings [] confirmed that they sent $3.5 million into the escrow account but they have not yet determined how and when the distribution of funds will happen" on March 23, 2018; "Todd signed the approval to send the wire today" on March 28, 2018; "I believe Todd

---

[4] The wire confirmations in Exhibit I, which Plaintiff produced as part of preliminary discovery, are incorporated into the FAC by reference and may therefore be considered by the Court. *See* FAC ¶¶ 17, 18, 32-34, 36, 40-44, 46.
[5] Although the three bank account statements produced by Defendants are heavily redacted, ███████████████████████████████████ Chestukhin Decl. Ex. E at 2, 6-8. SCM apparently then used these DPW-deposited funds to pay off all its obligations, including to Plaintiff. ████████████████████████ *Id.* at 6. ██████ *. Id.* ████████████████████ *Id.* at 7. There is no evidence that SCM had any source of funds except DPW, ████████████████████████████████████████ .

had some money wired today" on or around June 11, 2018; and "I'm with Todd in NY and he just confirmed that he is working to get you a wire tomorrow" on August 16, 2018. Chestukhin Decl. Ex. J.

Discovery also confirms that DPW—through its CEO, Ault, who held no executive position at SCM—was the ultimate decisionmaker for SCM. Not only did DPW apparently make (or at least authorize) all payments to SCM's third-party vendors, but DPW also appears to have had the final say as to the transactions in which SCM could engage. Although Magot was nominally SCM's CEO, before he could execute the Agreement with Plaintiff, he had to get approval from Ault (that is, DPW's CEO). On March 6, 2018 (two days before the Agreement's signing), Magot wrote to Plaintiff to say that he had "emails, voice messages, and texts out to the *CEO of our parent* [DPW] asking for approval to sign." Chestukhin Decl. Ex. K at 1 (emphasis added). Both before and after the Agreement's execution, Magot repeatedly made clear that DPW was ultimately in control of SCM and the transactions contemplated by the Agreement. On March 21, 2018, Magot (supposedly SCM's CEO) wrote to Plaintiff that "*Our CEO* [Ault] is still nervous over the transfer process between when *we* send the wire and get the machines." *Id.* at 15 (emphasis added). That Magot was referring to Ault is corroborated by the fact that, the very next day, Magot wrote to Plaintiff to explain that "the CEO of the parent company (DPW traded on the NYSE) can't have any opportunity for something to go wrong." *Id.* at 16.

Magot also constantly made clear that input from Ault, DPW's CEO, was needed for any decisions regarding the Agreement (many of which were made in and communicated from New York), revealing that Magot's role was more akin to messenger than true executive. Some representative emails from Magot read: "I'm with Todd in NY running around to meetings . . . . I'll pull him away to call just as soon as possible."; "I'm with Todd in NY and he just confirmed

that he is working to get you a wire tomorrow"; "Todd was traveling again in New York finalizing all the financing. . . . I hope to talk with him later today and then be able to get back to you."; "I will talk with Todd and reply today."; "I spoke to Todd about an hour ago. He did give me an update and I am awaiting an email tomorrow to confirm funding has closed."; "I just spoke with Todd. . .  He felt that we had a plan but weren't clear on the adjustments in timing."; and "Todd is requesting to connect with you directly today if at all possible. He is in NYC right now. Can I help to arrange a call . . . ?".  *Id.* Ex. L.

Magot regularly emailed Ault for input regarding the Agreement, including the following representative inquiries: ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████  *Id.* Ex. M.

As seen above, Magot and Ault repeatedly communicated in a way that shows they make no distinction between SCM and DPW.  On April 3, 2018, Magot wrote to Plaintiff that "Todd asked that I share the press release below that *we* made this morning" and linked to an article about *DPW*'s announcement that DPW had "entered into an agreement with a U.S. based entity securing the right to 25 megawatts of power in support of SCM's operations"—where "SCM" presumably referred to SCM but was not even defined in the article, evidencing DPW's centrality.[6]  *Id.* Ex. N (emphasis added).  In another glaring example of the intermingling of SCM and DPW, Magot, in a September 14, 2018 email, tells Plaintiff, "*We* wanted to be sure

---

[6] A copy of the article linked to in Magot's email is attached as well.  Chestukhin Decl. Ex. N.

that you saw *our* announcement today where *we* got approval to raise $23.50 million and *we* have begun that process to repay all outstanding debts" while linking to an article about *DPW*. *Id.* Ex. O.  Similarly, on October 11, 2018, ████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████[7] *Id.* Ex. P (emphases added).  On October 17, 2018, ████████████

████████████████████████████████████ *Id.* Ex. Q (emphasis added).

DPW's CEO (writing from his email address @dpwholdings.com[8]) repeatedly confirmed that he was in charge of obtaining financing for, and promised to pay, the obligations under the Agreement: "Every thing [sic] looks good to pay you down" on September 7, 2018; "I am seeing the board for dinner: at 8:30 am pst time Darren [Magot] and I will call you. *We are committed to closing this week. . . . I promise 14 hours from now this mess will be over*" on October 8, 2018; "You will have deal terms tonight. . . I will follow up in a few hours" on October 10, 2018; "I am in New York working on this. Please be calm for a few days. *I* am very close with *my* bankers" on August 9, 2018; "Why would I be wiring you if I intended not to pay. Clearly I have been wiring" on August 9, 2018; "Willy flying to NYC today. As I suggested this would be the week *we* closed on funding. . . . I am looking to close funding" on August 13, 2018; "I would like to have terms to the lawyers by noon with a settlement" and then "*We* have it done" on

---

[7] Defendants' contention, in their moving brief, that reference to this offer is an impermissible disclosure of an "offer of compromise" during "settlement discussions" is a red herring, Def. Br. at 4 n.5, because these discussions occurred before any claim had been made by Plaintiff.  At the time this suggestion was made, the parties were still simply exploring approaches to fulfilling Defendants' payment obligations under the Agreement.

[8] Although Ault also occasionally used an email address @gmail.com, he instructed Plaintiff to "use Todd@DPWholdings.com."  Chestukhin Decl. Ex. R at 1.

October 10, 2018; and, on October 24, 2018, right after Plaintiff formally notified Defendants of its intent to resell the machines that SCM was supposed to purchase under the Agreement, "I will call and talk about the stock plans *we* have. Still here my man." *Id.* Ex. S (emphases added). In addition to using the corporate "we" without distinguishing between SCM and DPW, Ault's emails reveal that he is the ultimate decisionmaker for both DPW and SCM, including, for example, when he tells Plaintiff, "*I* have been wiring" funds when DPW sent the wires. *Id.* at 13 (emphasis added).[9]

Likewise, when it became clear that SCM was unable to pay Plaintiff, Defendants offered to make partial payment in *DPW* stock. Chestukhin Decl. Ex. U at 1. Ault, writing from his email address @dpwholdings.com, represented on July 18, 2018 that "*We* think Friday *we* will wire you $100,000 and have a note ready for your review." *Id.* at 2 (emphases added). Ault's intimate involvement in the Agreement's negotiation and financing, as well as Magot's constant reliance on Ault's approval, show that Ault was acting in an executive capacity, rather than as a board member. Tellingly, SCM's corporate records do not show that SCM's board ever formally voted or even provided input on the Agreement. *See id.* Ex. B. Further, Ault's involvement in the day-to-day management of SCM goes far beyond the typical role of board chairman. Both Ault and Magot acted throughout the dealings as though *Ault* is SCM's CEO because, in fact, as DPW's CEO, Ault *was* also SCM's actual CEO, in all but technical name.

In addition, DPW was apparently paying not only for SCM's obligations under the Agreement, but for all debts owed by SCM to all vendors.[10] ▮▮▮▮▮▮▮▮▮▮ SCM did not

---

[9] Magot clearly shares Ault's view. On May 16, 2018, he wrote to Plaintiff that "I'm with *Todd's* Accounting team and will share confirmation once [the wire] is sent," when referring to a wire sent from DPW. Chestukhin Decl. Ex. T (emphasis added).

[10] Defendants redacted from the relevant correspondence anything that had to do with vendors other than Plaintiff, so these allegations are based on the unredacted material and reasonable inferences as to the content of the redacted material. Chestukhin Decl. Ex. V.

even have its own bank account and was forwarding its outstanding obligations to DPW for

approval and payment. *Id.* Exs. E, G, V. And even SCM's bank statements ███████████

████████████████████ show money coming in only from DPW and money going

out to Plaintiff and apparently other third-party vendors—meaning that, even then, DPW was

directly funding and subsidizing SCM's debts. *Id.*

## II.   Agreement's Terms and Defendants' Promises

Pursuant to the Agreement effective March 8, 2018, SCM agreed to purchase a total of

1,100 Bitmain Antminer S9 model cryptocurrency mining machines and 1,100 power supply

units (collectively, the "Machines") for a total purchase price of $3,272,500. FAC ¶ 16. As of

April 17, 2018, Defendants had paid a deposit of $163,625 (the "Deposit"), while DPW had paid

a total of $1,487,500 toward the first 500 Machines, leaving outstanding $1,621,375 (the

"Balance") to be paid toward the remaining 600 Machines. *Id.* ¶¶ 17-18. However, significantly

for Plaintiff's promissory estoppel claims, Article 3 of the Agreement goes on to provide that:

> In the event [SCM] fails to pay the Balance to [Plaintiff] on or before April 15,
> 2018, the Deposit funds shall be forfeited to [Plaintiff], and the remainder of this
> Agreement save and except for Article 2(a)(i) [dealing with the Deposit] and
> Article 3, shall be null and void and all parties shall be relieved of its [sic] further
> obligations herein.

Chestukhin Decl. Ex. A at 2 ¶ 3.

Accordingly, even though SCM has admitted that the Agreement "is a valid contract,"

Answer ¶ 71, it has ***not*** admitted that the Agreement continued to be in effect following the April

2018 purchase of the first 500 Machines and covering the period leading to Plaintiff's resale of

the remaining 600 Machines to a third party in November 2018. Defendants' *first* payment

under the Agreement was not fully completed until April 17, 2018—i.e., *after* the contractual

cut-off date for *both* payments. Chestukhin Decl. Ex. I at 3-4. Further, after the Agreement's

execution (and after April 15, 2018), Defendants both made numerous promises to pay the Balance for the remaining 600 Machines and also continued to make payments toward that Balance, as set out below.  By their express writings and conduct, Defendants manifested a clear intent to waive Article 3's possible application.  It is unclear, however, whether Defendants share this view, or whether they intend to argue that the Agreement was of no further effect as of April 15, 2018, thereby rendering it incapable of governing the entire dispute between the parties and potentially triggering Plaintiff's promissory estoppel claim.

The FAC already listed specific promises to pay by Defendants made over the course of many months (and after April 15, 2018), FAC ¶¶ 26-31, 35, 37-41, 45-47, 50, including: "we will have the funds to make the final purchase next week" on April 20, 2018; "We are anxious to make the payment so we can receive the machines and get them running" on April 24, 2018; we "hope to make the final payment this week" on April 30, 2018; "I'm emailing to make it clear that SCM will honor our obligation to finalize the purchase of the last 600 machines" on June 1, 2018; "We still plan to honor the agreement" on June 14, 2018; "We would like to proceed by paying the current outstanding balance" as early as the following week on September 14, 2018; and ██████████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████ on October 11, 2018.  Chestukhin Decl. Exs. W, P.  Defendants never suggested that they had somehow been relieved of any obligation to pay the Balance; to the contrary, they repeatedly represented the opposite, assuring Plaintiff of their continuing interest in the remaining Machines and thereby inducing reasonable reliance by Plaintiff in forgoing any possible sale of the Machines to a third party for more than half a year.

11

During jurisdictional discovery, Plaintiff identified additional written promises to pay made by Defendants, including by DPW. Some promises came directly from Ault. *See supra* at 8-9. Further, on May 22, 2018, Magot wrote to Plaintiff to indicate that he had spoken "with Todd who confirmed that you will receive another payment tomorrow. Todd will then have a plan for full payment finalized this Friday to discuss with you." Chestukhin Decl. Ex. X at 1. Around June 11, 2018, Magot wrote that "I'm being told that the funding is coming but that I'm not 100% able to guarantee a wire for $125K this week. I believe that Todd had some money wired today but I might need extend [sic] the timeline." *Id.* at 5. In response to Plaintiff's inquiry about "repayment paperwork," Magot wrote that "the wheels are in motion" on July 9, 2018. *Id.* at 8. Although many communications came from Magot, he was clearly a conduit for Ault, such as when Magot wrote to Plaintiff on May 9, 2018 that he "just spoke with Todd who is working with the NYSE to finalize approval of funds to buy the machines. . . . [Todd] hopes to know more from them tomorrow and I'll continue to keep you updated" *Id.* Ex. Y at 1.

Defendants, specifically DPW, made a series of payments to Plaintiff toward the Balance owed under the Agreement in conjunction with making continued promises to pay, thereby substantiating Defendants' promises. *See* FAC ¶¶ 20-21, 32-34, 36, 42-44. These payments were spread over the course of months, with the aforementioned April 17, 2018 wire followed by additional payments on or around May 18, May 29, June 13, July 18-20, July 23, July 26, July 30, July 31, August 2, August 7 and August 17, 2018. Chestukhin Decl. Ex. I at 5-18. Some of these payments were applied to the Balance under the Agreement and others were (with Defendants' knowledge and consent) applied toward charges for storing the remaining 600 Machines while Defendants promised to pay for them. FAC ¶¶ 20, 32.

Moreover, Plaintiff sent emails to Defendants confirming promises that Defendants had made on phone calls, such as on July 8, 2018 when, in memorializing a call that day, Plaintiff wrote to Ault and Magot, "*As you said*, the last thing you want is to promise something that won't be fulfilled."  Chestukhin Decl. Ex. Z at 1 (emphasis added).  Similarly, in response to Plaintiff's complaint, on July 11, 2018 about "empty promises … to finalize the funding of these 600 machines," Ault quickly wrote back, "Hang tight Willy as we are talking with the lawyers and NYSE."  *Id.* at 3.  Depending on whether the Agreement is held to have been in effect as of November 2018 (Article 3 notwithstanding) or to have been void as of April 15, 2018, Defendants' repeated promises to pay the Balance in order to obtain the Machines support either Plaintiff's breach of contract or promissory estoppel claim.  At this stage, though, it is too early to tell upon which alternative theory Plaintiff may ultimately need to rely.

## ARGUMENT

### I.    Plaintiff Has Averred Sufficient Facts Supporting Its Alter Ego Theory and Personal Jurisdiction over DPW

At this stage in the litigation, where limited jurisdictional discovery has taken place but there has been no evidentiary hearing or trial, Plaintiff is required only to "aver facts which, if credited, would suffice to establish" that SCM is an alter ego of DPW and that the Court has personal jurisdiction over DPW.  *Dorfman v. Marriott Int'l Hotels, Inc.*, 2002 WL 14363, at *1 (S.D.N.Y. Jan. 3, 2002); *see also Ginsberg v. Gov't Props. Tr., Inc.*, 2007 WL 2981683, at *4 n.1 (S.D.N.Y. Oct. 10, 2007).

### A.    Plaintiff Has Sufficiently Alleged That SCM Is a Mere Instrumentality or Department of DPW

The facts uncovered by limited jurisdictional discovery support Plaintiff's allegations in the FAC that SCM is a mere instrumentality, or alter ego, of DPW.  These credible facts

simultaneously justify both the retention of DPW in this case under an alter ego theory as well as the Court's exercise of personal jurisdiction over DPW. "Whether to pierce the corporate veil is a *fact-intensive* inquiry that requires the court to evaluate whether the owners of the entity unjustly misused the corporate form. *Some* of the factors to be considered *include*: '(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder.'" *CLP Toxicology, Inc. v. Casla Bio Holdings LLC*, 2020 WL 3564622, at \*7 n.61 (Del. Ch. June 29, 2020) (emphases added).[11] "These factors are not dispositive, however, and 'a [p]laintiff may survive a motion to dismiss by pleading *other relevant allegations* regarding the parent's complete domination.'" *Standex Int'l Corp. v. QCP, Inc.*, 2017 WL 481447, at \*6 (S.D.N.Y. Feb. 6, 2017) (quoting *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 975 F. Supp. 2d 392, 403 (S.D.N.Y. 2013)) (emphasis added). The same facts that support Plaintiff's alter ego claims simultaneously justify this Court's exercise of personal jurisdiction over DPW. Indeed, as further described below, "[e]stablishing the exercise of personal jurisdiction over an alleged alter ego requires application of a *less stringent standard* than that necessary to pierce the corporate veil for purposes of liability." *Storm LLC v. Telenor Mobile Communs. AS*, 2006 WL 3735657, at \*13 n.8 (S.D.N.Y. Dec. 15, 2006) (emphasis added).

---

[11] Blockchain does not contest that Delaware veil piercing law applies but notes that "New York and Delaware veil-piercing law do not materially differ." *LaCourte v. JP Morgan Chase & Co.*, 2013 WL 4830935, at \*6 n.2 (S.D.N.Y. Sep. 4, 2013).

**B.    Plaintiff Sufficiently Alleges That SCM Is DPW's Alter Ego**

Plaintiff's allegations in the FAC, as enhanced by facts uncovered during jurisdictional discovery, are not conclusory and provide adequate support for Plaintiff's alter ego theory. As described in detail above, SCM was not adequately capitalized, at inception or subsequently, and was never solvent through its dissolution in 2020.  *Supra* at 3-5.  SCM's balance sheets reflect negative net asserts ███████████████████████████████████████ ████████████████████████████████████████.  *See* Chestukhin Decl. Ex. D. It can be reasonably inferred that these intercompany money transfers were funds that SCM was not expected to repay, given that SCM did not even have its own bank account ██████████ ████.  *Id.* Ex. E.  Instead, DPW paid for all SCM's obligations, almost always directly.  *Supra* at 3-5, 9-10.  SCM's sustained undercapitalization and insolvency, coupled with DPW's sole support, weigh strongly in favor of a finding that SCM was a mere alter ego of DPW.

That neither Ault nor Magot distinguished between SCM and DPW in referring to both entities further shows that SCM was merely a façade for DPW.  *See supra* at 5-10.  When DPW received funding, Defendants reported this information to Plaintiff as though it was SCM that received funding.  Chestukhin Exs. O, P, S, W.  Similarly, Defendants' offer to issue DPW stock to satisfy the payment obligations under the Agreement shows that Defendants viewed themselves as one entity and further held themselves out as such to Plaintiff.  Chestukhin Decl. Exs. P, S, U, W.  This is unsurprising given that SCM (which had no bank account for most of its existence) was entirely dependent on DPW financially.  *See supra* at 3-5, 9-10.  SCM's constant references and deference to DPW were plainly intended to encourage Plaintiff to enter into the Agreement and continue dealing with it with respect to the remaining Machines by giving the impression that SCM was fully backed by and part of DPW (which it was).  Chestukhin Decl.

Exs. J, K, L, N, O, P, S, U, W, X.  Having not distinguished between themselves when dealing

with Plaintiff, Defendants should not suddenly be able to insist upon an artificial distinction now

that it no longer serves their ends to treat the companies as one and the same.

Defendants' claim that documentation shows that SCM was operated as "its own separate

entity," Defendants' Memorandum of Law in Support of Motion (ECF No. 75) ("Def. Br.") at

18, is belied by the documents themselves.  First, SCM had a bank account ███████████

██████, after which time DPW paid for all SCM's expenses.  Chestukhin Decl. Exs. E, G, V.

Although SCM may have created year-end balance sheets, these reports actually show that it was

undercapitalized, insolvent, and entirely reliant on DPW.  *Id.* Ex. D.  Further, even if SCM

nominally had its own vendors and insurance policy, the expenses were all paid by DPW.  *See id.*

Exs. V, H; *see supra* at 4.  SCM's nominal executive also had to get approval from DPW to run

day-to-day operations, Chestukhin Decl. Exs. J, K, L, M, while SCM's CFO and board of

directors overlapped with DPW's.  *Id.* Ex. B at 3, Ex. C at 53.  Certainly, DPW was no

"stranger" to the Agreement, Def. Br. at 22, as SCM was not even allowed to enter into the

Agreement without DPW's prior approval.

Further, contrary to Defendants' arguments, Plaintiff has sufficiently alleged that

Defendants abuse of SCM's corporate form was undertaken to perpetrate an injustice upon

Plaintiff, namely, to evade their obligations under the Agreement and deprive Plaintiff of the

payments to which it was rightfully entitled under the Agreement's terms.  *See Gabriel Capital,*

*Ltd. P'ship v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 435 (S.D.N.Y. 2000) (holding that

plaintiffs plead overall element of injustice where they alleged that "the actions of [defendant

subsidiary] caused their injuries" and that defendant related companies "operated as a single

economic entity in carrying out those actions").  Despite acting like SCM was entirely backed by

DPW prior to this lawsuit, Defendants would now pretend that DPW and SCM are separate entities, leaving Plaintiff with no means to recover the money owed it under the Agreement (especially now that SCM has ceased operations). As such, Plaintiff has adequately alleged that both Defendants have perpetrated a wrong against it.

Plaintiff notes that its allegations, though already factually robust, are still made upon the basis of only limited jurisdictional discovery, without the opportunity to depose Defendants' principals or to receive a full document production from Defendants. Plaintiff is confident further discovery would allow it to prove its allegations and identify additional supporting facts.

C.    **The Court Can Exercise Personal Jurisdiction Over DPW Based on SCM's Submission to Jurisdiction Because SCM Is a Mere Department of DPW**

Under a "mere department" theory, personal "jurisdiction will [] be found where the [parent] company has a *subsidiary that is amenable to jurisdiction* and is found to be *a 'mere department' of the corporate parent.*" *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 318 (S.D.N.Y. 2009) (emphasis added). Courts in this District look to four factors, namely: "(1) common ownership, which is essential; (2) financial dependency of the subsidiary on the parent; (3) the degree to which the parent interferes in the selection and assignment of the subsidiary's personnel and fails to observe corporate formalities; and (4) the degree of control that the parent exercises over the subsidiary's marketing and operational policies." *SODEPAC, S.A. v. M/V Choyang Park*, 2002 WL 3129634, at *4 (S.D.N.Y. Oct. 9, 2002). "[W]hen veil piercing is only being used to assert jurisdiction, 'the question is only whether the allegedly controlled entity was a shell for the allegedly controlling party.'" *GEM Advisors*, 667 F. Supp. 2d at 319 (further quotations and citations omitted).

The same factual allegations that underpin Plaintiff's broader alter ego claim likewise buttress the conclusion that this Court can properly exercise personal jurisdiction over DPW

under the mere department theory.  It is undisputed that SCM is DPW's wholly owned
subsidiary, meaning that common ownership, the only non-negotiable requirement for mere
department jurisdiction, is "easily satisfied."  *ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 52
(S.D.N.Y. 1999) (common ownership where alleged alter ego is wholly owned by parent).  *See*
Chestukhin Decl. Ex. C at 5 (describing SCM as DPW's "wholly-owned subsidiary").

        In examining the second factor, financial dependency, courts look to whether the
"operation and existence" of the subsidiary depends upon the parent's support, including whether
"the parent provides no- or low-interest loans to the subsidiary or extends credit on terms not
otherwise available, guarantees the subsidiary's obligations, [] provides and pays for insurance
coverage or other necessities on behalf of the subsidiary," or receives and reports the
subsidiary's profits on its own financial statements.  *Id.* at 52-53.  Here, all these facts exist.
SCM, which did not even have its own bank account ████████████, was entirely dependent
on DPW to pay for all its obligations to third parties, and there is no indication that DPW ever
required SCM to pay back any money provided by DPW or other DPW subsidiaries.  *See supra*
at 2-5, 9-10.  All the payments under the Agreement ultimately came from DPW: almost all
*directly* from DPW's own account, while the others were routed by DPW through SCM or
Defendants' attorneys.  Chestukhin Decl. Exs. E at 2, 6-8, Ex. I.  It also appears that DPW paid
for SCM's insurance policy, as discovery reveals that SCM had no other source of funds.  *See id.*
Ex. H; *supra* at 6.

        Moreover, DPW's 2020 10-K treats SCM's revenues as DPW's own, noting that
"[r]evenues from ***our*** cryptocurrency mining operations revenues decreased by . . . 100% from
the year ended December 31, 2019, due to ***our*** decision to cease ***our*** cryptocurrency mining
operations.  During the first quarter of 2020, due to deteriorating business conditions in the

cryptocurrency mining sector, *we* ceased operations *at Digital Farms [f/k/a SCM]*." Chestukhin Decl. Ex. F at 63 (emphases added). Given that DPW treated SCM as an extension of DPW even in its 2020 10-K, DPW cannot retroactively pretend to have had an arms' length relationship with SCM. Taken together, these facts show that SCM could not have functioned without DPW's constant monetary support and that DPW viewed SCM as part of DPW, leading to the inevitable conclusion that SCM was financially dependent upon DPW.

In examining the third factor, "interference with executive personnel and failure to observe corporate formalities, courts look to, *inter alia*, whether the parent shares officers with the subsidiary and shifts executives among its subsidiaries, [and] whether the parent pays the executives' salaries." *ESI*, 61 F. Supp. 2d at 54. Here, SCM and DPW shared offices at the one address where they were located. Chestukhin Decl. Ex. B at 4, Ex. C at 1. Horne was CFO and board member of both DPW and SCM, while Ault was the CEO of DPW and the Chairman of SCM's board. *Id.* Ex. B at 3, Ex. C at 53. It also appears that DPW was ultimately responsible for paying the salaries of SCM's executives and other employees, as SCM did not have a bank account from which it could make such payments. *See id.* Exs. E, G, V. Although SCM was formally incorporated as a separate corporate entity, "[a] subsidiary may function as a mere department of its parent even where the companies observe corporate formalities." *Dorfman*, 2002 WL 14363, at *8. Defendants' observation of the bare minimum of corporate formalities should not obscure the fact that, in practice, the two functioned as one entity, satisfying the third factor and allowing the Court to exercise personal jurisdiction over DPW.

"The fourth factor regarding the parent's degree of control over the marketing and operational policies of the subsidiary is satisfied where . . . the parent determines the subsidiary's operational policies and strategy." *ESI*, 61 F. Supp. 2d at 55. As explained above, Magot,

SCM's nominal CEO, did not make any decisions without first consulting with, and getting approval from, DPW.  Chestukhin Decl. Exs. J, K, L, M.  Thus, the fourth factor already weighs toward the Court exercising personal jurisdiction over DPW and further discovery will almost certainly show that DPW's control over SCM's operations was even more extensive.

Defendants do not contest that this Court has personal jurisdiction over SCM based on the latter's "irrevocably" submitting to the same in the Agreement.  *Id.* Ex. A at 6 ¶ 12(h). Accordingly, because SCM is subject to personal jurisdiction in this Court and is a "mere department" of DPW, DPW is likewise subject to this Court's jurisdiction. *See, e.g.*, *Storm*, 2006 WL 3735657, at *13 (exercising personal jurisdiction over subsidiary's controlling companies under mere department theory based on subsidiary's execution of agreement consenting to jurisdiction in New York); *GEM Advisors*, 667 F. Supp. 2d at 319 (exercising personal jurisdiction over a parent based on its subsidiary's conducting business in New York, which included, *inter alia*, signing letter agreements with a New York choice-of-law provision).

This Court authorized jurisdictional discovery in its December 4, 2020 order (ECF No. 56), including under the "mere department" theory that was raised in Plaintiff's letter requesting such discovery (ECF No. 50). This theory was once again raised by Plaintiff, and addressed by Defendants, in correspondence relating to certain redacted documents produced by Defendants.  (ECF Nos. 63, 66.)  In any case, the facts supporting this theory overlap with those underpinning Plaintiff's broader alter ego allegations in the FAC, as further developed by jurisdictional discovery.  *See Dorfman*, 2002 WL 14363, at *11 ("In support of their arguments, the plaintiff and [defendant alleged alter ego] rely on evidence elicited during the limited jurisdictional discovery granted by the Court."). *Cf. Avant Capital Partners, LLC v. Strathmore Dev. Co. Mich., LLC*, 2013 WL 5435083, at *13-14 (D. Conn. Sep. 30, 2013) ("[w]hile it is true

that [plaintiff] never succinctly expressed its veil piercing theory in its complaint, . . . the Court finds that [plaintiff] has pleaded sufficient facts in its complaint to allow the inference of an alter-ego theory") (quoting, *inter alia*, *K.D. ex rel. Duncan v. White Plains School Dist.*, 921 F. Supp. 2d 197, 203 (S.D.N.Y. 2013)). The presence of these allegations in the FAC also means that Defendants are on notice of them, thereby satisfying Fed. R. Civ. P. 8(a).  *Ainette v. Market Basket, Inc.*, 2021 WL 1022590, at *10 (S.D.N.Y. Mar. 16, 2021) (quoting *Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995)) (all that Rule 8(a) requires "is that a pleading 'give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial'").[12]

## II.    The Court Can Also Exercise Personal Jurisdiction Over DPW Based on DPW's Own Contacts with New York

The Court can also exercise jurisdiction over DPW based on DPW's own contacts with the forum under CPLR § 302(a)(1), which allows courts to exercise jurisdiction over a non-resident defendant that "transacts any business within the state," if that exercise comports with the Due Process Clause of the U.S. Constitution.  "In determining the strength of the contacts under both section 302(a)(1) and the Due Process Clause, [courts] look to the *totality of Defendants' contacts*" with New York that have some nexus to the plaintiff's claims, though "section 302 'is a "single act statute" and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant[s] never enter[] New York."  *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010) (quoting *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 522 N.E.2d 40, 43 (1988)).  "[T]he pivotal inquiry is 'whether the defendant has performed purposeful acts in New York in relation to the contract,'" *Bonsey v. Kates*, 2013 WL 4494678, at *3-4 (S.D.N.Y. Aug. 17, 2013) (quoting *A.C.K. Sports, Inc. v.*

---

[12] To the extent the absence of the specific words "mere department" in the FAC is deemed significant, this gap can be cured by a further amendment with the Court's leave.

*Doug Wilson Enters.*, 661 F. Supp. 386, 390 (S.D.N.Y. 1989)), keeping in mind that "[a]cts performed by a defendant subsequent to the execution of a contract are ordinarily of jurisdictional consequence." *CutCo Indus. v. Naughton*, 806 F.2d 361, 367 (2d Cir. 1986).

To start, DPW purposefully selected attorneys in New York, New York and directed that "[a]ll wires and all closing" in connection with the Agreement go through those attorneys. FAC ¶ 8. *See Fischbarg v. Doucet*, 38 A.D.3d 270, 273, 832 N.Y.S.2d 164, 167 (1st Dept. 2007) ("jurisdiction has been upheld where a defendant, beyond merely retaining a lawyer in New York, has purposely availed itself of the services of that New York lawyer in this state"). The first escrow payment, which was marked "DPW - DISBURSEMENT," was sent from DPW's attorneys' bank in New York. FAC ¶ 9.

Moreover, in his capacity as DPW's CEO, Ault repeatedly traveled to New York seeking funding to meet payment obligations under the Agreement, "even going so far as to send Plaintiff's president a photograph of the dinner he was having with the lender to prove to Plaintiff that he was in New York." *Id.* ¶ 10. Defendants' promises to pay were often coupled with informing Plaintiff that Ault was in New York in connection with the Agreement. *See id.* ¶¶ 10, 11, 13, 14; *supra* at 6-7. As such, DPW (through its CEO, Ault), performed purposeful acts in New York when it sought funding for SCM's obligations under the Agreement after its signing. *See Bonsey*, 2013 WL 4494678, at *4 (exercising personal jurisdiction over defendant whose performance under a contract was "centered in New York" and who "sought out a New York attorney"); *Sterling Nat'l Bank & Tr. Co. v. Fidelity Mortg. Inv'rs*, 510 F.2d 870, 873 (2d Cir. 1975) (finding that contract-related payments to and from New York banks, *inter alia*, were "purposeful acts done by the defendant in connection with" promissory note at issue). Contrary to Defendants' argument, "it is unnecessary that final negotiations or indeed execution of the

contract take place in New York," so DPW's pre- and post-execution acts are sufficient for jurisdictional purposes. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 60 (2d Cir. 1985). Accordingly, DPW transacted business in New York.

Further, Plaintiff's claims arise from DPW's transaction of business in New York because there is an articulable nexus "between the transaction and the claim asserted." *Newmont Mining Corp. v. AngloGold Ashanti Ltd.*, 344 F. Supp. 3d 724, 741 (S.D.N.Y. 2018). Plaintiff, because it has established that DPW transacted business in New York, "need show only that the cause of action is sufficiently related to the business transacted that it would not be unfair to deem it to arise out of the transacted business, and to subject [DPW] to suit in New York." *Hoffritz for Cutlery*, 763 F.2d at 59. Indeed, the "the proper test for satisfaction of the nexus requirement *should not be causally based*." *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 71 (2d Cir. 2012) (emphasis added). DPW's contacts with New York are sufficiently related to Plaintiff's claims, given DPW's presence in New York to raise funds to satisfy its contractual obligations and the use of a New York attorney to make contractually required payments.

### III.    Plaintiff's Promissory Estoppel Claim Is Not Duplicative of Its Breach of Contract Claim at This Stage

"Although it is correct that a claim for promissory estoppel cannot be predicated on obligations arising out of a valid contract, it is also well-established that '[p]laintiffs who allege the existence of a valid contract may nonetheless plead the alternative theories of promissory estoppel and breach of contract when the defendant does not concede the enforceability of such contract.'" *Personal Watercraft Prod. Sarl v. Robinson*, 2017 WL 4329790, at *11 (S.D.N.Y. Sep. 1, 2017) (quoting *Allison v. Clos-Ette Too, LLC*, 2014 WL 4996358, at *8 (S.D.N.Y. Sep. 12, 2014)) (alteration in original). For preclusion to apply, the scope of the indisputably valid agreement must "*clearly cover[] the dispute between the parties*." *O'Grady v. BlueCrest Capital*

*Mgmt. LLP*, 111 F. Supp. 3d 494, 504 (S.D.N.Y. 2015) (quoting *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (1987)) (emphasis added).

However, where, as here, the scope of the contract as issue is *not* concede to govern the *entire* dispute, then a promissory estoppel claim is *not duplicative*.  Even if Plaintiff may not ultimately *recover* under both its breach of contract and promissory estoppel claims, "courts in this Circuit routinely allow plaintiffs to *plead* such claims in the alternative." *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 452 (S.D.N.Y. 2014) (allowing plaintiffs to plead quasi-contractual unjust enrichment claim in alternative to breach of contract claim).

The recent case of *P&G Auditors & Consultants, LLC v. Mega Int'l Commer. Bank Co.*, 2019 WL 4805862 (S.D.N.Y. Sep. 30, 2019) is factually analogous and instructive.  There, the defendant did not "contest that there existed a *valid, binding* agreement" during *one* of three contractually defined time periods, but *did* argue that the agreement did not cover services beyond that first period and further that the contract only governed expenses up to a certain sum. *Id.* at *6.  Accordingly, the court allowed the plaintiff to plead promissory estoppel in the alternative to the contract claim because it could not "say at this stage that an express contract covers the *entire dispute* between the parties." *Id.* (emphasis added).  Similarly, here, though Defendants have conceded that the Agreement is valid, it is unclear what position they will take regarding how long the Agreement remained in effect and whether it included a payment obligation extending to the final 600 Machines that it continued to pursue from Plaintiff.

To the extent Defendants may attempt to rely on Article 3 to evade their payment obligations for the final 600 Machines, Plaintiff's promissory estoppel claim may be necessary to hold Defendants accountable for their actions after April 15, 2018.  Unless Defendants concede that they waived Article 3 and/or that the obligation to pay the Balance otherwise remained in

effect through Plaintiff's resale in November 2018,[13] they could still try to argue that Plaintiff's

breach of contract claim is barred by Article 3 of the Agreement.  Accordingly, at this early stage

of the case, Plaintiff can, and must be allowed to, plead a promissory estoppel claim as an

alternative to its breach of contract claim.

## IV.    New York's Statute of Frauds Does Not Bar Plaintiff's Promissory Estoppel Claim Against DPW

### A.    DPW's Promises to Plaintiff Were Not on Behalf of "Another Person"

New York's Statute of Frauds requires a signed writing for any "special promise to

answer for the debt, default or miscarriage of another person."  N.Y. Gen. Oblig. Law § 5-

701(a)(2).  Plaintiff does not allege that DPW made a "special promise" to answer for the debt of

"*another person*."  Instead, Plaintiff alleges that DPW's promise to answer for SCM's debt was

essentially a promise made by DPW *on DPW's own behalf* because SCM and DPW are one and

the same.  Indeed, DPW promised to put up its own stock in order to satisfy SCM's obligations

under the Agreement.  Chestukhin Decl. Exs. S, P, U, W.  *See Tchernichova Prods., Inc. v.

Ballet Int'l N.A., Inc.*, 1987 WL 16364, at *1 (S.D.N.Y. Aug. 25, 1987) (promise by individual

promoter to contribute funds to its alleged alter ego, the nominal corporate debtor, to allow it to

meet obligations to plaintiff "does not fall within the statute of frauds" relating to special

---

[13]A "'waiver, the intentional relinquishment of a known right, may be accomplished by express agreement or by such conduct or failure to act as to evince an intent not to claim the purported advantage.'"  *J&R Elecs., Inc. v. Business & Decision N. Am., Inc.*, 2013 WL 5203134, at *5 (S.D.N.Y. Sep. 16, 2013) (quoting *Hadden v. Consolidated Edison Co. of N.Y.*, 45 N.Y.2d 466, 469, 382 N.E.2d 1136 (1978)).  "The provision of an agreement prohibiting waiver does not necessarily preclude the waiver of a contractual clause."  *Id.* at *17.  For conduct to amount to a waiver, it must be incompatible with the agreement as written and evidence an indisputable mutual departure from the written agreement.  *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003).  Such is the case here.  Defendants' failure to make even the *first* payment required by the Agreement until April 17, 2018—*after* the cut-off date for *all* payments—and their constant reaffirmations of their intent to pay the Balance so they could obtain the remaining 600 Machines—by both express promises and partial payments of the balance owed—were incompatible with any position that the Agreement was "null and void."  *See* FAC ¶¶ 20-21, 26-34, 35-47, 50; Chestukhin Decl. Exs. O, P, W, Y, Z.  Moreover, Defendants' written promises to pay constituted written waivers of Article 3.  An express written waiver need not be in a formal agreement and an email exchange can constitute a waiver "in writing signed by both parties." *Ion Audio, LLC v. Bed, Bath & Beyond, Inc.*, 2019 WL 58913, at *3 (S.D.N.Y. Apr. 2, 2019) (emails plainly "in writing" and signed where concluded with signature block).

promises to pay for the debt of another). *Cf. Bagel Bros. Maple, Inc. v. Ohio Farmers, Inc.*, 279 B.R. 55, 68 (W.D.N.Y. 2002) (noting that lower court found that "the obligation imposed on [a corporate entity] was not the debt of another, but was [the entity]'s own obligation, based on the [principals'] promise to [third party] that payment would be made by the [entity's related] companies").

In any case, DPW also made express promises of its own to Plaintiff, both in written emails and on numerous telephone calls. FAC ¶¶ 26-31, 35, 37-41, 45-47, 50; Chestukhin Decl. Exs. S, Y, Z, P. If SCM is held to not be an alter ego of DPW, then DPW's written and oral promises would be independent promises made by DPW on behalf of DPW to make Plaintiff whole under the Agreement's terms in exchange for the additional benefit to DPW of Plaintiff continuing to hold the Machines for SCM. *Philippou v. Photios Cougentakis*, 2009 WL 1097542, at *9 (E.D.N.Y. Apr. 21, 2009) (quoting, *inter alia*, *Martin Roofing v. Goldstein*, 60 N.Y.2d 262, 265 (N.Y. 1983)) (where a promisor receives a benefit or consideration from his promise, "a writing is not required because the promisor has received something"). Moreover, if the Agreement is deemed to have been null and void as of April 15, 2018, then DPW's promises would be supported by the additional consideration of Plaintiff agreeing to hold for and deliver to SCM the 600 remaining Machines (despite the fact that Plaintiff was no longer obligated to do so under the Agreement).

### B.    In Any Case, DPW's Emailed Promises to Plaintiff Were Signed Writings Sufficient to Satisfy the Statute of Frauds

Even if DPW's promises were guarantees for the debt of "another person," DPW in any case made sufficient written promises to satisfy the Statute of Frauds. To suffice under New York's Statute of Frauds, a writing must be signed by the promisor, designate the parties to the agreement, "identify and describe the subject matter," and "establish, either expressly or by

reasonable implication, all the essential terms of the agreement." *Zhi Zhong Qiu v. Diamond*, 2020 WL 978352, at *3 (S.D.N.Y. Feb. 27, 2020). "New York courts have found emails to be sufficient written memoranda" for the purposes of the Statute of Frauds. *Id.* at *3; *Newmark & Co. Real Estate Inc. v. 2615 E. 17 Realty LLC*, 80 A.D.3d 476, 477, 914 N.Y.S.2d 162, 164 (1st Dept. 2011) ("An e-mail sent by a party, under which the sending party's name is typed, can constitute a writing for purposes of the statute of frauds."); *see Stevens v. Publicis, S.A.*, 50 A.D.3d 253, 255-56, 854 N.Y.S.2d 690, 692 (1st Dep't) ("The e-mails from plaintiff constitute 'signed writings' within the meaning of the statute of frauds, since plaintiff's name at the end of his e-mail signified his intent to authenticate the contents").

Here, DPW sent numerous emails confirming its intention to pay Plaintiff, including "Every thing [sic] looks good to pay you down," "We are committed to closing this week," and "Why would I be wiring you if I intended not to pay. Clearly I have been wiring." Chestukhin Decl. Ex. S. These emails were in writing and signed by Ault, DPW's CEO, and were sent to Plaintiff's principal. It is worth noting that even other emails that nominally came from Magot can be considered as having been sent on behalf of DPW because Ault, DPW's CEO, was the ultimate decisionmaker while Magot acted as a mere conduit. *See supra* at 14; Chestukhin Decl. Exs. Y, P, W, X. Accordingly, these emails both were subscribed by the party charged (DPW) and designated the parties to the agreement. The subject matter and terms of DPW's written promises were likewise sufficiently clear because they promised compliance with the written terms of the Agreement.

Further, especially if the Agreement is held to be null and void as of April 15, 2018, DPW's promises are not duplicative of the Agreement because Plaintiff would no longer been obligated to sell the Machines to SCM or DPW. As such, DPW's additional promises to pay for

these Machines would be separate from and additional to those in the Agreement.

## V.    Plaintiff Has Adequately Pled Promissory Estoppel as to DPW

"The elements of a promissory estoppel claim are: (i) a sufficiently clear and unambiguous promise; (ii) reasonable reliance on the promise; and (iii) injury caused by the reliance." *Castellotti v. Free*, 138 A.D.3d 198, 204, 27 N.Y.S.3d 507, 513-14 (1st Dept. 2016).

### A.    DPW's Promises to Pay Were Clear and Unambiguous

The Second Circuit has held that promises similar to those made by DPW are sufficiently clear and unambiguous to support a promissory estoppel claim.  In *Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co.*, 804 F.2d 787, 793 (2d Cir. 1986), a corporate defendant had "on several critical occasions . . . clearly and unambiguously promised to repurchase accumulated spare parts inventories" from the plaintiff.  Defendant, through a manager, "assured [plaintiff] that [defendant] would purchase the spare parts and that in the meantime [plaintiff] should consider such inventories as being held on [defendant]'s account.  *Id.*  Further, defendant's senior vice president "explicitly advised [plaintiff] not to 'concern yourself about the size of the inventory. We will buy the parts.'" *Id.* And, when plaintiff expressed concern about the costs of holding the inventory, defendant's representative responded "'We are going to buy them from you anyway. We are going to use them.'" *Id.*

These are exactly the kind of "specific, clear and unambiguous" statements that DPW made to Plaintiff in this case.  *Id.*  Specifically, DPW assured Plaintiff that it would purchase the 600 remaining Machines, indicating repeatedly that DPW was working on obtaining funding to make the purchase happen and reiterating that DPW was "committed to closing" and "would like to have terms to the lawyers" within a specific timeframe.  Chestukhin Decl. Ex. S.  *See supra* at 8-9.  These repeated assurances were combined with (small) partial payments toward the Balance

28

owed to Plaintiff, thereby corroborating DPW's promises.  *See* Chestukhin Decl. Ex. I at 5-18; *supra* at 5, 12-13; FAC ¶¶ 32-34, 36, 42-44, 86.

**B.      Plaintiff's Reliance on DPW's Promises Was Reasonable**

"Under New York law, a party cannot reasonably rely on an oral promise that is *contrary* to the provisions of a written contract."  *Doe v. NYU*, 2021 WL 1226384, at *23 (S.D.N.Y. Mar. 31, 2021) (emphasis added).  In *Doe*, the Court held that an oral promise not to impose the more serious sanctions listed in a written agreement was "at least arguably consistent with" the agreement's terms and therefore determined that plaintiff could reasonably rely on that promise. *Id.*[14]  Here, similarly, DPW did not promise "something that was not permitted under" the Agreement, but rather something that was required under the Agreement, i.e., to pay the required purchase price in order to obtain the remaining 600 Machines.  *Id.*  Moreover, if the Agreement is held to be void after April 15, 2018, DPW's promises were made in exchange for Plaintiff continuing to hold the remaining 600 Machines for SCM.  Given DPW's continued payments toward the Balance required to acquire the remaining Machines, Plaintiff's reliance on DPW's further promises to pay was reasonable.

**C.      Plaintiff Was Injured by Its Reasonable Reliance**

"[P]romissory estoppel requires that the injury directly result from the reliance, and thus is typically applied where vested or clearly identified rights have been lost."  *Hedspeth v. Citicorp Individual Bank Ret. Plan*, 1993 WL 204808, at *19 (S.D.N.Y. June 3, 1993).  Here, Plaintiff has identified an injury that stems *directly* from its reliance on DPW's gratuitous promises.  In particular, Plaintiff has alleged that it suffered losses of close to $1.4 million

---

[14] Accordingly, Defendants' reliance on *DDCLAB Ltd. v. E.I. du Pont de Nemours & Co.*, 2005 WL 425495 (S.D.N.Y. Feb. 18, 2005), which involved alleged promises that were "not consistent with the terms of" certain written agreements, is misplaced.  Def. Br. at 27.

because it deferred reselling the 600 remaining Machines in reasonable reliance on DPW's promises to pay for and take delivery of these Machines. *See* FAC ¶¶ 51, 87-88. As a result, it was forced to resell the Machines at a price well below that in the Agreement due to the precipitous decline in the cryptocurrency market. *See id.* ¶¶ 56, 88-89.

DPW claims that this injury cannot be direct because it could also have resulted from DPW's breach of the Agreement, Def. Br. at 29, but this argument ignores the fact that Plaintiff's promissory estoppel claim is pled in the *alternative* to its breach of contract claim. *See id.* ¶ 83. Further, DPW claims, without citing any caselaw, that Plaintiff's injury is based on "speculative" assumptions because it has not alleged that it had a specific buyer "ready, willing and able" to buy the Machines prior to November 2018. Def. Br. at 29. However, Plaintiff had "clearly identified rights" pursuant to DPW's promises (i.e., payment of a sum certain) and it was the loss of *this specific amount* as a result of DPW's failure to fulfill its promises that is the source of Plaintiff's injury, rather than Plaintiff's resale (the latter of which actually *mitigated* Plaintiff's damages). *Cf. Cairns & Assocs. v. Conopco, Inc.*, 372 B.R. 637, 658-59 (Bankr. S.D.N.Y. 2007) (plaintiff debtor established injury for promissory estoppel purposes where company refused to pay plaintiff's invoice for sum certain).

## **CONCLUSION**

For the foregoing reasons, Defendants' motion should be denied in its entirety.

Dated: July 8, 2020                    COWAN, LIEBOWITZ & LATMAN, P.C.

By: _____
       Richard S. Mandel (rsm@cll.com)
       Dasha Chestukhin (dxc@cll.com)
114 West 47th Street
New York, New York 10036
(212) 790-9200

*Attorneys for Plaintiff*