

**WELTZLAW**
WELTZ KAKOS GERBI WOLINETZ VOLYNSKY LLP
170 OLD COUNTRY ROAD | SUITE 310
MINEOLA, NEW YORK 11501

T: (516) 320-6945
F: (516) 855-8776
WWW.WELTZ.LAW

March 7, 2023

**Via ECF**
Hon. Andrew L. Carter, Jr.
United States District Court Judge
Southern District of New York
40 Foley Square, Courtroom 1306
New York, New York 10007

      Re:    Blockchain Mining Supply and Services, Ltd. v. Super Crypto
             Mining, Inc. (n/k/a Digital Farms, Inc.), *et al.* No. 18-CV-11099-ALC

Dear Judge Carter:

      The undersigned represents Defendants Super Crypto Mining, Inc. (n/k/a Digital Farms, Inc.) ("Super Crypto") and DPW Holdings, Inc. (n/k/a Ault Alliance, Inc.) ("DPW" and with "Super Crypto" collectively, "Defendants") in the above-referenced matter. Please allow this letter to serve as Defendants' response to Plaintiff's letter motion (the "Letter"), dated March 2, 2023, seeking a pre-motion conference in connection with Plaintiff's anticipated motion for summary judgment. For the reasons set forth below, the Court should deny the relief sought in the Letter.[1]

      The Letter is telling for what Plaintiff fails to disclose to the Court. Indeed, at some point prior to Plaintiff's initial solicitation of (and initial contact with) Super Crypto, Plaintiff had already purchased 1,100 Bitmain Antminer S9s (the "Machines") from Bitmain Ltd. ("Bitmain"), but had not procured any buyers that it could resell those Machines to.[2]

      Yonah Kalfa, a former principal of Plaintiff that currently serves as an officer of a NASDAQ listed company, testified that he had scoured Google to locate a prospective buyer for the Machines and stumbled upon a press release titled "DPW Holdings' Subsidiary, Super Crypto Mining to Launch Cloud Mining." Mr. Kalfa acknowledged during his deposition that he had reviewed numerous of DPW's prior filings with the Securities and Exchange Commission and further stated that he likely reviewed DPW's financials prior to the execution of the Agreement.

      On or about February 24, 2018, Mr. Kalfa solicited Darren Magot (Super Crypto's CEO) on LinkedIn, by sending him a direct message seeking to fire sale the Machines. Between February 24, 2018 - March 8, 2018 (the date that the Agreement was signed), Mr. Magot and Plaintiff would engage in numerous correspondence about the terms of Plaintiff's contemplated sale of the Machines. To that end, discovery has demonstrated that each party had counsel review iterations

---

[1] For the sake of transparency, Defendants also intend to seek summary judgment relief in this action and intend to file a pre-motion conference letter in connection with same, on or before the April 5, 2023 deadline.

[2] The depositions in this case revealed that Plaintiff would not make any further purchases of cryptocurrency machines beyond its premature purchase of the Machines because of the precipitous decline of the crypto-currency market, the onset of which began prior to the execution of the underlying Asset Purchase Agreement (the "Agreement").

Hon. Andrew L. Carter, Jr., U.S.D.J.
March 7, 2023
Page 2

of the Agreement, and, notwithstanding, Plaintiff never sought to have DPW be a guarantor or party under the Agreement.[3]

The material terms of the Agreement, however, are not seriously in dispute – Super Crypto was only contractually bound to purchase the first 500 Machines. With regard to the remaining 600 Machines, Super Crypto had the option of forfeiting the $163,625 deposit (the "Deposit") that it paid pursuant to Article 2(a)(i) of the Agreement, and the balance of the Agreement would be deemed null and void, with each party being "relieved of its further obligations" under the Agreement. *See* Agreement, § 3. As Mr. Magot made clear during his deposition, this was a material inducement for Super Crypto to enter into the Agreement as Super Crypto felt comfortable that the first 500 Machines would be paid for (and, indeed, they were paid for), but was unsure whether Super Crypto could pay for the next 600 Machines in such a short time frame given the ever changing, volatile cryptocurrency market. For this reason, Article 3 was part and parcel of the final Agreement.

Rather than acknowledge these facts, Plaintiff resorts to revisionist history and now contends that the parties abandoned Article 3 altogether through some indefinite amendment – an "abandonment" that is not mentioned in the Complaint. Such specious assertions fail as a matter of law. *See, e.g., Int'l Fin. Corp. v. Carrera Holdings Inc.*, 82 A.D.3d 641, 641 (1st Dep't Mar. 29, 2011) ("[T]he alleged obligation to manage country or governmental risk is ambiguous, indefinite and non-specific, rendering it unenforceable as a matter of law.").

Plaintiff's motivation here is nothing more than a disingenuous attempt to salvage its claim in light of the damaging testimony that was established during Plaintiff's depositions. Indeed, those depositions confirmed that, as of at least April 17, 2018, the cryptocurrency market was apocalyptic and the fair market value of the Machines had already declined to $1,070 per Machine, *i.e.*, $1,905 less than the price per Machine under the Agreement. Furthermore, as of April 17, 2018, pursuant to Article 3 of the Agreement, Super Crypto was no longer obligated to purchase the remaining 600 Machines and could, instead, opt to forfeit its Deposit.[4] During its depositions, Plaintiff did not dispute (nor could it) that this was the plain language of the Agreement.

Notwithstanding, in an effort to possibly salvage the Deposit and a potential future working relationship, as well as to avoid threatened litigation, Super Crypto and Plaintiff (who admittedly undertook no efforts to locate a new purchaser given the grim market conditions) continued to foster communications aimed at seeking an amicable resolution. ***At no point, however, did Super Crypto agree to waive the bargained-for protections contained in Article 3 and be contractually bound to Plaintiff for the contract price of the remaining 600 Machines***, *to wit*, Plaintiff presents no specific waiver/amendment (indeed, none exist), and, moreover, the purported "extensions" of the April 15th date in Article 3 are not tantamount to an unequivocal waiver of Super Crypto's

---

[3] Plaintiff also cannot seriously contend that it believed that DPW was a party to the Agreement or that the Agreement did not terminate. If that were so, then Plaintiff would need to first explain why it would seek to enter into a new agreement with Super Crypto and to also have DPW execute a guarantee, after April 15, 2018. Indeed, it is Plaintiff's actions (and not Defendants) that are inconsistent with its legal theories.

[4] Although Plaintiff seeks to portray itself as a victim, the reality was that Plaintiff had dissipating assets that it had prematurely purchased, prior to locating a prospective buyer. The best deal that Plaintiff could have gotten was a commitment for 500 Machines and a contingent payment provision for the remaining 600 Machines. Had Plaintiff been able to find a better deal, Plaintiff would have taken that deal, as Mr. Kalfa intimated during his deposition.

bargained-for protections or, more egregiously, an outright abandonment of Article 3. *See Keitel v. E*TRADE Fin. Corp.*, 153 A.D.3d 1181, 1182 (1st Dep't 2017) ("Waiver of a contractual provision 'should not be lightly presumed,' 'must be unmistakable manifested, and is not inferred from a doubtful or equivocal act.'"); *see also* Agreement, § 13(d) (no waiver provision).[5]

Moreover, Plaintiff's arguments concerning equitable estoppel and partial performance are meritless and, frankly, insulting, *to wit*, as of April 15, 2018 (the bargained-for date contained in Article 3), the fair market value of the 600 Machines had spiraled to $642,000 (*i.e.*, $1070 per Machine, as confirmed during Plaintiff's depositions). Plaintiff, nonetheless, indecorously seeks more than double that amount from Super Crypto and DPW, a stranger to the Agreement. *See Jackson v. Triborough Bridge & Tunnel Auth.*, No. 1639/92, 589 N.Y.S.2d 748, 749 (Sup. Ct. N.Y. Cty. Oct. 2, 1992) ("The doctrine of equitable estoppel cannot be used to create a right or place petitioner in a better position."). Simply put, Super Crypto did not breach the Agreement, Plaintiff is not owed damages totaling $1,375,955 (which figure has bizarrely decreased from the damages alleged in the Complaint), and no amount of briefing can overcome these inconvenient facts.

Plaintiff's alter-ego arguments fare no better. "A plaintiff seeking to persuade a Delaware court to disregard corporate structure faces 'a difficult task.'" *See R.F.M.A.S., Inc. v. So.*, 619 F. Supp. 2d 39, 68 (S.D.N.Y. 2009) (citations omitted); *National Gear & Pitson, Inc. v. Cummins Power Sys., LLC,* 975 F. Supp. 2d 392, 401-402 (S.D.N.Y. 2013) ("'Delaware courts' especially 'take the corporate form very seriously and will disregard it only in the exceptional case.'"). For a parent company to be liable for the acts of its subsidiaries, Delaware law requires that the plaintiff establish that "(1) that the parent and the subsidiary 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness… [is] present.'" *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) (citations omitted); *see also Official Comm. Of Unsecured Creditors v. Bay Harbour Master Ltd.*, 420 B.R. 112, 134 (Bankr. S.D.N.Y. 2009) ("With respect to the second factor required to pierce the corporate veil – a showing of unfairness of injustice – while a showing of fraud is not necessary, "***the requisite injustice or unfairness… is also not simple in nature but rather something that is similar in nature to fraud or a sham***." (Emphasis added)).

Here, and putting aside that Super Crypto did not breach the Agreement, there can be no genuine dispute that, upon entering into the Agreement, the only amounts that Super Crypto had an absolute obligation to pay were the Deposit and the $1,487,500 for the first 500 Machines (*See* Agreement, § 3) – both of which were paid. This salient point entirely undermines Plaintiff's specious contention that Super Crypto was insufficiently capitalized to meet its obligations under the Agreement, and, consequently, dispenses with Plaintiff's claimed "injustice" argument.[6]

---

[5] Effectively, Plaintiff wants this Court to accept the absurd proposition (as a matter of law, nonetheless) that Super Crypto, after already paying a total of $1,651,125 to Plaintiff for the first 500 Machines (which Plaintiff internally joked about as being "the biggest miracle ever" in light of the sharp decline in the price of the Machines (*See* [DE 90-3])), would then, on its own accord, determine that it would gratuitously (*i.e.*, without consideration) waive the built-in contractual protections that it specifically bargained-for with respect to the second tranche of 600 Machines.

[6] In fact, no injustice could befall Plaintiff in light of Plaintiff's testimony during its depositions that it had no other real market to sell the remaining 600 Machines, even prior to Super Crypto's alleged breach. In that same vein, and despite Plaintiff's efforts to mislead the Court regarding Mr. Magot's testimony concerning the "resale price," Mr. Magot was specifically asked, in this instance, whether the "resale price" was reasonable in November 2018, and not whether the eight- month delay in commencing a resale was reasonable.

Hon. Andrew L. Carter, Jr., U.S.D.J.
March 7, 2023
Page 4

   Regarding the balance of Plaintiff's alter-ego allegations, Plaintiff is once again attempting to manipulate unfavorable documents and testimony. For instance, nothing in the evidentiary record shows that DPW's CEO was the "final decisionmaker with respect to the Agreement, approving the deal." To the contrary, Mr. Magot competently testified that it was ultimately Super Crypto's (and its Board) decision as to whether Super Crypto would or would not enter into the Agreement and that Super Crypto naturally needed to understand what type of financing was available (from various sources) to it prior to making that decision. Moreover, Super Crypto also had its own independent business operations and assets. That Super Crypto would eventually suspend its operations due to the unfortunate market conditions in the cryptocurrency space (which Plaintiff, itself, uses as a justification for not mitigating its supposed damages in this case), does not serve as a basis to impose liability upon DPW. *See Mason v. Network of Wilmington, Inc.*, No. 19434-NC, 2005 Del. Ch. LEXIS 99, at *12 (Del. Ch. July 1, 2005) ("If creditors could enter judgments against shareholders every time that a corporation becomes unable to pay its debts as they become due, the limited liability characteristic of the corporate form would be meaningless.").

   For the foregoing reasons, the Court should deny Plaintiff's request for a premotion conference. We thank the Court for its time and consideration.

                       Respectfully submitted,

                        Robert B. Volynsky

cc:  All Counsel of Record