UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
BLOCKCHAIN MINING SUPPLY AND
SERVICES LTD.,                                            Case No. 18-CV-11099-ALC

                Plaintiff,

                                                          **DECLARATION OF**
   -against-                                                   **DARREN MAGOT**

SUPER CRYPTO MINING, INC. (N/K/A DIGITAL
FARMS, INC. and DPW HOLDINGS, INC.
(N/K/A AULT AULLIANCE, INC.),

                Defendants.
----------------------------------------------------------------X

      I, Darren Magot, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

      1.     I am the Chief Executive Officer of Defendant Super Crypto Mining, Inc. (n/k/a Digital Farms, Inc.) ("Super Crypto") in the above-referenced matter. I have been the Chief Executive Officer since Super Crypto's inception.

      2.     I make this declaration in support of Super Crypto's and DPW Holdings, Inc.'s (n/k/a Ault Alliance, Inc.) motion for partial summary judgment as to both counts of the First Amended Complaint filed by Plaintiff Blockchain Mining Supply and Services Ltd. ("Plaintiff").

      3.     I make this declaration based upon my own personal knowledge and a review of the documents that have been produced in this litigation.

      4.     Super Crypto is a Delaware corporation with its principal place of business located in Nevada.

      5.     On or about March 8, 2018, Super Crypto entered into an asset purchase agreement, dated March 8, 2018 (the "Agreement"), with Plaintiff, related to the purchase and sale of 1,100 Bitmain Antminer S9 model cryptocurrency machines and 1,100 power supply units (collectively,

the "Machines"). A true and correct copy of the Agreement is attached to accompanying Declaration of Robert B. Volynsky, dated May 29, 2023 at Exhibit 11 (BMS000002-BMS00009).

6. I executed the Agreement on behalf of Super Crypto, in my capacity as Chief Executive Officer of Super Crypto.

7. Pursuant to the terms of the Agreement, Super Crypto was only contractually obligated to: (i) pay a deposit of $163,625 (the "Deposit"); and (ii) purchase 500 Machines (the "Contracted-For Machines") for $1,487,500 (the "Contracted-For Amount"), or $2,975 per Contracted-For Machine.

8. Super Crypto was never contractually obligated to consummate a purchase for the remaining 600 Machines (the "Remaining Machines").

9. This was for good reason as I had expressed concern to Plaintiff's principal, William Tencer regarding Super Crypto's ability to obtain the necessary financing for the Remaining Machines, as well as the volatile state of the cryptocurrency market.

10. Indeed, Super Crypto did not want to commit itself to purchasing *all* 1,100 Machines due to the volatile cryptocurrency market, as well as the uncertainties surrounding its ability (as a nascent company) to obtain the necessary financing for *all* 1,100 Machines.

11. Super Crypto felt comfortable that it would be able to obtain the requisite financing to pay for some of the Machines and informed Plaintiff of this limitation.

12. Thus, Plaintiff proposed and Super Crypto agreed that, in the event that Super Crypto did not pay $1,621,375 (the "Remaining Amount") for the Remaining Machines, on or before April 15, 2018 (the "Expiration Date"), the Deposit would be automatically forfeited and that, among other things, Super Crypto would have no further obligations with regards to, among other things, the Remaining Machines.

13. Consequently, Article 3 of the Agreement provides that, in the event that the Remaining Amount is not paid on or before the Expiration Date, the Deposit would be forfeited and the balance of the Agreement "shall be deemed null and void and all parties shall be relieved of its further obligations herein." *See* Agreement, §3.

14. Super Crypto complied with its obligations under the Agreement by causing the Deposit and Contracted-For Amount to be paid to Plaintiff, in the amounts and on or about the dates set forth in the table below:

| Payment Date | Payment Amount | Purpose of Payment |
| --- | --- | --- |
| March 9, 2018 | $80,000 | Deposit |
| March 13, 2018 | $83,625 | Deposit |
| March 29, 2018 | $100,000 | Contracted-For Amount |
| April 17, 2018 | $1,387,500 | Contracted-For Amount |

15. Super Crypto did not pay the Remaining Amount to Plaintiff, in whole or in part, on or before April 15, 2018.

16. It was my understanding that the Deposit had been forfeited to Plaintiff and that Plaintiff was free to sell the Remaining Machines elsewhere. I articulated this sentiment to Mr. Tencer on multiple occasions.

17. Indeed, Plaintiff, has retained the Deposit.

18. Notwithstanding, from that point forward, Super Crypto and Plaintiff both expressed a continued willingness to work with one another beyond the expired Agreement, in an effort to foster an ongoing business relationship in this niche space and, to avoid the potential costs and expenses of the unnecessary litigation that had been threatened by Plaintiff.

19. Both parties were aware that the Agreement had been deemed null and void, the Deposit forfeited, and that Plaintiff was free to sell the Remaining Machines elsewhere. I had numerous discussions with Mr. Tencer to that effect.

20. At no point during these ongoing discussions with Plaintiff did Plaintiff ever state that it had decided that it was ceasing its active business operations or express its desire to exit the cryptocurrency space.

21. To the contrary, Plaintiff had made it seem like there could be future business relations. Relying on these representations, Super Crypto attempted to work something out with Plaintiff.

22. Unfortunately, the parties could not reach a new agreement and Plaintiff apparently sold the Remaining Machines to a third-party for $168,000 (the "Third-Party Sale Price") on or about November 9, 2018 (the "November 9th Sale").

23. Although Plaintiff was not required to, prior the November 9th Sale, Plaintiff neither informed me of the Third-Party Sale Price nor the payment schedule that it had agreed to.

24. I understand from my counsel that Plaintiff is now claiming that Super Crypto either modified the Expiration Date under the Agreement or agreed to waive Article 3. None of these statements are true and I, on behalf of Super Crypto, vehemently object to Plaintiff's insinuations.

25. Super Crypto never agreed to extend the Expiration Date and Super Crypto never executed any written amendments to that effect.

26. Similarly, Super Crypto never agreed to waive Article 3 and never executed any written waivers waiving Article 3 of the Agreement.

27. Super Crypto would not, did not, and never intended to waive or modify the terms of the Agreement in any way that would require Super Crypto to pay the Remaining Amount, as that provision was expressly bargained-for by and between Plaintiff and Super Crypto.

28. Super Crypto agreed to pay Plaintiff a total of $1,651,125 (*i.e.*, the Deposit and the Contracted-For Amount) under the Agreement for the inclusion of Article 3.

29. Additionally, the Machines were never shipped from nor delivered to the State of New York.

30. It was my understanding that the Machines would, in the first instance, be held in a storage facility in Canada (the "Storage Facility") by a company named Stonegate Logistics, Inc.

31. The Contracted-For Machines were shipped from the Storage Facility to a data center in Indiana.

32. Additionally, Super Crypto is not a New York domiciliary.

33. None of the alleged payments from Super Crypto were transmitted from a New York bank account.

Executed on this 29th day of May of 2023 in Huntington Beach, California.

_____
Darren Magot

Scanned with CamScanner