

**WELTZLAW**
WELTZ KAKOS GERBI WOLINETZ VOLYNSKY LLP
170 OLD COUNTRY ROAD | SUITE 310
MINEOLA, NEW YORK 11501

T: (516) 320-6945
F: (516) 855-8776
WWW.WELTZ.LAW

April 4, 2023

**Via ECF**
Hon. Andrew L. Carter, Jr.
United States District Court Judge
Southern District of New York
40 Foley Square, Courtroom 1306
New York, New York 10007

      Re:    Blockchain Mining Supply and Services, Ltd. v. Super Crypto
             Mining, Inc. (n/k/a Digital Farms, Inc.), *et al.* No. 18-CV-11099-ALC

Dear Judge Carter:

      The undersigned represents Defendants Super Crypto Mining, Inc. (n/k/a Digital Farms, Inc.) ("Super Crypto") and DPW Holdings, Inc. (n/k/a Ault Alliance, Inc.) ("DPW" and with "Super Crypto" collectively, "Defendants") in the above-referenced matter. Pursuant to Your Honor's Individual Practices, please allow this letter to serve as Defendants' request for a pre-motion conference in connection with their anticipated motion for summary judgment seeking: (i) dismissal of Plaintiff Blockchain Mining Supply and Services Ltd.'s ("Plaintiff") First Count for Breach of Contract and (ii) dismissal of Plaintiff's Second Count for Promissory Estoppel based on lack of personal jurisdiction.

## Plaintiff's First Count for Breach of Contract Should be Dismissed

      Prior to entering into the asset purchase agreement that is the subject of this action (the "Agreement"), Plaintiff was in the unenviable position of having prematurely purchased 1,100 Bitmain Antminer S9 miners and 1,100 power supplies (collectively, the "Machines") at the onset of a precipitous decline of the cryptocurrency market. Plaintiff (as confirmed during the depositions in this action) was desperate to find a buyer for the Machines and, on or about February 24, 2018, Yonah Kalfa (a former principal of Plaintiff) solicited Super Crypto's CEO Darren Magot, through LinkedIn, about a possible purchase of the Machines. Between February 24, 2018 - March 8, 2018 (the date that the Agreement was signed), Mr. Magot and Plaintiff engaged in numerous correspondence about the terms of Plaintiff's contemplated sale of the Machines.

      The material terms of the Agreement are not seriously in dispute. The Agreement unambiguously provides that the only ***absolute*** obligations that Super Crypto was required to satisfy were its payment of the deposit of $163,625.00 (the "Deposit"), pursuant to Article 2(a)(i), and its payment of $1,487,500.00 for the first 500 Machines, pursuant to Article 2(a)(ii).[1]

---

[1] The parties do not seemingly dispute that Super Crypto tendered $1,651,125 (*i.e.*, the Deposit and payment for the first 500 Machines) to Plaintiff and that Plaintiff delivered the first 500 Machines to Super Crypto.

Hon. Andrew L. Carter, Jr., U.S.D.J.
April 4, 2023
Page 2

In contrast, with regard to the remaining 600 Machines referenced in the Agreement, Super Crypto had the option of forfeiting the Deposit, and having the balance of the Agreement be deemed null and void, as of April 15, 2018, with each party being "relieved of its further obligations" under the Agreement. *See* Agreement, § 3. As Mr. Magot made clear during his deposition, this was a material inducement for Super Crypto to enter into the Agreement as Super Crypto felt comfortable that the first 500 Machines would be paid for, but was unsure whether Super Crypto could pay for the next 600 Machines in such a short time frame given the ever changing, volatile cryptocurrency market.[2] Thus, Article 3 was part and parcel of the Agreement.

Notably, there is no carve out for Article 2(a)(iii) (*i.e.*, the provision regarding the purchase price for the remaining 600 Machines), to survive the termination of the Agreement – indeed, such a survival is non-sensical given the clear differentiation between the mandatory language requiring the purchase of the first 500 Machines and the noncompulsory language regarding the purchase of the next 600 Machines. During its depositions, Plaintiff did not dispute (nor could it) that this was the plain language of the Agreement.

Further, as a matter of law, there is no instance where Super Crypto could be in breach of the Agreement based on its purported non-compliance with Article 2(a)(iii) because Super Crypto was not contractually bound to purchase the 600 Machines. Super Crypto never waived its rights such that it would be contractually bound to pay the $2,975 per Machine for Machines that, as of at least April 17, 2018, had already declined to $1,070 per Machine (as confirmed during Plaintiff's depositions).[3]

Plaintiff's arguments to the contrary are unavailing. It would be absurd and not commercially reasonable to contend that a party fortuitously agreed to be bound to more onerous terms **without any consideration or a modification, in writing**.[4] *See Cole v. Macklowe*, 99 A.D.3d 595, 595 (1st Dep't 2012) ("Not only is the agreement void of any language mandating this result, but such interpretation of the agreement runs afoul of the well settled principle that a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties.").

Thus, Super Crypto did not waive its bargained-for protections with regard to its ability to forfeit the Deposit in lieu of paying for the remaining 600 Machines. *See Keitel v. E*TRADE Fin. Corp.*, 153 A.D.3d 1181, 1182 (1st Dep't 2017) ("[W]aiver of a contractual provision 'should not

---

[2] The depositions in this case revealed that Plaintiff would not make any further purchases of cryptocurrency machines beyond its premature purchase of the Machines because of the decline of the cryptocurrency market. To that end, Plaintiff was faced with taking the best offer it could at that time – a guaranteed $1,651,125 (which it received), and, as a worst-case scenario, it would still retain more than half of the 1,100 Machines. Had Plaintiff been able to obtain better terms for itself for the Machines, it would have entered into such arrangement.

[3] Because Super Crypto could not be deemed to have breached the Agreement, it is axiomatic that DPW also cannot be deemed to have breached the Agreement based on Plaintiff's tenuous theory of alter-ego liability.

[4] The juxtaposition of Plaintiff's principals joking in internal emails that Super Crypto's total payments of $1,651,125 to Plaintiff for the first 500 Machines was "the biggest miracle ever" (*See* [DE 90-3]), and, its self-serving argument that Super Crypto, on its own accord, agreed to gratuitously waive the built-in, material contractual protections that it specifically bargained-for with respect to the second tranche of 600 Machines should not be lost on the Court.

be lightly presumed,' 'must be unmistakable manifested, and is not inferred from a doubtful or equivocal act.'"); *see also* Agreement, Article 13(d) (no waiver provision). Plaintiff's insistence that its post-April 15, 2018 communications regarding a potential resolution with respect to the 600 Machines constitute a waiver fail, as there is no piece of evidence that shows that **Super Crypto unmistakably agreed to waive the bargained-for protections contained in Article 3 and be contractually bound to Plaintiff for the <u>contract price</u> of the remaining 600 Machines**.

For this same reason, Plaintiff's other theory – that the parties somehow abandoned Article 3 all together through some indefinite amendment and which "abandonment" is not mentioned in the Amended Complaint – also fails. *See, e.g., Int'l Fin. Corp. v. Carrera Holdings Inc.*, 82 A.D.3d 641, 641 (1st Dep't Mar. 29, 2011) ("[T]he alleged obligation to manage country or governmental risk is ambiguous, indefinite and non-specific, rendering it unenforceable as a matter of law").

Moreover, Plaintiff's arguments concerning equitable estoppel and partial performance are similarly unavailing in light of Plaintiff's documents and its principals' damaging testimony which establishes that, as of April 17, 2018, the market value of the 600 Machines had spiraled to $642,000 (*i.e.*, $1,070 per Machine). Plaintiff, nonetheless, indecorously seeks more than double that amount in this litigation. *See Jackson v. Triborough Bridge & Tunnel Auth.*, No. 1639/92, 589 N.Y.S.2d 748, 749 (Sup. Ct. N.Y. Cty. Oct. 2, 1992) ("The doctrine of equitable estoppel cannot be used to create a right or place petitioner in a better position.").

### Plaintiff's Second Count for Promissory Estoppel Should Be Dismissed

Aside from the forum selection clause in the Agreement (which DPW is not a party to), this case has no nexus to New York, *to wit*, Plaintiff is a Canadian corporation; Super Crypto and DPW are Delaware corporations with their principal place of business located in Nevada; and the Machines were neither delivered to, nor shipped from New York.

The Court initially held, on a Rule 12(b)(6) motion, that there were sufficient allegations at the preliminary stage of this litigation to permit the exercise of jurisdiction over DPW, pursuant to the same forum selection clause (*See* [DE 92, pp. 8-9] (the "Order")). Notwithstanding, *that* forum selection clause (which is borne out of a null and void Agreement entered into between Super Crypto and Plaintiff) cannot serve as the basis to establish personal jurisdiction on a quasi-contractual claim. *See Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68, 83 (2d Cir. 2018) ("A plaintiff must establish the court's jurisdiction with respect to each claim asserted") (internal citations and quotation marks omitted).[5]

Indeed, as set forth in the introductory paragraph of this section, nothing related to Plaintiff's "promissory estoppel" allegations has any meaningful connection to New York, and, more than that, Plaintiff's threadbare allegations of minimum contacts have also been amply refuted in discovery.[6] *Dorchester Fin. Sec, Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013)

---

[5] In this regard, Plaintiff does not make clear in its pleadings (perhaps purposefully) whether it is asserting promissory estoppel against DPW independently or as the purported alter-ego of Super Crypto, and at this juncture, Plaintiff should be required to take a definitive position.

[6] For example, ¶ 10 of the Amended Complaint alleges that DPW's then-Chief Executive Officer purportedly sent Plaintiff a picture of himself attending a dinner meeting with a lender in New York, for the purpose of obtaining funds

Hon. Andrew L. Carter, Jr., U.S.D.J.
April 4, 2023
Page 4

("After discovery, the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant… the prima facie showing must be factually supported").[7]

Defendants respectfully request sixty days from the date of the pre-motion conference to file their anticipated motion and also respectfully request permission to attend the pre-motion conference virtually/telephonically. We thank the Court for its time and consideration.

Respectfully submitted,

*/s/ Robert Volynsky*

Robert B. Volynsky

cc: All Counsel of Record

---

to pay the amounts purportedly owed to Plaintiff. Discovery, however, would show that the referenced text message makes no mention of New York and that the individual in the photograph was the CEO's assistant, not a lender. Additionally, the wire referenced in ¶ 12 was not originated from a New York based bank account held in the name of DPW, but rather from the intermediary bank that would seemingly relay the funds to a Canadian bank account. *See Aquiline Capital Partners LLC v. Finarch LLC*, 861 F. Supp. 2d 378, 387 (S.D.N.Y. 2012) ("Temporary, random, or tenuous relationships with New York does not constitute a continued business relationship"). The foregoing examples are intended to be illustrative, not exhaustive.

[7] In the alternative, Defendants respectfully request permission to seek summary judgment establishing that the measure of damages for the promissory estoppel claim should be based on reliance damages, as a matter of law. *See Cyberchron Corp. v. Calldata Sys. Dev.*, 47 F.3d 39, 46 (2d Cir. 1995); *Kleinberg v. Radian Grp., Inc.*, 2003 U.S. Dist. LEXIS 18902, at *15 (S.D.N.Y. Oct. 24, 2003) (attorney's fees not recoverable for a promissory estoppel claim).