UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
BLOCKCHAIN MINING SUPPLY AND
SERVICES LTD.,                                              Case No. 18-CV-11099-ALC

                Plaintiff,

   -against-

SUPER CRYPTO MINING, INC. (N/K/A DIGITAL
FARMS, INC. and DPW HOLDINGS, INC.
(N/K/A AULT AULLIANCE, INC.),

                Defendants.
------------------------------------------------------------X

**LOCAL RULE 56.1 STATEMENT OF FACTS IN SUPPORT
OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGEMENT**

Defendants Super Crypto Mining, Inc. (n/k/a Digital Farms, Inc.) ("Super Crypto") and DPW Holdings, Inc. (n/k/a Ault Alliance, Inc.) ("DPW" and "Super Crypto" collectively, "Defendants"), by and through their undersigned counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule of Civil Procedure 56.1 of the United States District Court for the Southern District of New York, respectfully submit the following statement of facts which there is no genuine issue to be tried in support of their motion for summary judgment:

109. On or about November 29, 2017, Plaintiff Blockchain Mining Supply and Services Ltd. ("Plaintiff" or "Blockchain") was incorporated in Ontario, Canada as an Ontario Business Corporation.[1] *See* FAC, ¶2; Volynsky Decl., Ex. 30.

110. During its short existence, Plaintiff would only have two principals – William Tencer and Yonah "Joe" Kalfa. *See* Volynsky Decl., Ex. 7 (Tencer Tr., 40:20-41:13; 43:23-44:4).

---

[1] A true and correct copy of the First Amended Complaint ("FAC") is attached to the accompanying Declaration of Robert B. Volynsky, dated May 30, 2023 (hereinafter, "Volynsky Decl.") at Ex.1. References to deposition transcripts shall be referred to herein as "Deponent's Surname, Tr."

1

111.    Super Crypto is a Delaware corporation, with its principal place of business located in Nevada.  *See* Declaration of Darren Magot, dated May 29, 2023 (hereinafter, "Magot Decl."), at ¶4.

112.    DPW is a Delaware corporation with its principal place of business located in Nevada.  *See* Declaration of William B. Horne, dated May 24, 2023 (hereinafter, "Horne Decl."), at ¶4.

113.    At the time that Plaintiff commenced this lawsuit, DPW's principal place of business was in California and it did not have any offices located in New York.  *See id.*, at ¶¶4-5.

**Plaintiff's Business Model**

114.    Plaintiff's business purpose was to purchase Antminer cryptocurrency machines from a supplier and then resell the Antminer cryptocurrency machines.  *See* Volynsky Decl., Ex. 7 (Tencer Tr., 47:24-48:20).

115.    Plaintiff did not sell Antminer cryptocurrency machines prior to November 29, 2017, its date of incorporation.  *See id.* (Tencer Tr., 49:16-20).

116.    Plaintiff also never obtained a reseller's license or a bit license.  *See id.* (Tencer Tr., 49:4-11).

117.    In its ordinary course of business, Plaintiff would generally first place a purchase order with its overseas supplier, Bitmain Ltd. ("Bitmain"), for cryptocurrency machines and, thereafter attempt to locate a potential customer for the resale of such cryptocurrency machines, prior to Bitmain's shipment of the cryptocurrency machines to Plaintiff.  *See* Volynsky Decl., Ex. 8 (Kalfa Tr., 33:21-35:5).

118. Plaintiff had a short window to sell any such cryptocurrency machines to as it would only reach out to potential purchasers when it knew that the cryptocurrency machines were about to ship from Bitmain. *See id.* (Kalfa Tr., 34:20-35:5).

119. Indeed, Kalfa testified that he would need to "sort of make a decision really at the last minute or try to find a customer in that short window when good are about to ship." *See id.* (Kalfa Tr., 35:3-5).

**Plaintiff Solicits Super Crypto**

120. On February 23, 2018, Yonah Kalfa, a principal of Plaintiff, sent a message to Darren Magot, Chief Executive Officer of Super Crypto, on LinkedIn (the "February 23rd Message"), soliciting a potential sale of 1,100 Bitmain Antminer S9 Machines and 1,100 PSUs (collectively, the "Machines"). *See* Volynsky Decl., Ex. 12.

121. Kalfa presently serves as an officer of a publicly traded company. See Volynsky Decl., Ex. 8 (Kalfa Tr., 50:24-51:1).

122. Kalfa testified he has familiarity reviewing, *inter alia*, quarterly and yearly financial statements filed with the Securities and Exchange Commission. *See id.* (Kalfa Tr., 51:7-53:6).

123. The February 23rd Message was the initial contact that Plaintiff had with either Defendant. *See id.* (Kalfa Tr., 44:12-21); Ex. 9 (Magot Tr., 85:14-24); Ex. 13 (RFA Nos. 1-11).

124. Prior to transmitting the February 23rd Message, Plaintiff had already placed an order for the Machines with Bitmain and had received a notice of shipment for the Machines from Bitmain. *See* Volynsky Decl., Ex. 8 (Kalfa Tr., 39:20-41:3).

125. As far as Plaintiff was concerned, Plaintiff needed to pay Bitmain, in full, for the Machines irrespective of whether Plaintiff had located a potential customer to resell the Machines to. *See id.* (Kalfa Tr., 41:13-43:10).

126. Plaintiff had reached out to other prospective purchasers for the Machines prior to transmitting the February 23rd Message. *See id.* (Kalfa Tr., 46:25-47:13).

127. Kalfa would scour the internet in an attempt to locate a potential purchaser for the Machines. *See id.* (Kalfa Tr., 38:13-20).

128. Kalfa first learned about Super Crypto by reading a press release titled "DPW Holdings' Subsidiary, Super Crypto Mining to Launch Cloud Mining" (the "Press Release"), that he had located prior to the February 23rd Message. *See id.* (Kalfa Tr., 38:12-20; 47:18-20; 48:21-49:10); Volynsky Decl., Ex. 14.

129. From there, Kalfa would browse through DPW's public filings and conduct "due diligence" on DPW. *See* Volynsky Decl., Ex. 8 (Kalfa Tr., 51:7-52:5).

130. Kalfa testified that as part of his due diligence of DPW he "probably would have" reviewed DPW's Form 10-Q filing. *See id.* (Kalfa Tr., 53:4-53:8).

131. As regards DPW's quarterly and yearly financials, Mr. Kalfa testified that he "definitely wouldn't have read it in detail, but [he] would have browsed, you know, see revenue, assets or whatnot, you know." *See id.* (Kalfa Tr., 53:10-16).

132. DPW's Form 10-Q filing with the Securities Exchange Commission, for the quarterly period ended September 30, 2017 (the "2017 Q3 10-Q"), identifies the total revenue for the three-month period ended as of September 30, 2017, as $3,220,000.00. *See* Volynsky Decl., Ex. 15; Horne Decl., ¶8.

133. The 2017 Q3 10-Q identifies the total revenue for the nine-month period ended as of September 30, 2017, as $6,670,000.00. *See* Volynsky Decl., Ex. 15, at p. 5.

134. The 2017 Q3 10-Q states that as of September 30, 2017, DPW had cash and cash equivalents of $314,000. *See id.*, at p. 6.

4

135. The 2017 Q3 10-Q states that as of September 30, 2017, DPW had an accumulated deficit of $17,212,000.00. *See id.*

136. The 2017 Q3 10-Q states that as of September 30, 2017, DPW had a negative working capital of $4,174,000. *See id.*

137. On February 24, 2018, Magot would inform Kalfa that he was interested in purchasing the Machines, but needed to wait until the following Tuesday to confirm all financing. *See id.*, Ex. 12.

138. On February 25, 2018, Mr. Kalfa e-mailed Mr. Magot (the "February 25th E-mail") a draft of an Asset Purchase Agreement (the "2/25 Draft APA" (DEFENDANTS_000941-DEFENDANTS_000949)) and a draft on Escrow Agreement (the "2/26 Draft Escrow" (DEFENDANTS_000950-DEFENDANTS_000957)). *See id.*, Ex. 16.

139. On or about February 26, 2018, Kalfa would message Magot informing him that he could discount the price for the Machines to $2,975 USD per Machine. *See id.*, Ex. 15.

**Super Crypto and Plaintiff's Pre-Agreement Negotiations**

140. Kalfa testified that he offered this discount to Magot because he needed to "finalize a customer" and was "trying to incentive him to close the deal." *See id.*, Ex. 8 (Kalfa Tr., 66:10-17).

141. The 2/25 Draft APA would have required Super Crypto to purchase all of the Machines notwithstanding the volatility in the cryptocurrency market. *See id.*, Ex. 16.

142. This was unacceptable to Super Crypto, and Super Crypto made this very clear to Tencer prior to the execution of the Agreement. *See* Volynsky Decl., Ex. 9 (Magot Tr., 51:5-25; 53:17-23); Magot Decl., ¶9.

143. Indeed, Super Crypto did not want to commit itself to purchasing **all** 1,100 Machines due to the volatile cryptocurrency market, as well as the uncertainties surrounding its ability (as a nascent company) to obtain the necessary financing for **all** 1,100 Machines. *See* Magot Decl., ¶10; *see also* Volynsky Decl., Ex. 9 (Magot Tr., 51:19-25).

144. Super Crypto felt comfortable that it would be able to obtain the requisite financing to pay for some of the Machines and informed Plaintiff of this limitation. *See* Magot Decl., ¶11.

145. To address Super Crypto's stated concerns, on March 6, 2018, Tencer e-mailed (the "March 6th E-mail") a proposal to Mr. Magot "to try and accommodate Super Crypto's cash flow." *See* Volynsky Decl., Ex. 17.

146. Specifically, in the March 6th E-mail, Tencer proposed that Super Crypto: (i) pay a deposit of $163,625.00 by March 8, 2018; (ii) pay $1,487,500.00 for 500 Machines on March 16, 2018 or March 23, 2018; (iii) the $163,625.00 deposit would then be applied to the remaining 600 machines, and Super Crypto would pay the balance of $1,621,375.00 in April; and (iv) if the $1,621,375.00 was not paid, the $163,625.00 deposit would be non-refundable (collectively, the "E-mail Proposal"). *See id.*

**Plaintiff and Super Crypto Enter into the Agreement**

147. On or about March 8, 2018 (the "Effective Date"), Plaintiff and Super Crypto entered into the Asset Purchase Agreement, dated March 8, 2018 (the "Agreement"), a true and correct copy of which was produced by Plaintiff in this action at BMS000002-BMS000009. *See* Magot Decl., ¶5; *See* Volynsky Decl., Ex. 11; FAC, ¶15.

148. The only parties to the Asset Purchase Agreement are Plaintiff and Super Crypto. *See* Volynsky Decl., Ex. 11, at "Preamble" and "Signature Block."

149. Prior to the Effective Date of the Agreement, Plaintiff had not communicated with anyone from DPW. *See id.*, Ex. 13 (RFAs No. 1-11).

150. Plaintiff did not negotiate any of the Agreement's terms with DPW. *See id.*

151. The transaction between Super Crypto and Plaintiff, which forms the basis of this litigation, was the last active business that was conducted by Plaintiff. *See* Volynsky Decl., Exs. 7 (Tencer Tr., 53:1-3) and 8 (Kalfa Tr., 31:18-25).

152. Indeed, Plaintiff did not purchase anymore Antminers after March 2018 because "there was no market for it anymore." *See* Volynsky Decl., Ex. 7 (Tencer Tr., 50:11-18).

153. Tencer would further elaborate that "[t]here was no demand for the machines. As far as we were concerned, being the reseller, we would not be able to buy and sell and make a profit." *See id.* (Tencer Tr., 51:1-4).

154. Thus, during its short-lived existence, Plaintiff sold cryptocurrency mining machines to no more than five customers. *See id.* (Tencer Tr., 52:1-5).

**The Unambiguous Terms of the Agreement Provide**
**For a Discretionary Purchase of the Remaining Machines**

155. The Agreement defines "Assets" as 1,100 Bitmain Antminer S9 model miners and 1,100 PSUs (collectively, the "Machines"). *See* Volynsky Decl., Ex. 11, §1(b).

156. Pursuant to Article 2(a)(i) of the Agreement, Super Crypto was required to pay a deposit totaling $163,625.00 USD (the "Deposit") to Plaintiff. *See id.*, §2(a)(i).

157. By payments made on March 9 and 13, 2018, Super Crypto paid the Deposit to Plaintiff. FAC, ¶17; Magot Decl., ¶14.

158. Pursuant to Article 2(a)(ii) of the Agreement, Super Crypto was required to pay $1,487,500.00 (the "Contracted-For Amount") to Plaintiff for 500 Bitmain Antminer S9 model

7

miners and 500 PSUs (collectively, the "Contracted-For Machines"). *See* Volynsky Decl., Ex. 11, §2(a)(ii).

159. Plaintiff received payment of the total Contracted-For Amount and thereafter released the Contracted-For Machines from Plaintiff's storage facility. *See* FAC, ¶¶17-18; *see also* Volynsky Decl., Ex. 3, ¶¶17-18.

160. As of the Effective Date, Super Crypto did not have an absolute obligation to pay the $1,621,375 (the "Remaining Amount") referenced in Article 2(a)(iii) of the Agreement. *See* Volynsky Decl., Ex. 11, §§2(a)(iii) and 3.

161. Pursuant to Article 2(a)(iii), in the event that Super Crypto did not pay the Remaining Amount to Plaintiff on or before April 15, 2018, the Deposit would be deemed non-refundable. *See id.*, §2(a)(iii).

162. Pursuant to Article 3 of the Agreement, in the event that Super Crypto did not pay the Remaining Amount to Plaintiff for the remaining 600 Bitmain Antminer S9 model miners and 600 PSUs (collectively, the "Remaining Machines"), on or before April 15, 2018 (the "Expiration Date"), the Deposit would be forfeited to Plaintiff, and the remainder of the Agreement, with the exception of Article 2(a)(i) and Article 3, "shall be null and void and all parties shall be relieved of its further obligations" under the Agreement. *See id.*, §3.

163. The provisions contained in Article 3 of the Agreement were not contained in the 2/26 Draft APA. *Compare* Ex. 9 2/25 Draft APA *with* Volynsky Decl., Ex. 11, §3.

164. Articles 2(a)(i), 2(a)(ii), 2(a)(iii), and 3 of the Agreement reflect the terms of the Proposal. *Compare id.*, §§ 2(a)(i), 2(a)(ii), 2(a)(iii) and 3 *with* Volynsky Decl., Ex. 17.

165. Tencer, who authored the e-mail containing the Proposal, testified that, pursuant to the terms of the Agreement, as written, as of April 15, 2018, Super Crypto could forfeit the Deposit

8

to Plaintiff and the Agreement would thereafter be deemed null and void. *See* Volynsky Decl., Ex. 7 (Tencer Tr., 110:7-111:8).

166. For good measure, Kalfa also testified that he presumed that Plaintiff inserted Article 3 in the Agreement and that "My understanding is there was to be – my memory served me that there was a deposit that they were to give, and if they wouldn't take the machines, it would be nonrefundable, yes." *See* Volynsky Decl., Ex. 8 (Kalfa Tr., 105:21-25; 113:15-18).

167. Thus, as of the Effective Date when Plaintiff entered into the Agreement, Plaintiff understood that there was a potential risk that its only recourse with respect to the Remaining Machines would be a forfeiture of the Deposit. *See* Volynsky Decl., Ex. 7 (Tencer Tr., 110:20-111:18) and Ex. 8 (Kalfa Tr., 112:6-13).

168. Plaintiff also understood, as of the Effective Date, that, as of April 16, 2018, it could be stuck with the Remaining Machines. *See id.*

169. There was volatility in the resale price of the Machines. *See* Volynsky Decl., Ex. 7 (Tencer Tr., 55:15-19).

170. The price of Bitcoin at any particular time impacted the resale price of the Machines. *See id.* (Tencer Tr., 54:25-55:14).

171. Super Crypto did not pay the Remaining Amount to Plaintiff, on or before April 15, 2018. *See* Magot Decl., ¶15.

172. Super Crypto did not make a partial payment of the Remaining Amount to Plaintiff, on or before April 15, 2018. *See id.*

173. Plaintiff had every right to sell the Remaining Machines to another party as of April 16, 2018. *See* Volynsky Decl., Ex. 11, §3 and Ex. 9 (Magot Tr., 107:14-18).

**The Agreement Was Neither Amended Nor Its Provisions Waived**

174. Pursuant to Article 13(e) of the Agreement, no revision or modification of the Agreement could be effective unless in writing and executed by authorized representatives of Plaintiff and Super Crypto. *See* Volynsky Decl., Ex. 11, §13(e).

175. Super Crypto and Plaintiff did not amend Article 3 of the Agreement prior to April 15, 2018. *See* Volynsky Decl., Ex. 7 (Tencer Tr., 112:16-243).

176. In fact, Super Crypto and Plaintiff never executed a written modification of the Agreement. *See id.* (Tencer Tr., 112:16-243).

177. Stated differently, Super Crypto and Plaintiff never executed a written modification of the Agreement in accordance with Article 13(e) of the Agreement. *See id.*

178. At no point did Plaintiff and Super Crypto ever modify the Agreement to extend the Expiration Date in accordance with Article 13(e) of the Agreement. *See* Magot Decl., ¶¶24-25.

179. At no point did Plaintiff and Super Crypto ever waive the protections under Article 3 in accordance with Article 13(d) of the Agreement. *See* Magot Decl., ¶¶26-28.

180. There are no references in the FAC to any amendments to the Agreement. *See* Volynsky Decl., ¶7.

181. There are no references in the FAC to an alleged extension of the April 15, 2018, date contained in Article 3 of the Agreement. *See id.*, ¶9.

182. To the contrary, on May 7, 2018, Kalfa would e-mail Tencer asking whether Plaintiff and Super Crypto could enter into "a new written agreement" with "more forceful terms" that Super Crypto "will absolutely pay the full balance" for the Remaining Machines. *See id.*, Ex. 19.

183. In fact, to date, Plaintiff has not identified a post-April 15, 2018, date to which Article 3 was supposedly extended to, despite asserting in its pre-motion conference letter that Super Crypto and Plaintiff purportedly modified this date. *See id.*, ¶19 and Ex. 5, at pp. 2-3.

184. Notwithstanding this assertion, in an e-mail dated June 18, 2018 (the "June 18th E-mail"), Plaintiff's counsel noted that Super Crypto purportedly "defaulted" under the Agreement on April 15, 2018, and not on some other date. *See id.*, Ex. 20.

185. Pursuant to Article 13(d) of the Agreement, Plaintiff and Super Crypto agreed that "[t]he failure of a Party to insist upon strict adherence to any term of this Agreement on one or more occasions shall neither be considered a waiver nor deprive that Party of any right thereafter to insist upon strict adherence to that term or any other term of this Agreement." *See id.*, Ex. 11, §13(d).

186. There are no references in the FAC to any waiver of Article 3 of the Agreement. *See id.*, ¶8.

187. Super Crypto also never stated to Plaintiff, in writing, that it was waiving Article 3 of the Agreement. *See* Magot Decl., ¶¶26-27.

188. Thus, as set forth in Article 13(d) of the Agreement, "[a]ny waiver must be in writing and signed by the Party to be charged therewith." *See* Volynsky Decl., Ex. 11, §13(d).

189. Consequently, Super Crypto did not waive Article 3 of the Agreement prior to the Expiration Date. *See* Magot Decl., ¶¶26-27.

190. In fact, Super Crypto never waived Article 3 of the Agreement. *See id.*

191. Plaintiff's counsel also never asked Magot (Super Crypto's 30(b)(6) witness) point blank, during his deposition, whether Super Crypto ever "waived" Article 3. *See* Volynsky Decl., Ex. 9 (index does not contain any iteration of "waive").

192. As such, as of April 16, 2018, the Deposit was forfeited. *See* Volynsky Decl., Ex. 11, §3.

193. Plaintiff has never returned the Deposit to Super Crypto. *See* Volynsky Decl., Ex. 8 (Kalfa Tr., 112:17-21).

194. To this day, Plaintiff has retained the Deposit. *See id.*; *see also* Magot Decl., ¶17.

**At the time that the Agreement Expired, Plaintiff Had Long Abandoned its Business and the Fair Market Value of the Machines Had Precipitously Declined**

195. As of April 16, 2018, Super Crypto was not required to pay the Remaining Amount and consummate a purchase of the Remaining Machines. *See* Volynsky Decl., Ex. 8 (Kalfa Tr., 112:17-21).

196. Had Plaintiff been able to sell the Remaining Machines on April 16, 2018 (which it was contractually permitted to do) for a higher price than the contract price, Plaintiff would have undoubtedly retained the Deposit and proceeded to sell the Machines at such premium. *See id.*, at 43:3-8; *see also* Ex. 7 (Tencer Tr., 126:12-16).

197. Tencer testified that, with respect to Plaintiff's transaction with Super Crypto, "we timed the market just perfectly to buy the machines and sell them at the top of the market, and then we're out. We weren't planning on doing this business anymore." *See id.*, Ex. 7 (Tencer Tr., 126:12-16).

198. Thus, on April 4, 2018, Kalfa would e-mail Tencer noting that he was "still super uncomfortable, given that Bitmain still has the much cheaper machines available, and Leo just told me in next few days pricing will be going down another 10%. We may just need to hold our breath and hope for the best." *See id.*, Ex. 21.

199. "Leo" was an individual that worked at Bitmain. *See* Volynsky Decl., Ex. 8 (Kalfa Tr., 122:25-123:3).

200. More than that, on April 17, 2018, Kalfa would send another e-mail (the "April 17th E-mail") to Tencer referencing the "biggest miracle ever!" *See id.*, Ex. 22.

201. Specifically, in the April 17th E-mail, Mr. Kalfa states that "They can buy this same item now for $1,070 now from Bitmain, that we sold them for $2,975!!! Here is a link in case you think im nuts HAAA." *See id.*

202. Kalfa testified that the "same item" in the April 17th E-mail referred to the Machines. *See id.*, Ex. 8 (Kalfa Tr., 120:8-16).

203. Tencer testified that the fair market value of the Machines as of April 17, 2018, was $1,070 per Machine. *See id.*, Ex. 7 (Tencer Tr., 117:19-25).

204. Tencer also testified that the reference to the $1,070 price point in the April 17th E-mail meant that "the market had gone down for type of equipment, the demand has gone down, the price to buy the equipment went down." *See id.* (Tencer Tr., 117:15-18).

205. In that same vein, on April 20, 2018, Kalfa would e-mail Tencer again stating that Plaintiff "got in and out" on the Machines "literally in the perfect window." *See id.*, Ex. 15.

206. Indeed, the market price for the Machines as of April 20, 2018, was less than what Plaintiff had paid for the Machines when it purchased them from Bitmain. *See* Volynsky Decl., Ex. 8 (Kalfa Tr., 133:14-20).

207. More than that, Plaintiff also acknowledged that it was not actively seeking other purchasers for the Machines in July 2018, because, if it were to try to sell the Machines then, the amount that it could potentially sell the Machines for would be so small that it made the business

13

decision to try to work out a resolution with Super Crypto. *See* Volynsky Decl., Ex. 7 (Tencer Tr., 173:18-22).

208. Instead, "[i]t was [Plaintiff's] decision to try to cooperate with [Super Crypto] for as long, as long as possible until *we decided that there is no hope.*" (emphasis added). *See id.* (Tencer Tr., 165:5-8).

209. Upon the expiration of the Agreement, Super Crypto and Plaintiff, cognizant that there was no longer an Agreement, would engage in numerous back-and-forth negotiations to potentially work out some sort of new arrangement. *See* Magot Decl., ¶¶18-19.

210. Plaintiff never expressed its desire to exit the cryptocurrency space to Super Crypto. *See* Magot Decl., ¶20.

211. In fact, as far as Magot was concerned, the cryptocurrency space was "a small community, and we wanted to maintain relationships. And we were also, again, optimistic that the market could turn around." *See* Volynsky Decl., Ex. 9 (Magot Tr., 186:12-14).

212. Notwithstanding, over the course of Super Crypto and Plaintiff's ultimately fruitless negotiations, Plaintiff would routinely hurl threats of commencing legal action. *See* Magot Decl., ¶18.

213. For example, on May 14, 2018, Tencer would e-mail Magot initimating that Blockchain may soon "have to start with lawyers, which is in neither of our interests." *See* Volynsky Decl., Ex. 24 (BMS000202).

214. Similarly, on June 14, 2018, Tencer would send an e-mail stating that Blockchain had retained Ronald Meister, Esq., from Plaintiff's counsel's firm and that Plaintiff has already incurred legal fees. *See id.*, Ex. 25 (DEFENDANTS_002901).

215. On July 3, 2018, Ronald Meister would send an e-mail to Henry Nisser and Thomas Rose intimating that Plaintiff would be commencing legal action if "full payment" was not made by the close of business on July 5, 2018. *See id.*, Ex. 26 (BMS000282).

**There is No Nexus in this Forum for Plaintiff's Claims**

216. DPW initiated the following payments to Plaintiff, by wire transfer, on or about the corresponding date referenced below, from a U.S. Bank banking account (account number ending in 9499), held in the name of DPW (or its former name, Digital Power Corporation) (Volynsky Decl., Ex. 18, Interrogatory No. 9):

| DATE | AMOUNT |
|---|---|
| May 17, 2018 | $50,000.00 |
| May 25, 2018 | $5,000.00 |
| June 12, 2018 | $5,000.00 |
| July 17, 2018 | $1,000.00 |
| July 18, 2018 | $1,000.00 |
| July 19, 2018 | $5,000.00 |
| July 20, 2018 | $7,500.00 |
| July 23, 2018 | $5,000.00 |
| July 25, 2018 | $10,000.00 |
| July 27, 2018 | $10,000.00 |
| July 31, 2018 | $5,000.00 |
| August 1, 2018 | $5,000.00 |
| August 6, 2018 | $5,000.00 |
| August 17, 2018 | $5,000.00 |

15

217. The $5,000 payment referenced in Paragraph 12 of the FAC was wired from a U.S. Bank account, held in the name of DPW. *See* FAC, ¶12; Volynsky Decl., Exs. 31 (BMS000318-BMS000319) and 27 (BMS000563).

218. Neither Defendant has ever wired any funds to Plaintiff from a JPMorgan Chase Bank, NA banking account. *See* Volynsky Decl., Exs. 31 and 10 (Ault Tr., 174:2-5 ("MR. MANDEL: And I can represent to you that Exhibit 65 are documents that were produced by Blockchain showing the various confirmation on any payments that were made in connection with this transaction.")); *see also* Horne Decl., ¶7.

219. In fact, none of the alleged payments that were made to Plaintiff by Defendants originated from a New York based banking account. *See* Volynsky Decl., Exs. 31 and 10 (Ault Tr., 174:2-5).

220. Nor were such payments received by Plaintiff in a New York based banking account. *See id.*

221. Ault did not send a series of text messages to Plaintiff on May 3, 2018, indicating that he was in New York, New York, as alleged in Paragraph 10 of the FAC. *See* FAC, ¶10; Volynsky Decl., Exs. 28 and 7 (Tencer Tr., 233:23-25)

222. The photograph referenced in Paragraph 10 of the FAC was that of Ault's former assistant, and not a lender in New York. *See* FAC, ¶10; Volynsky Decl., Ex. 10 (Ault Tr., 188:25-189:15).

223. The Machines are not and were never in New York. *See* Magot Decl., ¶¶29-31.

224. To that end, the storage facility where the Machines were stored was also not located in New York. *See id.*

225. Neither DPW, the alleged promisor, nor Plaintiff, the alleged promisee, are New York domiciliaries.  See Magot Decl., ¶32; Horne Decl., ¶4; FAC, ¶2.

226. On or about October 29, 2018, Kalfa messaged a former colleague of his from Backbone Hosting Solutions, Inc. ("Backbone") and would offer, without provocation, a six-month payment plan for the purchase of the Remaining Machines.  See Volynsky Decl., Exs. 29 and 8 (Kalfa Tr., 181:14-182:15; 184:2-6).

227. Plaintiff would not reach out to or seek out any other purchasers for the Remaining Machines, despite acknowledging that the same model as the Remaining Machines was listed on Bitmain for somewhere between $300 to $500 during that time.  See id., Ex. 8 (Kalfa Tr., 184:7-11; 185:6-12).

228. Prior to Plaintiff's sale of the Remaining Machines to Backbone (the Backbone Sale"), Plaintiff neither informed Super Crypto of the sale price nor the payment plan that it had agreed to in connection with the Backbone Sale.  See Magot Decl., ¶23.

Dated: Los Angeles, California
       May 30, 2023

                                                 Respectfully submitted,

                                               WELTZ KAKOS GERBI
                                               WOLINETZ VOLYNSKY LLP

                                               By:   */s/ Robert Volynsky*
                                                      Robert B. Volynsky
                                               170 Old Country Road, Suite 310
                                               Mineola, New York 11501
                                               rvolynsky@weltz.law
                                               (212) 202-3178
                                               *Attorneys for Defendants*