UNITED STATES DISTRICT COURT SOUTHERN
DISTRICT OF NEW YORK

......................................................................................X

BLOCKCHAIN MINING SUPPLY AND
SERVICES LTD.,                                                    Case No. 18-CV-11099-ALC

          Plaintiff,

   -against-

SUPER CRYPTO MINING, INC. (N/K/A DIGITAL
FARMS, INC. and DPW HOLDINGS, INC.
(N/K/A AULT AULLIANCE, INC.),

          Defendants.

......................................................................................X

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

WELTZ KAKOS GERBI WOLINETZ VOLYNSKY LLP
170 Old Country Road, Suite 310
Mineola, New York 11501
(516) 320-6945

*Attorneys for Defendants Super*
*Crypto Mining, Inc.(n/k/a Digital Farms, Inc.) and*
*DPW Holdings, Inc.(n/k/a Ault Alliance, Inc.)*

On the Brief:
Robert B. Volynsky, Esq. (RV-7076)

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES... ....................................................................................... ii

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS .............................................................................................5

ARGUMENT ...............................................................................................................10

I.   Legal Standard at Summary Judgment.................................................................. 10

II.  Super Crypto Was Never Contractually
     Bound to Purchase the Remaining Machines ....................................................... 11

III. The Agreement Was Not Modified and Super Crypto
     Did Not Waive Its Bargained-For Protections Under Article 3................................14

     a.  Plaintiff and Super Crypto Never Modified or Amended Article 3................................. 15

     b.  Super Crypto Did Not Waive the Bargained-For
         Protections Under the Agreement That It Paid $1,651,125 For. ......................................17

IV.  Plaintiff Cannot Establish A Sufficient Nexus in this
     Forum to Sustain a Promissory Estoppel Claim Against DPW ….........................19

V.   Plaintiff Is Not Entitled to Contract Damages
     In Connection With Its Quasi-Contractual Claim.................................................21

CONCLUSION.............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*330 Co., LLC v. Regency Sav. Bank, F.S.B.*,
    293 A.D. 314  (1st Dep't 2002) ...................................................................................... 19

*Basu v. Alphabet Mgt. LLC*,
    No. 651340/2010, 2014 N.Y. Misc. LEXIS 3080 (Sup. Ct. N.Y. Cty. Jul. 9, 2014) .......... 21

*Berlinghof v. Long Is. Fiber Exch., Inc.*,
    No. 20956-2011, 2014 N.Y. Misc. LEXIS 2546
    (Sup. Ct. Suffolk Cty. Jun. 9, 2014) .................................................................................. 19

*Bloomfield Inv. Res. Corp. v. Daniloff*,
    No. 17-CV-4181-VM, 2021 U.S. Dist. LEXIS 79586
    (S.D.N.Y. Apr. 26, 2021)............................................................................................. 24, 25

*Borghese Trademarks, Inc. v. Borghese*,
    2013 U.S. Dist. LEXIS 39827 (S.D.N.Y. Jan. 14, 2013) ................................................... 19

*Capital Records, LLC v. VideoEgg, Inc.*,
    611 F. Supp.2d 349 (S.D.N.Y. 2009)................................................................................. 20

*Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp.*,
    963 F. Supp. 1342 (S.D.N.Y. 1997).................................................................................. 15

*Charles Schwab Corp. v. Bank of America Corp.*,
    883 F.3d 68 (2d Cir. 2018).................................................................................................. 19

*Clifford R. Gray, Inc. v. LeChase Constr. Services, LLC*,
    51 A.D.3d 1169 (3d Dep't 2008) ....................................................................................... 22

*Corral v. Outer Maker LLC*,
    No. 10-CV-1162-SJF-ARL, 2012 U.S. Dist. LEXIS 8668 (E.D.N.Y. Jan. 24, 2012)....... 12

*Cunningham v. Agro*,
    No. 15-CV-1266-ALC, 2023 U.S. Dist. LEXIS 52093 (S.D.N.Y. Mar. 27, 2023)........... 11

*Cyberchron Corp. v. Calldata Sys. Dev.*,
    47 F.3d 39 (2d Cir. 1995) ..................................................................................................22

*Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*,
    568 F. Supp. 2d 329 (S.D.N.Y. 2008) ............................................................................... 21

| **Cases** | **Page(s)** |
|---|---|

*Drummond v. Akselrad*,
   No. 23-CV-179-LJL, 2023 U.S. Dist. LEXIS 75793 (S.D.N.Y. May 1, 2023) .................. 23

*Enzo Biochem, Inc. v. Amersham PLC*,
   981 F. Supp. 2d 217 (S.D.N.Y. 2013) ................................................................................ 15

*First Am. Commercial Bancorp, inc. v. Saatchi & Saatchi Rowland, Inc.*,
   55 A.D.3d 1264 (4th Dep't 2008) ...................................................................................... 12

*Greenfield v. Philles Records*,
   98 N.Y.2d 562 (2002) ........................................................................................................ 12

*Jackson v. Triborough Bridge & Tunnel Auth.*,
   No. 1639/92, 589 N.Y.S.2d 748 (Sup. Ct. N.Y. Cty. Oct. 2, 1992) .................................. 25

*Jeffreys v. City of N.Y.*,
   426 F.3d 549 (2d Cir. 2005) ............................................................................................... 10

*Karan v. Sutton East Assocs.-88*,
   256 A.D.2d 29 (1st Dep't 1998) ................................................................................... 15-16

*Kipbea Baking Co. v. Strauss*,
   218 F. Supp. 696 (E.D.N.Y. 1963) .................................................................................... 13

*Landau v. New Horizon Partners, Inc.*,
   No. 02-CV-6802-JGK, 2003 U.S. Dist. LEXIS 15999
   (S.D.N.Y. Aug. 22, 2003) .................................................................................................. 21

*Law Office of J. Bacher, PLLC v. Saftler*,
   No. 654334/2019, 2023 N.Y. Misc. LEXIS 1840 (Sup. Ct. N.Y. Cty. Apr. 18, 2023) ...... 12

*Lee v. Marvel Enters.*,
   386 F. Supp. 2d 235 (S.D.N.Y. 2005) ............................................................................... 11

*Lewis v. Rahman*,
    147 F. Supp. 2d 225 (S.D.N.Y. 2001) .............................................................................. 17

*Lopez v. Shopify, Inc.*,
   No. 16-CV-9761-VEC-AJP, 2017 U.S. Dist. LEXIS 77708
   (S.D.N.Y. May 23, 2017) .................................................................................................. 20

*Macaluso v. Macaluso*,
   No. 17173-2006, 2008 N.Y. Misc. LEXIS 8552 (Sup. Ct. Suffolk Cty. Feb. 5, 2008) ..... 17

**<u>Cases</u>**                                                                                           **<u>Page(s)</u>**

*Mellen & Jayne, Inc. v. AIM Promotions, Inc.*
 33 A.D.3d 676 (2d Dep't 2006) ..................................................................................16

*Moore v. Publicis Groupe SA,*
 No. 11-CV-1279-ALC, 2012 U.S. Dist. LEXIS 173332 (S.D.N.Y. Dec. 3, 2012) ...... 10-11

*Natixis Real Estate Capital Tr. 2007-HE2 v. Natixis Real Estate Holdings, LLC,*
 149 A.D.3d 127 (1st Dep't 2017) ...............................................................................18

*Netherby Ltd. v. Jones Apparel Grp., Inc.,*
 No. 04-CV-7028-GEL, 2007 U.S. Dist. LEXIS 25720 (S.D.N.Y. Apr. 5, 2007) ...............3

*New World Capital Corp. v. Poole Truck Line, Inc.,*
 612 F. Supp. 166 (S.D.N.Y. 1985).............................................................................21

*New WTC Retail Owner LLC v. Fal Coffee WTC, LLC,*
 No. 654200/2020, 2022 N.Y. Misc. LEXIS 329
 (Sup. Ct. N.Y. Cty. Jan. 18, 2022) ........................................................................17-18

*Omor v. City of N.Y.,*
 No. 13-CV-2439-RA, 2015 U.S. Dist. LEXIS 24135 (S.D.N.Y. Feb. 27, 2015) ............... 11

*Oriental Commercial & Shipping Co. v. Rosseel, N.V.,*
 769 F. Supp. 514 (S.D.N.Y. 1991)............................................................................. 12

*Philo Smith & Co. v. USLIFE Corp.,*
 554 F.2d 34 (2d Cir. 1977).......................................................................................25

*Roche Diagnostics GmbH v. Enzo Biochem, Inc.,*
 992 F. Supp. 2d 213 (S.D.N.Y. 2013)......................................................................... 12

*Rondaeu v. Berman,*
 No. 654181/2015, 2017 N.Y. Misc. LEXIS 123 (Sup. Ct. N.Y. Cty. Jan. 13, 2017) ........24

*Schloss v. Danka Bus. Sys. PLC,*
 99-CV-0817-DC, 2000 U.S. Dist. LEXIS 2909 (S.D.N.Y. Mar. 15, 2000) ................ 15, 17

*Sheerin v. Tutor Perini Corp.,*
 No. 1:18-CV-7952-ALC-SLC, 2022 U.S. Dist. LEXIS 60965
 (S.D.N.Y. Mar. 31, 2022) ......................................................................................... 11

*Spherenomics Glob. Contact Ctrs. v. vCustomer Corp.,*
 427 F. Supp. 2d 236 (E.D.N.Y. 2006) .....................................................................22-23

**Cases**                                                                                                                    **Page(s)**

*Stock Shop, Inc. v. Bozell & Jacobs, Inc.*,
    126 Misc.2d 95 (Sup. Ct. N.Y. Cty. Oct. 23, 1984)............................................................14

*Supply Chain Prods., LLC v. NCR Corp.*,
    No. 19-CV-11376-ALC-JLC, 2023 U.S. Dist. LEXIS 55683
    (S.D.N.Y. Mar. 30, 2023) ...............................................................................11, 12, 16, 18

*Two Guys from Harrison-NY Inc. v. S.F.R. Realty Associates*,
    63 N.Y.2d 396 (1984) .........................................................................................................19

*Wallace v. 600 Partners Co.*, 205
    A.D.2d 202 (1st Dep't 1994) *aff'd* 86 N.Y.2d 543 (1995) ...........................................15-16

*Waraich v. Nat'l Austl. Bank*,
    No. 21-CV-5220-ALC, 2022 U.S. Dist. LEXIS 6930 (S.D.N.Y. Jan. 13, 2022) ............. 20

*Wechsler v. Hunt Health Sys.*,
    186 F. Supp. 2d 402 (S.D.N.Y. 2002)................................................................................ 16

*Wenger Constr. Co., Inc. v. City of Long Beach*,
    152 A.D.3d 726 (2d Dep't 2017) ..................................................................................14, 18

*Zurich Am. Ins. Co. v. XL Ins. Am., Inc.*,
    547 F. Supp. 3d 381 (S.D.N.Y. 2021)................................................................................18

**Rule(s)**                                                                                                                  **Page(s)**

FRCP 56......................................................................................................................................10

Defendants Super Crypto Mining, Inc. (n/k/a Digital Farms, Inc.) ("Super Crypto") and DPW Holdings, Inc. (n/k/a Ault Alliance, Inc.) ("DPW" and with "Super Crypto" collectively, "Defendants") hereby submit this memorandum of law in support of their motion for partial summary judgment (the "Motion") as to both counts of the First Amended Complaint (the "FAC") filed by Plaintiff Blockchain Mining Supply and Services Ltd. ("Plaintiff" or "Blockchain").[1]

## PRELIMINARY STATEMENT

The gravamen of this dispute is centered upon an asset purchase agreement, dated March 8, 2018, (the "Agreement"), and entered into between Blockchain and Super Crypto, related to the purchase and sale of 1,100 Bitmain Antminer S9 model cryptocurrency mining machines and 1,100 power supply units (collectively, the "Machines").[2]

Thus, Plaintiff asserts a bogus breach of contract claim against, *inter alia*, Super Crypto in the FAC, based on Super Crypto's purported "fail[ure] to pay Plaintiff for the remaining 600 Machines."[3]  *See* FAC, ¶75.  However, and for the reasons set forth below, this claim must be dismissed because the Agreement plainly and unambiguously provides for two distinct transactions related to the Machines – one mandatory and one discretionary – and Super Crypto satisfied its obligations (its **sole** obligations) as to both.

Indeed, the Agreement makes plain that Super Crypto's only **absolute** obligations were to pay an initial deposit of $163,625 (the "Deposit"), as well as $1,487,500 (the "Contracted-For Amount") for the first 500 Machines (the "Contracted-For Machines").  In stark contrast, as to the

---

[1] A true and correct copy of the FAC is attached to the accompanying Declaration of Robert B. Volynsky, dated May 29, 2023 (hereinafter, "Volynsky Decl.") at Ex. 1.  The Statement of Undisputed Material Facts shall be referred to herein as "SUMF" and references to depositions transcripts shall be referred to herein as "Deponent's Surname, Tr."

[2] A true and correct copy of the Agreement is attached to the Volynsky Decl., at Ex. 11 (BMS000002-BMS000009).

[3] As the breach of contract claim is alleged against DPW solely as the purported alter-ego of Super Crypto, it is axiomatic that such claim must also be dismissed as against DPW if it is dismissed as against Super Crypto.

remaining 600 Machines (the "Remaining Machines"), the Agreement unequivocally provides that in the event that Super Crypto does not pay the remaining $1,621,375 (the "Remaining Amount") for the Remaining Machines by April 15, 2018 (the "Expiration Date"), the Deposit would be forfeited and the balance of the Agreement would be deemed null and void, with each party being "relieved of its further obligations." To be certain, the Agreement is clear that the fixed and liquidated damages for not consummating a purchase of the Remaining Machines shall be the loss of the Deposit – a provision that is referenced twice in the Agreement (Articles 2(a)(iii) and 3).

Super Crypto complied with its contractual obligations, *to wit*, Plaintiff admits that it received the Contracted-For Amount and the Deposit. FAC, ¶¶ 17-18. As such, the Court's inquiry should end here, and Plaintiff's breach of contract claim should be outright dismissed.

Moreover, and although not required where, as here, there is an unambiguous agreement, extrinsic evidence also confirms that the second tranche was discretionary. Thus, Super Crypto would express its concern regarding its ability to obtain financing to purchase the Remaining Machines due to the volatile cryptocurrency market. Critically, in response to these articulated concerns and recognizing Super Crypto's "cash flow" issues, Plaintiff proposed **these exact payment terms** a mere two days before the effective date of the Agreement. Plaintiff was clearly desperate to recoup **anything** for these Machines, and quickly, as the cryptocurrency market was in a precipitous downward spiral. In what was essentially a fire sale, Plaintiff sought to accommodate Super Crypto.

Faced with these truths, Plaintiff **now** introduces scattershot "kitchen sink" arguments that Plaintiff and Super Crypto allegedly agreed, **after** the Expiration Date, to extend the Expiration Date (without identifying the date it was purportedly extended to) and/or that Super Crypto allegedly waived a provision in the Agreement, such that it knowingly and willingly agreed to be

contractually bound to Plaintiff for the Remaining Amount, despite forfeiting the Deposit.[4]  But these arguments are nonsensical, because, as a matter of law, an expired agreement cannot be modified nor its provisions waived.

There is also no real dispute that the Agreement unambiguously provides that, *inter alia*, all modifications must be in a writing signed by all parties and that neither party shall be deemed to waive its rights unless ascribed to in a signed writing by that party.  Plaintiff, even at this late stage in the proceedings, has still not specified the terms of any purported modifications or waivers (none exist) and has not (and cannot) identified a writing signed by Super Crypto contractually binding itself to consummate a purchase of the Remaining Machines.

What Plaintiff is really seeking is for the Court to rewrite the Agreement to hold Super Crypto liable for that which the parties intentionally omitted from the Agreement.  The Court should not (and cannot) countenance such disingenuous conduct.  *See Netherby Ltd. v. Jones Apparel Grp., Inc.*, No. 04-CV-7028-GEL, 2007 U.S. Dist. LEXIS 25720, at *19 (S.D.N.Y. Apr. 5, 2007) ("The court cannot rewrite a contract 'under the guise of interpretation' when the terms are clear and unambiguous; nor may the Court rewrite the contract in accordance with 'its instinct for the dispensation of equity upon the facts of a given case.'").  As there are no issues of material facts regarding Plaintiff's inability to establish a breach of the Agreement, and extrinsic evidence cannot be used to manufacture material facts, the breach of contract claim must be dismissed.

Furthermore, without its breach of contract claim, Plaintiff has no jurisdictional basis to sustain its promissory estoppel claim over DPW, a Delaware corporation with its principal place in Nevada, in this Court.  The promissory estoppel claim is not pled against DPW as a purported

---

[4] Indeed, none of these novel theories are alleged in the FAC and Plaintiff should not be permitted to raise them at this late juncture.  It should also not be lost on the Court that, to this day, Plaintiff has retained the non-refundable Deposit.

alter-ego of Super Crypto and the evidentiary record is devoid of any meaningful contacts for DPW in this forum related to its alleged dealings with Plaintiff, a non-New York domiciliary.

Finally, Super Crypto (and DPW, if the Court should not dismiss the promissory estoppel claim against it (it should)) requests that the Court limit Plaintiff's potential damages for promissory estoppel to reliance damages, as opposed to the expectation damages that Plaintiff unscrupulously seeks in this equitable claim. Plaintiff speciously alleges in the FAC that it detrimentally relied on Defendants' purported promises by not selling the Remaining Machines earlier, thereby missing out on a higher sale price. However, Plaintiff's internal communications, as augmented by its principals' deposition testimony, indisputably demonstrate the untruthfulness of this assertion. Specifically, Plaintiff's principals testified that, due to the volatility and precipitous decline in the demand for cryptocurrency mining machines, they immediately decided that Plaintiff's transaction with Super Crypto would be its final sale, *to wit*, after executing the Agreement, Plaintiff ceased: purchases of cryptocurrency mining machines for resale; actively marketing its services; and seeking out prospective purchasers. Thus, Plaintiff cannot now manufacture a feigned assertion that some unknown, non-existent buyer(s) would have purchased the Remaining Machines had Plaintiff tried to sell them on April 16, 2018, more than a month after Plaintiff decided to shutter its active business operations.

Beyond these damaging facts, the undisputed evidence developed during discovery also establishes that the fair market value of the Remaining Machines as of April 17, 2018 (two days after the Expiration Date and three days before the first alleged promise to pay was made) was $642,000 ($1,070 per Machine), of which Plaintiff has already allegedly recouped at least $87,000 from Defendants and another $168,000 from reselling the Remaining Machines (these amounts are in addition to the Deposit that was forfeited under the expired Agreement). Plaintiff, seemingly

disconnected from reality, seeks a windfall of more than double the fair market value of the Machines as of April 17, 2018 (this, in addition to the $87,000, the $168,000, the Deposit, and the Contracted-For Amount) based on its fabricated "detrimental reliance" on Defendants' alleged promises.  Awarding Plaintiff such an exorbitant sum in this instance would not only be inequitable, but is also unsupported by any legal authority.

For the reasons set forth herein, the Court should grant the Motion, in its entirety.

### STATEMENT OF FACTS[5]

On or about November 29, 2017, Plaintiff was incorporated as an Ontario Business Corporation under the laws of Canada.  *See* SUMF, ¶109.  During its short existence, Plaintiff had two principals – William Tencer and Yonah "Joe" Kalfa.  *See id.*, ¶110.  Plaintiff's business purpose was to capitalize on the widespread interest in the cryptocurrency market at that time, and its operations did not expand past this objective.  *See id.*, ¶¶114, 115, 154 and 197.

Specifically, Plaintiff's business model was, as follows: Plaintiff would, in the first instance, place a purchase order for Antminer cryptocurrency machines (the "Antminers"), with its overseas supplier Bitmain Ltd. ("Bitmain") and, thereafter, attempt to locate a potential customer to resell such Antminers to prior to Bitmain's shipment of the Antminers to Plaintiff. *See id.*, ¶¶117, 118, 119.

Prior to February 23, 2018, Plaintiff had already placed a purchase order with Bitmain for the Machines that was slated for delivery in March 2018. Plaintiff was on the clock to find a

---

[5] For a recitation of the Procedural History, the Court is respectfully referred to the Volynsky Decl., ¶¶4-22.

potential purchaser for the Machines, as it had already committed to its own purchase from Bitmain, irrespective of whether it could procure a buyer or not. *See id.*, ¶¶120, 124, 125.[6]

Indeed, Plaintiff was having trouble finding potential purchasers for the Machines. *Id.*, ¶126. Kalfa would scour the internet in an attempt to locate a potential purchaser for the Machines and would stumble upon a press release that referenced Super Crypto (the "Press Release"). *Id.*, ¶¶127, 128. Upon reviewing the Press Release, Kalfa would conduct his own "due diligence" on Super Crypto to determine whether Super Crypto was a worthwhile prospect. *Id.*, ¶¶129-136.

After conducting his "due diligence" and seemingly reaching out to other potential purchasers for the Machines, on February 23, 2018, Kalfa sent a message to Darren Magot, Chief Executive Officer of Super Crypto, on LinkedIn, soliciting a potential purchase and sale of the Machines. *Id.*, ¶120.[7] Magot would respond to Kalfa the next day informing him that he was interested in his proposal, but that he needed to wait until the following Tuesday to confirm all financing. *Id.*, ¶137.

On February 25, 2018, Kalfa would e-mail Magot, *inter alia*, a draft of an Asset Purchase Agreement that would have required Super Crypto to purchase all of the Machines notwithstanding the volatility in the cryptocurrency market. *Id.*, ¶141. This was unacceptable to Super Crypto, and Super Crypto made this very clear to Tencer prior to the execution of the Agreement. *Id.*, ¶142. Indeed, Super Crypto did not want to commit itself to purchasing *all* 1,100 Machines due to the volatile cryptocurrency market, as well as the uncertainties surrounding its ability (as a nascent company) to obtain the necessary financing for *all* 1,100 Machines. *Id.*, ¶143. Super Crypto felt

---

[6] The transaction with Super Crypto was Plaintiff's last because "[t]here was no demand for the machines. As far as [Plaintiff was] concerned, being the reseller, [Plaintiff] would not be able to buy and sell and make a profit." *Id.*, ¶¶ 151-153.

[7] Kalfa is an officer of a publicly-traded company and further testified that he has familiarity reviewing, *inter alia*, Form 10-Q and 10-K filings with the Securities and Exchange Commission. SUMF, ¶¶121, 122.

comfortable that it would be able to obtain the requisite financing to pay for some of the Machines and informed Plaintiff of this limitation. *Id.*, ¶144.

To address these stated concerns, on March 6, 2018, Tencer e-mailed a proposal (the "Proposal") to Magot "to try and accommodate Super Crypto's cash flow." *Id.*, ¶145. Specifically, Tencer, himself, proposed that Super Crypto: (i) pay a deposit of $163,625 by March 8, 2018; (ii) pay $1,487,500 for 500 Machines on March 16, 2018 or March 23, 2018; (iii) the $163,625 deposit would then be applied to the remaining 600 machines, and Super Crypto would pay the balance of $1,621,375 in April; and (iv) if the $1,621,375 was not paid, the $163,625 deposit would be non-refundable. *Id.*, ¶146. These provisions – proposed by Plaintiff – would ultimately become part and parcel of the Agreement. *Id.*, ¶145; *see also* Agreement, §§ 2, 3.

Ultimately, on or about March 8, 2018, Plaintiff and Super Crypto entered into the Agreement. SUMF, ¶148. DPW was not a party to the Agreement and, in fact, prior to the effective date of the Agreement, Plaintiff had not communicated with anyone from DPW. *Id.*, ¶¶148, 149. Plaintiff also did not negotiate any of the Agreement's terms with DPW. *Id.*, ¶150.

Pursuant to the Agreement's plain, unambiguous language, and consistent with the Proposal, Super Crypto only had two absolute obligations to Plaintiff – (i) to pay the Deposit (Article 2(a)(i)) and (ii) to pay the Contracted-For Amount for the Contracted-For Machines (Article 2(a)(ii)). *See* Agreement, §§2(a)(i)-2(a)(ii). Super Crypto satisfied both of these obligations, *to wit*, Plaintiff affirmatively alleges that the Deposit and the Contracted-For Amount were paid it. SUMF, ¶¶157, 159.

Conversely, the terms of the remaining payment provisions (Articles 2(a)(iii) and (3)) related to the Remaining Machines, which were proposed and authored by Plaintiff, did not contain the same compulsory language as their counterpart in Article 2(a)(ii). *Id.*, ¶¶145, 160-163.

Indeed, pursuant to Article 2(a)(iii), upon the full remittance of the Contracted-For Amount, the Deposit would be applied to the purchase price of the Remaining Machines, leaving a balance equal to the Remaining Amount. *See* <u>Agreement</u>, §2(a)(iii). Article 2(a)(iii) goes on to qualify that that "[i]f payment for the 600 machines is not paid then, the deposit is non refundable." *See id.* To be certain, Article 3 explicitly provides that, in the event that Super Crypto did not pay the Remaining Amount on or before April 15, 2018, the Deposit would be forfeited and the balance of the Agreement would "be null and void and all parties shall be relieved of its further obligations" thereunder. *See id.*, §3. Super Crypto did not pay the Remaining Amount, in whole or in part, on or before April 15, 2018. SUMF, ¶¶171, 172.

Notwithstanding, upon entering into the Agreement, Plaintiff, a sophisticated party, was aware of and agreed to the possibility that, as of April 15, 2018, it could be stuck with the Remaining Machines, worth only a fraction of their value just one month prior. *See id.*, ¶¶165-168. Despite this foreseeable possibility, Plaintiff decided not to expend resources on identifying new customers or promoting its services amidst the uncertainties prevailing in the cryptocurrency market. *See id.*, ¶¶ 151-153, 207; <u>Tencer Tr.</u>, 50:13-18. Instead, "[i]t was [Plaintiff's] decision to try to cooperate with [Super Crypto] for as long, as long as possible until *we decided that there is no hope.*" (Emphasis added). SUMF, ¶208, <u>Tencer Tr.</u>, 165:5-8.

Following that, Super Crypto and Plaintiff, cognizant that there was no longer an Agreement, would engage in numerous back-and-forth negotiations to potentially work out some sort of new arrangement. However, no new deal or agreement materialized despite these ongoing efforts. SUMF, ¶208.[8] In that vein, while Plaintiff had every right to sell the Remaining Machines

---

[8] Plaintiff never expressed its desire to exit the cryptocurrency space to Super Crypto. *See* SUMF, 210. Indeed, as far as Magot was concerned, the cryptocurrency space was "a small community, and we wanted to maintain relationships. And we were also, again, optimistic that the market could turn around." *Id.*, ¶211, <u>Magot Tr.</u>, 186:12-14.

as of April 16, 2018, Plaintiff instead made the business decision to try to consummate a sale with Super Crypto, because the fair market value had already plummeted to approximately 35% of the contract price and Plaintiff did not even have a new buyer lined up. *See id.*, ¶¶198-208.  Indeed, Plaintiff's own internal communications demonstrate that, as of April 17, 2018, the fair market value of the Machines was $1,070 per Machine. *See id.*, ¶203.  Over the course of these ultimately fruitless negotiations between the parties, Plaintiff would hurl threats of commencing legal action and a handful of wire payments were remitted to Plaintiff. *See, e.g., id.*, ¶¶212-216.  At no point, however, did Plaintiff and Super Crypto ever modify the Agreement to extend the Expiration Date in accordance with Article 13(e) of the Agreement or waive the protections under Article 3 in accordance with Article 13(d) of the Agreement.[9]  *See id.*, ¶¶174-179.

Plaintiff's specious contentions to the contrary originates from Plaintiff's pre-motion conference letter to the Court, dated March 2, 2023 ("Ps Pre-Motion Letter"), and remarkably (but not surprisingly), the FAC does not reference any written modifications or waivers (none exist). *Compare* <u>Volynsky Decl.</u>, Ex. 5 *with* FAC.  Indeed, Plaintiff's own documents demonstrate that, prior to the commencement of this suit, it understood the Agreement to be of no further force and effect.  For instance, on May 7, 2018, Kalfa would suggest to Tencer that Plaintiff and Super Crypto could enter into "a new written agreement" with "more forceful terms" that Super Crypto "will absolutely pay the full balance" for the Remaining Machines.  SUMF, ¶182.

On or about October 29, 2018, after not being able to reach an agreement with Super Crypto, Kalfa would reach out to a former customer, Backbone Hosting Solutions, Inc. ("Backbone"), and would offer, without provocation, a six-month payment plan for the purchase

---

[9] It is bizarre that Plaintiff's counsel introduces an argument in Ps Pre-Motion Letter that the April 15, 2018 date in Article 3 was apparently extended, when this same firm previously sent an e-mail to Defendants' counsel indicating that Super Crypto defaulted under the Agreement as of April 15, 2018, and not some supposed later date. *See* SUMF, ¶184.  Although Plaintiff is free to plead alternative legal theories, its counsel cannot plead alternative facts.

of the Remaining Machines. *Id.*, ¶226. Plaintiff would not reach out to or seek out any other purchasers, despite acknowledging that the same make as the Machines was listed on Bitmain's website for somewhere between $300 to $500 during that time. *Id.*, ¶227.

Plaintiff alleges that, on or about November 9, 2018, it sold the Remaining Machines to Backbone for $168,000. *See* FAC, ¶56; *see also* <u>Volynsky Decl.</u>, Ex. 8 (<u>Kalfa Tr.</u>, 181:23-25). Although it was not required to, Plaintiff never provided Super Crypto with the opportunity to match this price under similar payment terms. SUMF, ¶228. Shortly thereafter, Plaintiff commenced the instant suit, in which it seeks compensatory damages of either $1,388,495 (as alleged in the FAC) or $1,375,955 (as alleged in Ps Pre-Motion Letter), which figures each purportedly represent the difference between the Agreement price and the resale price.

## ARGUMENT

### I.    Legal Standard at Summary Judgment

"Summary judgment is warranted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005); *see also* FRCP 56. A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Jeffreys*, 426 F.3d at 553. "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Id.*, at 554 (emphasis in original).

To defeat a summary judgment motion, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [it] must come forward with

specific facts showing that there is a <u>genuine issue for trial</u>." *See Moore v. Publicis Groupe SA*, No. 11-CV-1279-ALC, 2012 U.S. Dist. LEXIS 173332, at *12 (S.D.N.Y. Dec. 3, 2012) (Carter, J.). Assertions that are "incoherent, contradictory, illogical, and unsupported" do not "establish a genuine dispute for trial[.]" *Omor v. City of N.Y.*, No. 13-CV-2439-RA, 2015 U.S. Dist. LEXIS 24135, at *24-25 (S.D.N.Y. Feb. 27, 2015); *see also Cunningham v. Agro*, No. 15-CV-1266-ALC, 2023 U.S. Dist. LEXIS 52093, at *4 (S.D.N.Y. Mar. 27, 2023) (Carter, J.) ("[S]ummary judgment cannot be defeated by drawing attenuated inferences.").

## II.    Super Crypto Was Never Contractually <u>Bound to Purchase the Remaining Machines</u>

Plaintiff's breach of contract claim must be dismissed because Plaintiff cannot establish Super Crypto's lack of performance under the Agreement, or any resulting damages.

To sustain a cause of action for breach of contract, a party must establish: "(1) the formation of a contract as to its scope and terms; (2) performance by plaintiff; (3) defendant's failure to perform; and (4) resulting damage." *Supply Chain Prods., LLC v. NCR Corp.*, No. 19-CV-11376-ALC-JLC, 2023 U.S. Dist. LEXIS 55683, at *15 (S.D.N.Y. Mar. 30, 2023) (Carter, J.) (internal citations omitted). On a summary judgment motion, the Court must initially determine "whether the contract is unambiguous with respect to the question disputed by the parties." *See Sheerin v. Tutor Perini Corp.*, No. 1:18-CV-7952-ALC-SLC, 2022 U.S. Dist. LEXIS 60965, at *16 (S.D.N.Y. Mar. 31, 2022) (Carter, J.). The Court's role is to "ascertain the intention of the parties ***at the time they entered into the contract. If that intent is discernible from the plain meaning of the language of the contract, there is no need to look further***." *Id.* (emphasis added); *see also Lee v. Marvel Enters.*, 386 F. Supp. 2d 235, 243 (S.D.N.Y. 2005) ("Summary judgment is appropriate for the interpretation of unambiguous contract language."). "A contract is unambiguous if the language it uses has definite and precise meaning, unattended by danger of

misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion.  Thus, if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notices of fairness and equity."  *See Law Office of J. Bacher, PLLC v. Saftler*, No. 654334/2019, 2023 N.Y. Misc. LEXIS 1840, at *6 (Sup. Ct. N.Y. Cty. Apr. 18, 2023) *citing Greenfield v. Philles Records*, 98 N.Y.2d 562, 569-570 (2002); *Corral v. Outer Maker LLC*, No. 10-CV-1162-SJF-ARL, 2012 U.S. Dist. LEXIS 8668, at *9 (E.D.N.Y. Jan. 24, 2012) ("Where a 'contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.'") *see also Oriental Commercial & Shipping Co. v. Rosseel, N.V.*, 769 F. Supp. 514, 517 (S.D.N.Y. 1991) ("[W]here the language of a contract is itself unambiguous, neither the intention of the parties nor the possibly unintended and unfortunate consequences of enforcing the agreement according to its terms offers a basis for modifying those terms."). Moreover, "language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *See Supply Chain Prods., LLC*, 2023 U.S. Dist. LEXIS 55683, at *22 (internal quotation and citation omitted).

Here, Plaintiff alleges in the FAC that "Super Crypto breached the Agreement by failing to pay Plaintiff for the [R]emaining 600 Machines."  FAC, ¶75.  The FAC, however, makes no mention of the specific provision that Super Crypto purportedly breached or the date of the purported breach. *See Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 220 (S.D.N.Y. 2013) *citing First Am. Commercial Bancorp, inc. v. Saatchi & Saatchi Rowland, Inc.*, 55 A.D.3d 1264 (4th Dep't 2008) ("[A] party may not simply allege a general breach of contract and, later on, sort out the specific breach that it intends to litigate."). [10]

---

[10] Remarkably, Plaintiff does not even affirmatively allege that Super Crypto was **contractually** bound to pay for the Remaining Machines, opting instead to cavalierly allege that Super Crypto was "to pick up the remaining 600

This is for good reason, **because Super Crypto simply could not breach any provision of the Agreement as to <u>the Remaining Machines</u>**.  By design, Articles 2(a)(iii) and 3, which govern the potential purchase of the Remaining Machines, are non-obligatory and, in fact, fix a liquidated damages amount as Plaintiff's recourse if Super Crypto did not purchase the Remaining Machines by the Expiration Date.[11] *See* <u>Agreement</u>, §§2(a)(iii), 3.  Those provisions provide, *in toto*:

> [2(a)](iii) <u>Balance:</u> The deposit will then be applied to the remaining 600 machines and Power Supplies that we will pick up after full payment ($1,621,275.00) is made on or before April 15th, 2018.  If the payment for the 600 machines is not paid then. (*sic*) the deposit is non refundable.
>
> 3.  In the event Purchaser fails to pay the Balance to Vendor on or before April 15, 2018, the Deposit funds shall be forfeited to the Vendor, and the remainder of this Agreement save and except for Article 2(a)(i) and Article 3, shall be null and void and all parties shall be relieved of its further obligations herein.

*See id.*; *see also* SUMF, ¶166, <u>Kalfa Tr.</u>, 113:15-18 (Kalfa testifying that his presumption was that Plaintiff inserted Article 3 in the Agreement); <u>Kalfa Tr.</u>, 105:21-25 ("KALFA: My understanding is there was to be – my memory served me that there was a deposit that they were to give, and if they wouldn't take the machines, it would be nonrefundable, yes.").

These provisions, which mirror the Proposal, unequivocally establish that Super Crypto could not breach the Agreement based on an alleged failure to pay the Remaining Amount, as such non-payment would automatically trigger: (i) forfeiture of the non-refundable Deposit; and (ii) termination of the Agreement such that, *inter alia*, Super Crypto was relieved of paying the

---

Machines after they made full payment of the $1,621,375 due, less the $163,625 [D]eposit." *See* FAC, ¶19.  Plaintiff's vague pleading is purposeful and should not be lost on the Court.  *See Kipbea Baking Co. v. Strauss*, 218 F. Supp. 696, 700 (E.D.N.Y. 1963) ("With respect to Local 3, there are no allegations as to what provisions of the contract were breached by it and in fact, the union contends that the complaint indicates that the contract was terminated by the employer when it discontinued its banking business.").

[11] In contrast, Articles 2(a)(i) and 2(a)(ii) contain unqualified language mandating that the Deposit and the Contracted-For Amount be paid to Plaintiff, and, indeed, it is undisputed that such amounts were paid to Plaintiff.  *See* SUMF, ¶¶157, 159.

Remaining Amount.[12]  *See Wenger Constr. Co., Inc. v. City of Long Beach*, 152 A.D.3d 726, 728 (2d Dep't 2017) ("A valid contractual provision for liquidated damages controls the rights of the parties in the event of a breach, notwithstanding that the stipulated sum may be less than the actual damages allegedly sustained by the injured party.").

To be certain, during this deposition, Tencer would concede (as he must) that the parties had agreed that Plaintiff's only recourse with respect to the Remaining Machines was the forfeiture of the Deposit (SUMF, ¶165), and, in fact, Plaintiff has retained the Deposit, treating it as non-refundable in clear recognition of the bargained-for strictures contained in Article 3. *See Stock Shop, Inc. v. Bozell & Jacobs, Inc.*, 126 Misc.2d 95, 98 (Sup. Ct. N.Y. Cty. Oct. 23, 1984) (noting that a party may not "have its cake and eat it too" by seeking both the amount of liquidated damages plus purported actual damages).  Plaintiff's actions speak much louder than its words and the Court should dismiss the fabricated breach of contract claim, in its entirety, against both Defendants.  *See supra*, fn. 3.

### III.    The Agreement Was Not Modified and Super Crypto<br>Did Not Waive Its Bargained-For Protections Under Article 3

Plaintiff seeks to sidestep the Agreement's unambiguous provisions and limitations with a hodgepodge of illogical theories that are each based upon the mindboggling contention that Super Crypto, for no consideration and to its extreme detriment, decided to modify or waive the very provisions that are now so inconvenient for Plaintiff.  *See* <u>Volynsky Decl.</u>, Ex. 5,  p. 2 ("Article 3 is inapplicable because (a) the parties amended the Agreement through exchanged writings or

---

[12] Plaintiff had dissipating assets that it had prematurely purchased from Bitmain, prior to locating a prospective buyer. Plaintiff had not located other buyers for what was essentially a fire sale.  *See* <u>Kalfa Tr.</u>, 47:8-13 ("KALFA: I'm sure I didn't just reach out to Darren [Magot].  I probably would have, you know, searched a whole bunch of variations of public or big crypto miners and sent a bunch of emails or LinkedIn – or made phone calls.  I'm not sure."); *see also* SUMF, ¶126.  Plaintiff did not find a better deal than Super Crypto's commitment for 500 Machines and a contingent payment provision for the remaining 600 Machines and tellingly, it knew it could not as it would, thereafter, cease all efforts to sell any further cryptocurrency mining machines.  The well was dry.

partial performance, or alternatively (b) Defendants are barred from relying on Article 3 by the doctrines of waiver and/or equitable estoppel.").[13]    As set forth below, Plaintiff's absurd, scattershot arguments remain just that – baseless theories.

### a.    _Plaintiff and Super Crypto Never Modified or Amended Article 3_

Plaintiff's initial claim of an alleged modification to the Agreement is fatally deficient because such alleged modification is ostensibly comprised of e-mails that all post-date the Expiration Date. Volynsky Decl., Ex. 5,  at pp. 1-3 (referencing "[t]he numerous emails signed by the parties making clear their intention **after April 15, 2018** to complete the transaction amended the Agreement by eliminating Article 3" (emphasis added)).  The case law, however, is clear that an agreement that has already expired by its own terms **cannot** be modified.  _See e.g., Schloss v. Danka Bus. Sys. PLC_, 99-CV-0817-DC, 2000 U.S. Dist. LEXIS 2909, at *12-13 (S.D.N.Y. Mar. 15, 2000) ("[A]n expired contract cannot be modified or its provisions waived unless a new contract is created."); _see also Mellen & Jayne, Inc. v. AIM Promotions, Inc.,_ 33 A.D.3d 676, 678 (2d Dep't 2006) ("[T]he defendant's promise to pay M&J was contingent upon an event that never occurred.  Under these circumstances, the court cannot, under the guise of interpretation, write a new contract for the parties or supply the missing terms.").  This is especially true where, as here, the challenged provision provides that the contract will be deemed null and void as of an enumerated date.  _See Karan v. Sutton East Assocs.-88_, 256 A.D.2d 29 (1st Dep't 1998) ("[T]he unambiguous provision contained in both of the subject contracts of purchase and sale that the

---

[13] As these arguments were not raised in the FAC, Plaintiff should be estopped from raising them at this late stage of the proceeding.  _See Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp._, 963 F. Supp. 1342 (S.D.N.Y. 1997) ("CWS in effect is apparently attempting to add a claim never addressed, or even hinted at, in the complaint.  Such a step is inappropriate at the summary judgment stage, after the close of discovery, without the Court's leave, and in a brief in opposition to a dispositive motion"); _see also Enzo Biochem, Inc. v. Amersham PLC_, 981 F. Supp. 2d 217, 224 (S.D.N.Y. 2013) ("A plaintiff may not pivot from its stated claims to new ones at the summary judgment stage simply because it inserted a few vague catch-all phrases into its pleadings.").

contracts would be null and void absent a closing by a certain date was properly given its plain and ordinary meaning by the motion court, without reference to extrinsic facts").

Even assuming, *arguendo*, that the expired Agreement could have somehow been modified (a legal impossibility), the piecemeal e-mail modification presented by Plaintiff (which is bereft of any details as to the terms of such purported modification) would be nullified by Article 13(e) of the Agreement, which provides that "[n]o revision or modification of [the] Agreement shall be effective unless in writing and executed by authorized representatives of both parties." *See* Agreement, § 13(e); *Supply Chain Prods., LLC*, 2023 U.S. Dist. LEXIS 55683, at *18 *citing Mellen & Jayne, Inc.*, 33 A.D.3d 676 ("The doctrine of definiteness means that a court cannot enforce a contract unless it can determine what the parties agreed to do.").

Moreover, Plaintiff's purported variance to the Expiration Date would, on its face, simply mean that the April 15th deadline would have been extended to a new unspecified ***expiration date***, at which time the Agreement would be deemed null and void, as opposed to creating some sort of windfall for Plaintiff.[14] *See Wechsler v. Hunt Health Sys.*, 186 F. Supp. 2d 402, 411 (S.D.N.Y. 2002) (finding that a purported subsequent modification and alleged performance were insufficient to establish a modification and noting that "[even] if the Court were to consider defendants' new argument concerning subsequent oral modification, the Court finds as a threshold matter that defendant have failed to define adequately the contours of such modification."); *Wallace v. 600 Partners Co.*, 205 A.D.2d 202, 206 (1st Dep't 1994) *aff'd* 86 N.Y.2d 543 (1995) ("Courts should

---

[14] Plaintiff's disingenuousness should not be lost on the Court here. Had Plaintiff been able to sell the Remaining Machines on April 16, 2018 (which it was contractually permitted to do) for a higher price than the contract price, Plaintiff would have undoubtedly retained the Deposit and proceeded to sell the Remaining Machines at a premium. *See* SUMF, ¶196, Kalfa Tr., 43:3-8 ("I would have been very dialed into the market so – at the time, and then knowing where we could sell it, and now was a matter of could I get you know, more money somewhere else."); SUMF, ¶197, Tencer Tr., 126:12-16 (referencing an April 20, 2018 e-mail and testifying that "[Plaintiff] timed the market just perfectly to buy the machines and sell them at the top of the market, and then we're out. We weren't planning on doing this business anymore.").

not, under the guide of interpretation, rewrite part of an agreement which is clear and explicit simply because a party's expectation of the bargain does not materialize due to a change in economic climate"); *Macaluso v. Macaluso*, No. 17173-2006, 2008 N.Y. Misc. LEXIS 8552, at *6-7 (Sup. Ct. Suffolk Cty. Feb. 5, 2008) ("The failure of events to develop or continue as expected, no matter how well-founded the expectation, does not entitle the disappointed party to reformation or avoidance of the contract.").

### b. *Super Crypto Did Not Waive the Bargained-For Protections Under the Agreement That It Paid $1,651,125 For*

Plaintiff's alternate "waiver" argument fares no better. *See Schloss*, 2000 U.S. Dist. LEXIS 2909, at *12-13 (noting that provisions of an expired agreement cannot be waived). A "waiver is the voluntary and intentional relinquishment of a known right, which is not created by negligence, oversight, or silence." *See Borghese Trademarks, Inc. v. Borghese*, 2013 U.S. Dist. LEXIS 39827, at *36-38 (S.D.N.Y. Jan. 14, 2013) (internal quotations and citations omitted). New York courts do not lightly presume a waiver and, instead, require that the waiver "be unmistakably manifested," not inferred by a doubtful or equivocal act. *See id.*, at *36-38 (internal quotations and citations omitted); *see also Lewis v. Rahman*, 147 F. Supp. 2d 225, 235 (S.D.N.Y. 2001) (noting that where, as here, "the right which is alleged to have been waived is so significant, the inference of a waiver must be clear" (internal citations omitted)).

Plaintiff's waiver theory, as with modification, is also defeated by the Agreement's no-waiver provision, which provides, in relevant part, that "***[a]ny waiver must be in writing and signed by the Party to be charged therewith***." *See* <u>Agreement</u>, §13(d) (emphasis added); *see New WTC Retail Owner LLC v. Fal Coffee WTC, LLC*, No. 654200/2020, 2022 N.Y. Misc. LEXIS 329, at *10-11 (Sup. Ct. N.Y. Cty. Jan. 18, 2022) *citing Gans v. Wilbee Corp.*, 199 A.D.3d 564, 565 (1st Dep't 2021) ("[A] party invoking waiver in the presence of a merger or no-waiver clause is

subject to a 'heightened standard' to merit relief."). There is simply no writing signed by Super Crypto (let alone one that pre-dates the Expiration Date) wherein it affirmatively manifests its intention to waive its bargained-for right (which it paid $1,651,125 for between the Deposit and the Contracted-For Amount) to not consummate a purchase of the Remaining Machines.[15]

Tellingly, Plaintiff does not even state which specific portions of Article 3 were supposedly waived. *See, e.g., Supply Chain Prods., LLC*, 2023 U.S. Dist. LEXIS 55683, at *19 ("Defendant has not explained what the oral modification was, when it was allegedly made, and how it altered the terms of the Agreement."). Further, Plaintiff entirely ignores the fact that Article 2(a)(iii) would survive such alleged waiver and ***that*** provision also similarly provides that "[i]f the payment for the 600 [M]achines is not paid [on or before April 15th 2018], the [D]eposit is non-refundable." *See* Agreement, §2(a)(iii); *see also* SUMF, ¶166, Kalfa Tr., 112:17-21 ("[T]he understanding is that they're committing to take all the goods. Their penalty would be that they lose their deposit. Thats the point of having a deposit.").

Thus, this bargained-for and surviving liquidated damages provision would be rendered meaningless if Super Crypto's obligation to pay the Remaining Amount was absolute.[16] *See Wenger Constr. Co., Inc.*, 152 A.D.3d at 728 ("A valid contractual provision for liquidated damages controls the rights of the parties in the event of a breach, notwithstanding that the stipulated sum may be less than the actual damages allegedly sustained by the injured party."); *see*

---

[15] Remarkably, Plaintiff also never asked Magot (Super Crypto's 30(b)(6) witness) point blank, during his deposition, whether Super Crypto ever "waived" Article 3. *See* SUMF, ¶191.

[16] Conversely, there is no liquidated damages provision as to the Contracted-For Machines because Super Crypto had an absolute obligation to pay the full purchase price for the Contracted-For Machines. *See Zurich Am. Ins. Co. v. XL Ins. Am., Inc.*, 547 F. Supp. 3d 381, 395 (S.D.N.Y. 2021) ("The Court starts with the contract principle that the specific governs over the general and that any contract should be interpreted to avoid surplusage."); *Natixis Real Estate Capital Tr. 2007-HE2 v. Natixis Real Estate Holdings, LLC*, 149 A.D.3d 127, 133 (1st Dep't 2017) ("The agreement must be 'read as a whole to determine its purpose and intent… It is a cardinal rule of contract construction that a court should 'avoid an interpretation that would leave contractual clauses meaningless.'" (internal citations omitted)).

*also Berlinghof v. Long Is. Fiber Exch., Inc.*, No. 20956-2011, 2014 N.Y. Misc. LEXIS 2546, at *10 (Sup. Ct. Suffolk Cty. Jun. 9, 2014) *citing Two Guys from Harrison-NY Inc. v. S.F.R. Realty Associates*, 63 N.Y.2d 396 (1984) ("In any event, any interpretation of a contract that would result in leaving one of its clauses without meaning or which would render the contract illusory when the parties made clear the intent to be bound must be avoided.").

Simply put, there were no waivers or modifications.  Instead, the record is clear that Plaintiff and Super Crypto simply expressed a continued willingness to work with one another beyond the expired Agreement, in an effort to foster an ongoing business relationship in this niche space, and to avoid the potential costs and expenses of the unnecessary litigation that had been threatened by Plaintiff.  *See* SUMF, ¶¶207, 208.  Plaintiff cannot now seek to distort these indisputable facts into a starting point for having this Court rewrite the Agreement.  See *330 Co., LLC v. Regency Sav. Bank, F.S.B.*, 293 A.D. 314, 316 (1st Dep't 2002) ("[A]n unambiguous written agreement setting forth the respective rights of the parties obviates the need to rely on evidence extrinsic to the contract or to indulge in factual determinations.").

Accordingly, the Court should grant summary judgment in Defendants' favor with respect to Plaintiffs breach of contract claim.  *See, supra,* fn. 3.

### IV.    Plaintiff Cannot Establish A Sufficient Nexus in this Forum to Sustain a Promissory Estoppel Claim Against DPW

If the Court finds that the Agreement was null and void as of the Expiration Date (which it should), then it should necessarily dismiss the promissory estoppel claim as against DPW for lack of personal jurisdiction.  *See Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68, 83 (2d Cir. 2018) (noting that jurisdiction must be established "with respect to each claim asserted.'").

A district court may exercise *specific* long-arm jurisdiction over a non-resident defendant where the defendant has "'purposefully dictated' its activities at ***residents of the forum***, ***and the***

*litigation results from alleged injuries that 'arise or relate to these activities*.'"[17]  *Lopez v. Shopify, Inc.*, No. 16-CV-9761-VEC-AJP, 2017 U.S. Dist. LEXIS 77708, at \*15 (S.D.N.Y. May 23, 2017) (emphasis added).  In so doing, the Court must consider "the totality of circumstances" surrounding the defendant's activities in New York to determine if there is "a *direct* relation between the cause of action and in-state conduct."  *See Capital Records, LLC v. VideoEgg, Inc.*, 611 F. Supp.2d 349, 361 (S.D.N.Y. 2009) (emphasis in original).  "[A] connection or nexus that is 'merely coincidental' or, 'at best, tangential,' is insufficient to support jurisdiction."  *Id.*

Here, Plaintiff's allegations regarding promissory estoppel are that (1) from April 20, 2018 forward, Defendants allegedly made promises to pay the balance of the contract price; (2) Defendants allegedly made payments toward the balance owed; and (3) Plaintiff detrimentally relied on those actions by incurring storage charges and not selling the Remaining Machines until such time that the cryptocurrency market collapsed.  *See* FAC, ¶¶82-89.  None of these allegations, however, have any nexus to New York.

The Machines are not and were never in New York.  The storage facilities are not in New York.  None of the alleged payments came from New York or were received in New York.  Neither DPW, the alleged promisor, nor Plaintiff, the alleged promisee, are New York domiciliaries.  SUMF, ¶¶223-225.[18]  As such, the Court should dismiss this action, in its entirety, against DPW for lack of personal jurisdiction.

---

[17] The FAC does not allege general jurisdiction over DPW, a Delaware corporation with its principal place of business in Nevada, as a basis for jurisdiction, and, indeed, this Court lacks general jurisdiction over DPW. *See, e.g., Waraich v. Nat'l Austl. Bank*, No. 21-CV-5220-ALC, 2022 U.S. Dist. LEXIS 6930, at \*4 (S.D.N.Y. Jan. 13, 2022) (Carter, J.).

[18] In addition, Plaintiff's few tenuous jurisdictional allegations are either insufficient to establish a meaningful nexus or are outright untruthful.  Plaintiff's allegation that DPW's then-Chief Executive Officer, Milton C. Ault, III, purportedly claimed in "a series of text messages" sent on May 3, 2018 that he was in New York was vitiated by Plaintiff's own document production and Tencer's testimony.  *See* FAC, ¶10; SUMF, ¶221.  Similarly, the e-mail identified at paragraph 12 of the FAC makes reference to a New York based JPMorgan Chase bank account held in the name of DPW.  FAC, ¶12.  To the contrary, a review of that e-mail demonstrates that such payment was initiated from a U.S. Bank banking account with no indication that such account is located in New York, New York (because it is not).  *See* SUMF, ¶218.  As to the balance of Plaintiff's allegations, Plaintiff does not identify which, if any,

## V.   Plaintiff Is Not Entitled to Contract Damages
##      In Connection With Its Quasi-Contractual Claim

To the extent that the Court allows Plaintiff to proceed with its promissory estoppel claim, Defendants also seek a declaration that Plaintiff be limited to reliance damages rather than its claimed contract damages under the Agreement (*i.e.*, expectation damages).[19]

It is well-settled under New York law that the remedy for a promissory estoppel claim must be "limited to damages resulting from 'expenses that plaintiff incurred in relying on defendant's alleged promise'" and not "expectation damages." *See Basu v. Alphabet Mgt. LLC*, No. 651340/2010, 2014 N.Y. Misc. LEXIS 3080, at *16 (Sup. Ct. N.Y. Cty. Jul. 9, 2014) (granting summary judgment dismissing a promissory estoppel claim because the plaintiff therein "did not assert any reliance damages recoverable under a promissory estoppel claim."); *Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*, 568 F. Supp. 2d 329, 341 (S.D.N.Y. 2008) ("Thus, in the absence of 'egregious' circumstances, courts have consistently rejected promissory estoppel claims when the alleged injuries consisted of lost profits, lost fees, forgone business opportunities or damage to business reputation."). Relatedly, Plaintiff's promissory estoppel claim must also necessarily be limited to the alleged acts and omissions occurring on or after April 20, 2018 – the first "promise" alleged in the FAC. *See FAC*, ¶26; *see also Cyberchron Corp. v. Calldata Sys.*

---

purported promises were communicated from the New York and, more importantly, how, if at all, such correspondence would shift the center gravity here to New York. *See New World Capital Corp. v. Poole Truck Line, Inc.*, 612 F. Supp. 166, 173 (S.D.N.Y. 1985) ("By answering the phone calls and receiving the correspondence [in New York], [defendant] did not purposefully avail itself of the opportunity of doing business in [New York].")*; Landau v. New Horizon Partners, Inc.*, No. 02-CV-6802-JGK, 2003 U.S. Dist. LEXIS 15999, at *18 (S.D.N.Y. Aug. 22, 2003) ("[E]ven if the correspondence or phone call was directed towards the plaintiff, the fact that the ultimate transaction, contract or activity by Spar2000 took place outside of New York and was purposefully directed towards Connecticut, the center of gravity of the transactions were outside of New York, and therefore Spar2000's alleged phone conversation and correspondence could not subject it to jurisdiction under § 302(a)(1)").

[19] For the avoidance of doubt, Defendants do not concede or waive any arguments, objections, or defenses with respect to the remaining elements of Plaintiff's promissory estoppel claim.

*Dev.*, 47 F.3d 39, 45 (2d Cir. 1995) ("We reject, however, Cyberchron's arguments that promissory estoppel recovery should be extended to the periods prior to mid-July 1990 [(*i.e.*, prior to the date of the alleged promises therein)]").[20]

The promissory estoppel claim is markedly distinct from the breach of contract claim. Plaintiff acknowledges, as it must, that its promissory estoppel claim is pled in the alternative "[i]f the Agreement is found to be null, void, or unenforceable."[21]  *See*, FAC, ¶83.  Stated differently, promissory estoppel presupposes that no valid agreement exists between the parties. Consequently, there is no basis for Plaintiff to seek damages allegedly stemming from a contract as part of this purely equitable claim.  *See* FAC, ¶ 89 (seeking the "difference between the **contract price** and the resale price" (emphasis added)); *see also Clifford R. Gray, Inc. v. LeChase Constr. Services, LLC*, 51 A.D.3d 1169, 1171 (3d Dep't 2008) ("The doctrine [of promissory estoppel] is not being used 'defensively in support of contract right' but, instead, to create 'a new right in the interest of justice with relief designed to achieve equity. Under these circumstances, plaintiff 'is not entitled to the benefit of the bargain because there was no bargain.'") (internal citations omitted); *Spherenomics Glob. Contact Ctrs. v. vCustomer Corp.*, 427 F. Supp. 2d 236, 253 (E.D.N.Y. 2006) ("Because Spheronomics cannot show that it would otherwise have secured the Fingerhut account, it has failed to establish that it was actually harmed by VCC's broken promise. The lack of evidence on this score prevents it from recovering for VCC's clear breach of this promise, whether the promise is framed as a contractual one or an equitable one.").

---

[20] Plaintiff seemingly agrees that communications which pre-date April 15, 2018 have no bearing on its promissory estoppel claim as it does not allege any pre-April 15, 2018 communications in its FAC.  *See* FAC, ¶ 26 (first alleged promise dated April 20, 2018).

[21] Although Plaintiff has been equivocal as to whether the promissory estoppel claim is pled against DPW individually or as the purported alter-ego of Super Crypto, the FAC's allegations seemingly point to the latter. *See generally*, FAC ¶¶82-89 (no alter-ego allegations) and ¶¶67-68 and 80 (alleging that DPW acted as Super Crypto's alter-ego **with regard to the Agreement**, in connection with Plaintiff's breach of contract claim).

The measure of the alleged harm (if any) then, is based on the steps a party took to its detriment. "As opposed to a breach of contract, the 'wrong' in a promissory estoppel claim is not primarily in depriving the plaintiff of the promised reward but in causing the plaintiff to ***change position*** to his detriment." *Drummond v. Akselrad*, No. 23-CV-179-LJL, 2023 U.S. Dist. LEXIS 75793, at *36 (S.D.N.Y. May 1, 2023) (internal quotations and citations omitted; emphasis added).

Here, Plaintiff baldly asserts that "[i]n reliance on Defendants' frequent and consistent promises, Plaintiff did not resell the [Remaining Machines] until a time when the market for cryptocurrency had sharply declined, thereby greatly reducing the fair market value of the assets." *See* FAC, ¶88. However, Plaintiff's legal theories, its own internal communications and its documentary evidence belie this assertion. Thus, on April 17, 2018, after Plaintiff received the full payment for the Contracted-For Machines, Kalfa would e-mail Tencer boasting that Plaintiff's sale to Super Crypto was the "biggest miracle ever!" SUMF, ¶200. Kalfa would go on to inform Tencer that Super Crypto "can buy [the Machines] now for $1,070 from Bitmain, that we sold them for $2,975!!! Here is a link in case you think im nuts [*sic*] HAAA." *See id.*[22] Tencer would further acknowledge that this figure "definitely" represented the fair market value of the Machines as of April 17, 2018. SUMF, ¶203. From there, the FAC alleges that the purported promises that Plaintiff allegedly detrimentally relied upon commenced on April 20, 2018. *See* FAC, ¶ 26 (first alleged promise dated April 20, 2018). *See supra*, fn. 20. Thus, by Plaintiff's own admissions and documentation, the fair market value of the Remaining Machines upon the expiration of the Agreement and before any alleged promises were communicated to Plaintiff, was, at most, $642,000 (*i.e.*, $1,070 multiplied by 600 Remaining Machines).

---

[22] Kalfa would send this e-mail to Tencer thirteen days after another e-mail, dated April 4, 2018, in which he expressed his concerns about the volatility in the cryptocurrency space. *See* SUMF ¶¶198, 199.

By this time, however, Plaintiff had already long decided that it would cease purchases and resales of cryptocurrency mining machines. SUMF, ¶¶151-153, 197. Hence, Plaintiff did not have any prospective purchasers for the Remaining Machines (or any cryptocurrency mining machines), as of April 20, 2018. *Id.*, ¶¶205-207. Plaintiff could not have realistically sold the Remaining Machines for anywhere near $2,975 per Machine (the damages it claims here) because the Machines were worth no more than $1,070 per Machine at that time, the cryptocurrency market was in a precipitous downward spiral, and Plaintiff had already ceased its operations by then. *Id.*, ¶¶197, 203-205. *See Bloomfield Inv. Res. Corp. v. Daniloff*, No. 17-CV-4181-VM, 2021 U.S. Dist. LEXIS 79586, at *18 (S.D.N.Y. Apr. 26, 2021) (dismissing promissory estoppel claim and noting that "[w]hile Daniloff has alleged that 'he would have sought other investors,' there are no allegations that he actually did forego any alternative offers."); *Rondaeu v. Berman*, No. 654181/2015, 2017 N.Y. Misc. LEXIS 123, at *10-11 (Sup. Ct. N.Y. Cty. Jan. 13, 2017) (dismissing plaintiff's promissory estoppel claim and noting that "[t]he injury alleged was simply that Plaintiff did not approach other news outlets. Plaintiff further asserts, without any supporting evidence, that his inability to approach other news outlets contributed to his ongoing financial struggle… In the absence of any quantifiable and identifiable injury, the second element of the promissory estoppel claim fails.").

Plaintiff made the business decision to continue holding on to the Remaining Machines for Super Crypto because Plaintiff simply did not have another alternative. *See Bloomfield Inv. Res. Corp.*, 2021 U.S. Dist. LEXIS 79586, at *18 ("[P]romissory estoppel requires that the injury directly result from the reliance, and ***thus is typically applied where vested or clearly identified rights have been lost***." (Emphasis added)). Plaintiff, therefore, could not have had a significant and prejudicial change in its position when the alleged first promise was made on April 20, 2018

that would warrant an award of expectation damages flowing from an expired contract. *See Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34, 36 (2d Cir. 1977) ("[T]his is not the kind of injury contemplated by New York law, for it is solely a result of the non-performance of a void agreement. Plaintiffs claim substantial injury in the form of their relinquishment of their opportunity to seek other purchasers for All American. This hardly seems the sort of irremediable change in position normally associated with the doctrine of promissory estoppel.").

The Court should not countenance Plaintiff's efforts to recover more than double the amount of the fair market value of the Remaining Machines on the date that Plaintiff's promissory estoppel claim was allegedly triggered, especially when there is no evidence that there were any buyers ready, willing, and able to pay Plaintiff's asking price. *See generally Jackson v. Triborough Bridge & Tunnel Auth.*, No. 1639/92, 589 N.Y.S.2d 748, 749 (Sup. Ct. N.Y. Cty. Oct. 2, 1992) ("[E]quitable estoppel cannot be used to create a right or place petitioner in a better position.").

In sum, Plaintiff should not be allowed a second "miracle," and the Court should limit the alleged damages that Plaintiff may seek under its promissory estoppel claim to reliance damages.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court grant the relief sought in Defendants' motion for partial summary judgment, in its entirety.

Dated: May 30, 2023                                Respectfully submitted,

                                                   WELTZ KAKOS GERBI
                                                   WOLINETZ VOLYNSKY LLP

                                                   By:    */s/ Robert Volynsky*
                                                          Robert B. Volynsky
                                                   170 Old Country Road, Suite 310
                                                   Mineola, New York 11501
                                                   rvolynsky@weltz.law
                                                   (212) 202-3178
                                                   *Attorneys for Defendants*

25