**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BLOCKCHAIN MINING SUPPLY AND
SERVICES LTD.,

      Plaintiff,

          –against–

SUPER CRYPTO MINING, INC. n/k/a
DIGITAL FARMS, INC. and DPW
HOLDINGS, INC. n/k/a AULT ALLIANCE,
INC.,

      Defendants.

Civil Action No. 1:18-cv-11099-ALC

**PUBLIC VERSION**

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel (rsm@cll.com)
Dasha Chestukhin (dxc@cll.com)
114 West 47th Street
New York, New York 10036
(212) 790-9200

*Attorneys for Plaintiff Blockchain Mining Supply &*
*Services Ltd.*

# TABLE OF CONTENTS

Table of Contents .................................................................................................................... i

Table of Authorities .............................................................................................................. ii

Preliminary Statement ........................................................................................................... 1

Statement of Facts .................................................................................................................. 3

   I.   Super Crypto's Relationship with DPW .................................................................... 3

   II.   DPW's Involvement in Negotiating the Agreement ................................................ 4

   III.   Execution and Performance of the Agreement ....................................................... 5

      A.   The Payment Terms ......................................................................................... 5

      B.   First 500 Machines ........................................................................................... 6

      C.   The Remaining 600 Machines ........................................................................ 7

   IV.   Plaintiff's Resale of the 600 Machines .................................................................... 8

   V.   Defendants' After-the-Fact Attempt to Avoid Liability ......................................... 8

Argument ................................................................................................................................. 9

   I.   Plaintiff Is Entitled to Summary Judgment on Its Breach of Contract Claim .................... 9

      A.   Defendants' Breach of the Agreement ......................................................... 9

      B.   The Parties Modified the Agreement to Strike Article 3 ............................ 10

         1.   The Parties' Emails Constituted Signed Writings That Modified the Agreement ..... 12

         2.   Defendants Waived Article 3 Through Words and Conduct ..................................... 14

      C.   The Parties Modified Their Agreement, or Entered into a  New Agreement, to Provide for Payment of Storage Costs ........................... 18

      D.   Plaintiff Is Entitled to Its Attorneys' Fees .................................................. 19

   II.   Super Crypto Is an Alter Ego of DPW, Allowing Piercing of the Corporate Veil ............ 19

      A.   Super Crypto and DPW Operated as a Single Economic Entity ....................... 21

      B.   Defendants Disregarded the Corporate Form to Engage in Inequitable Conduct .......... 24

CONCLUSION ..................................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC,*
    364 F. Supp. 3d 291 (S.D.N.Y. 2019)................................................................20, 21, 22, 23

*Capital One, N.A. v. Auto Gallery Motors, LLC,*
    2019 WL 4805253 (E.D.N.Y. Sept. 30, 2019) ........................................................................19

*Careandwear II, Inc. v. Nexcha LLC,*
    581 F. Supp. 3d 553 (S.D.N.Y. 2022).....................................................................................10

*Computer Strategies, Inc. v. Commodore Bus. Machs., Inc.,*
    105 A.D.2d 167 (2d Dep't 1984) .............................................................................................17

*CT Chems., Inc. v. Vinmar Impex, Inc.,*
    81 N.Y.2d 174 (1993) .......................................................................................................11, 15

*Dallas Aero., Inc. v. CIS Air Corp.,*
    352 F.3d 775 (2d Cir. 2003)....................................................................................................15

*De Sole v. Knoedler Gallery, LLC,*
    139 F. Supp. 3d 618 (S.D.N.Y. 2015)........................................................................21, 22, 23

*Elmsford Sheet Metal Workers, Inc. v. Shasta Indus., Inc.,*
    103 A.D.2d 764 (2d Dep't 1984) .............................................................................................11

*Forcelli v. Gelco Corp.,*
    109 A.D.3d 244 (2d Dep't 2013)..............................................................................................18

*GM Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.,*
    85 N.Y.2d 232 (1995) ..............................................................................................................14

*Great Am. Ins. Co. v. M/V Handy Laker,*
    2002 WL 32191640 (S.D.N.Y. Dec. 19, 2002) *aff'd* 348 F.3d 352 (2d Cir.
    2003) ........................................................................................................................................14

*Hidden Brook Air, Inc. v. Thabet Aviation Int'l, Inc.,*
    241 F. Supp. 2d 246 (S.D.N.Y. 2002)................................................................................14, 15

*Ira v. Unified Capital Partners 3 LLC,*
    2022 WL 3359759 (S.D.N.Y. Aug. 15, 2022) .......................................................................12

*Irwin & Leighton, Inc. v. W.M. Anderson Co.,*
    532 A.2d 983 (Del. Del. Ch. 1987) .........................................................................................20

*JoySuds, LLC v. N.V. Labs, Inc.*,
  2023 WL 2744537 (S.D.N.Y. Mar. 31, 2023) .......................................................16

*Kamco Supply Corp. v. On the Right Track, LLC*,
  149 A.D.3d 275 (2d Dep't 2017) ................................................................15, 16, 17

*Kaplan v. Old Mut. PLC*,
  526 F. App'x 70 (2d Cir. 2013) ..........................................................................11

*In re Lebenthal Holdings, LLC*,
  2019 WL 6379779 (Bankr. S.D.N.Y. Nov. 27, 2019) ....................................12, 16

*Martin Hilti Family v. Knoedler Gallery, LLC*,
  386 F. Supp. 3d 319 (S.D.N.Y. 2019)...................................................................20

*Menlo v. Friends of Tzeirei Chabad in Israel., Inc.*,
  2013 WL 1387057 (S.D.N.Y. Apr. 5, 2013)...........................................................19

*Midland Interiors, Inc. v. Burleigh*,
  2006 WL 3783476 (Del. Ch. Dec. 19, 2006) .........................................................23

*Mohegan Lake Motors, Inc. v. Maoli*,
  559 F. Supp. 3d 323 (S.D.N.Y. 2021)....................................................................24

*Morrison v. Buffalo Bd. Of Educ.*,
  741 Fed. App'x 827 (2d Cir. 2018).........................................................................16

*NetJets Aviation, Inc. v. LHC Communs., LLC*,
  537 F.3d 168 (2d Cir. 2008)........................................................................... *passim*

*R.D. Weis & Co. v. Children's Place Retail Stores, Inc.*,
  2008 WL 4950962 (S.D.N.Y. Nov. 19, 2008) ......................................................12

*Reliable Automatic Sprinkler Co. v. Sunbelt Grp. L.P.*,
  472 F. Supp. 3d 64 (S.D.N.Y. 2020)......................................................................14

*Sec. Indus. Automation Corp. v. United Comput. Capital Corp.*,
  282 A.D.2d 404 (1st Dep't 2001) ...................................................................15, 17

*Soroof Trading Dev. Co. v. GE Fuel Cell Sys. LLC*,
  842 F. Supp. 2d 502 (S.D.N.Y. 2012).............................................................23, 25

*Symphony Fabrics Corp. v. Podell Indus., Inc.*,
  1996 WL 497011 (S.D.N.Y. Aug. 30, 1996) .........................................................16

*T. J. Stevenson & Co. v. 81,193 Bags of Flour*,
  629 F.2d 338 (5th Cir. 1980) ................................................................................15

*Terwilliger v. Terwilliger*,
  206 F.3d 240 (2d Cir. 2000)..................................................................................9

*The Savage Is Loose Co. v. United Artists Theatre Circuit, Inc.*,
  413 F. Supp. 555 (S.D.N.Y. 1976)......................................................................11

*Trafigura Beheer B.V. v. S. Caribbean Trading, Ltd.*,
  7 Misc. 3d 1010(A) (Sup. Ct. N.Y. Co. 2004)....................................................11

*Varbero v. Belesis*,
  2020 WL 5849516 (S.D.N.Y. Oct. 1, 2020).........................................................20

**Statutes**

N.Y. Gen. Oblig. § 15-301......................................................................................11

N.Y. U.C.C. § 1-103................................................................................................9

N.Y. U.C.C. § 1-201................................................................................................12

N.Y. U.C.C. § 2-208.........................................................................................11, 15

N.Y. U.C.C. § 2-209.....................................................................................11, 13, 14

## PRELIMINARY STATEMENT

Plaintiff Blockchain Mining Supply and Services Ltd. ("Plaintiff") moves for summary judgment on its breach of contract claim against Defendant Super Crypto Mining, Inc. n/k/a Digital Farms, Inc. ("Super Crypto") and its parent company, DPW Holdings, Inc. n/k/a Ault Alliance, Inc. ("DPW"), which is an alter ego of Super Crypto.[1]  The relevant facts are not in dispute.  Super Crypto contracted to buy 1,100 cryptocurrency mining machines (known as "miners") from Plaintiff for more than $3 million.  It timely paid the initial 5% deposit, but quickly fell behind on the future payment schedule.  It did not pay the almost $1.5 million that had been due on March 23, 2018 for the first 500 miners until April 17, 2018.  By that date, the deadline for completing payment on all 1,100 machines (April 15, 2018) had already passed.

The parties nevertheless continued to work together to accommodate Defendants' cash flow issues as both Super Crypto and DPW, which was providing all the funding for the transaction, insisted that they would soon pay the balance due for the remaining 600 machines. Between May and August 2018, Defendants paid more than $87,000 toward the purchase of the 600 machines (in addition to another $32,000 in storage charges that Defendants had agreed to pay).  However, after two months without further payments and repeated unfulfilled promises to complete the purchase, Plaintiff notified Defendants in late October 2018 of its intention to resell the 600 machines it had been holding for them.  In November 2018, Plaintiff resold the machines for a small fraction of the purchase price Defendants had agreed to pay and filed this lawsuit.

Defendants' contemporaneous internal communications repeatedly acknowledged that Super Crypto owed Plaintiff for the balance due on the final 600 machines.  However, since being sued, Defendants have invented a new contractual interpretation that supposedly relieved

---

[1] Although Plaintiff has also alleged an alternative claim for promissory estoppel, a finding of liability on the breach of contract claim would render that claim moot.

Super Crypto of any obligation on the 600 machines beyond its initial deposit. This interpretation, which is premised on the agreement having been rendered "null and void" as of April 15, 2018, fails as a matter of law because it is at complete odds with the parties' unequivocal words and actions in performing their agreement. As of April 15, Super Crypto had not even yet received the first 500 machines it concededly purchased so the contract clearly continued beyond that date. It is likewise nonsensical to claim that Super Crypto's obligation was limited to the initial deposit when Defendants paid substantial additional amounts beyond that toward the purchase of the last 600 machines for months after April 15 while also promising to pay the balance. The undisputed facts establish that the parties modified their agreement to remove, or Super Crypto otherwise waived its right to invoke, the provision on which it now relies to excuse its breach.

The undisputed evidence also shows that DPW is equally liable for that breach. The same evidence this Court accepted in denying DPW's motion to dismiss, reinforced by additional discovery, establishes that Super Crypto and DPW operated as a single economic entity. Defendants' witnesses admitted that Super Crypto was entirely dependent upon DPW's support to meet its obligations. Super Crypto was insolvent throughout its existence, with balance sheets showing many millions of dollars in negative value. Super Crypto had its own bank account only for a matter of months, with all the funds contributed by DPW, which exercised full control of Super Crypto's finances in determining which of its many creditors would be paid, as well and when and how much they would be paid. This arrangement created the requisite element of unfairness or injustice for alter ego liability, as Defendants encouraged vendors, including Plaintiff, to view Defendants as a single entity while retaining the purported ability to avoid obligations that Super Crypto could not possibly meet on its own.

## STATEMENT OF FACTS

The relevant facts are set forth in detail in Plaintiff's Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl. 56.1 St.") and are summarized below.

## I.    SUPER CRYPTO'S RELATIONSHIP WITH DPW

DPW, a holding company set up to hold interests in other subsidiaries, formed Super Crypto as a wholly owned subsidiary in January 2018 to acquire miners and produce cryptocurrency.  By the first quarter of 2020, Super Crypto had ceased operations.  Super Crypto was not adequately capitalized at formation and remained insolvent until it ceased operations, with its liabilities exceeding its assets throughout its entire existence.  Pl. 56.1 St. ¶¶ 2-7.

Mr. Ault, the CEO and Chairman of DPW and Chairman of Super Crypto, testified that Super Crypto was dependent upon DPW to meet its obligations.  Indeed, DPW funded Super Crypto throughout its existence.  Mr. Ault described allocating DPW's capital to the various subsidiaries as "the reason we're here."  As of 2018, Mr. Ault was regularly involved in determining how much money to send to its subsidiaries, including Super Crypto, to fund their operations on an ongoing basis.  Pl. 56.1 St. ¶¶ 7-11.

It is hardly surprising, then, that Super Crypto only had its own bank account for approximately three months between February and April 2018.  After the account was opened with a $25 deposit, DPW subsequently deposited the remaining funds, totaling ███████████ ██████.  Super Crypto never had ██████████████████████ at the end of the month, because all the other deposited funds were used to pay third parties.  After April 2018, all payments on behalf of Super Crypto came directly from DPW itself, or another of DPW's wholly owned subsidiaries or affiliated companies at Mr. Ault's direction.  Pl. 56.1 St. ¶¶ 12-15, 25.

There was no formal loan agreement between DPW and Super Crypto.  Accordingly,

Super Crypto was not obligated to pay interest or to repay funds within any set period. The funds were treated as advances with any repayment terms to be worked out if Super Crypto ever became financially viable. Pl. 56.1 St. ¶¶ 16-18. Super Crypto never paid back DPW's advances. Its balance sheet for 2019 shows "intercompany receivables" of nearly $12 million. Super Crypto never made a profit and never paid any dividends. When it ceased operations, it had no cash or other currency on hand. Pl. 56.1 St. ¶¶ 19-22.

DPW determined which of Super Crypto's many creditors would be paid and when. Super Crypto's CEO, Mr. Magot, regularly requested funds from DPW's CEO and Chairman, Mr. Ault, to pay Super Crypto's bills, and Mr. Ault would then decide how much funding to provide. Pl. 56.1 St. ¶¶ 23-24. Without DPW's contributions, Super Crypto could not pay its bills. Even with DPW's assistance, Super Crypto still owed ███████████ to vendors (including more than $1.5 million to Plaintiff) as of October 2018, according to a memo sent by Mr. Magot to Mr. Ault. DPW ultimately paid Super Crypto's debts to some of those vendors, even though DPW was not a direct party to Super Crypto's contracts. Pl. 56.1 St. ¶¶ 26-29.

DPW and Super Crypto shared common officers and directors. Mr. Ault was Chairman of the Board for both DPW and Super Crypto, and William Horne was a Board member of, and served as CFO for, both entities. In addition, Mr. Magot, the CEO of Super Crypto, along with both Mr. Ault and Mr. Horne, were member of the Board of Ault & Company Inc., a large shareholder in DPW. DPW and Super Crypto also shared not only a street address, but a suite at that address. Pl. 56.1 St. ¶¶ 30-33.

## II.    DPW'S INVOLVEMENT IN NEGOTIATING THE AGREEMENT

From the outset of the parties' negotiations, it was clear that Super Crypto could not make any substantive decisions without DPW's approval. Plaintiff first approached Mr. Magot

on February 23, 2018, after seeing a press release about DPW setting up crypto mining operations through Super Crypto.  Joe Kalfa, acting for Plaintiff, asked whether Mr. Magot was interested in purchasing 1,100 Antminer S9 machines that Plaintiff had available.  Mr. Magot indicated that he was "very interested," but he would need a few days "to confirm all the financing."  By financing, Mr. Magot was referring to getting an advance from DPW, without which Super Crypto could not pay for the machines.  Pl. 56.1 St. ¶¶ 34-38.

Mr. Magot's communications with Plaintiff consistently made clear that Super Crypto needed DPW's approval and funding to enter into an agreement.  Mr. Magot emphasized to Plaintiff that "our parent company is very supportive and wants us to make the purchase with you."  Mr. Magot testified that he wanted Plaintiff to take comfort from the fact that DPW was supportive of the transaction.  And Plaintiff took such comfort, understanding from the outset that Super Crypto was part of a much bigger public company.  Pl. 56.1 St. ¶¶ 39-47.

Mr. Magot ultimately obtained Mr. Ault's approval to sign an agreement with Plaintiff after confirming that Mr. Ault was "comfortable" working under the negotiated terms and that it was "possible" to meet the financial obligations.  DPW's 10-K filing indicated that DPW intended to fund Super Crypto's $3.2 million purchase of 1,100 miners through the proceeds of a DPW stock offering.  Pl. 56.1 St. ¶¶ 48-54.

## III.    EXECUTION AND PERFORMANCE OF THE AGREEMENT

### A.    The Payment Terms

On March 8, 2018, Plaintiff and Super Crypto signed an "Asset Purchase Agreement" (the "Agreement") providing for the sale of 1,100 Bitmain Antminer S9 model cryptocurrency machines and 1,100 power supply units (collectively, the "Machines") for $3,272,500.  The Agreement divided payment into: (a) two deposits totaling $163,625 to be paid on March 9, 2018

and March 13, 2018, respectively, and to be applied toward the final 600 of the 1,100 Machines; (b) a payment of $1,487,500 on or before March 23, 2018 for the first 500 Machines; and (c) a payment of $1,621,375 on or before April 15, 2018 to cover the balance due on the remaining 600 Machines.  Pl. 56.1 St. ¶¶ 55-56.  Using funds advanced to it by DPW, Super Crypto made timely payments to Plaintiff of the deposit amounts, but it was unable to meet any of the deadlines specified in the Agreement for the remaining payments.  Pl. 56.1 St. ¶ 57.

### B.    First 500 Machines

On March 22, 2018, at Mr. Ault's request, Super Crypto and Plaintiff entered into an escrow agreement covering the payment for and release of the first 500 Machines.  In a March 21, 2018 email to Plaintiff, Mr. Magot wrote: "*Our CEO* is still nervous over the transfer process," and Plaintiff thus agreed to using an escrow agent, stating "I believe *your CEO* will now be comfortable" (emphases added).  Mr. Magot testified that both references to his CEO were to Mr. Ault, the CEO of DPW.  Pl. 56.1 St. ¶¶ 58-61.

Although Article 2(a)(ii) of the Agreement required payment for the first 500 Machines by March 23, 2018, Super Crypto could not meet that schedule.  Once that became apparent, Mr. Ault became directly involved in discussions with Plaintiff and effectively took over managing the transaction for Defendants.  Mr. Magot's communications with Plaintiff made clear that Mr. Ault's input was required to provide any information on the anticipated timing of payments, and Defendants' internal communications confirm that Mr. Ault directed Mr. Magot's interactions with Plaintiff.  Communications from Messrs. Magot and Ault to Plaintiff frequently made no distinction between DPW and Super Crypto as separate entities.  Pl. 56.1 St. ¶¶ 62, 64-70.

Plaintiff worked with Defendants to provide flexibility on the timing of the payment for the first 500 Machines and subsequent payment owed under the Agreement.  Mr. Ault and Mr.

Tencer spoke on March 26, 2018, and Mr. Ault promised to send some of the money due. On March 29, 2018, DPW wired $100,000 to Plaintiff. DPW eventually paid the remaining $1,387,500 that was owed on the first 500 Machines into escrow and the funds were released to Plaintiff on April 17, 2018, nearly a month after the due date and after the deadline had already passed for paying the balance due on the remaining 600 Machines. Super Crypto took possession of the first 500 Machines. Pl. 56.1 St. ¶¶ 63, 70-73.

> ### C.    The Remaining 600 Machines

In the period leading up to the delayed payment on the first 500 Machines and continuing for months thereafter, Defendants repeatedly reiterated their desire to complete the transaction and obtain the remaining 600 Machines. Pl. 56.1 St. ¶ 74. They also confirmed that they would pay for storage at $300/day until full payment was made. Pl. 56.1 St. ¶ 81.

Right after paying for the first 500 Machines, Super Crypto entered into a new escrow agreement with Plaintiff for the remaining 600 Machines. Although Defendants never funded the escrow account, DPW paid Plaintiff more than $87,000 between May and August 2018 to be applied toward the purchase of the 600 Machines, in addition to another $32,000 applied toward storage charges. DPW made those payments to show their continuing intention to pay for the 600 Machines. As Mr. Ault testified, "[t]here would be no other reason to wire him than to show him our intentions to pay." Mr. Magot agreed that the payments were made to show a commitment to complete purchasing the 600 Machines. Pl. 56.1 St. ¶¶ 76-78, 81-84.

Defendants also made repeated promises to Plaintiff over a period of months that payment for the 600 Machines was forthcoming. Mr. Ault testified that those promises were "commitments" DPW made to fund Super Crypto so that they could complete the purchase. Plaintiff agreed to work with Defendants in holding the Machines beyond the dates set in the

Agreement so long as Defendants would honor their payment commitments within a reasonable time.  Defendants believed that Plaintiff was acting reasonably with respect to the arrangement and continued to work with it on that basis.  Pl. 56.1 St. ¶¶ 79-80, 85-86.

Despite Defendants' continued promises to pay for the remaining 600 Machines, they made no further payments after August 17, 2018.  In late October 2018, Plaintiff notified Defendants of Plaintiff's intention to resell the 600 Machines.  Pl. 56.1 St. ¶¶ 87-88.

## IV.    PLAINTIFF'S RESALE OF THE 600 MACHINES

In November 2018, Plaintiff resold the 600 Machines to Backbone Hosting Solutions Inc. for $189,840.00, including tax.  By that time, the market value of the Machines had dropped substantially, and they could not be sold for anything close to the price set in the Agreement. Mr. Magot, who closely followed the market for miners at least weekly as of 2018, testified that he had no reason to believe the resale price was unreasonable.  Pl. 56.1 St. ¶¶ 89-92.

## V.    DEFENDANTS' AFTER-THE-FACT ATTEMPT TO AVOID LIABILITY

After the filing of this lawsuit, Defendants asserted for the first time that Super Crypto did not breach the Agreement based on Article 3, which provides:

> In the event [Super Crypto] fails to pay the Balance to [Plaintiff] on or before April 15, 2018, the Deposit funds shall be forfeited to [Plaintiff], and the remainder of this Agreement save and except for Article 2(a)(i) [dealing with the Deposit] and Article 3, shall be null and void and all Parties shall be relieved of its [sic] further obligations herein.

Pl. 56.1 St. ¶ 93.

At no time during the parties' course of dealings did Defendants ever indicate that that they intended to invoke Article 3.  Defendants' concern was that Plaintiff might sell the Machines to someone else.  Mr. Ault could not recall even considering whether to invoke Article 3 to avoid the purchase; he "just remember[ed] wanting the machines" and being concerned

Defendants could lose them after April 15, 2018.  Pl. 56.1 St. ¶¶ 94-95, 103.  Mr. Magot

confirmed that while the value of the Machines had decreased, he "made the business decision to

try continue purchasing equipment."  He knew that the cryptocurrency market was volatile and

"that the fluctuations in this new market aren't predictable."  Defendants remained optimistic

that the market could turn around and thus consciously decided not to walk away from the

purchase of the 600 Machines.  All the parties' communications reflect that decision, which was

also confirmed by Mr. Ault and Mr. Magot at their depositions.  Pl. 56.1 St. ¶¶ 74, 96-102, 105.

Defendants' internal communications also consistently refer to an ongoing obligation to

pay Plaintiff for the final 600 Machines.  Mr. Magot acknowledged at his deposition believing

that Super Crypto owed Plaintiff for the 600 Machines well after the date in Article 3, including

as late as just a few weeks before Plaintiff resold the Machines.  Pl. 56.1 St. ¶¶ 106, 108.

## ARGUMENT

### I.    PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT CLAIM

#### A.    Defendants' Breach of the Agreement

The parties' contract is governed by New York law.[2]  Mandel Ex. HH (¶ 13.h.).  "To

prevail on a breach of contract claim under New York law, a plaintiff must prove (1) a contract;

(2) performance of the contract by one party; (3) breach by the other party; and (4) damages."

*Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000) (internal quotations omitted).

Defendants do not dispute that the Agreement is a valid contract (Defendants' Answers,

ECF Nos. 98, 99 ¶ 71), nor can they dispute that Plaintiff performed its obligations by delivering

---

[2]As a contract for the sale of goods, the Agreement is governed by the New York Uniform Commercial Code ("UCC") as supplemented by New York common law.  N.Y. U.C.C. § 1-103 ("Unless displaced by the particular provisions of this Act, the principles of law and equity… relative to … estoppel … or other validating or invalidating cause shall supplement its provisions.").

the first 500 Machines for which Defendants paid.  Pl. 56.1 St. ¶ 72.  Under the Agreement,

Super Crypto owed $1,621,375 for the remaining 600 Machines.  Mandel Ex. HH ¶ 2.a.

Although Defendants paid around $87,000 of that amount, they stopped making payments after

August 2018 and never paid the remaining balance due.  Tencer Decl. ¶ 13 & Ex. 1.  In

November 2018, Plaintiff resold the 600 Machines for $189,840, an amount that Mr. Magot

agreed was not unreasonable given marketplace conditions at the time.  Pl. 56.1 St. ¶¶ 89-92.

There can be no serious dispute that Super Crypto breached the Agreement.  Indeed,

Mr. Magot, in internal emails to DPW, repeatedly acknowledged that Plaintiff was owed

upwards of $1.5 million pursuant to the Agreement.  Pl. 56.1 St. ¶ 106.  Plaintiff was therefore

damaged in the amount of at least $1,344,055 (the amount outstanding under the Agreement, less

Defendants' partial payments and the resale proceeds), plus an additional $31,900 for

outstanding storage costs Defendants had agreed to pay (*see* Pl. 56.1 St. ¶ 81; Point I, D *infra*),

for a total of $1,375,955.[3]  *See* Tencer Decl. ¶ 20 & Ex. 1.

Since being sued, however, Defendants have attempted to avoid liability based on a post

facto determination that Article 3 of the Agreement relieved them of any obligation beyond the

initial deposit by rendering the Agreement "null and void" as of April 15, 2018.  As set forth

below, Defendants' post-April 15 writings and conduct are plainly incompatible with their newly

discovered position, which should be rejected as a matter of law.

### B.    The Parties Modified the Agreement to Strike Article 3

Under New York law, parties may modify a contract "by another agreement, by

course of performance, or by conduct amounting to waiver or estoppel.  In order to determine the

---

[3] Plaintiff is also entitled to 9% prejudgment interest, *see Careandwear II, Inc. v. Nexcha LLC*, 581 F. Supp. 3d 553, 558 (S.D.N.Y. 2022), as well as reasonable attorneys' fees.  *See* Point I, E *infra*.

terms of such change, we look to UCC 2-208 and 2-209…." *CT Chems., Inc. v. Vinmar Impex, Inc.*, 81 N.Y.2d 174, 179 (1993).[4]  Although a provision requiring a written modification is typically enforced under New York law (*see Trafigura Beheer B.V. v. S. Caribbean Trading, Ltd.*, 7 Misc. 3d 1010(A) (Sup. Ct. N.Y. Co. 2004) (citing N.Y. Gen. Oblig. § 15-301 and N.Y. U.C.C. §2-209)), attempted modifications that do not comply with it may nevertheless operate as a waiver (N.Y. U.C.C. § 2-209(4)) and course of performance may evidence such a waiver.  N.Y. U.C.C. § 2-208(3).  Here, the parties modified the Agreement by mutually signed writings confirming the continued validity and effect of the Agreement notwithstanding Article 3. Furthermore, Defendants waived the right to invoke Article 3 through repeated writings and continued performance under the Agreement.

At the outset, it is beyond dispute that the parties' behavior under the Agreement is incompatible with its original written terms.  The Agreement required payment for the first 500 Machines to have been made by March 23, 2018, but Defendants did not make that payment until April 17, 2018 – two days *after* the Agreement would become "null and void" under Article 3 absent full payment for all 1,100 Machines.  The parties unquestionably modified the timing of payments set forth in the Agreement to accommodate Defendants' cash flow issues and permit them to complete Defendants' intended purchase of all 1,100 Machines.

Indeed, immediately after making the delayed payment for the first 500 Machines, Super Crypto entered into an escrow arrangement to cover payment for the remaining 600 Machines,

---

[4] The same standard applies under New York common law.  *See, e.g.*, *Kaplan v. Old Mut. PLC*, 526 F. App'x 70, 72 (2d Cir. 2013). Thus, "the result should not be any different whether the case is governed by the General Obligations Law or the Uniform Commercial Code."  *The Savage Is Loose Co. v. United Artists Theatre Circuit, Inc.*, 413 F. Supp. 555, 559 (S.D.N.Y. 1976); *see also Elmsford Sheet Metal Workers, Inc. v. Shasta Indus., Inc.*, 103 A.D.2d 764, 764 (2d Dep't 1984) (no-oral-modification provision may be unenforced based on "an executed modification, waiver or estoppel" under N.Y. U.C.C. § 2-209 or N.Y. Gen. Oblig. § 15-301).

an action that would be pointless if the Agreement were no longer in effect and its obligation to buy those Machines were relieved.  Moreover, over the next several months, Defendants repeatedly confirmed their intention to be bound by the Agreement while continuing to pay down the balance owed for the final 600 Machines.  These actions cannot be squared with Defendants' new interpretation that Article 3 limited their exposure to the forfeiture of their initial deposit. Whether analyzed as a written modification established through the parties' email exchanges, or a course of conduct involving partial performance incompatible with the original contract terms and thus amounting to a waiver, the undisputed evidence shows that Article 3 of the Agreement did not excuse Super Crypto's obligation to pay for the remaining 600 Machines.

### 1.    The Parties' Emails Constituted Signed Writings That Modified the Agreement

While the Agreement requires modifications to be in a writing signed by both parties (Mandel Ex. HH ¶ 13.e.), a signed writing is defined very broadly under the UCC: it encompasses any intentional reduction to tangible form marked with any symbol signifying the intention to adopt or accept the writing.  N.Y. U.C.C. §§ 1-201(37), (43).  Supplementing that permissive definition, New York law provides that "signed electronic communications between parties are sufficient to modify contract terms."  *In re Lebenthal Holdings, LLC*, 2019 WL 6379779, at *8 (Bankr. S.D.N.Y. Nov. 27, 2019); *see also R.D. Weis & Co. v. Children's Place Retail Stores, Inc.*, 2008 WL 4950962, at *4 (S.D.N.Y. Nov. 19, 2008) ("Courts have held that a typed signature in an e-mail can qualify as a signed writing.").  That the Agreement requires the parties to provide notices via email (Mandel Ex. HH ¶ 13.c.) further supports that the parties' emails constituted a writing for purposes of modifying the Agreement.  *See, e.g.*, *Ira v. Unified Capital Partners 3 LLC*, 2022 WL 3359759, at *4 (S.D.N.Y. Aug. 15, 2022) (where agreement provided for electronic notices, email correspondence sufficient "written instrument" for

modification).[5]

The parties exchanged numerous mutually signed writings for months after the April 15 date in Article 3 by which they clearly manifested their intent to maintain the Agreement in full force and effect.  These emails repeatedly confirmed Defendants' intention to complete the purchase of the remaining 600 Machines.  *See, e.g.*, Mandel Ex. HHHH (June) ("I'm emailing to make it clear that SCM will honor our obligation to finalize the purchase of the last 600 machines."); *see also* Mandel Ex. BBBB (April 24) ("[W]e are working on finalizing the financing timing for the last 600 machines….  We are anxious to make the payment so we can receive the machines and get them running."); Mandel Ex. ZZ (April 30) ("I do want the machines ASAP so will continue to push the payment for the last set of machines."); Mandel Ex. FFFF (May) ("I really want the machines and have open racks ready to take them asap."); Mandel Ex. NNN (September) ("We would like to proceed by paying the current outstanding balance with funds raised via the preferred outlined above.").  Plaintiff responded by agreeing to work with Defendants in holding the Machines beyond the dates set in the Agreement so long as Defendants would honor their payment commitments within a reasonable time.  Pl. 56.1 St. ¶ 85; *see*, *e.g.*, Mandel Ex. HHHH ("Thank you for … your stated commitment to honor your obligation to finalize the purchase of the last 600 machines. We will continue to work with you to find a mutually acceptable resolution."); Mandel Ex. BBBB ("As I have indicated in the past, we will work with you in regards to the late payment.").

These emails leave no room for doubt that the parties agreed in writing to complete the

---

[5]A modification needs no consideration to be binding, N.Y. U.C.C. § 2-209(1)), although here such consideration exists because Defendants received a continuing ability to obtain the Machines for which they had made a deposit and still wished to acquire and Plaintiff received the certainty of a committed buyer.

transaction with respect to the final 600 Machines.  Such writings necessarily eliminated Article

3 by treating the Agreement, including the obligation to buy the remaining Machines, in full

force and effect at all relevant times after April 15, 2018.  Moreover, the parties' conduct

following their agreed-upon elimination of Article 3 clearly evidences their assent to the

modification.  *See Reliable Automatic Sprinkler Co. v. Sunbelt Grp. L.P.*, 472 F. Supp. 3d 64, 74-

75 (S.D.N.Y. 2020).  For months after April 15, Defendants continued to make payments for the

600 remaining Machines and Plaintiff continued to forbear from reselling those Machines—all

conduct that would be incompatible with the Agreement being null and void as of April 15.

### 2.    Defendants Waived Article 3 Through Words and Conduct

Even if the parties' emails did not satisfy the Agreement's requirement for a written

modification signed by both parties, an attempted modification can still operate as a waiver

under N.Y. U.C.C. § 2-209(4).[6]  "A waiver is the 'voluntary and intentional abandonment of a

known right which, but for the waiver, would have been enforceable.'"  *Hidden Brook Air, Inc.*

*v. Thabet Aviation Int'l, Inc.*, 241 F. Supp. 2d 246, 269 (S.D.N.Y. 2002) (quoting *GM*

*Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*, 85 N.Y.2d 232, 236 (1995)). Waiver may be

established by affirmative conduct or by failure to act so as to evince an intent not to claim a

purported advantage."  *GM Acceptance Corp.*, 85 N.Y.2d at 236.  "Courts have held that 'a

waiver under the Uniform Commercial Code may take place through conduct as well as words.'"

*Great Am. Ins. Co. v. M/V Handy Laker*, 2002 WL 32191640, at *7 (S.D.N.Y. Dec. 19, 2002)

*aff'd* 348 F.3d 352 (2d Cir. 2003) (quoting *Federal Express Corp. v. Pan American World*

*Airways, Inc.,* 623 F.2d 1297, 1302-03 (8th Cir. 1980) (applying New York law)).

---

[6]Section 2-209(4) is intended to prevent a no-oral-modification clause "from limiting in
other respects the legal effect of the parties' actual later conduct."  N.Y. U.C.C. Law § 2-209
cmt. 4.

A waiver may be proven "by 'undisputed acts or language so inconsistent with [the party's] purpose to stand upon his [or her] rights as to leave no opportunity for a reasonable inference to the contrary.'" *Kamco Supply Corp. v. On the Right Track, LLC*, , 281 (2d Dep't 2017) (quoting *Alsens Am. Portland Cement Works v. Degnon Contracting Co.*, 222 N.Y. 34, 37 (1917)); *see also Dallas Aero., Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003) (for conduct to amount to waiver, it must not otherwise be compatible with the agreement as written). New York courts have found that an attempted oral modification can operate as a waiver as a matter of law. *See, e.g., Hidden Brook*, 241 F. Supp. 2d at 269 (finding that attempted oral modification "operated, as a matter of law, as a waiver of" contractual closing date); *Sec. Indus. Automation Corp. v. United Comput. Capital Corp.*, 282 A.D.2d 404, 405 (1st Dep't 2001) (defendant waived right to object to late notice as matter of law, despite provision requiring signed writing for modification, based on the parties' course of performance).

In analyzing whether a waiver occurred, "it is useful to recall that the roots of waiver lie firmly in equity, and are 'designed to prevent the waiving party from lulling the other party into a belief that strict compliance with a contractual duty will not be required and then … demanding compliance for the purpose of avoiding the transaction.'" *Kamco*, 149 A.D.3d at 281 (quoting 13 Richard A. Lord, Williston on Contracts § 39:15 at 621 (4th ed 2013)).  Where an agreement involves repeated occasions for performance, "such course of performance shall be relevant to show a waiver" of any contractual term inconsistent with such performance. *CT Chems.*, 81 N.Y.2d 174, 179-80 (quoting N.Y. U.C.C. § 2-208(3)); *see also T. J. Stevenson & Co. v. 81,193 Bags of Flour*, 629 F.2d 338, 365 (5th Cir. 1980) ("The combination of [U.C.C.] §§ 2-208(3) and 2-209(4) establishes that the parties' course of performance after execution of the contract can operate as a waiver of specific contractual provisions.") (citing, *inter alia, Nederlandse*

*Draadindustrie NDI B.V. v. Grand Pre-Stressed Corp.*, 466 F. Supp. 846, 851 (E.D.N.Y. 1979)).

The undisputed facts concerning the parties' course of performance make plain that Defendants waived Article 3 by deciding to move forward with the purchase of the final 600 Machines.  Indeed, Mr. Magot testified that after internal consideration, Super Crypto "made the business decision" not to invoke Article 3 and walk away from the transaction, but "to try to continue purchasing equipment."  Magot Dep. at 62-65; *see also* Magot Dep. at 186.  Such testimony confirms that, after considering their options, Defendants knowingly, voluntarily and intentionally waived their right to invoke Article 3 and simply forfeit their deposit.

Instead, Defendants repeatedly reiterated to Plaintiff their intention to purchase the 600 Machines and continued to make payments for months after April 15.  *See* Pl. 56.1 St. ¶¶ 74-84; *see also* pp. 7-8 *supra*.  Such ongoing performance was patently incompatible with the continued applicability of Article 3, leaving no doubt that Defendants waived it.  *See, e.g.*, *Symphony Fabrics Corp. v. Podell Indus., Inc.*, 1996 WL 497011, at *6 (S.D.N.Y. Aug. 30, 1996) (defendant's continued payment under agreement waived provision setting forth delivery timing); *see also Kamco*, 149 A.D.3d at 284 (defendants' continued acceptance of plaintiff's non-performance so inconsistent with intent to enforce agreement as to constitute waiver).

That the Agreement required signed written waivers (Mandel Ex. HH ¶ 13.d.) does not change the result.  First, Defendants' emails explicitly confirming their continued intent to uphold their contractual obligations satisfy the requirement of a signed writing waiving Article 3.  *See, e.g., In re Lebenthal*, 2019 WL 6379779, at *8.  In any event, under New York law, the mere existence of a non-waiver clause does not preclude a party from waiving another contractual term through its course of performance.  *See, e.g., Morrison v. Buffalo Bd. Of Educ.*, 741 Fed. App'x 827, 830 (2d Cir. 2018); *JoySuds, LLC v. N.V. Labs, Inc.*, 2023 WL 2744537, at

*9 (S.D.N.Y. Mar. 31, 2023); *see also Kamco* 149 A.D.3d at 284.

By repeatedly acknowledging and partially performing their contractual obligations through continued payments, Defendants clearly manifested their intention to waive Article 3 and the no-waiver clause. As in *Kamco*, it is unnecessary to determine the precise moment when waiver occurred, since it clearly took place "well before [defendants] first attempted to formally enforce their rights under the agreement" once in litigation. *Id*. Like the defendant in *Kamco*, Defendants here never sought to enforce, or indeed even mention, Article 3 at any time prior to Plaintiff's institution of this lawsuit. Such a belated assertion of rights is way too late in the day, coming on the heels of months of partial payments concededly designed to assure Plaintiff that it should continue to hold the Machines for Defendants while they paid the balance down. *See* Ault Dep. at 215-16; Magot Dep. at 186-87, 210-11.

For the same reason, Defendants may not now retract their waiver where it is undisputed that they never attempted to do so prior to this lawsuit. *See, e.g.*, *Computer Strategies, Inc. v. Commodore Bus. Machs., Inc.*, 105 A.D.2d 167, 174 (2d Dep't 1984) (waiving party's failure to give the other party "reasonable notice or time to alleviate the prejudice created" by a waiver precludes retraction thereof); *see also Sec. Indus. Automation*, 282 A.D.2d at 405 (defendant's failure to notify plaintiff of intent to enforce contract provision precluded reliance on that provision as matter of law). Mr. Magot testified that had Super Crypto intended to rely on Article 3 to avoid purchasing the 600 Machines, it would have communicated that to Plaintiff. However, it concededly never made such a decision, and the only message it ever delivered to Plaintiff was its intent to move forward with buying the Machines. Magot Dep. at 194-95; *see also* Magot Dep. at 62-65; Pl. 56.1 St. ¶¶ 74, 78-80, 104-105. As a result, just as Defendants intended, Plaintiff delayed resale of the 600 Machines for months, even as the cryptocurrency

market collapsed.  Defendants cannot avoid liability by invoking a provision they expressly

decided not to invoke and thus never sought to enforce or even mention prior to this litigation.

### C. The Parties Modified Their Agreement, or Entered into a New Agreement, to Provide for Payment of Storage Costs

The parties also either modified the Agreement, or simply entered into a new agreement,

providing that Defendants would pay Plaintiff $300 per day for storage costs starting in

April 2018 once it became apparent that Defendants would not be able to make timely payment

for the final 600 Machines.  *See* Pl. 56.1 St. ¶ 81.  The parties exchanged definite, mutually

signed writings confirming their agreement.  *See, e.g.*, Mandel Ex. NNN ("we expect to have a

clearly outlined payment plan for both the machines as well as the storage invoice"); Mandel

Ex. LLLL (requesting "total outstanding balance … including the storage costs").  Both Messrs.

Ault and Magot testified that Defendants agreed to pay for storage costs and never objected to

the amount charged.  Ault Dep. at 230-31; Magot Dep. at 83, 224-26.  Plaintiff issued numerous

storage-specific invoices and with Defendants' knowledge and assent, applied $32,000 of

Defendants' payments toward storage.  *See, e.g.*, Mandel Ex. KKKK; Mandel Ex. MMMM.

Such payments were incompatible with the original Agreement, which assumed Defendants

would take possession of the Machines by April 15, 2018.  The parties' mutually signed writings,

viewed in light of Defendants' continued storage payments costs, modified the Agreement to

include a provision requiring Defendants to pay $300 per day for storage.

Alternatively, the parties' exchanges formed a new agreement concerning storage costs.[7]

*See, e.g.*, *Forcelli v. Gelco Corp.*, 109 A.D.3d 244, 251 (2d Dep't 2013) (email exchange

sufficient to form basis of enforceable agreement).  Even if the parties' emails are insufficient to

---

[7] Such a separate agreement (which would not be for the sale of goods) would not have to satisfy the statute of frauds—though, through Defendants' emails, it would.  *See* N.Y. Gen. Oblig § 5-701(1).

constitute a fully executed written agreement, the parties entered into an enforceable oral

agreement. *See Menlo v. Friends of Tzeirei Chabad in Israel., Inc.*, 2013 WL 1387057, at *2

(S.D.N.Y. Apr. 5, 2013) (citing, *inter alia*, *Winston v. Mediafare Entertainment Corp.*, 777 F.2d

78, 80 (2d Cir. 1985)) (oral agreement enforceable as a matter of law where terms sufficiently

definite and parties' intent to be bound supported by objective signs). Defendants' testimony

confirms that they intended and understood themselves to be bound by an agreement to pay $300

a day for storage. Plaintiff performed by storing the remaining Machines. While Defendants

partially performed by remitting payment toward storage, they ultimately breached the storage

agreement by failing to pay the full amount due. As there is no factual dispute, the Court should

hold that Defendants breached the storage agreement as a matter of law. *See Menlo*, 2013 WL

1387057, at *3; *Capital One, N.A. v. Auto Gallery Motors, LLC*, 2019 WL 4805253, at *4

(E.D.N.Y. Sept. 30, 2019).

**D.    Plaintiff Is Entitled to Its Attorneys' Fees**

The Agreement provides that "[t]he prevailing party in any dispute arising out of this

Agreement shall be entitled to his or its reasonable attorney's [sic] fees and costs." Mandel

Ex. HH ¶ 13.h. To the extent that Plaintiff prevails on its breach of contract claim, it is entitled

to recover the attorneys' fees expended in connection with this litigation. If the requested relief

is granted, Plaintiff will submit detailed invoices showing its fees and costs.

**II.    SUPER CRYPTO IS AN ALTER EGO OF DPW, ALLOWING PIERCING OF
       THE CORPORATE VEIL**

As a matter of law, DPW is liable for Super Crypto's breach because Super Crypto is an

alter ego for DPW. To establish alter ego status under Delaware law, Plaintiff must satisfy a

two-pronged test by showing that DPW and Super Crypto operated as a single economic entity

such that it would be inequitable for the Court to uphold the legal distinction between them.

*NetJets Aviation, Inc. v. LHC Communs., LLC*, 537 F.3d 168, 177 (2d Cir. 2008) (applying

Delaware law); *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 317

(S.D.N.Y. 2019) (same).  "If the relevant standards are met, the corporate veil may be pierced to

attach liability for a contract breach to a non-signatory." *Varbero v. Belesis*, 2020 WL 5849516,

at *3 (S.D.N.Y. Oct. 1, 2020).

      "The central question is whether 'the individual [or parent corporation] has complete

domination and control over the entity such that it no longer ha[s] legal or independent

significance of [its] own.'" *Martin Hilti Family v. Knoedler Gallery, LLC*, 386 F. Supp. 3d 319,

355 (S.D.N.Y. 2019) (quoting *Carotek, Inc. v. Kobayashi Ventures, LLC*, 875 F. Supp. 2d 313,

350 (S.D.N.Y. 2012)) (alterations in original; further quotations & citations omitted).  In

deciding whether to pierce the corporate veil, courts consider factors that include, but are not

limited to, (1) "whether the corporation was adequately capitalized for the corporate

undertaking;" (2) "whether the corporation was solvent;" (3) "whether corporate formalities were

observed;" and (4) "whether, in general, the corporation simply functioned as a facade for the

dominant shareholder." *NetJets*, 537 F.3d at 176-77 (quoting *Harco Nat'l Ins. Co. v. Green

Farms, Inc.*, 1989 WL 110537, at *4 (Del. Ch. Sep. 19, 1989)) (further quotations & citations

omitted).  However, no single factor is required to justify a decision to disregard the corporate

entity.  *See NetJets*, 537 F.3d at 177; *see also Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532

A.2d 983, 989 (Del. Del. Ch. 1987). "[T]he most relevant factor in the *NetJets* inquiry is whether

the entity simply functioned as a facade for the dominant shareholder." *A.V.E.L.A.*, 364 F. Supp.

3d at 318 (finding corporate entities to be alter egos as matter of law).

      In denying Defendants' motion to dismiss Plaintiff's alter ego theory after jurisdictional

discovery, the Court set out a number of allegations that, "if proven true, would demonstrate that

Super Crypto is an alter ego of DPW." ECF No. 92 at 6. Full discovery has yielded undisputed evidence that supports all the Court's previously highlighted facts as well as additional facts demonstrating that, as a matter of law, Super Crypto is merely an alter ego of DPW.

### A.    Super Crypto and DPW Operated as a Single Economic Entity

This Court held that two companies operated as a single economic entity as a matter of law where the evidence showed that one individual: (1) was a director, officer and shareholder of both companies; (2) signed checks on behalf of both companies; and (3) directed licensees of one company to write their checks to the other company, such that the licensees understood the two companies to be a single entity. *A.V.E.L.A.*, 364 F. Supp. 3d at 318. The foregoing facts were sufficient to pierce the corporate veil, even where none of the other so-called *NetJets* factors were discussed by the movant, because it was "quite clear" that the controlling individual and his business partners treated the two companies "as a single unit." *Id.*

In another case, this Court found the fact that an LLC and its sole corporate member shared a corporate address, personnel and accounting department, and that the controlling member gave the LLC interest-free loans without written agreements (characterized as "interdivisional receivables"), among other things, to be "substantial evidence" of the mingling of the two entities' operations. *De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 667 (S.D.N.Y. 2015) ("While [controlling corporate member] is free to lend money to [the LLC], the fact that it did so without observing the formalities and procedures typical of an arm's-length transaction is persuasive evidence that the two entities are 'one and the same.'"). The Second Circuit has also held that two corporate entities' failure to follow legal formalities when contracting with one another is "'tantamount to declaring that they are indeed one in [sic] the same.'" *NetJets*, 537 F.3d at 178 (quoting *Trustees of Village of Arden v. Unity Constr. Co.*,

2000 WL 130627, at *3 (Del. Ch. Jan. 26, 2000)).

All these elements, and more, are present here.  There was significant overlap between the officers and directors of DPW and Super Crypto, and the entities shared the same address. Pl. 56.1 St. ¶¶ 30-33; s*ee A.V.E.L.A.*, 364 F. Supp. 3d at 318 (overlap in officers and directors relevant to alter ego analysis); *De Sole*, 139 F. Supp. 3d at 667 (same).  More importantly, Mr. Ault (on behalf of DPW) was responsible for deciding what funding to provide Super Crypto.  Ault Dep. at 88.  DPW initially funded Super Crypto's short-lived bank account, and later directly paid Super Crypto's debts to third-party vendors itself or via a wholly owned subsidiary, even though DPW was not a nominal signatory to Super Crypto's agreements with the vendors.  *See* Pl. 56.1 St. ¶¶ 12-14, 23-25, 29.  All payments made to Plaintiff pursuant to the Agreement were funded by DPW, most directly from DPW's own bank account.  *See* Mandel Ex. H; Tencer Decl. ¶¶ 9-10.  *See also NetJets*, 537 F.3d at 179 (evidence that sole controlling member put money into LLC as it needed it would support alter ego finding); *A.V.E.L.A.*, 364 F. Supp. 3d at 318 (overlapping director, officer and shareholder who signed checks on behalf of two companies supported determination they were alter egos as a matter of law); *De Sole*, 139 F. Supp. 3d at 666 (shared accounting department weighed in favor of alter ego finding).

In addition, there was no formal loan agreement between DPW and Super Crypto, and Super Crypto was not obligated to pay interest or to repay the funds within a certain time.  Pl. 56.1 St. ¶¶ 16-17.  These advances were recorded on Super Crypto's balance sheets as "intercompany receivables" and amounted to nearly $12 million.  *Id*. ¶ 20.  Super Crypto never paid back these supposed loans.  *Id*. ¶ 19.  *See De Sole*, 139 F. Supp. 3d at 667 (intercompany interest-free loans without written agreements, characterized as "interdivisional receivables," supported alter ego finding).  Defendants' failure to follow legal formalities where DPW was

"lending" Super Crypto millions of dollars is essentially a declaration that they are one and the same.  *See NetJets*, 537 F.3d at 178; *De Sole*, 139 F. Supp. 3d at 667.

Messrs. Ault and Magot themselves, in communicating with Plaintiff, frequently made no distinction between DPW and Super Crypto, thereby leading Plaintiff to understand that the two were a single entity.  Pl. 56.1 St. ¶¶ 39-47, 66.  *See A.V.E.L.A.*, 364 F. Supp. 3d at 318 (third parties with contract with one entity directed to pay checks to second entity, causing third parties to understand the entities were the same and supporting alter ego finding as a matter of law).

Crucially, Super Crypto was never adequately capitalized for its venture and remained insolvent throughout its existence.  Pl. 56.1 St. ¶¶ 5-6.  Its bank account was opened with a deposit of only $25 and never had a monthly ending balance of more than $30,000, even as it ran up millions of dollars' worth of obligations.  *Compare* Mandel Ex. G *with* Mandel Ex. H.  *See NetJets*, 537 F.3d at 179 (initial capitalization of $20,100 relevant to alter ego analysis).  Mr. Ault acknowledged that, without DPW's continued financial support, Super Crypto would not exist (Ault Dep. at 62-66) and, even with DPW's support, Super Crypto's expenses always exceeded its revenues.  Magot Dep. at 44.  When it ceased operations, Super Crypto had no cash or other currency on hand.  Magot Dep. at 44-45; *see Soroof Trading Dev. Co. v. GE Fuel Cell Sys. LLC*, 842 F. Supp. 2d 502, 522 (S.D.N.Y. 2012) (that controlled entity "had no cash assets at the time of dissolution" supported determination that it was an alter ego of controlling corporate members).  This persistent insolvency is compelling proof that Super Crypto was a mere instrumentality of DPW.  *See Midland Interiors, Inc. v. Burleigh,* 2006 WL 3783476, at *5 (Del. Ch. Dec. 19, 2006) (insolvency of controlled company favored veil piercing).

Finally, as this Court previously held, "[Plaintiff] has demonstrated that Ault, and DPW, was the final decision maker for the negotiations and deals under the agreement."  ECF No. 92 at

7. In "provid[ing] the final sign offs on payments, facilitate[ing] the wire payments, and direct[ing] Super Crypto's interactions with [Plaintiff]," Ault's level of "involvement exceeded the participation of a mere shareholder." *Id*.; *see* Pl. 56.1 St. ¶¶ 64-65. In short, Super Crypto simply functioned as a facade for its shareholder DPW, which completely ran the show in terms of both the specific transaction with Plaintiff and Super Crypto's operations generally.

### B.    Defendants Disregarded the Corporate Form to Engage in Inequitable Conduct

Plaintiff has also satisfied the injustice element as a matter of law. Plaintiff "need not prove that [Super Crypto] was created with fraud or unfairness in mind. It is sufficient to prove that it was so used." *NetJets*, 537 F.3d at 177. Although the injustice must be more than solely an underlying breach of contract claim, "[c]ourts routinely pierce the corporate veil where there is a nexus between the domination and the injustice, even if the injustice forms a basis for the underlying cause of action, so long as the corporate form is used to perpetrate the injustice." *Mohegan Lake Motors, Inc. v. Maoli*, 559 F. Supp. 3d 323, 341 (S.D.N.Y. 2021). Moreover, "nothing prevents a court, in determining whether there is sufficient evidence of fraud or unfairness, from taking into account relevant evidence that is also pertinent to the question of whether the two entities in question functioned as one." *NetJets*, 537 F.3d at 183.

As this Court recognized in denying Defendants' motion to dismiss, the same evidence that Super Crypto was not sufficiently capitalized can not only establish that the two entities functioned as one, but also create the overall element of injustice or unfairness required to prove alter ego status. ECF No. 92 at 7-8 (citing cases). Mr. Ault testified that without a parent company committed to acting as a supportive investor providing capital, Super Crypto would not even exist as an entity. Ault Dep. at 65-66. Because Super Crypto had no independent ability to meet its ongoing expenses, it regularly reported to DPW on which creditors needed to be paid.

Pl. 56.1 St. ¶¶ 23-27.  DPW would in turn determine which of Super Crypto's many creditors would be paid and when.  *Id*. ¶ 24.  Such an arrangement created an overall element of unfairness by permitting Super Crypto to make numerous commitments beyond its possible ability to meet unilaterally, while retaining for DPW the option to pick and choose what obligations to honor.

At the same time, Defendants encouraged Plaintiff to view Super Crypto and DPW as one and the same when it served their interests.  Defendants would refer to the parties interchangeably, with Mr. Magot even identifying Mr. Ault as "*our* CEO" in discussions with Plaintiff.  *See*, *e.g.*, Mandel Ex. II (emphasis added).  Mr. Magot admitted referencing DPW because he wanted Plaintiff to take comfort from DPW's support.  Magot Dep. at 94-95.  Yet now that Super Crypto has ceased operations, Defendants suddenly wish to disavow DPW's role.  Such self-serving abuse of the corporate form is exactly the type of manifest injustice that justifies the piercing of a corporate veil.  *See, e.g.*, *NetJets*, 537 F.3d at 184; *Soroof*, 842 F. Supp. 2d at 522; *see also* ECF No. 92 at 8 (noting Defendants' assurances of compliance and payment without distinguishing between the entities supported element of unfairness and injustice).  Accordingly, DPW should be held liable for Super Crypto's breach as a matter of law.

## **CONCLUSION**

Plaintiff respectfully submits that it is entitled to judgment as a matter of law on its breach of contract claim against both Defendants.

Dated: May 30, 2023                    **COWAN, LIEBOWITZ & LATMAN, P.C.**
                                       Attorneys for Plaintiff

                                       By: _____
                                             Richard S. Mandel (rsm@cll.com)
                                             Dasha Chestukhin (dxc@cll.com)
                                       114 West 47th Street
                                       New York, New York 10036
                                       (212) 790-9200

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on May 30, 2023, I caused true and correct copies of the

*Notice of Plaintiff's Motion for Summary Judgment*, the foregoing *Plaintiff's Memorandum of*

*Law in Support of Motion for Summary Judgment*, *Plaintiff's Statement of Undisputed Facts*

*Pursuant to Local Rule 56.1*, the supporting *Declaration of Richard S. Mandel* including

Exhibits A to BBBBB thereto, and the supporting *Declaration of William Tencer* including

Exhibits 1 to 2 thereto to be served on Defendants by sending a copy thereof via email to

Defendants' attorney of record Robert Brian Volynsky of Weltz Kakos Gerbi Wolinetz Volynsky

LLP at Rvolynsky@weltz.Law.


_____
                    Richard S. Mandel