## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

BLOCKCHAIN MINING SUPPLY AND
SERVICES LTD.,

       Plaintiff,

       –against–

SUPER CRYPTO MINING, INC. n/k/a
DIGITAL FARMS, INC. and DPW
HOLDINGS, INC. n/k/a AULT ALLIANCE,
INC.,

       Defendants.

Civil Action No. 1:18-cv-11099-ALC

### PUBLIC VERSION

### PLAINTIFF'S STATEMENT OF UNDISPUTED
### FACTS PURSUANT TO LOCAL RULE 56.1

    Plaintiff Blockchain Mining Supply and Services Ltd. ("Plaintiff") submits this statement

of undisputed facts pursuant to Local Rule 56.1 in support of its motion for summary judgment.

### UNDISPUTED FACTS

**I.**    **The Parties and the Relationship Between the Defendants**

    1.  Plaintiff is a corporation organized under the laws of Ontario, Canada that was formed to

engage in transactions involving the purchase and sale of cryptocurrency mining machines,

which are known in the industry as "miners."  Tencer Decl. ¶ 2.

    2.  Defendant DPW Holdings, Inc. n/k/a Ault Alliance, Inc. ("DPW") is a Delaware

corporation that acts as a holding company set up to hold interests in other subsidiaries.  Ault

Dep. (Mandel Ex. A) at 29-30 and Mandel Ex. D; First Amended Complaint (ECF No. 35) and

Answer of DPW (ECF No. 99) ¶ 3.

3.   Defendant Super Crypto Mining, Inc. n/k/a Digital Farms, Inc. ("Super Crypto") is a Delaware corporation that is a wholly owned subsidiary of DPW and was formed in January 2018 to acquire miners and produce cryptocurrency.  Ault Dep. (Mandel Ex. A) at 45-46; Mandel Ex. E; Magot Dep. (Mandel Ex. B) at 29-30; First Amended Complaint (ECF No. 35) and Answer of Super Crypto (ECF No. 98) ¶ 4.

4.   Super Crypto ceased operations in the first quarter of 2020 due to deteriorating market conditions and has no current operations.  Ault Dep. (Mandel Ex. A) at 53, 55-56; Mandel Ex. F at F-28; Magot Dep. (Mandel Ex. B) at 22-23, 44.

5.   Super Crypto was insolvent throughout its existence, with its liabilities consistently exceeding its assets.  Ault Dep. (Mandel Ex. A) at 64; Magot Dep. (Mandel Ex. B) at 44-45; Mandel Ex. G.

6.   Its balance sheet showed a ██████████████████████ for its first year of existence and ████████████████ for 2019, its second year of existence.  Mandel Ex. G; Ault Dep. (Mandel Ex. A) at 62-63; Magot Dep. (Mandel Ex. B) at 237.

7.   Mr. Ault, the CEO and Chairman of DPW and Chairman of Super Crypto, acknowledged at his deposition that Super Crypto was incapable of meeting its obligations without assistance from DPW and would not exist without a parent company that was a supportive investor committed to providing it capital.  Ault Dep. (Mandel Ex. A) at 64-66.

8.   DPW funded Super Crypto throughout its existence.  Ault Dep. (Mandel Ex. A) at 73-80, 87-88, 92-93, 97-98; Magot Dep. (Mandel Ex. B) at 242-243.  *See also* paragraphs 23-25 *infra* and citations therein concerning DPW's payment of Super Crypto's bills.

9.   In his capacity as CEO and Chairman of DPW, Mr. Ault was responsible for allocating capital to Super Crypto and DPW's other subsidiaries.  Ault Dep. (Mandel Ex. A) at 87-88;

Magot Dep. (Mandel Ex. B) at 153-154.

10. Mr. Ault described allocating DPW's capital to the various subsidiaries as "the reason we're here." Ault Dep. (Mandel Ex. A) at 88.

11. As of 2018, DPW's subsidiaries were not fully developed and Mr. Ault was regularly involved in making determinations as to how much money to send to its subsidiaries, including Super Crypto, to fund their operations. Ault Dep. (Mandel Ex. A) at 92-93, 97-98.

12. Super Crypto only had its own bank account for approximately three months between February and April 2018. Magot Dep. (Mandel Ex. B) at 239-241; Ault Dep. (Mandel Ex. A) at 72; Mandel Ex. H.

13. The bank account was opened ████████████ with a deposit of a mere $25. Ault Dep. (Mandel Ex. A) at 76; Mandel Ex. H.

14. All the funds subsequently deposited into that account, totaling ████████████, came from DPW. Ault Dep. (Mandel Ex. A) at 75-80; Magot Dep. (Mandel Ex. B) at 242-243; Mandel Ex. H.

15. Despite the volume of DPW's deposits, Super Crypto never had ████████████ ████ at the end of the month, because all the other deposited funds were used by Super Crypto to pay third parties. Mandel Ex. H.

16. There was no formal loan agreement in place between DPW and Super Crypto with respect to the funds DPW provided to Super Crypto. Magot Dep. (Mandel Ex. B) at 150; Ault Dep. (Mandel Ex. A) at 68-69.

17. Accordingly, Super Crypto was not obligated to pay interest or to repay the funds within any set period. Magot Dep. (Mandel Ex. B) at 150-151.

18. The funds provided to Super Crypto were treated as advances with any repayment terms

to be worked out in the end if Super Crypto ever became financially viable. Magot Dep. (Mandel Ex. B) at 150-151; Ault Dep. (Mandel Ex. A) at 68-71.

19. Super Crypto never paid back the advances made to it. Magot Dep. (Mandel Ex. B) at 151.

20. Super Crypto's balance sheet for 2019 shows "intercompany receivables" of nearly $12 million, reflecting more than $2 million that had been advanced to it by DPW and another $9 million advanced by another wholly owned subsidiary of DPW, Coolisys, to fund the purchase of miners. Magot Dep. (Mandel Ex. B) at 238-239; Mandel Ex. G.

21. Super Crypto never made a profit and never paid any dividends. Magot Dep. (Ex. B) at 239.

22. When Super Crypto ceased operations, it had no cash or other currency on hand. Magot Dep. (Mandel Ex. B) at 44-45.

23. DPW exercised full control over Super Crypto's finances, determining which of Super Crypto's many creditors would be paid and when. Ault Dep. (Mandel Ex. A) at 84-100, 102-106, 108-111; Magot Dep. (Mandel Ex. B) at 69-72, 75, 84-85; Mandel Ex. J-CC, RRR, AAAAA.

24. Super Crypto's CEO, Mr. Magot, regularly came to DPW's CEO and Chairman, Mr. Ault, with requests for funds to pay Super Crypto's bills, and Mr. Ault would then determine what amount of funding to make available. Ault Dep. (Mandel Ex. A) at 84-100, 102-106, 108-111; Magot Dep. (Mandel Ex. B) at 69-72, 75, 84-85; Mandel Ex. J-CC, RRR, AAAAA.

25. After April 2018 when Super Crypto no longer had a bank account, payments were made directly by DPW or another of DPW's wholly owned subsidiaries at Mr. Ault's direction. Ault Dep. (Mandel Ex. A) at 99-100, 102-106, 108-111; Magot Dep. (Mandel Ex. B) at 69-72, 75, 84-

85; Mandel Ex. W-CC, RRR, AAAAA.

26. Super Crypto was unable to pay its bills without contributions from DPW. Ault Dep. (Mandel Ex. A) at 104; Magot Dep. (Mandel Ex. B) at 70.

27. Even with DPW's assistance, Super Crypto still owed ███████████████ as of October 2018, according to a memo sent by Mr. Magot to Mr. Ault. Mandel Ex. DD.

28. Included among Super Crypto's outstanding balances in Mr. Magot's October 7, 2018 memo was more than $1.5 million owed to Plaintiff. Mandel Ex. DD.

29. DPW ultimately paid for outstanding debts of Super Crypto to some of the vendors shown in Mr. Magot's October 7, 2018 email even though DPW was not a party to the contract between Super Crypto and those entities. Ault Dep. (Mandel Ex. A) at 111-113, 115-116; Mandel Ex. DD.

30. DPW and Super Crypto shared common officers and directors. Ault Dep. (Mandel Ex. A) at 74-75; Magot Dep. (Mandel Ex. B) at 31-32; Mandel Ex. I, QQ.

31. Mr. Ault was Chairman of the Board for both DPW and Super Crypto, and William Horne was a Board member of, and served as CFO for, both entities. Ault Dep. (Mandel Ex. A) at 74-75; Magot Dep. (Mandel Ex. B) at 31-32; Mandel Ex. I, QQ.

32. In addition, Mr. Magot, the CEO of Super Crypto, along with both Mr. Ault and Mr. Horne, were member of the Board of Ault & Company Inc., a large shareholder in DPW. Ault Dep. (Mandel Ex. A) at 198; Magot Dep. (Mandel Ex. B) at 31-32.

33. DPW and Super Crypto also shared not only a street address, but a suite at that address. Mandel Decl. ¶ 107 & Ex. BBBBB.

II.    **Negotiation of the Asset Purchase Agreement**

34. Joe Kalfa, acting on behalf of Plaintiff, reached out to Mr. Magot, Super Crypto's CEO,

via LinkedIn on February 23, 2018 after reading a press release about DPW setting up crypto

mining operations through Super Crypto.  Kalfa Dep. (Mandel Ex. C) at 38-39, 47-50; Mandel

Ex. SSSS.

35. Mr. Kalfa inquired whether Mr. Magot was interested in purchasing 1,100 Antminer S9

machines that Plaintiff had available.  Mandel Ex. SSS; Magot Dep. (Mandel Ex. B) at 85-86.

36. Mr. Magot indicated that he was "very interested" in purchasing the machines, but he

would need a few days "to confirm all the financing."  Mandel Ex. SSS; Magot Dep. (Mandel

Ex. B) at 86.

37. By financing, Mr. Magot was referring to getting an advance from the parent company,

DPW.  Magot Dep. (Mandel Ex. B) at 86.

38. Both Mr. Magot and Mr. Ault acknowledged at their depositions that Super Crypto had

no ability to meet the obligation for purchasing the machines from Plaintiff without an advance

from DPW.  Magot Dep. (Mandel Ex. B) at 86; Ault Dep. (Mandel Ex. A) at 78, 95-96, 119-121.

39. Mr. Magot's communications with Plaintiff consistently made clear that Super Crypto

needed DPW's approval and funding before entering into an agreement with Plaintiff.  Mandel

Ex. EE, TTT, UUU, VVV; Tencer Decl. ¶ 4.

40. In a February 27, 2018 email to Willy Tencer, Plaintiff's President, Mr. Magot wrote that

"[w]e absolutely want the machines but would need more time to get board approval to purchase

the machines."  Magot Dep. (Mandel Ex. B) at 90; Mandel Ex. TTT.

41. The other members of the Super Crypto board of directors, Mr. Ault and Mr. Horne, were

both also members of the board of DPW, which was to supply Super Crypto with the funding for

the transaction. Magot Dep. (Mandel Ex. B) at 90.

42. A few days later, on March 2, 2018, Mr. Magot wrote to Mr. Tencer that "I'm working to

get confirmations on when I'm getting the funding that I need to finalize the purchase." Magot Dep. (Mandel Ex. B) at 93; Mandel Ex. EE.

43. The funding to which Mr. Magot was referring was a cash advance from DPW, and Mr. Magot testified that he wanted to make clear to Plaintiff that the deal was dependent upon Super Crypto receiving such funding. Magot Dep. (Mandel Ex. B) at 93-94.

44. Mr. Magot went on in his March 2, 2018 email to expressly reference DPW, emphasizing that "our parent company is very supportive and wants us to make the purchase with you." Mandel Ex. EE.

45. Mr. Magot acknowledged at his deposition that he wanted Plaintiff to take comfort from the fact that DPW was supportive of the transaction. Magot Dep. (Mandel Ex. B) at 94-95.

46. Mr. Ault testified that Mr. Magot mentioned the parent company because that's where Super Crypto was getting the money from. Ault Dep. (Mandel Ex. A) at 124-125.

47. As a result of communications such as these, Plaintiff understood from the outset that Super Crypto was part of a much bigger organization, the public company DPW, which was funding the deal. Tencer Decl. ¶ 4.

48. In a March 6, 2018 email to Mr. Tencer, Mr. Magot expressed frustration that he was not yet able to sign the agreement with Plaintiff, while assuring Plaintiff that that he had "emails, voice messages, and texts out to the CEO of our parent asking for approval to sign" and "that Todd (the CEO) wants to close the deal as well so I expect good news when we connect." Mandel Ex. UUU; Magot Dep. (Mandel Ex. B) at 111-114.

49. Mr. Magot had not yet been able to secure DPW's commitment to finance the transaction and would not sign the agreement without assuring that the funding was available from DPW. Magot Dep. (Mandel Ex. B) at 111-114.

50. On March 7, 2018, Mr. Magot reiterated in an email to Mr. Tencer that "[o]nce I'm comfortable that we can meet the financial commitment on the timeline and I have approval to sign today, I will."  Mandel Ex. VVV.

51. Mr. Magot testified at his deposition that he reached that necessary comfort level through communications with the parent company on how advances would arrive at Super Crypto. Magot Dep. (Mandel Ex. B) at 115-116.

52. Mr. Magot's internal communications with Mr. Ault confirm that Mr. Magot sought and obtained Mr. Ault's confirmation that Mr. Ault was "comfortable" working under the terms negotiated with Plaintiff and that it was "possible" to meet the financial obligations.  Mandel Ex. FF, GG; Magot Dep. (Mandel Ex. B) at 97-98, 109.

53. Mr. Ault believed that DPW would be able to fund Super Crypto's purchase of the 1,100 machines from Plaintiff along with all Super Crypto's needs.  Ault Dep. (Mandel Ex. A) at 126-128.

54. DPW's 10-K filing for the 2017 fiscal year indicated that DPW intended to fund Super Crypto's $3.2 million purchase of 1,100 miners through the proceeds of a DPW stock offering. Mandel Ex. QQ at F-64; Ault Dep. (Mandel Ex. A) at 159-160.

## III.    Execution and Performance of the Agreement

### A.  The Payment Terms

55. On March 8, 2018, Plaintiff and Super Crypto signed an "Asset Purchase Agreement" (the "Agreement") pursuant to which Super Crypto agreed to purchase from Plaintiff 1,100 Bitmain Antminer S9 model cryptocurrency machines and 1,100 power supply units (collectively, the "Machines") for a total purchase price of $3,272,500.  Mandel Ex. HH; Magot Dep. (Mandel Ex. B) at 50; Tencer Decl. ¶ 3.

56. The Agreement divided the payment of the purchase price as follows: (a) two deposit payments totaling $163,625 to be paid on March 9, 2018 and March 13, 2018 respectively and to be applied toward the final 600 of the 1,100 Machines; (b) a payment of $1,487,500 to be paid on or before March 23, 2018 to pay for the first 500 Machines; and (c) a payment of $1,621,375 to be paid on or before April 15, 2018 to cover the balance due on the remaining 600 Machines. Mandel Ex. HH; Tencer Decl. ¶ 5.

57. Using funds advanced to it by DPW, Super Crypto made timely payments to Plaintiff of the deposit amounts totaling $163,625, but it was unable to meet any of the deadlines specified in the Agreement for the remaining payments.  Tencer Decl.¶ 6; Ault Dep. (Mandel Ex. A) at 77-79; Mandel Ex. H.

**B.  The First 500 Machines**

58. On March 22, 2018, Super Crypto and Plaintiff entered into an escrow agreement pursuant to which the payment of $1,487,500 that was due for the first 500 Machines would be paid into escrow and those 500 Machines would then be released to Super Crypto.  Magot Dep. (Mandel Ex. B) at 120-121; Ault Dep. (Mandel Ex. A) at 140-142; Mandel Ex. JJ.

59. The escrow arrangement was implemented at Mr. Ault's request.  Ault Dep. (Mandel Ex. A) at 138-140; Magot Dep. (Mandel Ex. B) at 119-120.

60. In a March 21, 2018 email to Mr. Tencer, Mr. Magot wrote: "*Our CEO* is still nervous over the transfer process," and Mr. Tencer thus agreed to using an escrow agent, stating "I believe *your CEO* will now be comfortable." (emphasis added).  Mandel Ex. II, JJ; Magot Dep. (Mandel Ex. B) at 119-120.

61. Mr. Magot testified at his deposition that both references to his CEO were to Mr. Ault, the CEO of DPW.  Magot Dep. (Mandel Ex. B) at 119-120.

62. Although Article 2(a)(ii) of the Agreement required the payment for the first 500 Machines in the amount of $1,487,500 to be made on or before March 23, 2018, Super Crypto was unable to meet that schedule.  Tencer Decl. ¶ 6; Magot Dep. (Mandel Ex. B) at 53-55.

63. Plaintiff worked with Defendants to provide flexibility on the timing of that payment and subsequent payment owed under the Agreement in an effort to allow Defendants to satisfy the contractual obligation to purchase the 1,100 Machines.  Magot Dep. (Mandel Ex. B) at 53-55, 73-74, 137, 144-146, 168, 195-196, 203-204; Ault Dep. (Mandel Ex. A) at 145-148, 165-167; Mandel Ex. SS, EEE, WWW, BBBB; Tencer Decl. ¶¶ 9, 15.

64. Once it became apparent that the March 23, 2018 payment for the first 500 Machines would not be made in a timely manner, Mr. Ault became directly involved in discussions with Plaintiff concerning the timing of payments and effectively took over all management of the transaction on the part of Defendants.  Tencer Decl. ¶ 7; Mandel Ex. KK, RR, SS, TT, UU, AAA, WWW, XXX; Magot Dep. (Mandel Ex. B) at 124-125, 137-139, 142-143, 148-150; Ault Dep. (Mandel Ex. A) at 145-148, 164-165, 167-169.

65. Mr. Magot's communications with Plaintiff consistently made clear that Mr. Ault's input was required to provide any information on the anticipated timing of payments, and Defendants' internal communications confirm that Mr. Ault directed Mr. Magot's interactions with Plaintiff. Mandel Decl. Ex. YY, AAA, CCCC, GGGG, TTTT, UUUU; Magot Dep. (Mandel Ex. B) at 166-167, 169-171, 173-176, 178-179, 188-189, 199-201; Ault Dep. (Mandel Ex. A) at 190-191.

66.  Communications from Messrs. Magot and Ault to Plaintiff frequently made no distinction between DPW and Super Crypto as separate entities.  Mandel Ex. NNN, VVVV, WWWW, XXXX, YYYY, ZZZZ (Ex. G to stipulation); Magot Dep. (Mandel Ex. B) at 221-222. Tencer Decl. ¶ 7.

67. On March 26, 2018, three days after the payment for the first 500 Machines was due under the Agreement, Mr. Magot emailed Mr. Tencer that "[t]he CEO of the parent company would like to share with you the details around the timing of the release from escrow."  Mandel Ex. KK; Magot Dep. (Mandel Ex. B) at 124-125.

68. Mr. Magot testified that the purpose of having Mr. Ault convey the information was to be as transparent as possible in clarifying the timing of the advance DPW would be sending Super Crypto to complete the purchase.  Magot Dep. (Mandel Ex. B) at 124-125.

69. Mr. Ault testified that he was likely talking to Mr. Tencer to go through with him when money would be available given that the March 23 payment called for in the Agreement had not been made.  Ault Dep. (Mandel Ex. A) at 145-146.

70. Mr. Ault and Mr. Tencer spoke on March 26, 2018, and Mr. Ault provided assurances that some of the money that was due would be sent. Tencer Decl. ¶ 8; Ault Dep. (Mandel Ex. A) at 147-150; Mandel Ex. LL-NN.

71. On March 29, 2018, DPW wired $100,000 to Plaintiff toward the payment of the first 500 Machines.  Ault Dep. (Mandel Ex. A) at 151-153; Magot Dep. (Mandel Ex. B) at 131-134; Mandel Ex. OO; Tencer Decl. ¶ 8.

72. After further communications between Mr. Ault and Mr. Tencer over the next two weeks, DPW eventually paid the remaining $1,387,500 that was owed on the first 500 Machines into escrow and the funds were released to Plaintiff on April 17, 2018, nearly a month after the payment was required under the Agreement and after the deadline had already passed for paying the balance due on the remaining 600 Machines.  Tencer Decl. ¶¶ 9-10; Ault Dep. (Mandel Ex. A) at 157-158, 167-169, 173-177; Magot Dep. (Mandel Ex. B) at 127, 161-162; Mandel Ex. RR-WW, ZZZ.

73. Super Crypto took possession of the first 500 Machines.  Tencer Decl. ¶ 10.

**C.  The Remaining 600 Machines**

74. In the period leading up to the delayed payment on the first 500 Machines and continuing for months thereafter, Defendants repeatedly reiterated their desire to complete the transaction and obtain the remaining 600 Machines covered by the Agreement.  Ault Dep. (Mandel Ex. A) at 154-158, 162-163, 168-169, 179-180, 185-186, 203-209, 217-218, 221; Magot Dep. (Mandel Ex. B) at 135-136, 158-159, 167-176, 188-189, 199-201, 203, 205-206, 217, 221-222; Mandel Ex. PP, UU, YY, ZZ, DDD, EEE, FFF, MMM, NNN, CCCC, DDDD, EEEE, FFFF, GGGG, IIII, ZZZZ (Exhibits B, D, F, G, I to stipulation); Tencer Decl. ¶¶ 11, 19.

75. Defendants did not at any time indicate to Plaintiff that they were no longer interested in the 600 Machines.  Tencer Decl. ¶ 11; Magot Dep. (Mandel Ex. B) at 172-173; Ault Dep. (Mandel Ex. A) at 155-156.

76. Right after completing the payment for the first 500 Machines, Super Crypto entered into a new escrow agreement with Blockchain covering the remaining 600 Machines.  Tencer Decl. ¶ 12; Magot Dep. (Mandel Ex. B) at 163-165; Ault Dep. (Mandel Ex. A) at 182-184; Mandel Ex. XX, AAAA.

77. The escrow agreement provided that an escrow account was to be funded with the $1,621,375 amount remaining due on the 600 Machines under the Agreement, and the 600 Machines would be released to Super Crypto upon such payment.  Mandel Ex. XX; Ault Dep. (Mandel Ex. A) at 182-184; Tencer Decl. ¶ 12.

78. Although Defendants never funded the escrow account, DPW made numerous payments to Blockchain over the next several months toward the purchase of the 600 Machines.  Tencer Decl. ¶ 13 & Ex. 1; Ault Dep. (Mandel Ex. A) at 197-198, 211-216; Magot Dep. (Mandel Ex. B)

at 79-80, 183-184, 213; Mandel Ex. BBB, CCC, GGG-LLL, JJJJ.

79. Defendants also made repeated promises to Plaintiff over a period of months that

payment for the 600 Machines was forthcoming.  Tencer Decl. ¶ 14; Ault Dep. (Mandel Ex. A)

at 162, 185-186, 203-206, 217-218, 221; Magot Dep. (Mandel Ex. B) at 166-176, 188-189, 199-

201, 203, 205-206; Mandel Ex. YY, ZZ, DDD, FFF, MMM, CCCC, EEEE, GGGG, IIII.

80. Mr. Ault described those promises at his deposition as "commitments" of the parent

company:

> Those were commitments I made, yeah, on behalf of the parent to – I mean,
> we fund our subsidiary, so you know, the subsidiary made a commitment to
> buy something, and it was always our intention to fund the subsidiary, so
> they could complete their business model.  There's not a question about
> that.

Ault Dep. (Mandel Ex. A) at 162-163, 226.

81. Between May and August 2018, DPW paid Plaintiff more than $87,000 to be applied

toward the purchase of the 600 Machines under the Agreement, in addition to another $32,000

applied toward storage charges of $300 a day that Defendants had agreed to pay to Plaintiff for

storing the 600 Machines while the balance due remained unpaid.  Tencer Decl. ¶ 13 & Ex. 1;

Ault Dep. (Mandel Ex. A) at 230-231; Magot Dep. (Mandel Ex. B) at 83, 217-220, 224-226;

Mandel Ex. BBB, GGG-LLL, OOO, JJJJ, KKKK, MMMM, ZZZZ (Ex. O to stipulation).

82. Defendants' purpose in making the payments to Plaintiff was to show Plaintiff their

continuing intention to pay for the 600 Machines.  Ault Dep. (Mandel Ex. A) at 215-216; Magot

Dep (Mandel Ex. B) at 186-187, 210-211; Mandel Ex. LLL.

83. As Mr. Ault testified at his deposition, "[t]here would be no other reason to wire him than

to show him our intentions to pay."  Ault Dep. (Mandel Ex. A) at 215-216.

84. Mr. Magot agreed at his deposition that the intention in continuing to make payments was

to show there was still a commitment to finalize the payment on the remaining 600 Machines. Magot Dep. (Mandel Ex. B) at 186-187, 210-211.

85. Plaintiff agreed to work with Defendants in holding the Machines beyond the dates set in the Agreement so long as Defendants would honor their payment commitments within a reasonable time.  Tencer Decl. ¶ 15; Ault Dep. (Mandel Ex. A) at 165-167; Magot Dep. (Mandel Ex. B) at 144-146, 168, 203-205; Mandel Ex. SS, BBBB, HHHH.

86. Defendants believed that Plaintiff was acting reasonably with respect to the arrangement and continued to work with it on that basis.  Ault Dep. (Mandel Ex. A) at 165-167; Magot Dep. (Ex. B) at 144-146, 195-196, 203-205; Mandel Ex. EEE.

87. Despite Defendants' many months of promises that payment for the remaining 600 Machines was forthcoming, Defendants made no further payments to Plaintiff after August 17, 2018.  Tencer Decl. ¶ 15 & Ex. 1; Ault Dep. (Mandel Ex. A) at 227-229; Magot Dep. (Mandel Ex. B) at 223-226; Mandel Ex. LLLL, MMMM.

88. In late October 2018, Plaintiff notified Defendants of Plaintiff's intention to resell the 600 Machines and to seek recovery of the difference between the resale price and the contract price, together with incidental damages and attorney's fees as provided in the Agreement.  Tencer Decl. ¶ 16 & Ex. 2; Magot Dep. (Mandel Ex. B) at 235; Mandel Ex. PPPP.

**IV.    <u>Plaintiff's Resale of the 600 Machines</u>**

89. In November 2018, Plaintiff entered into an agreement with Backbone Hosting Solutions Inc. ("Backbone") pursuant to which Plaintiff resold the 600 Machines to Backbone for a total price of $189,840.00, including tax.  Tencer Decl. ¶ 17; Kalfa Dep. (Mandel Ex. C) at 181-196; Mandel Ex. QQQQ, RRRR.

90. By the time of the sale to Backbone, the market value of the Machines had dropped

substantially, and they could not be sold for anything close to the price set in the Agreement.
Kalfa Dep. (Mandel Ex. C) at 185-186.

91. Super Crypto's CEO, Mr. Magot, had noted to Plaintiff about a month prior to the resale
that the listed price for the Machines on the Bitmain website had dropped to $411 per machine.
Magot Dep. (Mandel Ex. B) at 229; Mandel Ex. NNNN.

92. Mr. Magot, who closely followed the market for miners at least weekly as of 2018,
testified at his deposition that he had no reason to believe the resale price obtained by Blockchain
was unreasonable given marketplace conditions.  Magot Dep. (Mandel Ex. B) at 235-237.

## IV.    Defendants' After-the-Fact Attempt to Avoid Liability

93. After the filing of this lawsuit, Defendants asserted for the first time that Super Crypto
did not breach the Agreement based on Article 3 of the Agreement, which provides as follows:

> In the event [Super Crypto] fails to pay the Balance to [Plaintiff] on or
> before April 15, 2018, the Deposit funds shall be forfeited to [Plaintiff],
> and the remainder of this Agreement save and except for Article 2(a)(i)
> [dealing with the Deposit] and Article 3, shall be null and void and all
> Parties shall be relieved of its (sic) further obligations herein.

Mandel Ex. HH; Defendants' Pre-Motion Letter (ECF No. 107); Magot Dep. (Mandel Ex. B) at
48-49.

94. At no time during the parties' course of dealings did Defendants ever indicate to Plaintiff
either in writing or orally that that they intended to walk away from the purchase of the
remaining 600 Machines pursuant to Article 3.  Tencer Decl. ¶ 18; Magot Dep. (Mandel Ex. B)
at 66-67, 172-173; Ault Dep. (Mandel Ex. A) at 155-156.

95. Indeed, Mr. Ault could not recall even considering whether to invoke Article 3 as
grounds for avoiding the purchase of the final 600 Machines; he "just remember[ed] wanting the
machines" and being concerned that Plaintiff might sell the Machines to someone else after April

15, 2018.  Ault Dep. (Mandel Ex. A) at 177-179.

96.  While Mr. Magot testified that internal consideration was given to walking away from the purchase of the final 600 Machines as of the April 15, 2018 date set in Article 3, he "made the business decision to try to continue purchasing equipment."  Magot Dep. (Mandel Ex. B) at 62-63.

97. Mr. Magot closely followed pricing in the market for miners during 2018 and was aware that the value of the Machines on the open market had decreased since entering into the Agreement.  Magot Dep. (Mandel Ex. B) at 59-61.

98. However, he also knew that the cryptocurrency market was volatile and "that the fluctuations in this new market aren't predictable…."  Magot Dep. (Mandel Ex. B) at 63-64.

99. He remained hopeful that prices would increase again and made the assessment when the time came for invoking Article 3 that it was in the best interest of the company "to do whatever I could to keep the company running and buy equipment."  Magot Dep. (Mandel Ex. B) at 63-65.

100.      Mr. Ault shared that assessment and also wanted to buy the Machines.  Ault Dep. (Mandel Ex. A) at 157, 177-178.

101.      Mr. Magot never altered his view over the next six months, as he remained focused during that entire period on trying to purchase the Machines from Plaintiff.  Magot Dep. (Mandel Ex. B) at 67-68.

102.      Although the value of the Machines continued to decline dramatically over this period, Defendants made a business decision that they still wanted them and remained optimistic that the market could turn around.  Magot Dep. (Mandel Ex. B) at 186, 204-05.

103.      Defendants' concern was focused not on avoiding an obligation to purchase the remaining 600 Machines, but on the possibility that Plaintiff might sell the Machines to someone

else.  Ault Dep. (Mandel Ex. A) at 177-178; Magot Dep. (Mandel Ex. B) at 73, 107-109, 144-147.

104.     Had Defendants opted to rely on Article 3 to avoid purchasing the Machines, they would have communicated that decision to Plaintiff.  Magot Dep. (Mandel Ex. B) at 192-195.

105.     However, no such decision was ever made or is reflected in any of the parties' communications, all of which reiterated Defendants' goal of completing the purchase as Mr. Ault consistently worked to obtain the necessary funding.  Magot Dep. (Mandel Ex. B) at 194-195, 228, 231; Ault Dep. (Mandel Ex. A) at 157-158, 179-181, 186, 205-206, 211-212, 217-218.  *See also* paragraph 74 *supra* and citations therein.

106.     Super Crypto's internal communications to DPW consistently refer to an ongoing obligation to Plaintiff to pay for the final 600 Machines without any suggestion that the Agreement somehow permitted them to avoid that obligation.  Magot Dep. (Mandel Ex. B) at 56-58, 70, 72, 75-79, 81-84, 159-161, 196-197, 233-234; Mandel Ex. X, Z, AA, CC, DD, EEE, PPP, QQQ, RRR, YYY, OOOO.

107.     Defendants never objected to any of Plaintiff's accountings of the amounts owed. Magot Dep. (Mandel Ex. B) at 217-220; Mandel Ex. KKKK.

108.     Mr. Magot acknowledged at this deposition believing that Super Crypto owed Plaintiff for the 600 Machines well after the date in Article 3, including as late as just a few weeks before Plaintiff eventually sold the Machines to another party.  Magot Dep. (Mandel Ex. B) at 56-58, 70, 72, 75-79, 81-84, 196-197.

Dated:  May 30, 2023

**COWAN, LIEBOWITZ & LATMAN, P.C.**

By: _____

           Richard S. Mandel (rsm@cll.com)
           Dasha Chestukhin (dxc@cll.com)
114 West 47th Street
New York, New York 10036
(212) 790-9200

*Attorneys for Plaintiff Blockchain Mining Supply &
Services Ltd.*