UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLOCKCHAIN MINING SUPPLY AND SERVICES LTD., <br><br> Plaintiff, <br><br> –against– <br><br> SUPER CRYPTO MINING, INC. n/k/a DIGITAL FARMS, INC. and DPW HOLDINGS, INC. n/k/a AULT ALLIANCE, INC., <br><br> Defendants. | Civil Action No. 1:18-cv-11099-ALC <br><br> **DECLARATION OF WILLIAM TENCER IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

WILLIAM TENCER, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am the President of Plaintiff Blockchain Mining Supply and Services Ltd. ("Plaintiff"). I submit this declaration in support of Plaintiff's motion for summary judgment. I have personal knowledge of the facts and circumstances set forth herein.

2. Plaintiff is a corporation organized under the laws of Ontario, Canada. It was originally incorporated under the name Bubalo 18 Trading Inc. before changing its name to Blockchain Mining Supply and Services Ltd. I formed Plaintiff to engage in transactions involving the purchase and sale of cryptocurrency mining machines, which are known in the industry as "miners."

3. On March 8, 2018, Plaintiff and Defendant Super Crypto Mining, Inc. n/k/a Digital Farms, Inc. ("Super Crypto") signed an "Asset Purchase Agreement" (the "Agreement") pursuant to which Super Crypto agreed to purchase from Plaintiff 1,100 Bitman Antminer S9 model miners and 1,100 power supply units (collectively, the "Machines") for a total purchase

price of $3,272,500. A copy of the Agreement is attached (along with other deposition exhibits from the case) to the accompanying declaration of our counsel, Richard S. Mandel, as Exhibit HH.

4. At the time we entered into the Agreement, I understood that Super Crypto was part of a much bigger organization, the public company DPW Holdings n/k/a Ault Alliance, Inc. ("DPW"). During our negotiations, Darren Magot, Super Crypto's CEO, frequently referred to DPW and made clear that approval and funding for the deal was coming from DPW, which controlled the negotiations for Super Crypto.

5. In order to accommodate Super Crypto's and DPW's cash flow issues, the Agreement was structured so that the payment of the purchase price would be divided as follows: (a) two deposit payments totaling $163,625 to be paid on March 9, 2018 and March 13, 2018 respectively and to be applied toward the purchase of the final 600 of the 1,100 Machines; (b) a payment of $1,487,500 to be paid on or before March 23, 2018 to pay for the first 500 Machines; and (c) a payment of $1,621,375 to be paid on or before April 15, 2018 to cover the balance due on the remaining 600 Machines.

6. Although Super Crypto made timely payments to Plaintiff of the deposit amounts totaling $163,625, it was unable to meet any of the deadlines specified in the Agreement for the remaining payments. Although Article 2(a)(ii) of the Agreement required the payment for the first 500 Machines in the amount of $1,487,500 to be made on or before March 23, 2018, Super Crypto failed to make any additional payment beyond the initial deposits by that date.

7. Once it became apparent that Super Crypto would not be making a timely payment for the first 500 Machines, Mr. Ault, the CEO of DPW and Chairman of both Super Crypto and DPW, became directly involved in discussions with me concerning the timing of payments and

effectively took over all management of the transaction on the part of Defendants. From that point forward, Mr. Magot became little more than a messenger, arranging calls between Mr. Ault and myself and relaying messages as to when DPW would be obtaining funding or be making payments toward the purchase of the Machines. Communications from both Mr. Magot and Mr. Ault over the next several months frequently made no distinction between Super Crypto and DPW as separate entities in addressing whether funds were available and when payments would be made.

8. I spoke directly to Mr. Ault on March 26, 2018, and he promised to send $100,000 of the amount due immediately, to be quickly followed by the remainder of the payment that was now overdue for the first 500 Machines. On March 29, 2018, we received a wire for $100,000 from DPW toward the payment of the first 500 Machines.

9. Over the next few weeks, I had further communications with Mr. Ault both by telephone and email. Mr. Ault emphasized that he was committed to moving forward with the purchase of the 1,100 Machines but needed additional time to obtain the necessary funding. I made clear that we had no problem working with Defendants and holding the Machines beyond the agreed terms in our contract, so long as they were prepared to honor their payment commitments within a reasonable time. Both Mr. Ault and Mr. Magot repeatedly assured me that they were committed to that objective.

10. On or around April 16, 2018, nearly a month after the payment was required under the Agreement for the first 500 Machines and after the deadline had already passed for paying the balance due on the remaining 600 Machines, DPW paid the remaining $1,387,500 that was owed on the first 500 Machines into escrow. The funds were released to us on April 17, 2018, and Super Crypto took possession of the first 500 Machines.

11. In the period leading up to the delayed payment on the first 500 Machines and continuing for months thereafter, both Mr. Ault and Mr. Magot repeatedly reiterated their intention to complete the transaction and obtain the remaining 600 Machines covered by the Agreement. At no time did either Mr. Ault or Mr. Magot ever indicate to me that they were no longer interested in the 600 Machines or wished to walk away from the transaction.

12. Immediately after we received the payment for the first 500 Machines, Plaintiff and Super Crypto entered into a new escrow agreement covering the remaining 600 Machines. The escrow agreement provided that an escrow account was to be funded with the $1,621,375 amount remaining due on the 600 Machines under the Agreement, and the 600 Machines would be released to Super Crypto upon such payment.

13. Although Defendants never funded the escrow account, DPW made numerous payments to us over the next several months toward the purchase of the 600 Machines. Between May and August 2018, DPW paid Plaintiff $87,480 to be applied toward the purchase of the 600 Machines under the Agreement, in addition to another $32,000 applied toward storage charges of $300 a day that Defendants had agreed to pay to Plaintiff for storing the 600 Machines while the balance due remained unpaid. Attached hereto as Exhibit 1 is a summary I prepared as of November 26, 2018 reflecting the invoices issued by Plaintiff and the payments received from Defendants during 2018, along with copies of the confirmations for each of the wire payments made to Plaintiff during that time frame.

14. Mr. Ault and Mr. Magot also made repeated promises to me over an approximately six-month period following the payment for the first 500 Machines that payment for the remaining 600 Machines was forthcoming. Numerous of these promises are reflected in email communications which were marked as exhibits at the depositions of Mr. Ault and Mr. Magot

and which have been attached as exhibits to the accompanying Declaration of Richard S. Mandel, Esq.

15. Just as I had done in accommodating Defendants' late payment for the first 500 Machines, I indicated my willingness to work with Defendants in accepting delayed payment on the final 600 Machines so long as they honored their commitment within a reasonable time. However, despite many months of promises that payment for the remaining 600 Machines was forthcoming, Defendants made no further payments of any kind (either toward the balance owed on the 600 Machines or to cover the storage fees we charged them) after August 17, 2018.

16. On October 25, 2018, our counsel at the time, Ronald Meister of Cowan, Liebowtiz & Latman, P.C., sent a letter to the law firm that was then representing Defendants notifying them that Plaintiff intended to resell the 600 Machines. A copy of Mr. Meister's letter is attached hereto as Exhibit 2. The next day, I sent an email to Mr. Ault and Mr. Magot (Mandel Decl. Ex. PPPP) also providing the same notice.

17. On November 9, 2018, Plaintiff entered into an agreement with Backbone Hosting Solutions Inc. ("Backbone") pursuant to which we resold the 600 Machines to Backbone for a total price of $189,840, including tax. A copy of our agreement with Backbone is attached as Exhibit RRRR to the Mandel Declaration. By the time of the sale to Backbone, the market value of the Machines had dropped substantially, and they could not be sold for anything close to the price set in the Agreement.

18. I understand that Defendants contend in this lawsuit that they did not breach the Agreement because of Article 3 of the Agreement, which provided that if the balance owed on the final 600 Machines was not paid on or before April 15, 2018, the deposit payments would be forfeited, and any remaining obligations of the parties would be null and void. At no time during

our course of dealings did either Mr. Ault or Mr. Magot ever indicate to me either in writing or orally that they were invoking Article 3 to choose not to move forward with the purchase of the 600 Machines.

19. To the contrary, as set forth above, well after the Article 3 deadline had passed, both Mr. Ault and Mr. Magot repeatedly made clear their desire to acquire the Machines and to complete the purchase on the payment terms set forth in the Agreement. The only issue was how quickly they would be able to complete the required payments. Quite obviously, if their intention was to limit their exposure to just the initial deposits, it would have been senseless for them to continue making more than $87,000 in additional payments toward purchase of the Machines. While we made reasonable efforts to accommodate their delayed payments, it eventually became clear when their continuing payments ceased that they were not able to come up with the required funds.

20. Accordingly, we seek recovery in this action of $1,375,955, plus prejudgment interest, attorneys' fees (as provided for in Article 13(h) of the Agreement) and costs. The damages reflect the unpaid amount of the purchase price on the last 600 Machines ($1,533,895) plus unpaid storage charges ($31,900), as reflected in the attached Exhibit 1, less the amount we received from the resale of the 600 Machines to Backbone ($189,840).

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON MAY 23, 2023 AT TORONTO, CANADA.

_____
WILLIAM TENCER