UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
BLOCKCHAIN MINING SUPPLY AND
SERVICES LTD.,

           Plaintiff,

  -against-

SUPER CRYPTO MINING, INC. (N/K/A DIGITAL
FARMS, INC. and DPW HOLDINGS, INC.
(N/K/A AULT AULLIANCE, INC.),

           Defendants.
---------------------------------------------------------------X

Case No. 18-CV-11099-ALC

**SUPPLEMENTAL DECLARATION OF DARREN MAGOT**

[**PUBLIC – REDACTED**]

    I, Darren Magot, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

    1.    I am the Chief Executive Officer of Defendant Super Crypto Mining, Inc. (n/k/a Digital Farms, Inc.) ("Super Crypto") in the above-referenced matter. I have been the Chief Executive Officer since Super Crypto's inception.

    2.    I make this supplemental declaration in opposition to Plaintiff Blockchain Mining Supply and Services Ltd.'s ("Plaintiff") motion for summary judgment.

    3.    I make this supplemental declaration based upon my own personal knowledge of the facts and circumstances set forth herein.

    4.    On or about March 8, 2018, Super Crypto entered into an asset purchase agreement, dated March 8, 2018 (the "Agreement"), with Plaintiff, related to the purchase and sale of 1,100 Bitmain Antminer S9 model cryptocurrency machines and 1,100 power supply units (collectively, the "Machines"). A true and correct copy of the Agreement is attached to the Supplemental Declaration of Robert B. Volynsky, dated August 12, 2023, at Exhibit 36.

1

5. I executed the Agreement on behalf of Super Crypto, in my capacity as Chief Executive Officer of Super Crypto.

6. Pursuant to the terms of the Agreement, Super Crypto was only contractually obligated to: (i) pay a deposit of $163,625 (the "Deposit"); and (ii) purchase 500 Machines (the "Contracted-For Machines") for $1,487,500 (the "Contracted-For Amount"), or $2,975 per Contracted-For Machine.

7. At no point did I state to either of Plaintiff's principals, William Tencer or Yonah "Joe" Kalfa, that Super Crypto needed approval from DPW Holdings, Inc. (n/k/a Ault Alliance, Inc.) ("DPW") to enter into an agreement with Plaintiff.

8. Super Crypto was never contractually obligated to consummate a purchase for the remaining 600 Machines (the "Remaining Machines").

9. This was for good reason as I had expressed concern to Mr. Tencer regarding Super Crypto's ability to obtain the necessary financing for the Remaining Machines, as well as the volatile state of the cryptocurrency market.

10. Indeed, Super Crypto did not want to commit itself to purchasing *all* 1,100 Machines due to the volatile cryptocurrency market, as well as the uncertainties surrounding its ability (as a nascent company) to obtain the necessary financing for *all* 1,100 Machines.

11. Super Crypto felt comfortable that it would be able to obtain the requisite financing to pay for some of the Machines and informed Plaintiff of this limitation.

12. Thus, Super Crypto and Plaintiff agreed that the Agreement would be structured with a fixed liquidated damages provision such that Super Crypto would forfeit the Deposit if a purchase of all 1,100 Machines was not consummated by a date certain.

13. Super Crypto and Plaintiff exchanged multiple drafts of the Agreement that incorporated this bargained-for construct. *See* Exs. 1 and 2 hereto.

14. Exhibit 1 hereto is a document that is Bates Stamped DEFENDANTS_001410 – DEFENDANTS_001436 and is a true and correct copy of an e-mail, and accompanying attachment, from Mr. Tencer, which was received by me at the email address, darren@supercrypto.com.

15. During 2018, I utilized the e-mail address darren@supercrypto.com in connection with my Super Crypto related communications.

16. Throughout my correspondence with Mr. Tencer during 2018, Mr. Tencer utilized two e-mail addresses: sales@timerlane-mldg.com and wtencer@midcitycapital.ca.

17. Throughout my correspondence with Mr. Kalfa during 2018, Mr. Kalfa utilized the e-mail address joekalfa@gmail.com.

18. On or about March 6, 2018, Plaintiff proposed and Super Crypto agreed that, in the event that Super Crypto did not pay $1,621,375 (the "Remaining Amount") for the Remaining Machines, on or before April 15, 2018 (the "Expiration Date"), the Deposit would be automatically forfeited and that, among other things, Super Crypto would have no further obligations with regards to, among other things, the Remaining Machines.

19. Exhibit 2 hereto is a document that is Bates Stamped BMS 001141 – BMS 001167, which I recognize to be a true and correct copy of an e-mail, and accompanying attachment, that I sent from the email address darren@supercrypto.com to Messrs. Tencer and Kalfa.

20. Article 3 of the draft form of the Agreement contained at Exhibit 2 (*i.e.*, BMS 001159 – BMS 001167) was revised at least one additional time prior to the execution of the Agreement.

21. Article 3 of the Agreement provides that, in the event that the Remaining Amount is not paid on or before the Expiration Date, the Deposit would be forfeited and the balance of the Agreement "shall be deemed null and void and all parties shall be relieved of its further obligations herein." *See* Agreement, §3.

22. Super Crypto complied with its obligations under the Agreement by causing the Deposit and Contracted-For Amount to be paid to Plaintiff, in the amounts and on or about the dates set forth in the table below:

| Payment Date | Payment Amount | Purpose of Payment |
|---|---|---|
| March 9, 2018 | $80,000 | Deposit |
| March 13, 2018 | $83,625 | Deposit |
| March 29, 2018 | $100,000 | Contracted-For Amount |
| April 17, 2018 | $1,387,500 | Contracted-For Amount |

23. Although the Contracted-For Amount was paid after March 23, 2018, and Plaintiff accepted and retained the Contracted-For Amount after March 23, 2018, Plaintiff never conditioned its acceptance of the belated Contracted-For Amount on a modification or waiver of Article 3.

24. Super Crypto did not pay the Remaining Amount to Plaintiff, in whole or in part, on or before April 15, 2018.

25. As a result of same, it was my understanding that the Deposit had been forfeited to Plaintiff and that Plaintiff was free to sell the Remaining Machines elsewhere.

26. I articulated this sentiment to Mr. Tencer on multiple occasions after the Expiration Date.

27. To date, Plaintiff has retained the Deposit.

28. Notwithstanding, from April 16, 2018 forward, Super Crypto and Plaintiff both expressed a continued willingness to work with one another beyond the expired Agreement, in an effort to foster an ongoing business relationship in this niche space and to avoid the potential costs and expenses of the unnecessary litigation that had been threatened by Plaintiff.

29. Both parties were aware that the Agreement had been deemed null and void, the Deposit forfeited, and that Plaintiff was free to sell the Remaining Machines elsewhere. As previously stated, I had numerous discussions with Mr. Tencer to that effect.

30. At no point during these ongoing discussions with Plaintiff did Super Crypto and Plaintiff agree that Plaintiff would be required to forebear from reselling the Remaining Machines.

31. Additionally, at no point during these ongoing discussions with Plaintiff did Plaintiff ever state that it had decided that it was ceasing its active business operations or express its desire to exit the cryptocurrency space.

32. To the contrary, Plaintiff had made it seem like there could be future business relations. Relying on these representations, Super Crypto attempted to work something out with Plaintiff.

33. Over the course of the next few months, Plaintiff would insist that Super Crypto continue to make good-faith deposits and additional payments while Plaintiff and Super Crypto endeavored to formulate a new arrangement between the parties that could avoid the cost and burden of the threatened litigations by Plaintiff.

34. Super Crypto and Plaintiff, however, could not reach a new agreement with definitive terms regarding the Remaining Machines.

35. I understand from my counsel that Plaintiff is now claiming that Super Crypto either modified the Expiration Date under the Agreement or agreed to waive Article 3.

36. None of these statements are true and I, on behalf of Super Crypto, vehemently object to Plaintiff's insinuations.

37. Super Crypto never agreed to extend the Expiration Date and Super Crypto never executed any written amendments to that effect.

38. Similarly, Super Crypto never agreed to waive Article 3 and never executed any written waivers waiving Article 3 of the Agreement.

39. Super Crypto would not, did not, and never intended to waive or modify the terms of the Agreement in any way that would require Super Crypto to pay the Remaining Amount, as that provision was expressly bargained-for by and between Plaintiff and Super Crypto.

40. Super Crypto agreed to pay Plaintiff a total of $1,651,125 (*i.e.*, the Deposit and the Contracted-For Amount) under the Agreement for the inclusion of Article 3.

41. Throughout its existence, Super Crypto had its own bylaws. A true and correct copy of Super Crypto's bylaws is attached hereto at Exhibit 3 (DEFENDANTS_000007 – DEFENDANTS_000027).

42. In 2018, I was not an officer, director, or employee of DPW.

43. Throughout its existence, Super Crypto also had its own Board of Directors that executed numerous unanimous written consents ("UWCs") authorizing various of Super Crypto's corporate actions. True and correct copies of UWCs are attached hereto at Exhibit 4 (DEFENDANTS_000035 – DEFENDANTS_000041).

44. Throughout its existence, Super Crypto also had its own website: first, at www.supercryptomining.com and then, after its name change, at www.digitalfarmsinc.com.

45. Throughout its existence, Super Crypto had its own balance sheet.

46. Throughout its existence, Super Crypto also generated its own revenue from mining cryptocurrency from its cryptocurrency mining machines. Such cryptocurrency would be deposited into Super Crypto's cryptocurrency wallet.

47. A majority of Super Crypto's cryptocurrency mining machines, including, but not limited to, the Contracted-For Machines, were maintained at a data mining center located at 506 W. South St, South Bend, IN 46601-2784 (the "Data Mining Center").

48. The Data Mining Center was uniquely outfitted to support a large scale of cryptocurrency mining machines.

49. In connection with the Data Mining Center, Super Crypto engaged Digital Farms, LLC, who was responsible for managing the Data Mining Center, including, but not limited to, the build out of the Data Mining Center. True and correct copies of the Master Services Agreement between Super Crypto and Digital Farms, LLC, and the Amended and Restated Master Services Agreement between Super Crypto and Digital Farms, LLC are attached hereto at Exhibits 5 (DEFENDANTS_004793 –DEFENDANTS_004803) and 6 (DEFENDANTS_004832 – DEFENDANTS_004840) hereto.

50. Super Crypto also had its own insurance policy from ▮▮▮▮ (the "Insurance Policy"). A true and correct copy of the Insurance Policy is attached hereto at Exhibit 7 (DEFENDANTS_000089 – DEFENDANTS__000196). A copy of the cover page from the Insurance Policy is also attached to the Declaration of Richard Mandel, dated May 30, 2023, at Exhibit BBBBB.

51. Super Crypto's "▮▮▮▮ is listed on the Insurance Policy as: ▮▮▮▮ See Ex. 7, at DEFENDANTS_000098.

52. One of the locations listed under the "████████████████" section of the Insurance Policy is ████████████████████████████████████████████████ ████████████. *See id.*, at DEFENDANTS_000099.

53. From time to time, Super Crypto would seek advances from DPW related to, *inter alia*, potential transactions that Super Crypto was contemplating and/or Super Crypto's outstanding obligations.

54. DPW would then generally advance a set amount to Super Crypto without any conditions on the usage of such advanced funds.

55. Thus, any decisions regarding the allocation of the advanced funds from DPW remained exclusively with Super Crypto.

56. Exhibit 8 hereto is a document that is Bates Stamped DEFENDANTS_001813 – DEFENDANTS_001814 and is a true and correct copy of an e-mail that I sent from the email address darren@supercrypto.com to Mr. Tencer.

57. Exhibit 9 hereto is a document that is Bates Stamped DEFENDANTS_003178 – DEFENDANTS_003179 and is a true and correct copy of an e-mail from Mr. Tencer, which was received by me at the email address darren@supercrypto.com.

58. Exhibit 10 hereto is a document that is Bates Stamped DEFENDANTS_003198 and is a true and correct copy of an e-mail from Mr. Tencer, which was received by me at the email address darren@supercrypto.com.

59. Exhibit 11 hereto is a document that is Bates Stamped DEFENDANTS_003331 – DEFENDANTS_003338 and is a true and correct copy of an e-mail from Mr. Tencer, which was received by me at the email address darren@supercrypto.com.

60. Exhibit 12 hereto is a document that is Bates Stamped DEFENDANTS_003648 and is a true and correct copy of an e-mail from Mr. Tencer, which was received by me at the e-mail address darren@supercrypto.com.

Executed on this 12 day of August, 2023 in Costa Mesa, California.

Darren Magot

Scanned with CamScanner