Message

| | |
|---|---|
| **From:** | Willy Tencer [sales@timberlane-mldg.com] |
| **Sent:** | 3/6/2018 8:06:09 AM |
| **To:** | darren@supercrypto.com |
| **Subject:** | Antminer Sale Agreement |
| **Attachments:** | Escrow Agreement 3.1.18 Final.doc; super crypto mining purchase agreement 3 05 18 v2.docx |

Here you go.
I think it would be best to discuss any changes your attorney is contemplating before we go and forth with paperwork.
This will save a lot of time and legal fees.
Let me know what the issues are, if any.


Willy Tencer
Blockchain Mining Supply and Services Ltd.
200 - 345 Wilson Ave.,
Toronto, ON M3H 5W1
Tel. 416 398 1198
Fax 416 398 0878
sales@timberlane-mldg.com

**From:** Willy Tencer [mailto:sales@timberlane-mldg.com]
**Sent:** March 5, 2018 1:26 PM
**To:** 'darren@supercrypto.com' <darren@supercrypto.com>
**Cc:** Joe Kalfa - NADW <joekalfa@gmail.com>
**Subject:** RE: Antminer Sale Agreement


I have covered off all the points that you have mentioned below in the attached Purchase Agreement and Escrow Agreement.

Also attached are original Bitmain packing slips and Invoices (prices have been whited out by me).

Please return the signed agreements and let's firm up when you are coming to inspect.

Please send me a copy of the wire you are sending to the Escrow agent on 3/7.

As I told you, I'm happy to work within your time frame, as long as we know that we have a firm deal. So we need to finalize today.

Regarding your question  - The machines are in a logistics Warehouse. Once we inform them that your final payment has been received they will release the goods to Super Crypto.  You will be copied on the release that I give them. They will not release goods to anyone else.  We can have a conference call with them so that they are fully in the loop and they can also see the copy of the wire you are sending to confirm that releasing the goods to Super Crypto is going to happen. The Logistics company that is storing the goods are the ones that will deliver your machines to the destination of your choice. So they won't be going anywhere except to your facility.

If you need any additional assurances, we are happy to provide.

I will put you in touch  with the logistics company so that you can arrange the freight and confirm that the goods will be delivered.

They are a very reputable firm.

It's a pretty simple procedure.  We do it all the time.

Look forward to getting this first deal done discussing future possibilities.


Willy Tencer

Blockchain Mining Supply and Services Ltd.

200 - 345 Wilson Ave.,

Toronto, ON M3H 5W1

Tel. 416 398 1198

Fax 416 398 0878

sales@timberlane-mldg.com

---

**From:** darren@supercrypto.com [mailto:darren@supercrypto.com]
**Sent:** March 4, 2018 11:02 PM
**To:** sales@timberlane-mldg.com
**Subject:** RE: Antminer Sale Agreement


Hello Willy,


I appreciated your time on the phone today and I'm looking forward to our first transaction. I imagine that this will be one of many to come. Below please find my understanding of the terms along with a few questions I hoping you can help me with:


**March 7th**: Super Crypto place 5% of the purchase price (1,100 * $2,975 = $3,272,500 * 5% = **$163,625**) in Escrow with our Attorneys according to the escrow instruction.

By **March 9th** Super Crypto travels to Toronto and inspects the machines (we open randomly selected boxes of both machines and power supplies, plug and test random machines, count all machines and compare to packing slips).

Release the 5% deposit after the inspection is complete and we sign off.

By **March 16th** Super Crypto pays the remaining **$3,108,875** via wire directly to Blockchain Mining Supply). No need to go to escrow since we will have already inspected the machines.

We then ship the machines immediately and/or pay the $300 per day storage fee.

Thank you again for offering to help as a customs broker. I'll follow up with your plan for placement as it unfolds this week so we can discuss this further.


A few questions:

Could you share with us copies of the orders from Bitmain for us to review?

Who controls the machines at the airport? How do we take access after we pay and what assurances do we have that the machines will be there after we wire the money? (meaning how do we know that no one but an agent of Super Crypto can take the machines after payment?)


Thank you,

DEFENDANTS_001411

Darren Magot

714-887-6377

---

**From:** Willy Tencer [mailto:sales@timberlane-mldg.com]
**Sent:** Sunday, March 4, 2018 9:16 AM
**To:** darren@supercrypto.com
**Subject:** RE: Antminer Sale Agreement

Let me know when you are available this morning and I'll call you.
I am now available but did not want to call you too early.

Willy Tencer
Blockchain Mining Supply and Services Ltd.
200 - 345 Wilson Ave.,
Toronto, ON M3H 5W1
Tel. 416 398 1198
Fax 416 398 0878
sales@timberlane-mldg.com

---

**From:** darren@supercrypto.com [mailto:darren@supercrypto.com]
**Sent:** March 2, 2018 5:04 PM
**To:** sales@timberlane-mldg.com; 'Joe Kalfa - NADW' <joekalfa@gmail.com>
**Subject:** RE: Antminer Sale Agreement

Hi Willy,

I've been working to get confirmations on when I'm getting the funding that I need to finalize the purchase. As you know, the money never becomes available as fast as you want. With that said, our parent company is very supportive and wants us to make the purchase with you. I was just told that I can sign the agreement if we can agree that the Deposit of 5% can be made by 3/7/18. We then would be able to make the full payment by 3/16/18.

I went ahead and made the adjustments that you suggested below to the attached as well as adding the terms above. I understand that this isn't ideal but hope that it is something you will consider. With your approval I'm ready to sign the attached.

Thank you,

Darren Magot

**From:** Willy Tencer [mailto:sales@timberlane-mldg.com]
**Sent:** Friday, March 2, 2018 9:58 AM
**To:** darren@supercrypto.com; 'Joe Kalfa - NADW' <joekalfa@gmail.com>
**Subject:** RE: Antminer Sale Agreement

In have reviewed the agreements and a couple of minor changes should be inserted.

Page 1: insert today's date

Section 2: insert the escrow agent's name

Add section 2.1 Delivery of Escrow Amount – By March 5, 2018, or before, the Purchaser shall deposit the Escrow amount with the            Escrow agent, to be held and administered in accordance with the terms and conditions of this agreement.

Section 3 : we need to have a time line on the inspection date. I suggest to add wording that states inspection to take place by March 9,    2018. Assets must be retrieved within 3 days after inspection and Escrow funds released at that time. In the event goods are not picked up within 3 days, funds are, nevertheless, to be released. Purchaser shall be responsible for warehouse storage in the event goods are not picked up within 3 days after inspection.

Signing page: name should be William Tencer - President


Escrow agreement:

Page 1: insert today's date

Section 1.3: need a time line here too. Same as Section 2.1 of the asset Purchase agreement

Signing page: name should be William Tencer - President


If you have any questions or care to discuss, I am available, until 5:00 pm EST.

Otherwise I'll be awaiting your executed copy.

Look forward to meeting you next week when you come up for inspection. (we have some awesome restaurants here).

Take care.


Willy Tencer
Blockchain Mining Supply and Services Ltd.
200 - 345 Wilson Ave.,
Toronto, ON M3H 5W1
Tel. 416 398 1198
Fax 416 398 0878
sales@timberlane-mldg.com

**From:** darren@supercrypto.com [mailto:darren@supercrypto.com]
**Sent:** March 2, 2018 10:55 AM
**To:** 'Joe Kalfa - NADW' <joekalfa@gmail.com>; 'Willy Tencer' <sales@timberlane-mldg.com>
**Subject:** RE: Antminer Sale Agreement

DEFENDANTS_001413

Thank you Joe and good to meet you Willy.

I have a meeting with the board this morning at which time I expect to be able to sign and send you the executed agreement. I'll then add a few others to the chain who will be flying to Toronto for inspection and to arrange shipping. We are looking forward to moving through this smoothly so we can repeat the process again in the very near future.

Thank you,

Darren

**From:** Joe Kalfa - NADW [mailto:joekalfa@gmail.com]
**Sent:** Thursday, March 1, 2018 9:55 PM
**To:** darren@supercrypto.com; Willy Tencer <sales@timberlane-mldg.com>
**Subject:** Fwd: Antminer Sale Agreement

Hi Darren & Willy,

Connecting you both, so we can hopefully get this agreement to the finish line today.

Best Regards,
Joe Kalfa

**Mobile:** +1-410-504-6032

```
***** Confidentiality Disclaimer *****
This email (and any attached document) contains confidential information from Joe Kalfa. and
is intended solely for the person or organization to whom it is addressed. If you have
received this email in error, please notify joekalfa@gmail.com and destroy the attached
message (and all attached documents) immediately. Any unauthorized distribution, copying, or
other dissemination of this email is strictly prohibited.
```

---------- Forwarded message ----------
From: <darren@supercrypto.com>
Date: Fri, Mar 2, 2018 at 12:58 AM
Subject: RE: Antminer Sale Agreement
To: Joe Kalfa - NADW <joekalfa@gmail.com>

Hello Joe,

DEFENDANTS_001414

The attorney's worked fast and I'm happy to be able to get back to you with the attached. Note a redline on the agreement as well as a clean version (I had them update for the $2,975 price per). Also, there are Escrow instructions for your review.

A few questions:

-How long can we leave at the airport and is it secure, fee, etc.?

-Will you be doing this again or is this a one time opportunity to work together?

Thank you,

Darren Magot

---

**From:** darren@supercrypto.com [mailto:darren@supercrypto.com]
**Sent:** Thursday, March 1, 2018 1:47 PM
**To:** 'Joe Kalfa - NADW' <joekalfa@gmail.com>
**Subject:** RE: Antminer Sale Agreement

Hello Joe,

The attorneys confirmed that they are reviewing the agreement and are setting up Escrow instructions. They are in NY so I expect to hear back in the morning. I know that you wanted to have this signed today but I want to be an open book in sharing that I don't expect to have their approval until tomorrow. I'm pushing but just wanted to be clear.

Great to hear about the machines. How long can they be held at the airport? I'm making arrangements for pick up and sending a team to help get them inspected and moved next week.

Thank you,

Darren

**From:** Joe Kalfa - NADW [mailto:joekalfa@gmail.com]
**Sent:** Thursday, March 1, 2018 9:26 AM
**To:** darren@supercrypto.com
**Subject:** Re: Antminer Sale Agreement

Darren, ok, perfect.

It's 7:30pm on my end. So I'll be around for next few hours.

Half the shipment already arrived at Toronto airport. Rest is en route.

On Thu, Mar 1, 2018 at 7:22 PM <darren@supercrypto.com> wrote:

Hi Joe,

I'm sorry that I missed your reply. Fantastic – I'll get approval to sign the contract today.

Expect to hear from me this afternoon.

Darren

**From:** Joe Kalfa - NADW [mailto:joekalfa@gmail.com]
**Sent:** Thursday, March 1, 2018 9:20 AM
**To:** darren@supercrypto.com
**Subject:** Fwd: Antminer Sale Agreement

Darren, yes. See below I replied yesterday.
Let me know.

---------- Forwarded message ---------
From: Joe Kalfa - NADW <joekalfa@gmail.com>
Date: Wed, Feb 28, 2018 at 10:37 PM
Subject: Re: Antminer Sale Agreement
To: <darren@supercrypto.com>

Yes, we can do that.

I'm fine with using that firm as escrow agent.

5% deposit will be ok as well.

I would like to get this signed by tomorrow morning though, as I need to know this is a done deal. I already have the awb's. The machines are en route.

On Wed, Feb 28, 2018 at 10:30 PM <darren@supercrypto.com> wrote:

Hi Joe,

Thank you for the follow up. We would like to use a law firm that we are familiar with in NY. Would you consider using them for the Escrow – see below:

**Sichenzia Ross Ference Kesner LLP**

1185 Avenue of the Americas,

37th Floor

New York, NY 10036

Telephone: (212) 930-9700

www.srfkllp.com

DEFENDANTS_001416



I've been told that we can make a 5% deposit by the end of this week and then pay in full next week to accept delivery. Is that something that you would entertain? Sorry the funding never comes together as fast as I want but I'm confident in this proposition. We would even consider agreeing to a cancelation fee to help assure you that we will complete the transaction (however we want the machines).

Thank you for your consideration.

Darren Magot

**From:** Joe Kalfa - NADW [mailto:joekalfa@gmail.com]
**Sent:** Wednesday, February 28, 2018 5:02 AM

**To:** darren@supercrypto.com
**Subject:** Re: Antminer Sale Agreement

Darren,

How's this looking?

Best Regards,
Joe Kalfa

**Mobile:** +1-410-504-6032

***** Confidentiality Disclaimer *****
This email (and any attached document) contains confidential information from Joe Kalfa.
and is intended solely for the person or organization to whom it is addressed. If you have
received this email in error, please notify joekalfa@gmail.com and destroy the attached
message (and all attached documents) immediately. Any unauthorized distribution, copying,
or other dissemination of this email is strictly prohibited.

DEFENDANTS_001417

On Tue, Feb 27, 2018 at 8:57 PM, <darren@supercrypto.com> wrote:

Great thank you! I'll work on this on my end.

**From:** Joe Kalfa - NADW [mailto:joekalfa@gmail.com]
**Sent:** Tuesday, February 27, 2018 10:55 AM
**To:** darren@supercrypto.com
**Subject:** Re: Antminer Sale Agreement

Darren,

I'm out of the office now, so if you can update on your end would be fine.

Re escrow. I'm ok with it being any respectable law firm. So if you have a law firm you work with, I'm okay with them being the escrow agent as well.

On Tue, Feb 27, 2018 at 8:49 PM <darren@supercrypto.com> wrote:

Hello Joe,

Could you please update the agreement to reflect the new pricing? Also, our attorney would like to call the Escrow company to confirmation/to get to know them. I wanted to give you this heads up and ask if you had a key point of contact we should talk with?

Working hard on my side to make this happen.

Thank you,

Darren

**From:** Joe Kalfa - NADW [mailto:joekalfa@gmail.com]
**Sent:** Sunday, February 25, 2018 12:58 AM
**To:** darren@supercrypto.com
**Subject:** Antminer Sale Agreement

Darren,

See attached as discussed on LinkedIn.

Let me know any changes..

Best Regards,
Joe Kalfa

**Mobile:** +1-410-504-6032

\*\*\*\*\* Confidentiality Disclaimer \*\*\*\*\*
This email (and any attached document) contains confidential information from Joe Kalfa.
and is intended solely for the person or organization to whom it is addressed. If you
have received this email in error, please notify joekalfa@gmail.com and destroy the
attached message (and all attached documents) immediately. Any unauthorized distribution,
copying, or other dissemination of this email is strictly prohibited.

--

Best Regards,
Joe Kalfa

**Mobile:** +1-410-504-6032

\*\*\*\*\* Confidentiality Disclaimer \*\*\*\*\*
This email (and any attached document) contains confidential information from Joe Kalfa.
and is intended solely for the person or organization to whom it is addressed. If you have
received this email in error, please notify joekalfa@gmail.com and destroy the attached
message (and all attached documents) immediately. Any unauthorized distribution, copying,
or other dissemination of this email is strictly prohibited.

--

Best Regards,
Joe Kalfa

**Mobile:** +1-410-504-6032

\*\*\*\*\* Confidentiality Disclaimer \*\*\*\*\*

This email (and any attached document) contains confidential information from Joe Kalfa. and is intended solely for the person or organization to whom it is addressed. If you have received this email in error, please notify joekalfa@gmail.com and destroy the attached message (and all attached documents) immediately. Any unauthorized distribution, copying, or other dissemination of this email is strictly prohibited.

--

Best Regards,
Joe Kalfa

**Mobile:** +1-410-504-6032

***** Confidentiality Disclaimer *****
This email (and any attached document) contains confidential information from Joe Kalfa. and is intended solely for the person or organization to whom it is addressed. If you have received this email in error, please notify joekalfa@gmail.com and destroy the attached message (and all attached documents) immediately. Any unauthorized distribution, copying, or other dissemination of this email is strictly prohibited.

--

Best Regards,
Joe Kalfa

**Mobile:** +1-410-504-6032

***** Confidentiality Disclaimer *****
This email (and any attached document) contains confidential information from Joe Kalfa. and is intended solely for the person or organization to whom it is addressed. If you have received this email in error, please notify joekalfa@gmail.com and destroy the attached message (and all attached documents) immediately. Any unauthorized distribution, copying, or other dissemination of this email is strictly prohibited.

--
**Shira Kalfa, BA, JD**
**Partner**
**Kalfa Law**

Toronto Office:
2300 Yonge St. Suite 1600
Toronto, Ontario
M4P 1E4

Vaughan Office:
400 Applewood Crescent, Suite 100
Vaughan, Ontario
L4K 0C3

Phone: (416) 631-7227
Toll Free: (800) 631-7923
Fax: (647) 849 3974
Email: info@kalfalaw.com

The contents of this email may be subject to solicitor-client privilege. This email, together with any attachments, is for the exclusive and confidential use of the addressee(s). Any other distribution, use or reproduction without the sender's prior consent is unauthorized and strictly prohibited. If you have received this message in error, please notify the sender by email immediately and delete the message from your computer without making any copies.

DEFENDANTS_001421

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement") is made as of March 5, 2018, by and among Super Crypto Mining, Inc., a California corporation (the "Company"), Blockchain Mining Supply & Services Ltd., a Province of Ontario corporation ("Vendor"), and Sichenzia Ross Ference Kesner LLP, with an address at 1185 Avenue of the Americas, New York, NY 10036 (the "Escrow Agent").

### W I T N E S S E T H:

WHEREAS, the Company and the Vendor desires to enter into an agreement for the sale of certain equipment from the Vendor to the Company (the "Assets"), pursuant to an asset purchase agreement dated as of the date hereof (the "Purchase Agreement"); and

WHEREAS, the Company and the Vendor wish the Escrow Agent to hold the purchase price for the equipment in the amount of ONE HUNDRED AND SIXTY-THREE THOUSAND, SIX HUNDRED AND TWENTY-FIVE ($163,625.00 USD) US DOLLARS pending satisfaction of certain conditions set forth in the Purchase Agreement (the "Escrow Funds");

NOW, THEREFORE, in consideration of the covenants and mutual promises contained herein and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged and intending to be legally bound hereby, the parties agree as follows:

### ARTICLE I
### TERMS OF THE ESCROW

1.1    The parties hereby agree to establish an escrow account (the "Escrow Account") with the Escrow Agent whereby the Escrow Agent shall hold the Escrow Funds from the Company.

1.2    Wire transfers to the Escrow Agent shall be made as follows:

> Citibank
> 153 East 53rd Street
> 23rd Floor
> New York, NY 10022
>
> A/C of Sichenzia Ross Ference Kesner LLP
> A/C#:
> ABA#:
> SWIFT Code:

1.3    Deposit into Escrow by Purchaser. The sum of ONE HUNDRED AND SIXTY-THREE THOUSAND, SIX HUNDRED AND TWENTY-FIVE ($163,625.00 USD) US DOLLARS being five (5) per cent of the Purchase Price, shall be deposited into the Escrow Account of the Escrow Agent by the Company on or before March 7, 2018.

1.4    Release of Escrow Funds. The Escrow Funds shall be released from the Escrow Agent to Vendor upon completion of Inspection by Purchaser at Toronto Warehouse, which shall occur no later than March 9, 2018. If Inspection is not completed by the Purchaser by March 9, 2018, then on March 10, 2018, the Escrow Funds shall be released from the Escrow Agent to Vendor. Upon completion of Inspection, Purchaser shall send written notice to Vendor in the form attached as Schedule A to this Agreement to Escrow Agent advising of such completion of Inspection (the "Purchaser's Notice"). The Escrow Agent shall pay the Escrow Funds to the Vendor to an account as directed by the Vendor on the same day of its receipt of the Purchaser's Notice.

## ARTICLE II
## MISCELLANEOUS

2.1    No waiver or any breach of any covenant or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof, or of any other covenant or provision herein contained.  No extension of time for performance of any obligation or act shall be deemed an extension of the time for performance of any other obligation or act.

2.2    Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of (a) the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number set forth on the signature pages attached hereto (and on the first page in the case of the Escrow Agent) prior to 5:30 p.m. (Eastern Time) on a Business Day, (b) the next Business Day after the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number set forth on the signature pages attached hereto (or the first page of this agreement in the case of the Escrow Agent) on a day that is not a Business Day or later than 5:30 p.m. (Eastern Time) on any business Day, (c) the 2nd business Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service, or (d) upon actual receipt by the party to whom such notice is required to be given.  As used herein, "Business Day" shall mean any day other than Saturday, Sunday or other day on which commercial banks in the City of New York are authorized or required by law to remain closed. The address for such notices and communications shall be as set forth above in the case of the Escrow Agent and on the signature pages attached hereto, in the case of the Company and the Vendor, until changed by notice given in accordance with this Section.

2.3    This Escrow Agreement shall be binding upon and shall inure to the benefit of the permitted successors and permitted assigns of the parties hereto.

2.4    This Escrow Agreement is the final expression of, and contains the entire agreement between, the parties with respect to the subject matter hereof and supersedes all prior understandings with respect thereto.  This Escrow Agreement may not be modified, changed, supplemented or terminated, nor may any obligations hereunder be waived, except by written instrument signed by the parties to be charged or by its agent duly authorized in writing or as otherwise expressly permitted herein.

2.5    Whenever required by the context of this Escrow Agreement, the singular shall include the plural and masculine shall include the feminine.  This Escrow Agreement shall not be

[ PAGE  \* MERGEFORMAT ]

construed as if it had been prepared by one of the parties, but rather as if all parties had prepared the same. Unless otherwise indicated, all references to Articles are to this Escrow Agreement.

2.6     The parties hereto expressly agree that this Escrow Agreement shall be governed by, interpreted under and construed and enforced in accordance with the laws of the State of New York. Any action to enforce, arising out of, or relating in any way to, any provisions of this Escrow Agreement shall only be brought in a state or Federal court sitting in New York City.

2.7     The Escrow Agent's duties hereunder may be altered, amended, modified or revoked only by a writing signed by the Company, the Vendor and the Escrow Agent.

2.8     The Escrow Agent shall be obligated only for the performance of such duties as are specifically set forth herein and may rely and shall be protected in relying or refraining from acting on any instrument reasonably believed by the Escrow Agent to be genuine and to have been signed or presented by the proper party or parties. The Escrow Agent shall not be personally liable for any act the Escrow Agent may do or omit to do hereunder as the Escrow Agent while acting in good faith and in the absence of gross negligence, fraud and willful misconduct, and any act done or omitted by the Escrow Agent pursuant to the advice of the Escrow Agent's attorneys-at-law shall be conclusive evidence of such good faith, in the absence of gross negligence, fraud and willful misconduct.

2.9     The Escrow Agent is hereby expressly authorized to disregard any and all warnings given by any of the parties hereto or by any other person or corporation, excepting only orders or process of courts of law and is hereby expressly authorized to comply with and obey orders, judgments or decrees of any court. In case the Escrow Agent obeys or complies with any such order, judgment or decree, the Escrow Agent shall not be liable to any of the parties hereto or to any other person, firm or corporation by reason of such decree being subsequently reversed, modified, annulled, set aside, vacated or found to have been entered without jurisdiction.

2.10     The Escrow Agent shall not be liable in any respect on account of the identity, authorization or rights of the parties executing or delivering or purporting to execute or deliver the Subscription Agreement or any documents or papers deposited or called for thereunder in the absence of gross negligence, fraud and willful misconduct.

2.11     The Escrow Agent shall be entitled to employ such legal counsel and other experts as the Escrow Agent may deem necessary properly to advise the Escrow Agent in connection with the Escrow Agent's duties hereunder, may rely upon the advice of such counsel, and may pay such counsel reasonable compensation; provided that the costs of such compensation shall be borne by the Escrow Agent.

2.12     The Escrow Agent's responsibilities as escrow agent hereunder shall terminate if the Escrow Agent shall resign by giving written notice to the Company and the Vendor. In the event of any such resignation, the Company and the Vendor shall appoint a successor Escrow Agent and the Escrow Agent shall deliver to such successor Escrow Agent any escrow funds held by the Escrow Agent.

[ PAGE  \* MERGEFORMAT ]

2.13    If the Escrow Agent reasonably requires other or further instruments in connection with this Escrow Agreement or obligations in respect hereto, the necessary parties hereto shall join in furnishing such instruments.

2.14    It is understood and agreed that should any dispute arise with respect to the delivery and/or ownership or right of possession of the documents (if any) or the escrow funds held by the Escrow Agent hereunder, the Escrow Agent is authorized and directed in the Escrow Agent's sole discretion (1) to retain in the Escrow Agent's possession without liability to anyone all or any part of said documents or the escrow funds until such disputes shall have been settled either by mutual written agreement of the parties concerned by a final order, decree or judgment or a court of competent jurisdiction after the time for appeal has expired and no appeal has been perfected, but the Escrow Agent shall be under no duty whatsoever to institute or defend any such proceedings or (2) to deliver the escrow funds and any other property and documents held by the Escrow Agent hereunder to a state or Federal court having competent subject matter jurisdiction and located in the City of New York in accordance with the applicable procedure therefore.

2.15    The Company and the Vendor agree jointly and severally to indemnify and hold harmless the Escrow Agent and its partners, employees, agents and representatives from any and all claims, liabilities, costs or expenses in any way arising from or relating to the duties or performance of the Escrow Agent hereunder or the transactions contemplated hereby or by the Subscription Agreement other than any such claim, liability, cost or expense to the extent the same shall have been determined by final, unappealable judgment of a court of competent jurisdiction to have resulted from the gross negligence, fraud or willful misconduct of the Escrow Agent.

2.16    The Escrow Agent shall be permitted to act as counsel for the Company in any transaction and/or dispute including any dispute between the Company and the Vendor, whether or not the Escrow Agent is then holding the escrow funds held by the Escrow Agent hereunder.

*************************

*REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK*

[ PAGE  \* MERGEFORMAT ]

DEFENDANTS_001425

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement as of date first written above.

COMPANY:
SUPER CRYPTO MINING, INC.

By:_____

Darren Magot,
CEO

ESCROW AGENT:
SICHENZIA ROSS FERENCE KESNER LLP

By:_____

Thomas A. Rose,
Partner

VENDOR:
BLOCKCHAIN MINING SUPPLY & SERVICES LTD.

By: _____

William Tencer
President

[PAGE ]

DEFENDANTS_001426

## EXHIBIT A

### RELEASE NOTICE

The UNDERSIGNED, pursuant to the Escrow Agreement, dated as of March___, 2018, among Super Crypto Mining, Inc., (the "Company"), Blockchain Mining Supply & Services Ltd. (the "Vendor"), and Sichenzia Ross Ference Kesner LLP, as Escrow Agent (the "Escrow Agreement"); capitalized terms used herein and not defined shall have the meaning ascribed to such terms in the Escrow Agreement), hereby notify the Escrow Agent that each of the conditions precedent to the purchase and sale of the Assets set forth in the Purchase Agreement have been satisfied. The Company hereby authorizes the release by the Escrow Agent of the funds upon the instructions of the Vendor.

IN WITNESS WHEREOF, the undersigned have caused this Release Notice to be duly executed and delivered as of this ___ day of March, 2018.

**SUPER CRYPTO MINING, INC.**

By:_____
      Darren Magot, CEO

[PAGE ]

DEFENDANTS_001427

## ASSET PURCHASE AGREEMENT

**THIS AGREEMENT** made this 5th day of March, 2018 (this "Agreement")

 **BETWEEN:**

### BLOCKCHAIN MINING SUPPLY & SERVICES LTD.
a corporation incorporated under the laws of the Province of Ontario
(the "Vendor")

- and -
### SUPER CRYPTO MINING, INC.
a corporation incorporated under the laws of the State of California
(the "Purchaser")

**WHEREAS** the Vendor is the owner of certain assets being 1,100 Bitmain Antminer S9 model & 1,100 PSU more fully described on Schedule I attached hereto (the "Assets");

**AND WHEREAS** the Purchaser is desirous of purchasing the Assets from the Vendor;

**NOW THEREFORE THIS AGREEMENT WITNESSETH** that in consideration of the mutual covenants and agreements set out herein, the parties respectively covenant and agree as follows.

1.  **Definitions**.

Where used in this Agreement or in any amendment, the following terms shall have the following meanings respectively:

  (a)  "Agreement" means this Agreement of Purchase and Sale, including all schedules, and all instruments supplemental to or in amendment or confirmation of this Agreement;
  (b)  "Assets" means 1,100 Bitmain Antminer S9 model, and 1,100 PSU;
  (c)  "Escrow Funding Date:" means March 7, 2018;
  (d)  "Purchase Price" means the purchase price to be paid by the Purchaser to the Vendor as described in Section 2 of this Agreement;
  (e)  "Inspection" means inspecting the machines by opening randomly selected boxes of both machines and power supplies, plug and test random machines, counting all machines and comparing to packing slips. counting of items, opening boxes and confirming contents are as represented; and
  (f)  "Toronto Warehouse" means the premises municipally known as
_____

2.  **Purchase Price**. The purchase price payable to the Vendor by the Purchaser for the Assets shall be the sum of THREE MILLION TWO HUNDRED AND SEVENTY-TWO

[PAGE \* MERGEFORMAT]

DEFENDANTS_001428

THOUSAND FIVE HUNDRED ($3,272,500 USD) US DOLLARS (the "Purchase Price").

   a. **Payment of Purchase Price.** The Purchase Price shall be payable as follows:

   i. Deposit. The sum of ONE HUNDRED AND SIXTY-THREE THOUSAND, SIX HUNDRED AND TWENTY-FIVE ($163,625.00 USD) US DOLLARS being five (5) per cent of the Purchase Price, shall be paid to the Vendor as a Deposit herewith (the "Deposit") into an escrow account selected by the Purchaser being the trust account of Sichenzia Ross Ference Kesner LLP (the "Escrow Agent") on the Escrow Funding Date, and pursuant to the escrow agreement in the form attached hereto as Exhibit A (the "Escrow Agreement"); and;

   ii. Balance. The remaining sum of THREE MILLION, ONE HUNDRED AND EIGHT THOUSAND, EIGHT HUNDRED AND SEVENTY-FIVE ($3,108,875.00 USD) US DOLLARS shall be paid on or before March 16, 2018 directly to Vendor to an account indicated by Vendor (the "Balance"). Upon receipt of the Balance, Vendor shall release the Assets to Purchaser and Purchaser shall make arrangements for its pick-up.

3. Release of Escrow. Upon completion of Inspection by Purchaser at Toronto Warehouse, the Deposit shall be released from escrow by the Escrow Agent and deposited to the account of Vendor which shall occur no later than March 9, 2018. If Inspection is not completed by the Purchaser by March 9, 2018, then on March 10, 2018, the Deposit shall be released from escrow by the Escrow Agent and deposited to the account of the Vendor. Upon completion of Inspection, Purchaser shall send written notice to Vendor and to Escrow Agent advising of such completion of Inspection (the "Purchaser's Notice"). The Escrow Agent shall release the Deposit to the Vendor on the same day of its receipt of the Purchaser's Notice.

4. In the event Purchaser fails to pay the Balance to Vendor on or before March 16, 2018, the Deposit funds shall be forfeited Vendor and/or released from the Escrow Agent to Vendor if applicable, and the remainder of this Agreement save and except for Article 2(a)(i) and Article 3, shall be null and void and all parties shall be relieved of its further obligations herein.

5. In the event the Assets are not retrieved by Purchaser on or before March 19, 2018, then the Purchaser shall be responsible for all warehouse storage charges being THREE HUNDRED ($300.00 USD) US DOLLARS per day payable by Purchaser to the Vendor.

5.1 Assets are sold FOB Toronto Warehouse. Any additional delivery of freight charge, customs clearance charges, duties, insurance, and taxes are on the account of the Purchaser. All applicable charges including those in Article 5 herein must be paid to Vendor prior to pick up by Purchaser. Vendor agrees to assist purchaser in arranging freight and customs clearance at Purchaser's cost.

[PAGE \* MERGEFORMAT]

DEFENDANTS_001429

6. **Warranty.** Vendor hereby transfers and assigns to Purchaser any and all warranties with respect to the Assets provided by Bitmain to Vendor in connection with its original purchase of the Assets, and Vendor provides the Purchaser with full benefit of the warranty over the assets provided by Bitmain as published by Bitmain online. Vendor is the true and lawful owner, and has good title to, all of the Assets, free and clear of all encumbrances. The Assets owned are in good operating condition and repair and are adequate for the uses to which they are being put, ordinary wear and tear excepted. As of the Escrow Funding Date, there will be no restrictions on the Purchaser's right or ability to modify, relocate, or dispose of the Assets as the Purchaser sees fit.

7. **Title.** All right, title and interest to the Assets shall pass to Purchaser on the Closing Date by operation of law.

8. **Risk of Loss.** All risk of loss with respect to the Assets shall remain with Vendor until the Closing Date.

9. **Duty to Insure.** Vendor shall adequately insure the Assets against loss or damage by insurable hazards to at least equal to that of the Purchase Price until the Closing Date.

10. **No taxable supply.** It is acknowledged and understood that the Assets are a taxable supply under the *Excise Tax Act, RSC 1985 C E-15* (the "ETA"), however will not be subject to excise tax of GST/HST under the *ETA* pursuant to Schedule VI (Subsection 123(1)), Part V as an exempt supply of goods for export. Purchaser confirms that upon taking title to the Assets, the Assets will immediately be exported from Canada. If Assets remain in Canada, and excise taxes under the ETA become exigible, Purchaser shall be wholly responsible for same.

**11.  Representations and Warranties of Vendor:**

Vendor hereby makes the following representations and warranties, as of the date hereof, to and in favour of Purchaser, and acknowledges that Purchaser is relying upon such representations and warranties in connection with entering into this Agreement:

*9.1        Incorporation and Corporate Power of Vendor.* Vendor is a corporation incorporated, organized, validly subsisting and in good standing under the laws of the jurisdiction of its incorporation. Vendor has all requisite corporate power, authority and capacity to carry on its business as presently conducted and to execute and deliver this Agreement and all other agreements and instruments to be executed by it as contemplated herein and to perform its other obligations hereunder and under all such other agreements and instruments contemplated herein. Vendor has the corporate power, authority and capacity to own and dispose of the Assets to Purchaser.

*9.2        Authorization by Vendor.* The execution and delivery of this Agreement and all other agreements and instruments to be executed by it as contemplated herein and the completion of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of Vendor and no further corporate action is required to be taken by the directors or shareholders to authorize the completion of the transactions contemplated herein.

[PAGE  \* MERGEFORMAT]

*9.3*        *Title to Assets.* Vendor has good and marketable legal and beneficial title to the Assets, in each case, which will be free and clear of any and all liens and encumbrances. There is no agreement, option or other right or privilege outstanding in favour of any Person for the purchase from Vendor of the Assets or any part thereof.

*9.4*        *Regulatory Approvals.* No regulatory approval or filing with, notice to, or waiver from any governmental authority is required to be obtained or made by Vendor: (a) in connection with the execution and delivery of, and performance by Vendor of its obligations under, this Agreement or the consummation of the transactions contemplated hereby; (b) to transfer any and all rights and benefits thereunder to Purchaser; or (c) to the knowledge of the Vendor, to permit the Purchaser to operate the Assets as contemplated.

*9.5*        *Absence of Conflicting Agreements.* The execution, delivery and performance of this Agreement by Vendor and the completion of the transactions contemplated by this Agreement do not and will not result in or constitute any of the following:

i.    a default, breach or violation or an event that, with notice or lapse of time or both, would be a default, breach or violation of any of the terms, conditions or provisions of the articles or by-laws of Vendor;

ii.   an event which, pursuant to the terms of any contract or licence, would cause any right or interest of Vendor to come to an end or be amended in any way that is detrimental to the Assets or the business of Purchaser;

iii.  the violation of any applicable law.

*9.6*        *Intellectual Property.* The Assets do not violate or infringe the intellectual property of any third party and Purchaser will have all rights to intellectual property (without the need to make any payments in connection therewith) required to operate the Assets in the manner currently contemplated.

*9.7*        *Warranty Matters.* There have not been any warranty claims made against Vendor in respect of its business or sales of miners or for which Vendor was responsible in the 24 months prior to the date hereof.

**12.   Representations and Warranties of Purchaser:**

Purchaser hereby makes the following representations and warranties, as of the date hereof, to and in favour of Vendor, and acknowledges that Vendor is relying upon such representations and warranties in connection with entering into this Agreement:

*10.1*       *Incorporation and Corporate Power.* Purchaser is a corporation incorporated and organized and subsisting under the laws of the jurisdiction of its incorporation. Purchaser has the corporate power, authority and capacity to execute and deliver this Agreement and Purchaser as the requisite funds to satisfy the payment of the Purchase Price and has the authority to execute and deliver all other agreements and instruments to be executed by it as contemplated herein and to perform its obligations under this Agreement and under all such other agreements and instruments.

[PAGE  \* MERGEFORMAT]

*10.2*        *Authorization by Purchaser*. The execution and delivery of this Agreement and all other agreements and instruments to be executed by it as contemplated herein and the completion of the transactions contemplated by this Agreement and all such other agreements and instruments have been duly authorized by all necessary corporate action on the part of Purchaser.

*10.3*        *Enforceability of Obligations.* This Agreement constitutes a valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms.

*10.4*        *Absence of Conflicting Agreements*. The execution, delivery and performance of this Agreement by Purchaser and the completion of the transactions contemplated by this Agreement do not and will not result in or constitute any of the following:

   i.   a default, breach or violation or an event that, with notice or lapse of time or both, would be a default, breach or violation of any of the terms, conditions or provisions of the articles or by-laws of Purchaser; or

   ii.  the violation of any applicable law.

13.   **General**.

        a.  Confidentiality.  The parties shall hold in strictest confidence any information and material which is related to either Purchaser or Vendor's business or is designated by either Purchaser or Vendor as proprietary and confidential, herein or otherwise. Vendor further covenants not to disclose or otherwise make known to any Party nor to issue or release for publication any articles or advertising or publicity matter relating to this Agreement in which the name of Purchaser or any of its affiliates is mentioned or used, directly or indirectly, unless prior written consent is granted by the other party; provided, however, that the Purchaser shall be entitled to make any disclosures required by it as a public company under applicable law, regulation or stock exchange rule without any consent of Vendor, including the filing of this Agreement as an exhibit thereto.

        b.  Force Majeure. Any delay or failure of Vendor to perform its obligations under this Agreement will be excused to the extent that the delay or failure was caused directly by an event beyond the Vendor's control, without the Vendor's fault or negligence and that by its nature could not have been foreseen by the Vendor or, if it could have been foreseen, was unavoidable (which events may include natural disasters, embargoes, explosions, riots, wars, acts of terrorism, strikes, labour stoppages or slowdowns or other industrial disturbances, and shortage of adequate power or transportation facilities).

        c.  Notices.  All notices and other communications pertaining to this Agreement shall be in writing and shall be deemed duly to have been given if personally delivered to the other Party or if sent by certified mail, return receipt requested, postage prepaid or by Federal Express, United Parcel or other nationally recognized overnight carrier. All notices or communications between Purchaser and Vendor pertaining to this Agreement shall be addressed to the Vendor at: [ HYPERLINK "file:///C:\\Users\\Shira\\AppData\\Local\\Microsoft\\Windows\\INetCache\\Conte

DEFENDANTS_001432

nt.Outlook\\17Q9ZG6J\\joekalfa@gmail.com"   ]   and   to   the   Purchaser   at
darren@supercrypto.com. Either Party may change its notification address by
giving written notice to that effect to the other Party in the manner provided
herein.

d.  Waiver.   Any waiver by either Party of a breach of any provision of this
    Agreement shall not operate as or be construed to be a waiver of any other breach
    of such provision or of any breach of any other provision of this Agreement. The
    failure of a Party to insist upon strict adherence to any term of this Agreement on
    one or more occasions shall neither be considered a waiver nor deprive that Party
    of any right thereafter to insist upon strict adherence to that term or any other term
    of this Agreement. Any waiver must be in writing and signed by the Party to be
    charged therewith.

e.  Modifications.   No revision or modification of this Agreement shall be effective
    unless in writing and executed by authorized representative of both parties.

f.  Assignment.   Neither party shall assign, transfer, delegate or subcontract any of
    its rights or obligations under this Agreement without the prior written consent of
    the other party. Any purported assignment or delegation in violation of this
    Section shall be null and void. No assignment or delegation shall relieve the other
    party of any of its obligations hereunder.

g.  Severability.   If any portion of this Agreement is held invalid, such invalidity
    shall not affect the validity of the remaining portions of the Agreement, and the
    parties will substitute for any such invalid portion hereof a provision which best
    approximates the effect and intent of the invalid provision.

h.  Construction and Jurisdiction.   This Agreement, the legal relations between the
    parties and any action, whether contractual or non-contractual, instituted by any
    party with respect to any matter arising between the parties, including but not
    limited to matters arising under or in connection with this Agreement, such as the
    negotiation, execution, interpretation, coverage, scope, performance, breach,
    termination, validity, or enforceability of this Agreement, shall be governed by
    and construed in accordance with the internal laws of the State of New York
    without reference to principles of conflicts of laws. The parties hereto hereby
    irrevocably submit to the exclusive jurisdiction of the courts of the State of New
    York and the Federal Courts of the United States of America located within the
    Eastern or Southern District of New York with respect to any matter arising
    between the parties, and hereby waive, and agree not to assert, as a defense in any
    action, suit or proceeding for the interpretation or enforcement hereof or thereof,
    that it is not subject thereto or that such action, suit or proceeding may not be
    brought or is not maintainable in said courts or that the venue thereof may not be
    appropriate or that this Agreement or any such document may not be enforced in
    or by such courts, and the parties hereto irrevocably agree that all claims with
    respect to such action or proceeding shall be heard and determined in such a New
    York State or Federal court. The parties hereby consent to and grant any such

DEFENDANTS_001433

court jurisdiction over the person of such parties and over the subject matter of such dispute and agree that mailing of process or other papers in connection with any such action or proceeding in any manner as may be permitted by applicable law, shall be valid and sufficient service thereof. With respect to any particular action, suit or proceeding arising between the parties, including but not limited to matters arising under or in connection with this Agreement, venue shall lie solely in any New York County or any Federal Court of the United States of America sitting in the Eastern or Southern District of New York. The prevailing party in any dispute arising out of this Agreement shall be entitled to his or its reasonable attorney's fees and costs.

i.  Headings. The paragraph titles of this Agreement are for conveniences only and shall not define or limit any of the provisions hereof.

j.  Entire Agreement. This Agreement, all schedules attached hereto and the Escrow Agreement, is intended as the complete and exclusive statement of the agreement between Purchaser and Vendor with respect to the subject matter hereof, and supersede all prior agreements and negotiations related thereto.

k.  Binding Effect. The provisions hereof shall be binding upon and shall inure to the benefit of Purchaser and Vendor, their respective successors, and permitted assigns.

l.  Counterparts. Provided that all parties hereto execute a copy of this Agreement, this Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. Executed copies of this Agreement may be delivered by facsimile transmission or other comparable means. This Agreement shall be deemed fully executed and entered into on the date of execution by the last signatory required hereby.

**[SIGNATURES APPEAR ON FOLLOWING PAGES AND ARE SIGNED IN COUNTERPART]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

By the Purchaser

**SUPER CRYPTO MINING, INC.**

Per: _____
Name: Darren Magot
Title: CEO

[PAGE \* MERGEFORMAT]

DEFENDANTS_001434

*I have authority to bind the corporation*

By the Vendor

**BLOCKCHAIN MINING SUPPLY &
SERVICES LTD.**

Per: _____

Name:  William Tencer

Title:   President

*I have authority to bind the corporation*

**Schedule "A"**

[PAGE  \* MERGEFORMAT]

DEFENDANTS_001435

EXHIBIT A

[PAGE \* MERGEFORMAT]

DEFENDANTS_001436