UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

.................................................................X

BLOCKCHAIN MINING SUPPLY AND
SERVICES LTD.,                                              Case No. 18-CV-11099-ALC

            Plaintiff,

                                  **[PUBLIC – REDACTED]**

  -against-

SUPER CRYPTO MINING, INC. (N/K/A DIGITAL
FARMS, INC. and DPW HOLDINGS, INC.
(N/K/A AULT AULLIANCE, INC.),

            Defendants.

.................................................................X

### DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS PURSUANT TO LOCAL RULE 56.1 AND DEFENDANTS' SUPPLEMENTAL STATEMENT OF MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT

      Defendants Super Crypto Mining, Inc. (n/k/a Digital Farms, Inc.) ("Super Crypto" or "SCM") and DPW Holdings, Inc. (n/k/a Ault Alliance, Inc.) ("DPW" and "Super Crypto" collectively, "Defendants"), by and their undersigned counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule of Civil Procedure 56.1 of the United States District Court for the Southern and Eastern Districts of New York, respectfully submit Defendants' response ("Ds Resp.") to Plaintiff's Local Rule 56.1 Statement ("Ps SF" [DE 121]), as well as Defendants' Supplemental Statement of Material Facts that Preclude Summary Judgment ("Ds Supp. SF"), in connection with Defendants' opposition (the "Opposition") to Plaintiff's motion for summary judgment.  By responding to these statements, Defendants do not concede, and indeed, dispute, the materiality of many of these statements.

### PRELIMINARY STATEMENT

      "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without

guidance from the parties." *See Blue v. City of New York*, No. 14-CV-7836-VSB, 2018 U.S. Dist. LEXIS 33761, at *2 (S.D.N.Y. Mar. 1, 2018) *citing Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). On a summary judgment motion, only admissible evidence needs to be considered, and, as such a Court should disregard statements in a Local Rule 56.1 statement or in an affidavit that "are not based on personal knowledge, contain inadmissible hearsay, are conclusory or argument, or do not cite to supporting evidence." *See, e.g.*, *Blue*, 2018 U.S. Dist. LEXIS 33761, at *2-3; *see also Holtz*, 258 F.3d 62, 73-74 (collecting cases) ("[W]here there are no citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion."). The Court should similarly disregard any statements where the supporting evidence is either irrelevant, inadmissible, or fails to provide specific line number citations to depositions. *See Faulkner v. Arista*, 797 F. Supp. 299, 306 (S.D.N.Y. 2011); *Taylor v. Dollar Tree Stores*, No. 18-CV-1306-SJB, 2020 U.S. Dist. LEXIS 87446, at *7 (E.D.N.Y. May 13, 2020).

Here, ***Ps SF incredibly cites to 308 full pages of deposition testimony, as well as an additional 105 exhibits, <u>without pincites</u>***. Plaintiff cannot reasonably expect the Court and Defendants "to search hundreds of pages of depositions for portions that might be helpful to [it], so [its] citation to evidence is tantamount to no evident at all." *See Ambrose v. City of White Plains*, No. 10-CV-4946-CS, 2018 U.S. Dist. LEXIS 56309, at fn. 5 (S.D.N.Y. Apr. 2, 2018). "Rule 56.1 requires a party to provide pinpoint citations; this Court is not required to look for the proverbial needle in a haystack." *Id.*

Plaintiff's haphazard Statement of Undisputed Facts entirely undermines the purpose of Local Rule 56.1, as it unfairly seeks to shift the burden on Defendant to parse through unrelated material and effectively guess which portions of the testimony and exhibits Plaintiff is relying on

to support the assertion contained in a specific paragraph. *See LG Capital Funding, LLC v. PositiveID Corp.*, No. 17-CV-1297-NGG-SJB, 2019 U.S. Dist. LEXIS 126991, at *7 (E.D.N.Y. Jul 29, 2019), *adopted by* 2019 U.S. Dist. LEXIS 161701 (E.D.N.Y. Sep. 20, 2019) (noting that that frequent citations to "three or more pages of deposition transcripts" without pincites, "undermines the purpose of Local Rule 56.1 and forces the Court to unnecessarily sift through evidence."); *see also Sch. For Language & Commun. Dev. v. N.Y. State Dep't of Educ.*, No. 02-CV-0269-JS-JO, 2006 U.S. Dist. LEXIS 73297, fn. 1 (E.D.N.Y. Sept. 26, 2006) ("Rule 56.1 requires a party to provide pinpoint citations; this Court is not required to look for the proverbial 'needle in a haystack.'").

Notwithstanding, Defendants have attempted, in good-faith, to respond to each and every paragraph of Ps SF, based on the portions of the deposition testimony and exhibits that Defendants believe that Plaintiff is referring to. In this regard, it is impossible to address every single one of Plaintiff's scattershot citations, and to the extent that Plaintiff claims that Defendants have not addressed a particular portion of a transcript or exhibit (for which there is no pincite), Defendants submit that, in light of the foregoing, any such alleged omission should not be deemed an admission. *See Fernandez v. DeLeno*, 71 F. Supp. 2d 224, 228 (S.D.N.Y. 1999) (noting that the practice employed by Ps SF "is not only inconsistent with the plain requirements of Local Civil Rule 56.1 but, if accepted, would eviscerate summary judgment as an efficient tool for distinguishing claims that should be tried from that need not be tried.").

## **DEFINED TERMS**

Unless otherwise stated herein, the terms "Agreement," "Deposit," "Contracted-For Amount," "Contracted-For Machines," "Remaining Amount," "Remaining Machines," and "Expiration Date" shall have the same meanings as ascribed to them in Defendants' Memorandum,

of Law in Support of the Opposition.

## GENERAL OBJECTIONS

Defendants dispute each and every one of Plaintiff's assertions set forth below to the extent that such assertions: (i) imply that Super Crypto was absolutely obligated to pay the Remaining Amount; (ii) imply that Super Crypto was absolutely obligated to purchase the Remaining Machines; (iii) imply that Super Crypto was obligated to pay the Remaining Amount after the Expiration Date; (iv) imply that Super Crypto was obligated to purchase the Remaining Machines after the Expiration Date; (v) imply that Article 3 of the Agreement was either modified or waived; or (vi) imply that DPW was a party to the Agreement. *See* Declaration of Richard Mandel, dated May 30, 2023 ("Mandel"), Ex. HH, at DEFENDANTS_001714 and DEFENDANTS_001715, §3; *see also* Magot Dep. (Volynsky Supp. Decl., Ex. 32), 51:19-25; Tencer Dep. (Volynsky Supp. Decl., Ex. 34), 81:8-15. Each of these objections are incorporated into each and every one of Defendants' responses to Plaintiff's Statement of Undisputed Facts set forth below, whether or not separately set forth therein.

## I.    The Parties and the Relationship Between the Defendants[1]

1. Plaintiff is a corporation organized under the laws of Ontario, Canada that was formed to engage in transactions involving the purchase and sale of cryptocurrency mining machines, which

---

[1] Defendants include these titles from Plaintiff's 56.1 statement for reference only. To the extent any title can be construed as a statement of material fact, it is disputed.

Defendants provide these responses in connection with the parties' briefing on summary judgment and not for all purposes in this action. To the extent Defendants do not dispute a particular fact, Defendants do not thereby concede that any such undisputed fact constitutes a material fact, that the cited evidence is relevant, or that the cited evidence would be admissible at trial. To the extent Defendants do not dispute the fact that a witness testified to a particular fact or assertion, or included a particular statement in a declaration, Defendants do not thereby concede that the witness is credible on that topic or that the statement is accurate or admissible.

Unless otherwise noted herein, references to excerpts from deposition transcripts are attached as Ex. 32 (Magot Dep.), Ex. 33 (Ault Dep.), Ex. 34 (Tencer Dep.), and Ex. 35 (Kalfa Dep.), to the accompanying Supplemental Declaration of Robert. B. Volynsky, dated August 12, 2023 ("Volynsky Supp. Decl."). *See also* Volynsky Supp. Decl., ¶¶ 4-7

are known in the industry as "miners."  Tencer Decl. ¶ 2.

**Response:**      **Undisputed.**

2.  Defendant DPW Holdings, Inc. n/k/a Ault Alliance, Inc. ("DPW") is a Delaware corporation that acts as a holding company set up to hold interests in other subsidiaries.  Ault Dep. (Mandel Ex. A) at 29-30 and Mandel Ex. D; First Amended Complaint (ECF No. 35) and Answer of DPW (ECF No. 99) ¶ 3.

**Response:**   **Undisputed that DPW is a Delaware corporation and that Milton C. Ault, III ("Ault") so testified regarding the nature of DPW's business.**

3.  Defendant Super Crypto Mining, Inc. n/k/a Digital Farms, Inc. ("Super Crypto") is a Delaware corporation that is a wholly owned subsidiary of DPW and was formed in January 2018 to acquire miners and produce cryptocurrency.  Ault Dep. (Mandel Ex. A) at 45-46; Mandel Ex. E; Magot Dep. (Mandel Ex. B) at 29-30; First Amended Complaint (ECF No. 35) and Answer of Super Crypto (ECF No. 98) ¶ 4.

**Response:**      **Undisputed that Super Crypto is a Delaware corporation, is a wholly-owned subsidiary of DPW, and was incorporated on January 30, 2018.  Undisputed that Super Cryptos' business purpose was to purchase cryptocurrency miners and mine cryptocurrency.  _See_ Magot Dep. (Volynsky Supp. Decl., Ex. 32), 29:24-30:7;  Ault Dep. (Volynsky Suppl. Decl., Ex. 33) 46:21-47:17.**

4.  Super Crypto ceased operations in the first quarter of 2020 due to deteriorating market conditions and has no current operations.  Ault Dep. (Mandel Ex. A) at 53, 55-56; Mandel Ex. F at F-28; Magot Dep. (Mandel Ex. B) at 22-23, 44.

**Response:**      **Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the First Amended Complaint**

("FAC").  Notwithstanding, undisputed that, in or about the first quarter of 2020, Super Crypto's operations were ceased.

The referenced exhibit (DPW's Form 10-K filing for the fiscal year ended December 31, 2020) further clarifies that the decision to cease cryptocurrency mining operations "was based on several favors, which had negatively affected the number of active miners the Company operated, including the market prices of digital currencies at the time, power cost considerations available to [Super Crypto], and a significant increase in the difficulty of mining blocks of cryptocurrency.  *See* Mandel, Ex. F at F-28.  The referenced exhibit further clarifies that, as of the date of the filing of such Form 10-K, the "assets" of Super Crypto were not yet abandoned.  *See id.*

5.   Super Crypto was insolvent throughout its existence, with its liabilities consistently exceeding its assets.  Ault Dep. (Mandel Ex. A) at 64; Magot Dep. (Mandel Ex. B) at 44-45; Mandel Ex. G.

Response:     Disputed that Super Crypto was insolvent throughout its existence.  This is a legal conclusion, not a fact that can be disputed or undisputed.  Disputed that Ault or Magot testified that Super Crypto was insolvent.  *See* Ault Dep. (Volynsky Supp. Decl., Ex. 33), 64:20-65-18; *see* Magot Dep. (Volynsky Supp. Decl., Ex. 32) at "Index" (no permutation of "insolvent" or "insolvency").  Further disputed that Magot testified that Super Crypto's liabilities "consistently" exceeded its assets.  *Id.*, 44:8-16 (question regarding "expenses exceed[ing] revenues" and not about Super Crypto's "assets" and "liabilities").

Undisputed that Ault testified that he "would think that would be fair" to say "that the liabilities exceeded the assets for Super Crypto throughout its existence."  Ault Dep. (Volynsky Supp. Decl., Ex. 33), 64:11-15.

Notwithstanding, further disputed to the extent that this statement implies that Super Crypto is the alter-ego of DPW.  Indeed, throughout Super Crypto's existence, Super Crypto had: its own bylaws (Supplemental Declaration of Darren Magot, sworn to on August 12, 2023 ("**Magot Supp. Decl.**"), ¶41, Ex. 3)); its own Board of Directors ████████████████ (*id.*, ¶43, Ex. 4); its own balance sheet (**Mandel**, Ex. G); its own insurance policy ██████████████████ ████████████████ (**Magot Supp. Decl.**, ¶¶46-48, 50, 52, Ex. 7); its own websites (www.supercryptomining.com and www.digitalfarmsinc.com) (*id.*, ¶44; **Volynsky Supp. Decl.**, ¶18, Ex. 46); its own accounts, assets, and revenue stream (**Magot Supp. Decl.**, ¶ 46-47; *see also* **Magot Dep. (Volynsky Supp. Decl., Ex. 32)**, 33:18-34:8; 39:21-40:3, 44:24-47:1); maintained its own bank account for as long as it could  (**Mandel**, Ex. H; *see infra*, Response, ¶12); and entered into its own agreements with various crypto specific vendors.  *See* **Magot Dep. (Volynsky Supp. Decl., Ex. 32)**, 44:24-47:1, 34:21-39:5 (colloquy about the relationship between SCM and various of its crypto specific vendors); *see also* **Magot Supp. Decl.**, ¶49, Exs. 5-6.

6.  Its balance sheet showed a ███████████████████████ for its first year of existence and ██████████████ for 2019, its second year of existence.  Mandel Ex. G; Ault Dep. (Mandel Ex. A) at 62-63; Magot Dep. (Mandel Ex. B) at 237.

**Response:  Disputed.  Plaintiff's citation to Mandel Ex. G does not support the vague assertion regarding a** █████████████ **Notwithstanding, the referenced balance sheets also show that, Super Crypto's Fixed Assets,** █████████████████████ **, totaled** ███████████████ **and** ████████████████ ***See also supra*, Response, ¶5.**

7.  Mr. Ault, the CEO and Chairman of DPW and Chairman of Super Crypto, acknowledged

at his deposition that Super Crypto was incapable of meeting its obligations without assistance from DPW and would not exist without a parent company that was a supportive investor committed to providing it capital.  Ault Dep. (Mandel Ex. A) at 64-66.

**Response:    Disputed.  Ault testified as follows: "I think it's fair to say that if [Super Crypto] didn't have a parent company that was a supportive shareholder, _based on the way you are asking the question_, then it wouldn't exist."    Ault Dep. (Volynsky Supp. Decl., Ex. 33), 66:4-7 (emphasis added); _see also supra_, Response, ¶5.**

8.    DPW funded Super Crypto throughout its existence.  Ault Dep. (Mandel Ex. A) at 73-80, 87-88, 92-93, 97-98; Magot Dep. (Mandel Ex. B) at 242-243.  _See also_ paragraphs 23-25 _infra_ and citations therein concerning DPW's payment of Super Crypto's bills.

**Response:    Incorporating the citations from paragraphs 23-25, _infra_, Plaintiff has cited to 49 full pages of deposition testimony, as well as an additional 18 exhibits, without pincites, that are replete with objectionable testimony based on, _inter alia_, hearsay, opinion testimony, speculation and testimony that is not based on the deponent's personal knowledge.  _See supra_, Preliminary Statement.**

**Disputed to the extent that this statement implies that aside from funds that DPW advanced to Super Crypto, that Super Crypto had no other sources of revenue.  _See_ Magot Dep. (Volynsky Supp. Decl., Ex. 32), 44:21-45:7; _see also_ Ault Dep. (Volynsky Supp. Decl., Ex. 33), 47:12-17 (acknowledging that Super Crypto generated revenue from its mining operation)**

**Further disputed to the extent that this statement refers to any time period beyond 2018, as Plaintiff does not cite to any documents dated, created, or referencing any time period beyond 2018.  _See_ Plaintiff's citations to ¶8.**

Notwithstanding, undisputed that, from time to time, during the 2018 calendar year, DPW would advance funds to Super Crypto. Otherwise, disputed. ***See supra*, Response, ¶5.**

9.   In his capacity as CEO and Chairman of DPW, Mr. Ault was responsible for allocating capital to Super Crypto and DPW's other subsidiaries. Ault Dep. (Mandel Ex. A) at 87-88; Magot Dep. (Mandel Ex. B) at 153-154.

**Response:       Undisputed that Ault testified that he is in "charge of all capital allocation from the parent company." *See* Ault Dep. (Volynsky Supp. Decl., Ex. 33), 87:24-88:4. Disputed, however, that this assertion applies to any time period beyond February 22, 2018, which is the time period that Ault was specifically asked about in the cited excerpts from Ault's deposition. *See id.*, 87:16-88:4.**

**Further disputed that neither Ault or Magot testified as to whether Ault allocated capital as "Chairman" or as "CEO" of DPW at the cited excerpts from Ault's deposition. Plaintiff's counsel inserted the leading qualifier "in your capacity as chairman of DPW" in his questioning, rather than ask Ault the capacity to which he was referring to. *See id.***

10. Mr. Ault described allocating DPW's capital to the various subsidiaries as "the reason we're here." Ault Dep. (Mandel Ex. A) at 88.

**Response:       Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.**

**Further disputed that Ault so testified. Ault responded to a general question asking whether "it is common practice for the parent company to allocate capital to various of its subsidiaries," by stating "That's the reason we're here." *See* Ault Dep. (Volynsky Supp. Decl., Ex. 33), 88:5-8.**

11. As of 2018, DPW's subsidiaries were not fully developed and Mr. Ault was regularly

involved in making determinations as to how much money to send to its subsidiaries, including Super Crypto, to fund their operations.  Ault Dep. (Mandel Ex. A) at 92-93, 97-98.

**Response:**    **The Court should disregard this paragraph as violative of the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain *only one* factual assertion in each numbered paragraph." (emphasis added).  *See Mayaguez S.A. v. Citigroup, Inc.*, 2021 U.S. Dist. LEXIS 86634, at *19 (S.D.N.Y. Apr. 30, 2021).  This assertion is further disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.**

**Further disputed, as Ault did not testify that DPW's subsidiaries were not fully developed in 2018.  Rather, Ault testified that, in 2018, "[t]he subsidiaries weren't developed as much as they are now" and that "[he] think[s] it's fair to say that at any given time any of the 18 subsidiaries [DPW has] may or may not need money."  *See* <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, 92:18-20; 93:20-21.  Ault further clarified that some of DPW's subsidiaries "have the ability to do business without the parent company."  *See id.*, 88:9-88:18.**

**Notwithstanding, undisputed that Ault testified that, in 2018, he was regularly involved in determining the allocation of funds for DPW's subsidiaries.  *See id.*, 92:21-92:25.**

12. Super Crypto only had its own bank account for approximately three months between February and April 2018.  Magot Dep. (Mandel Ex. B) at 239-241; Ault Dep. (Mandel Ex. A) at 72; Mandel Ex. H.

**Response**:    **This assertion is disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.  Further disputed that Ault so testified at <u>Ault Dep.</u>, 72.**

Notwithstanding, undisputed that **Super Crypto had a checking account with Wells Fargo Bank (the "Checking Account") for approximately three months between February 2018 and April 2018. N.A.  However, Magot and Ault each testified that the reason that the Checking Account was closed after such a short period of time was because banks were reluctant to hold accounts for crypto-related entities.  *See* <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 239:22-240:8; *see also id.*, Ex. 33, <u>Ault Dep.,</u> 81:10-16.**

13. The bank account was opened ████████████████ with a deposit of a mere $25.  Ault Dep. (Mandel Ex. A) at 76; Mandel Ex. H.

**Response:      This assertion is disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.**

**Further disputed to the extent that this statement implies that the Checking Account represents the totality of Super Crypto's income during the stated period.  *See* <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 44:21-45:7; *see also* <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, 47:12-17 (acknowledging that Super Crypto generated revenue from its mining operation).**

**Notwithstanding, undisputed that the initial deposit in the Checking Account was ████.**

14. All the funds subsequently deposited into that account, totaling ████████████████, came from DPW.  Ault Dep. (Mandel Ex. A) at 75-80; Magot Dep. (Mandel Ex. B) at 242-243; Mandel Ex. H.

**Response:      The Court should disregard this paragraph as violative of the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain *<u>only one</u>* factual assertion in each numbered paragraph." (emphasis added).  *See Mayaguez,* 2021 U.S. Dist. LEXIS 86634, at *19.   This assertion is further**

disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.

Disputed that "all the funds" that were subsequently deposited into the Checking Account came from DPW. *See* Mandel, Ex. H, at ███████████████████

████████████████████████████████████████████████

█████████████████

Further disputed to the extent that this statement implies that the Checking Account represents the totality of Super Crypto's income during the stated period. *See* Magot Dep. (Volynsky Supp. Decl., Ex. 32), 44:21-45:7; *see also* Ault Dep. (Volynsky Supp. Decl., Ex. 33), 47:12-17 (acknowledging that Super Crypto generated revenue from its mining operation).

Further disputed as Ault also did not testify that "all the funds subsequently deposited" "came from DPW." Rather, Ault was merely asked about several discrete deposits, line by line. *See* Ault Dep. (Volynsky Supp. Decl., Ex. 33), 77:3-12; 77:17-77:23; 78:23-80:15.

15. Despite the volume of DPW's deposits, Super Crypto never had ████████████ ████████ at the end of the month, because all the other deposited funds were used by Super Crypto to pay third parties. Mandel Ex. H.

**Response:** This assertion is disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.

Further disputed to the extent that this statement implies that the Checking Account represents the totality of Super Crypto's income during the stated period. *See* Magot Dep. (Volynsky Supp. Decl., Ex. 32), 44:21-45:7; *see also* Ault Dep. (Volynsky Supp. Decl., Ex. 33), 47:12-17 (acknowledging that Super Crypto generated revenue from its mining operation).

Undisputed that the ending balances for the Checking Account were ███████████ at

months end, in ███████████ and ███████████ Undisputed that Super Crypto used funds

that were deposited into its Checking Account to pay for Super Crypto's business operations

during the stated period. *See* Entries in <u>Mandel</u>, Ex. H.

16. There was no formal loan agreement in place between DPW and Super Crypto with respect

to the funds DPW provided to Super Crypto.  Magot Dep. (Mandel Ex. B) at 150; Ault Dep.

(Mandel Ex. A) at 68-69.

<u>Response:</u>      Disputed on the grounds that this alleged undisputed fact is not material to the

issues relating to the breach of contract claim, as alleged in the FAC.

Further disputed as the cited testimony states that the referenced funds that were

advanced from DPW to Super Crypto constituted "loans."  To the contrary, each of Magot

and Ault testified that the terms of the advance would be determined at a later date.  *See*

<u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u> 150:10-15; <u>Ault Dep. (Volynsky Supp. Decl., Ex.</u>

<u>33)</u>, 69:11-13 ("Q: What would an advance be?  AULT: Be a transfer of money towards a

future transaction."); 68:19-21 ("AULT: If it's 100 percent owned, it's usually

intracompany.  If it's not, there usually are some sort of loan agreements in place.").  As

Plaintiff has not established that DPW loaned money to Super Crypto, the statement that

"There was no formal loan agreement in place" is conclusory and argumentative, and should

be disregarded.  *See Epstein v. Kemper Ins. Cos.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002).

17. Accordingly, Super Crypto was not obligated to pay interest or to repay the funds within

any set period.  Magot Dep. (Mandel Ex. B) at 150-151.

<u>Response</u>:      Disputed on the grounds that this alleged undisputed fact is not material to the

issues relating to the breach of contract claim, as alleged in the FAC.  *See supra*, Response

**¶16. Further disputed to the extent that this statement refers to any amounts aside from the Contracted-For Amount, as the cited excerpt at <u>Magot Dep.</u>, 150-151 is circumscribed to the advancement of funds for the Contracted-For Machines. *See* <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 148-151. <u>In that context</u>, Magot would testify that Super Crypto was not paying interest on those funds (*i.e.*, the Contracted-For Amount) and that that money was never paid back. *See id.*, 151:15-21. Further disputed that Super Crypto "was not obligated" to make payments "within any set period." *See* <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, 69:11-24.**

18. The funds provided to Super Crypto were treated as advances with any repayment terms to be worked out in the end if Super Crypto ever became financially viable. Magot Dep. (Mandel Ex. B) at 150-151; Ault Dep. (Mandel Ex. A) at 68-71.

**Response:        Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.    Notwithstanding, undisputed that Magot responded "yes" when asked "So if the company became financially viable, then you would pay back any advances that had been made?" <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 151:4-7. Disputed that such testimony establishes that the "repayment terms" would only be worked out "if Super Crypto ever became financially viable." Disputed that Ault testified that the "repayment terms" would be "worked out in the end if Super Crypto ever became financially viable." <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, 69:4-24.**

19. Super Crypto never paid back the advances made to it. Magot Dep. (Mandel Ex. B) at 151.

**Response:        Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC. Notwithstanding,**

undisputed that Magot testified that Super Crypto never paid DPW back the funds that DPW advanced for the Contracted-For Machines.  *See* <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 144:4-151:12 (line of questioning related to Ex. 39 from <u>Magot Dep.</u>).  Exhibit 39 from the <u>Magot Dep.</u> is attached as <u>Ex. SS</u> to the <u>Mandel</u> *See also* <u>Mandel</u>, ¶46.  Exhibit SS is an e-mail chain dated April 5, 2018 – April 9, 2018.  Otherwise disputed, as the cited deposition page does not support the assertion contained in this statement.

20. Super Crypto's balance sheet for 2019 shows "intercompany receivables" of nearly $12 million, reflecting more than $2 million that had been advanced to it by DPW and another $9 million advanced by another wholly owned subsidiary of DPW, Coolisys, to fund the purchase of miners.  Magot Dep. (Mandel Ex. B) at 238-239; Mandel Ex. G.

**Response:    The Court should disregard this paragraph as violative of the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain *only one* factual assertion in each numbered paragraph."  (emphasis added).  *See Mayaguez S.A.*, 2021 U.S. Dist. LEXIS 86634, at \*19.**

**Further disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.  All of the alleged events, including the commencement of this suit, occurred during the time period between February 2018 – November 2018.   Thus, entries from a 2019 balance sheet could have no bearing on events that occurred from February 2018 – November 2018.**

**Notwithstanding, further disputed because the referenced "intercompany receivables" line items show a ████████████████████████.  *See* <u>Mandel</u>, Ex. G. Further disputed that Magot testified that Coolisys was a wholly-owned subsidiary of DPW in 2019.  Rather, Magot testified that he believes that Coolisys *is* a wholly-owned subsidiary**

of DPW.  **Magot Dep. (Volynsky Supp. Decl., Ex. 32), 239:13-14.**

21. Super Crypto never made a profit and never paid any dividends.  Magot Dep. (Ex. B) at 239.

**Response:    Disputed that Super Crypto "never made a profit."  This is a legal conclusion, not a fact that can be disputed or undisputed.  Otherwise, undisputed that Magot testified that Super Crypto never made a profit and never paid any dividends.**

22. When Super Crypto ceased operations, it had no cash or other currency on hand.  Magot Dep. (Mandel Ex. B) at 44-45.

**Response:  Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.**

**Further disputed to the extent this statement implies that Super Crypto had no other assets when it ceased operations.  To the contrary, when Super Crypto ceased its operations in 2020, Super Crypto had assets (namely, cryptocurrency mining machines) that it would thereafter sell, with the proceeds of such sale deposited into an escrow account.  *See* Magot Dep. (Volynsky Supp. Decl., Ex. 32), 45:8-47:3; *see also id.*, Ex. 33, 59:3-21.  Furthermore, as of the date of the Magot Dep., Magot recalled that SCM had one potential outstanding obligation to SMS, which,  as of the date of the Magot Dep., SMS had previously "dropped." Magot Dep. (Volynsky Supp. Decl., Ex. 32), 47:16-48:18.**

23. DPW exercised full control over Super Crypto's finances, determining which of Super Crypto's many creditors would be paid and when.  Ault Dep. (Mandel Ex. A) at 84-100, 102-106, 108-111; Magot Dep. (Mandel Ex. B) at 69-72, 75, 84-85; Mandel Ex. J-CC, RRR, AAAAA.

**Response:   The Court should disregard this paragraph as violative of the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement**

must contain <u>*only one*</u> factual assertion in each numbered paragraph." (emphasis added). *See Mayaguez S.A.*, 2021 U.S. Dist. LEXIS 86634, at *19 (S.D.N.Y. Apr. 30, 2021).

Plaintiff has also cited to 33 full pages of deposition testimony, as well as an additional 18 exhibits, that are replete with objectionable testimony based on, *inter alia*, hearsay, opinion testimony, speculation and testimony that is not based on the deponent's personal knowledge. *See supra*, <u>Preliminary Statement</u>.

Notwithstanding, disputed that DPW exercised "full control" over Super Crypto's finances. This is a legal conclusion, not a fact. For the reasons set forth in the memorandum of law in opposition to the Motion (the "Opposition"), Defendants dispute that DPW exercised "full control" over Super Crypto's finances.

Further disputed that the referenced exhibits demonstrate any such "full control" or that DPW was "determining which of Super Crypto's many creditors would be paid and when." The referenced exhibits (Exs. J-CC, RRR) are comprised of e-mails: (i) from Magot to Ault providing a summary of potential opportunities (which included the amounts that Plaintiff was demanding to consummate some sort of transaction (*see infra*, Response, ¶27)) and outstanding obligations, as well as (ii) e-mails from Ault allocating a blanket amount (generally a round figure) to be advanced to Super Crypto (the "Advanced Amounts"). There is no indication in any of the e-mails that DPW is directing that Super Crypto use the Advanced Amounts to pay one third-party over another, directing Super Crypto as to how it should allocate the Advanced Amounts, directing Super Crypto as to the timing of its use of the Advanced Funds, or prohibiting Super Crypto from using such Advanced Funds to pay a particular third-party.

The cited excerpts from the deposition testimony similarly do not reference DPW's

**"full control" over Super Crypto's finances.  *See* <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, Index ("control" and "controller" references do not support this assertion); <u>Magot Dep. (Volynsky Supp. Decl.</u>, Ex. 32), Index ("control" and "controller" references do not support this assertion).  Nor do such excerpts show that DPW made any decisions beyond the aggregate amount that would be allocated to Super Crypto.**

**Further disputed that the vendors contained in the referenced e-mails were Super Crypto's creditors.  *See* <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 72:6-73:4 (Magot testifying that Super Crypto did not have an obligation or owe Plaintiff for the Remaining Machines after the Expiration Date); 80:18-81:13 (Magot testifying that the summary list shows "what [he'd] *like* to pay."  (emphasis added)); 82:2-83:3 ("This isn't a contract.  This is just an email.  It's a different context."); 84:18-21 (stripping away Plaintiff's Counsel's argumentative questioning, Magot testified that he listed Plaintiff in the October 2018 summary "[f]or the same reason as before."); 69:8-15 ("These are what I *wanted to have paid*, if I could get an advance."  (Emphasis added)).**

24. Super Crypto's CEO, Mr. Magot, regularly came to DPW's CEO and Chairman, Mr. Ault, with requests for funds to pay Super Crypto's bills, and Mr. Ault would then determine what amount of funding to make available.  Ault Dep. (Mandel Ex. A) at 84-100, 102-106, 108-111; Magot Dep. (Mandel Ex. B) at 69-72, 75, 84-85; Mandel Ex. J-CC, RRR, AAAAA.

**Response:    The Court should disregard this paragraph as violative of the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain *only one* factual assertion in each numbered paragraph."  (emphasis added).  *See Mayaguez S.A.*, 2021 U.S. Dist. LEXIS 86634, at *19 (S.D.N.Y. Apr. 30, 2021).**

**Plaintiff has also cited to 33 full pages of deposition testimony, as well as an additional**

18 exhibits, that are replete with objectionable testimony based on, *inter alia*, hearsay, opinion testimony, speculation and testimony that is not based on the deponent's personal knowledge. *See* <u>Preliminary Statement</u>.

Further disputed on the additional grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.

Further disputed as, by way of illustration, Exs. L-R, V purport to be ████████. ████████████████████████████████████████████████ Thus, disputed that the referenced e-mails demonstrate "requests for funds to pay Super Crypto's bills."

Further disputed to the extent that this statement refers to any other period of time beyond the 2018 calendar year. *See* <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, 84:4-12 (targeted questions regarding 2018); *see also* <u>Mandel</u>, J-CC, RRR (all dated during 2018).

Further disputed that the referenced e-mails demonstrate "requests for funds to pay Super Crypto's bills." *See* <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 72:6-73:4 (Magot testifying that Super Crypto did not have an obligation or owe Plaintiff for the Remaining Machines after the Expiration Date); 80:18-81:13 (Magot testifying that the summary list shows "what [he'd] *like* to pay." (emphasis added)); 82:2-83:3 ("This isn't a contract. This is just an email. It's a different context."); 84:18-21 (stripping away Plaintiff's Counsel's argumentative questioning, Magot testified that he listed Plaintiff in the October 2018 summary "[f]or the same reason as before."); 69:8-15 ("These are what I *wanted to have paid*, if I could get an advance." (Emphasis added)).

Notwithstanding, undisputed that Ault testified that, during 2018, Magot would come to him with requests for funds to pay certain bills and that Ault would then determine what

**amount of funding to make available.  _See_ _Ault Dep. (Volynsky Supp. Decl., Ex. 33)_, 84:4-10;  _see also id._, 97:18-98:12 (noting that such determinations could be based on DPW's forecasted capital).**

25. After April 2018 when Super Crypto no longer had a bank account, payments were made directly by DPW or another of DPW's wholly owned subsidiaries at Mr. Ault's direction.  Ault Dep. (Mandel Ex. A) at 99-100, 102-106, 108-111; Magot Dep. (Mandel Ex. B) at 69-72, 75, 84-85; Mandel Ex. W-CC, RRR, AAAAA.

**Response:       The Court should disregard this paragraph as violative of the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain _only one_ factual assertion in each numbered paragraph."  (emphasis added).  _See Mayaguez S.A._, 2021 U.S. Dist. LEXIS 86634, at \*19 (S.D.N.Y. Apr. 30, 2021).**

**Plaintiff has also cited to 18 full pages of deposition testimony, as well as an additional 8 exhibits, that are replete with objectionable testimony based on, _inter alia_, hearsay, opinion testimony, speculation and testimony that is not based on the deponent's personal knowledge.  _See_ _Preliminary Statement_.**

**Notwithstanding, disputed as this statement does not make clear what the term "payments" refers to.  The evidentiary record further establishes that this assertion is disputed as Super Crypto also used its revenues from cryptocurrency mining to pay its outstanding bills.  _Magot Dep. (Volynsky Supp. Decl., Ex. 32)_, 44:21-45:7; _see also_ _Ault Dep. (Volynsky Supp. Decl., Ex. 33)_, 47:12-17 (acknowledging that Super Crypto generated revenue from its mining operation).**

**Further disputed as the cited deposition excerpts and exhibits do not show any payments being made whatsoever, let alone, payments from one of DPW's wholly-owned**

subsidiaries made on behalf of Super Crypto at Ault's direction.

Further disputed to the extent that this statement refers to any other time period beyond the 2018 calendar year. *See* <u>Mandel Ex.</u>, W-CC, RRR, AAAAA (dated during the 2018 calendar year).

Further disputed as there are no e-mails from Ault contained at <u>Mandel Ex.</u>, W-CC, RRR, AAAAA, and therefore such e-mails cannot demonstrate payments made at "Ault's direction."

Notwithstanding the foregoing, it is worth underscoring that the only page which Plaintiff leaves out of from the <u>Ault Dep.</u>, 99-106 range, is page 101, wherein Ault explains, *inter alia*, his understanding of the Agreement – "[W]e had to make a deposit and we could hold onto [the cryptocurrency machines] but then after that date we weren't obligated to buy them or something." *See* <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, 101:10-20.

26. Super Crypto was unable to pay its bills without contributions from DPW. Ault Dep. (Mandel Ex. A) at 104; Magot Dep. (Mandel Ex. B) at 70.

**Response:    Disputed that the cited deposition excerpts reference "contributions." Further disputed to the extent that this statement implies that Super Crypto was wholly reliant on DPW to pay its outstanding obligations. Magot testified that Super Crypto would generate revenue from mining cryptocurrency and that such revenue was always used to pay for Super Crypto's bills and expenses. <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 44:21-45:7; 39:25-40:3; *see also* <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, 47:12-17 (acknowledging that Super Crypto generated revenue from its mining operation); 53:16-21 (acknowledging that Super Crypto used its crypto-mining proceeds to pay bills); *see also* <u>Volynsky Supp. Decl.</u>, ¶14, Ex. 42, p. 49 (disclosing that Super Crypto generated $1,675,549 in revenue for 2018).**

Notwithstanding, undisputed that Super Crypto did use some of the funds that were advanced to it by DPW to pay for a portion of Super Crypto's outstanding obligations. **See supra, Ds Resp., ¶23.**

27. Even with DPW's assistance, Super Crypto still owed ████████████████ as of October 2018, according to a memo sent by Mr. Magot to Mr. Ault. Mandel Ex. DD.

**Response:  Disputed that the referenced e-mail states that Super Crypto still owed "██ ████████████████" as of October 2018.  Ex. DD was marked as Ex. 10 at the Magot Deposition.  <u>Mandel</u>, ¶31.  As to this discrete e-mail, Magot testified that he was not stating that Super Crypto was obligated to pay ████████████████ ████████████ to Plaintiff, but rather that this was the amount that Plaintiff had demanded if Super Crypto still wanted to purchase the Remaining Machines, after the Expiration Date.  <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 80:18-83:20; *see also supra*, Ds Resp., ¶23.  There is no reference in the e-mail to any amounts purportedly being "owed."**

28. Included among Super Crypto's outstanding balances in Mr. Magot's October 7, 2018 memo was more than $1.5 million owed to Plaintiff. Mandel Ex. DD.

**Response:   Disputed that the referenced e-mail states that Super Crypto owed any amounts to Plaintiff.  *See supra*, Ds Resp., ¶27.**

29.  DPW ultimately paid for outstanding debts of Super Crypto to some of the vendors shown in Mr. Magot's October 7, 2018 email even though DPW was not a party to the contract between Super Crypto and those entities.  Ault Dep. (Mandel Ex. A) at 111-113, 115-116; Mandel Ex. DD.

**Response:   The Court should disregard this paragraph as violative of the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain *only one* factual assertion in each numbered paragraph."  (emphasis**

added).  *See Mayaguez S.A.*, 2021 U.S. Dist. LEXIS 86634, at *19 (S.D.N.Y. Apr. 30, 2021).

Notwithstanding, disputed.  Ault testified at <u>Ault Dep.</u>, 111-116 that he could not recall the ultimate resolution concerning various of Super Crypto's alleged obligations.  Ault was not asked about Plaintiff during this colloquy, and, at <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, 114:13-19 (the only page that Plaintiff omits from this sequence), Ault notes that the inquiries should be directed to Magot.  *See also id.*, 115:15-22 (Ault did not know whether Lord Abstract "was paid for by DPW *or if it was paid for in Bitcoin.* I don't know." (emphasis added)).  The only matters that Ault could testify to with any certainty were: (i) that DPW was not a party to an agreement with SMS  (*id.*, 115:13-14) and that (ii) DPW was not a party to an agreement with Lord Abstract.  *Id.*, 116:3-4.

30. DPW and Super Crypto shared common officers and directors.  Ault Dep. (Mandel Ex. A) at 74-75; Magot Dep. (Mandel Ex. B) at 31-32; Mandel Ex. I, QQ.

**Response:**      **Undisputed that some of Super Crypto's directors were also directors of DPW and that Horne was the Chief Financial Officer of both companies.  Notwithstanding, Darren Magot, Super Crypto's Chief Executive Officer, President, Secretary, and member of the Board of Directors, was neither an officer nor director of DPW.  *See* <u>Mandel</u>, Ex. I, at DEFENDANTS_000005; *see also* <u>Magot Supp. Decl.</u>, ¶42.**

31. Mr. Ault was Chairman of the Board for both DPW and Super Crypto, and William Horne was a Board member of, and served as CFO for, both entities.  Ault Dep. (Mandel Ex. A) at 74-75; Magot Dep. (Mandel Ex. B) at 31-32; Mandel Ex. I, QQ.

**Response:**      **Undisputed to the extent that this assertion refers to the time period between February 23, 2018 (Plaintiff's initial contact with SCM) to November 28, 2018 (the commencement date of this action).**

32. In addition, Mr. Magot, the CEO of Super Crypto, along with both Mr. Ault and Mr. Horne, were member of the Board of Ault & Company Inc., a large shareholder in DPW.  Ault Dep. (Mandel Ex. A) at 198; Magot Dep. (Mandel Ex. B) at 31-32.

**Response:**      **Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.**

**Undisputed that Magot testified that, as of the date of his deposition, that he, Horne, and Ault, are members of the Board of Directors of Ault & Company, Inc. ("A&C").  Magot Dep. (Volynsky Supp. Decl., Ex. 32), 31:16-32:2.  Disputed that Magot's testimony permits an inference to any other time period beyond the date of his deposition (January 20, 2023).**

**Undisputed that Ault testified that A&C "probably was" a large shareholder "at the time of DPW."  Ault Dep. (Volynsky Supp. Decl., Ex. 33), 198:4-11.**

33. DPW and Super Crypto also shared not only a street address, but a suite at that address. Mandel ¶ 107 & Ex. BBBBB.

**Response:**      **Undisputed**.  **In addition, Super Crypto also utilized a data mining center in Indiana from which Super Crypto would place and operate its cryptocurrency mining machines to generate revenue.  *See*  Magot Dep. (Volynsky Supp. Decl., Ex. 32), 34:21-35:19; 40:1-3; 45:1-7; *see also*  Magot Supp. Decl., ¶¶47, 50, 52, Ex. 7, at DEFENDANTS_000099.** ( ███████████████████████████████████████████ ).

**II.    Negotiation of the Asset Purchase Agreement**

34. Joe Kalfa, acting on behalf of Plaintiff, reached out to Mr. Magot, Super Crypto's CEO, via LinkedIn on February 23, 2018 after reading a press release about DPW setting up crypto mining operations through Super Crypto.  Kalfa Dep. (Mandel Ex. C) at 38-39, 47-50; Mandel Ex. SSSS.

**Response:    Disputed that the press release annexed at <u>Mandel</u>, Ex. SSSS (the "Press Release") references "DPW setting up crypto mining operations through Super Crypto." The Press Release provides that DPW entered into an agreement to acquire the operations of non-party Flexisphere that "will work with Super Crypto Mining, DPW's wholly owned subsidiary," to leverage its curated blockchain and cloud mining technology and expertise." <u>Mandel</u>, Ex. SSSS.  Otherwise, undisputed.**

35. Mr. Kalfa inquired whether Mr. Magot was interested in purchasing 1,100 Antminer S9 machines that Plaintiff had available.  Mandel Ex. SSS; Magot Dep. (Mandel Ex. B) at 85-86.

**Response:    Disputed that Kalfa indicated the referenced machines "available." Kalfa's February 23, 2018 LinkedIn message to Magot indicates that Plaintiff has "1,100 coming next week from Bitmain from the March Batch."  *See* <u>Mandel</u>, Ex. SSS.  Plaintiff was invoiced for 500 of the Antminer S9 machines that Kalfa references, on February 28, 2018. *See* <u>Tencer Dep. (Volynsky Supp. Decl., Ex. 34)</u>, 71:25-73:17; 75:2-23; *see also* <u>Volynsky Supp. Decl.</u>, Ex. 47 at BMS 0001354.   Plaintiff was also invoiced for the other 600 Antminer S9 machines that Kalfa references, on March 3, 2018.  *See* <u>Tencer Dep. (Volynsky Supp. Decl., Ex. 34)</u>, 71:25-73:17; 76:11-77:3.**

36. Mr. Magot indicated that he was "very interested" in purchasing the machines, but he would need a few days "to confirm all the financing."  Mandel Ex. SSS; Magot Dep. (Mandel Ex. B) at 86.

**Response:    Undisputed that Magot messaged Kalfa stating that he "will need until Tuesday to confirm all the financing but [he is] very interested in making the purchase." <u>Mandel</u>, Ex. SSS, at BMS001592.**

37. By financing, Mr. Magot was referring to getting an advance from the parent company,

DPW.  Magot Dep. (Mandel Ex. B) at 86.

**Response:    Undisputed.  Notwithstanding, Kalfa testified that he did not know that he would have read much into Magot's statement that he needed to "confirm all financing," "other than [that Magot] was saying he was interested in making the purchase."  *See* Kalfa Dep. (Volynsky Supp. Decl., Ex. 35), 64:21-65:3.**

38. Both Mr. Magot and Mr. Ault acknowledged at their depositions that Super Crypto had no ability to meet the obligation for purchasing the machines from Plaintiff without an advance from DPW.  Magot Dep. (Mandel Ex. B) at 86; Ault Dep. (Mandel Ex. A) at 78, 95-96, 119-121.

**Response:    The Court should disregard this paragraph as violative of the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain _only one_ factual assertion in each numbered paragraph."  (emphasis added).  *See Mayaguez S.A.*, 2021 U.S. Dist. LEXIS 86634, at \*19 (S.D.N.Y. Apr. 30, 2021).**

**Further disputed as the cited excerpts from Magot's deposition reference Magot's communications with Kalfa in February 2018, which pre-date the March 8, 2018 effective date of the Agreement.  Thus, the cited excerpts cannot concern any purported "obligation(s)."**

**Notwithstanding, the question that was posed to Magot during his deposition was whether, as of February 2018, Super Crypto had any ability to purchase the equipment that Mr. Kalfa was _offering_ without an advance from DPW.  Magot Dep. (Volynsky Supp. Decl., Ex. 32), 86:18-21.  Magot responded, "Not that I recall."  *Id.*, 86:22.**

**The cited excerpts from Ault's deposition transcript similarly do not demonstrate any such "acknowledgment" by Ault.  Ault Dep. (Volynsky Supp. Decl., Ex. 33), 78:10-15 (noting that Super Crypto had mining proceeds); 96:4-10 (inadmissible testimony wherein Ault is**

asked to speculate as to whether as of a certain date, **Super Crypto had any ability to meet a hypothetical obligation of $1,487,500);** 121:2-8 (Ault noting that its "fair to say" that Super Crypto "required the support of DPW" to "meet an obligation of the kind that's reflected in th[e] _**proposed**_ [A]greement." (emphasis added)); _see also_ <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 45:1-7.

39. Mr. Magot's communications with Plaintiff consistently made clear that Super Crypto needed DPW's approval and funding before entering into an agreement with Plaintiff. Mandel Ex. EE, TTT, UUU, VVV; Tencer Decl. ¶ 4.

**Response:** **Disputed that Magot's communications "consistently made clear" as conclusory, argumentative, and improper opinion testimony. The Tencer Declaration, itself, does not even state that Magot's communications with Plaintiff "consistently made clear that Super Crypto needed DPW's approval and funding before entering into an agreement with Plaintiff."** _See_ <u>Tencer Decl.</u>, **¶4. Rather, Tencer states that "during... negotiations, Darren Magot, Super Crypto's CEO… made clear that approval and funding for the deal was coming from DPW, which controlled the negotiations for Super Crypto."** _See id._

**Disputed that Magot's communications with Plaintiff "consistently made clear" that Super Crypto required DPW's approval to enter into an agreement with Plaintiff.** <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, **113:6-114:7; 95:7-15 ("That was a decision made at the Super Crypto board level.");** _see also_ <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, **120:3-24 (testifying that Super Crypto did not need DPW's approval to enter into the Agreement).**

**To the contrary, on February 27, 2018, well before Magot even mentions a parent company, Magot would e-mail Kalfa from his supercrypto.com e-mail stating that he "need[s] more time to get board approval to purchase the machines."** _See_ <u>Mandel</u>, **Ex. TTT,**

at DEFENDANTS__000979;  Magot Dep. (Volynsky Supp. Decl., Ex. 32), 90:1-9 (noting that he needed to seek board approval from Super Crypto's board); *see also* Ault Dep. (Volynsky Supp. Decl., Ex. 33), 120:23-25 (Ault's recollection was that DPW has seven members of the board of directors during this time"); Mandel, Ex. QQ, p.61.

There is no reference to DPW in that e-mail and, further, Magot further continues, "I don't want to hold you up but want to be an open book so you can made a decision... If you are willing to wait or do you have other shipments coming in the future that I can buy." Mandel, Ex. TTT, at DEFENDANTS__000979.   Kalfa would respond to that e-mail by offering a ten percent discount, and *only then*, when this variance in pricing was presented, does Magot forward such e-mail to Ault with a message stating "FYI." *See id.*

Kalfa also testified that he unilaterally determined that Super Crypto was a division of DPW long before Plaintiff reached out to Super Crypto.  Thus, Kalfa testified that prior to his initial contact with Magot, he reviewed the Press Release and saw that DPW was "publically (*sic*) traded, seemed like a big company with tons of divisions, and so it seemed like a great customer to go after." Kalfa Dep. (Volynsky Supp. Decl., Ex. 35), 48:1-20.  Kalfa would go on to testify that, at the time that he reviewed the Press Release, he understood that DPW "set up a super – they set up a mining division or here, it says, wholly-owned subsidiary." *Id.*, 50:1-51:6.  Kalfa further testified that he unilaterally determined that Ault was Magot's boss based on the Press Release.  *See id.*, 125:22-126:4; *see also id.*, 58:1-21 (Kalfa also noted feeling more "familiar" with DPW because he is located in Israel and he recalled reading one of DPW's press releases "surrounding them having acquired an Israeli power start-up." )

To be certain, on February 25, 2018, two days after Kalfa's initial contact with Magot

on LinkedIn, Kalfa would circulate a draft asset purchase agreement between Plaintiff and Super Crypto.  **Volynsky 5/29 Decl., Ex. 16 (Ds Supp. SF, ¶238); Kalfa Dep. (Volynsky Supp. Decl., Ex. 35),** 67:17-71:15.  Kalfa testified that, as of February 25, 2018, based exclusively on the handful of LinkedIn messages between himself and Magot, he determined that Super Crypto and DPW were "one and the same."  *Id.*, 67:17-71:15.  Kalfa would further concede that prior to entering to an agreement with Super Crypto, Magot never told him that DPW and Super Crypto were one and the same.  *Id.*, 71:18-23.

Tencer would also testify that Magot never told him that DPW would be responsible for the payments under the Agreement (**Tencer Dep. (Volynsky Supp. Decl., Ex. 34),** 64:2-65:4) and Kalfa testified that Magot never told him that Super Crypto and DPW were one and the same.  **Kalfa Dep. (Volynsky Supp. Decl., Ex. 35),** 71:18-23.

As regards, Ex. UUU, Magot testified that the context of his statement in that email was that he, as Chief Executive Officer of Super Crypto, could sign an agreement with Plaintiff, but would not feel comfortable doing so without first confirming the financing. **Magot Dep. (Volynsky Supp. Decl., Ex. 32),** 112:22-113:11.  At the end of such e-mail, Magot states to Plaintiff that he "hope[s] we can work this out but considering the chain of events I'll understand if you prefer to pass on this opportunity and sell the machines to others." **Mandel,** Ex. UUU, at DEFENDANTS__001501.

Magot's transparency regarding Super Crypto's finances can be further gleaned from the e-mail directly beneath the top-level e-mail at Ex. UUU.  *See id.* (e-mail from Tencer, Mar. 6, 11:14) ("*Regarding your finances*, I spoke with Joe and seeing the future potential, we would to try and *accommodate your cash flow*." (emphasis added)).

Ex. EE further establishes that Tencer was not introduced to Magot until March 1,

2018.  *See* **Mandel**, Ex. EE, at DEFENDANTS_001186.  Then, on March 2, 2018, at 10:55 AM, Magot, using his supercrypto.com e-mail, informs Tencer that he "has a meeting with the board" without any reference to DPW.  *See id.*

Notwithstanding, undisputed that, prior to entering into the Agreement with Plaintiff, Magot's communications with Plaintiff consistently made clear that Super Crypto needed to confirm that it could obtain the requisite financing prior to committing itself to any agreement with Plaintiff.  **Magot Dep. (Volynsky Supp. Decl., Ex. 32)**, 113:6-114:7; *see also* **Magot Supp. Decl.**, ¶¶ 9, 12-13.

40. In a February 27, 2018 email to Willy Tencer, Plaintiff's President, Mr. Magot wrote that "[w]e absolutely want the machines but would need more time to get board approval to purchase the machines."  Magot Dep. (Mandel Ex. B) at 90; Mandel Ex. TTT.

**Response:** **Disputed.  Ex. TTT does not support the assertion that Magot sent an e-mail to Tencer, on or about February 27, 2018.  Magot was not introduced to Tencer until March 1, 2018.  *See* Mandel, Ex. EE, at DEFENDANTS_001186.**

41. The other members of the Super Crypto board of directors, Mr. Ault and Mr. Horne, were both also members of the board of DPW, which was to supply Super Crypto with the funding for the transaction. Magot Dep. (Mandel Ex. B) at 90.

**Response:  The Court should disregard this paragraph as violative of the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain *only one* factual assertion in each numbered paragraph."  (emphasis added). *See Mayaguez S.A.*, 2021 U.S. Dist. LEXIS 86634, at \*19 (S.D.N.Y. Apr. 30, 2021).**

Notwithstanding, undisputed that Ault and Horne were members of the Board of Directors of both DPW and Super Crypto, during the relevant time period.

Disputed that the cited excerpt from Magot's deposition states that DPW was to supply Super Crypto with the funding for the unspecified transaction. Rather, Magot testified that ultimately, Super Crypto was *looking to fund* the purchase from DPW:

> Q:    Who did you seek board approval from?
>
> MR. MAGOT:  Mr. Horner and Mr. Ault.
>
> Q:    Did you actually discuss it with both of them?
>
> MR. MAGOT:  I don't recall but I would imagine.
>
> Q:    And both of them of them are also board members of DPW; correct?
>
> MR. MAGOT:  Yes.
>
> Q:    And it was DPW again that you were looking to fund this purchase; correct?
>
> MR. VOLYNSKY:  Objection; form.
>
> MR. MAGOT:  Ultimately, yes, from DPW's funding advance.

*See* **Magot Dep. (Volynsky Supp. Decl., Ex. 32)**, 90:10-90:20.  In a later colloquy, Magot would further indicate that Super Crypto may have also had other avenues through which it could "raise capital." *See id.*, 109:20-110:1.

42. A few days later, on March 2, 2018, Mr. Magot wrote to Mr. Tencer that "I'm working to get confirmations on when I'm getting the funding that I need to finalize the purchase."  Magot Dep. (Mandel Ex. B) at 93; Mandel Ex. EE.

**Response:    Disputed that Magot wrote "I'm working to get confirmations on when I'm getting the funding that I need to finalize the purchase," in an e-mail to Tencer, dated March 2, 2018.  The cited exhibit does not contain this explicit statement.**

**In the e-mail contained at Mandel, Ex. EE, Magot states "I've been working to get**

**confirmations on when I'm getting the funding to finalize the purchase."**

43. The funding to which Mr. Magot was referring was a cash advance from DPW, and Mr. Magot testified that he wanted to make clear to Plaintiff that the deal was dependent upon Super Crypto receiving such funding.  Magot Dep. (Mandel Ex. B) at 93-94.

**Response:      The Court should disregard this paragraph as violative of the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain _only one_ factual assertion in each numbered paragraph."  (emphasis added).  _See Mayaguez S.A._, 2021 U.S. Dist. LEXIS 86634, at \*19 (S.D.N.Y. Apr. 30, 2021).**

**Notwithstanding, undisputed, and for completeness, Magot's complete testimony establishes that he was informing Plaintiff of same "for communication purposes.  I wanted to be very clear, _and I was with Willy along the whole process_, that this would be dependent on my funding."  Magot Dep. (Volynsky Supp. Decl., Ex. 32), 94:18-24 (emphasis added).**

44. Mr. Magot went on in his March 2, 2018 email to expressly reference DPW, emphasizing that "our parent company is very supportive and wants us to make the purchase with you."  Mandel Ex. EE.

**Response:      Undisputed that Magot states in the e-mail at Mandel, Ex. EE that "our parent company is very supportive and wants to make the purchase with you."  Disputed that the cited portion of the e-mail is emphasized.  Disputed that Magot "expressly references" DPW in such email.**

45. Mr. Magot acknowledged at his deposition that he wanted Plaintiff to take comfort from the fact that DPW was supportive of the transaction.  Magot Dep. (Mandel Ex. B) at 94-95.

**Response:      Undisputed that Magot responded in, the affirmative, to a question as to whether he wanted Plaintiff to have "comfort from the fact that the parent company was**

**supportive."** *See* **Magot Dep. (Volynsky Supp. Decl., Ex. 32), 94:25-95:4.  The question was posed to Magot after he stated that the reason he was mentioning the parent company was "for communication purposes.  I wanted to be very clear,** *and I was with Willy along the whole process***, that this was would be dependent on my funding."** *See id.***, 94:18-24 (emphasis added).  Furthermore, this statement is immaterial as Tencer testified that he did not know that DPW owned Super Crypto.** *See* **Tencer Dep. (Volynsky Supp. Decl., Ex. 34), 99:10-14.**

46. Mr. Ault testified that Mr. Magot mentioned the parent company because that's where Super Crypto was getting the money from.  Ault Dep. (Mandel Ex. A) at 124-125.

**Response:  Disputed because this excerpt from Ault's testimony is inadmissible as his assertions are not based on his own personal knowledge and furthermore, Ault was asked to speculate as to the reason to why Magot drafted an e-mail a certain way.** *See Pacenza v. IBM Corp.***, 363 F. App'x 128, 130 (2d Cir. 2010) ("Portions of documents submitted Plaintiff in support of his summary judgment motion included legal conclusions and arguments, as well as assertions not based on personal knowledge.").  Indeed, Ault testified that he did not have any discussions with Magot prior to the transmittal of the e-mail contained at** **Mandel****, Ex. EE.** *See* **Ault Dep. (Volynsky Supp. Decl., Ex. 33), 125:12-14 ("Q: Did you discuss with [Magot] whether or not to reference the parent company in his discussions?  AULT: No.").**

47. As a result of communications such as these, Plaintiff understood from the outset that Super Crypto was part of a much bigger organization, the public company DPW, which was funding the deal.  Tencer Decl. ¶ 4.

**Response:    The statement is vague with regard to "communications such as these" and, consequently, such an alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.  Moreover, paragraph 4 of the self-serving**

Tencer  Declaration does not reference or cite to any specific communications.

Notwithstanding, this assertion is disputed.  Tencer and Kalfa's testimonies on this topic were wholly inconsistent on this point.

Thus, Tencer initially testified that his alleged understanding that Super Crypto was a "division" of DPW was based on a phone call with Magot, not e-mails.  **Tencer Dep. (Volynsky Supp. Decl., Ex. 34)**, 58:24-59:19.   Tencer would then testify that his understanding was that Super Crypto "was associated or it was a division or it was part of DPW."  *Id.*, 86:4-13.

Tencer also noted that, prior to entering into the Agreement, Kalfa had told him that Super Crypto was a public company.  *Id.*,  98:22-99:5.

Tencer would then testify that he did not know who the owner of Super Crypto was.  *See id.*, 99:10-14.  Such testimony, however, is at odds with an April 4, 2018 e-mail from Tencer to Kalfa, wherein Tencer acknowledged that DPW owns Super Crypto.  *See id.*, 118:19-119:15; *see also* **Volynsky 5/29 Decl.**, Ex. 21 ("Had a big call with CEO of DPW which owns Super Crypto."); Ds Supp. SF, ¶239.

Tencer would further testify that, at the time Magot introduced himself to Tencer, Magot allegedly "told him that he was part of a bigger corporation, public company, being DPW."  *See* **Tencer Dep. (Volynsky Supp. Decl., Ex. 34)**, 85:15-20.  However, the e-mail chain at Ex. EE established that Magot was *first* introduced to Tencer on March 1, 2018 and in such introductory email, Magot references a "meeting with the board," without any references to DPW.  *See* **Mandel**, Ex. EE, at DEFENDANTS_001186; *see also* **Tencer Dep. (Volynsky Supp. Decl., Ex. 34)**, 58:15-20.

Additionally, although Tencer states that DPW "controlled the negotiations for Super

Crypto" (<u>Tencer Decl.</u>, ¶4), he acknowledged during his deposition that such "control" was circumscribed to discrete terms that relate to financing.  <u>Tencer Dep. (Volynsky Supp. Decl., Ex. 34)</u>, 82:10-22.

  With regards to Kalfa, he first testified that he unilaterally determined that Super Crypto was a division of DPW long before Plaintiff reached out to Super Crypto.   Thus, Kalfa testified that prior to his initial contact with Magot, he reviewed the Press Release and saw that DPW was "publically (*sic*) traded, seemed like a big company with tons of divisions, and so it seemed like a great customer to go after." <u>Kalfa Dep. (Volynsky Supp. Decl., Ex. 35)</u>, 48:1-20.  Kalfa would go on to testify that, at the time that he reviewed the Press Release, he understood that DPW "set up a super – they set up a mining division or here, it says, wholly-owned subsidiary." *Id.*, 50:1-51:6.   Kalfa further testified that he unilaterally determined that Ault was Magot's boss based on the Press Release. *See id.*, 125:22-126:4; *see also id.*, 58:1-21 (Kalfa also noted feeling more "familiar" with DPW because he is located in Israel and he recalled reading one of DPW's press releases "surrounding them having acquired an Israeli power start-up." )

  To be certain, on February 25, 2018, two days after Kalfa's initial contact with Magot on LinkedIn, Kalfa would circulate a draft asset purchase agreement between Plaintiff and Super Crypto.  <u>Volynsky 5/29 Decl.</u>, Ex. 16 (Ds Supp. SF, ¶238); <u>Kalfa Dep. (Volynsky Supp. Decl., Ex. 35)</u>, 67:17-71:15.  Kalfa testified that, as of February 25, 2018, based exclusively on the handful of LinkedIn messages between himself and Magot, he determined that Super Crypto and DPW were "one and the same." *Id.*, 67:17-71:15.  Kalfa would further concede that prior to entering to an agreement with Super Crypto, Magot never told him that DPW and Super Crypto were one and the same. *Id.*,  71:18-23.

**Finally, Tencer also testified that Magot never told him that DPW would be responsible for the payments under the Agreement (Tencer Dep. (Volynsky Supp. Decl., Ex. 34), 64:2-65:4) and Kalfa testified that Magot never told him that Super Crypto and DPW were one and the same.  Kalfa Dep. (Volynsky Supp. Decl., Ex. 35), 71:18-23.**

48. In a March 6, 2018 email to Mr. Tencer, Mr. Magot expressed frustration that he was not yet able to sign the agreement with Plaintiff, while assuring Plaintiff that that he had "emails, voice messages, and texts out to the CEO of our parent asking for approval to sign" and "that Todd (the CEO) wants to close the deal as well so I expect good news when we connect."  Mandel Ex. UUU; Magot Dep. (Mandel Ex. B) at 111-114.

**Response:    The Court should disregard this paragraph as violative of the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain _only one_ factual assertion in each numbered paragraph."  (emphasis added).  _See Mayaguez S.A._, 2021 U.S. Dist. LEXIS 86634, at \*19 (S.D.N.Y. Apr. 30, 2021).**

**Notwithstanding, undisputed that, in the referenced e-mail, Magot states that he is "frustrated that we are here again at the end of the day without a signed agreement;" that he has "emails, voice messages, and texts out to the CEO of our parent asking for approval to sign,"; and that he (Magot) "want[s] to be clear that Todd (the CEO) wants to close this deal as well so I expect good news when we connect."  _See_ Mandel, Ex. UUU.  Magot, however, would clarify that the context of his statement was that Super Crypto did not need approval from DPW to sign the Agreement.  Magot Dep. (Volynsky Supp. Decl., Ex. 32), 112:22-114:7.  Rather, Super Crypto would not feel comfortable signing an agreement without first knowing whether it could obtain financing.  _See id._**

**Furthermore, in the Ex. UUU e-mail, Magot goes on to inform Tencer that although**

he is hopeful that Super Crypto and Plaintiff can "work this out," "considering the chain of events I'll understand if you prefer to pass on this opportunity and sell the machines to others.  If so, please consider us for the next delivery."  *See* <u>Mandel</u>, Ex. UUU, at DEFENDANTS_001543-DEFENDANTS_001544.

49. Mr. Magot had not yet been able to secure DPW's commitment to finance the transaction and would not sign the agreement without assuring that the funding was available from DPW. Magot Dep. (Mandel Ex. B) at 111-114.

**Response:    The Court should disregard this paragraph as violative of the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain *only one* factual assertion in each numbered paragraph." (emphasis added).  *See Mayaguez S.A.*, 2021 U.S. Dist. LEXIS 86634, at \*19 (S.D.N.Y. Apr. 30, 2021).**

**Further disputed that Super Crypto would not sign the agreement without assuring that funding was available from DPW, *specifically*.  <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 109:20-110:1; *see also* 109:14-15 ("I don't know about assured.  I was comfortable enough to sign the agreement.").**

**Further disputed as to that portion of the statement which states "DPW's commitment to finance the transaction."  The statement is vague as to what "transaction" means and what the terms of such "transaction" are.  Thus, it is impossible to admit or dispute this conclusory term.  *See Epstein v. Kemper Ins. Cos.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002).**

**Undisputed that Magot testified that, as of March 6, 2018, that it appears, based on the e-mails contained at <u>Mandel</u>, Ex. UUU, that Super Crypto had not yet secured a commitment from DPW for an advance in order to meet the commitments of the Agreement.**

*See* **Magot Dep. (Volynsky Supp. Decl., Ex. 32)**, **111:15-112:21. However, the e-mail from Tencer on March 6, 2018, which precedes the top-level e-mail in Ex. UUU, proposes that "[i]f you don't pay the balance for the 600 machines, the deposit is nonrefundable."** *See* **Mandel, Ex. UUU, at DEFENDANTS_001501. Indeed, a few hours prior to that e-mail, Tencer would circulate a proposed draft of the Agreement which had contemplated that Super Crypto would only be contractually obligated to pay a deposit of $163,625 on or before March 16, 2018.** *See* **Magot Supp. Decl., Ex. 1, at DEFENDANTS_001410, DEFENDANTS_001428- DEFENDANTS_001429, at §§ 2-4.**

50. On March 7, 2018, Mr. Magot reiterated in an email to Mr. Tencer that "[o]nce I'm comfortable that we can meet the financial commitment on the timeline and I have approval to sign today, I will." Mandel Ex. VVV.

**Response:       Disputed that the cited e-mail references a "reiteration" of any purported fact. Undisputed that in response to Tencer's request for an update (*See* Mandel, Ex. VVV, at DEFENDANTS_001543), Magot stated, as part of his response, that "Once I'm comfortable that we can meet the Financial commitment on the timeline and I have approval to sign today I will."** *See id.* **The timeline referenced in that e-mail chain provides that in the event that Super Crypto does not pay the Remaining Amount, "the [D]eposit is non-refundable."** *See id.*, **at DEFENDANTS_001544, E-mail from Tencer, dated March 6, 2018, 11:14 AM. To that end, as of March 7, 2018, the parties had already** ███████████████
████████████████████████████████
████████████████████████████████
████████████████████████

*See* **Magot Supp. Decl.**, **Ex. 2, at BMS001141, BMS001160.  This** ███████████

███████████, **would be revised at least one more time prior to Plaintiff and SCM executing**

**the Agreement.  *Compare id.*, with Mandel, Ex. HH.**

51. Mr. Magot testified at his deposition that he reached that necessary comfort level through communications with the parent company on how advances would arrive at Super Crypto.  Magot Dep. (Mandel Ex. B) at 115-116.

**Response:        Disputed as this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.    Notwithstanding, undisputed that Magot so testified.  For completeness, the timeline referenced in that e-mail chain provides that in the event that Super Crypto does not pay the Remaining Amount, "the [D]eposit is non-refundable."  *See* Mandel, Ex. VVV, at DEFENDANTS_001544, E-mail from Tencer, dated March 6, 2018, 11:14 AM.   To that end, a few hours prior to that e-mail, Tencer would circulate a proposed draft of the Agreement which had contemplated that Super Crypto would only be contractually obligated to pay a deposit of $163,625 on or before March 16, 2018.  *See* Magot Supp. Decl., Ex. 1, at DEFENDANTS_001410, DEFENDANTS__001428-DEFENDANTS_001429, at §§ 2-4.  More than that, as of March 7, 2018, the parties had already** ███████████████████████████████████████████████

██████████████████████████: 

████████████████████████████████████████

*See* **Magot Supp. Decl.**, **Ex. 2, at BMS001141, BMS001160.  This** ███████████

███████████, **would be revised at least one more time prior to Plaintiff and SCM executing**

the Agreement.  *Compare id.*, with <u>**Mandel**</u>, **Ex. HH.**

52. Mr. Magot's internal communications with Mr. Ault confirm that Mr. Magot sought and obtained Mr. Ault's confirmation that Mr. Ault was "comfortable" working under the terms negotiated with Plaintiff and that it was "possible" to meet the financial obligations.  Mandel Ex. FF, GG; Magot Dep. (Mandel Ex. B) at 97-98, 109.

**Response:       Disputed as this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.**

**Further disputed as the cited e-mails are dated March 4, 2018 (Ex. FF) and March 6, 2018 (Ex. GG) and both e-mails were sent from Magot.  *See* <u>Mandel</u>, Exs. FF and GG. There is no e-mail from Ault, cited herein, let alone an e-mail that shows that Ault "confirmed" that he was "comfortable" working under unspecified terms.  *See id.***

**Moreover, the proposed "terms" contained in Ex. FF differ from the proposed terms contained in Ex. GG.  *Compare* Ex. FF (payment of $3,108,875 on March 16, 2018 and no forfeiture of deposit) *with* Ex. GG  (two tranches for the Contracted-For Machines and the Remaining Machines and language regarding a forfeiture of the Deposit).   Furthermore, on March 6, 2018, prior to the e-mails contained in <u>Mandel Ex.</u>, GG, Tencer would also circulate a proposed draft of the Agreement which had contemplated that Super Crypto would only be contractually obligated to pay a deposit of $163,625 on or before March 16, 2018.  *See* <u>Magot Supp. Decl.</u>, Ex. 1, at DEFENDANTS_001410, DEFENDANTS__001428-DEFENDANTS_001429, at §§ 2-4.**

53. Mr. Ault believed that DPW would be able to fund Super Crypto's purchase of the 1,100 machines from Plaintiff along with all Super Crypto's needs.  Ault Dep. (Mandel Ex. A) at 126-128.

**Response**:       Disputed as this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.   Further disputed to the extent that this statement implies that Super Crypto had an absolute obligation to purchase 1,100 machines at any point in time, let alone on March 6, 2018.

Notwithstanding, at <u>Ault Dep.</u>, 126-128, Ault, who also served as Chairman of the Board of Super Crypto, was specifically asked whether he recalled telling Magot anything in connection with a March 4, 2018 e-mail.  *See* <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, 126:12.  Ault responded that, "[t]he only major thing I told him was you needed an escrow and you need an out-clause in the event we couldn't pay them.  That's it." *Id.*, 126:13-15. Thereafter, Ault would testify as to <u>Mandel</u>, Ex. GG, as follows:

> Q:       And in this e-mail Mr. Magot is asking you whether it sounds possible. I assume he's asking whether you would be able to provide the financing to meet the timetable that's set forth in the e-mail.  Is that fair?
>
> MR. VOLYNSKY:  Objection. Form.
>
> MR. AULT:  That's fair.
>
> Q:       And do you know whether you advised that it would be feasible to do that?
>
> MR. AULT:  I believe that we would be able to raise sufficient capital to fund Super Crypto, yes.
>
> Q:       And to pay for 1100 machines?
>
> MR. AULT:  That would be including funding all of their needs, including the 1100 machines, yes.

<u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, 128:18-24.

For completeness, the timeline referenced in the <u>Mandel</u>, Ex. GG e-mail chain provides that in the event that Super Crypto does not pay the Remaining Amount, "the [D]eposit is non-refundable." *See id.*, at DEFENDANTS_001544, E-mail from Tencer, dated

March 6, 2018, 11:14 AM.   Moreover, on March 6, 2018, prior to the e-mails contained in **Mandel Ex.**, GG, Tencer would also circulate a proposed draft of the Agreement which had contemplated that Super Crypto would only be contractually obligated to pay a deposit of **$163,625 on or before March 16, 2018.   *See* Magot Supp. Decl.,** Ex. 1, at **DEFENDANTS_001410, DEFENDANTS__001428-DEFENDANTS_001429, at §§ 2-4.**

54. DPW's 10-K filing for the 2017 fiscal year indicated that DPW intended to fund Super Crypto's $3.2 million purchase of 1,100 miners through the proceeds of a DPW stock offering. Mandel Ex. QQ at F-64; Ault Dep. (Mandel Ex. A) at 159-160.

**Response:       Undisputed that the referenced 10-K filing states that "DPW *intends* to fund SCM's acquisition of the Miners through the proceeds derived from its ongoing ATM Offering.  *See* Mandel, Ex. QQ, at F-64 (emphasis added).  Notwithstanding, the referenced 10-K filing also forewarns, in relevant part, that:**

> **This Annual Report on Form 10-K (the "Annual Report") contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, and Section 21E of the Securities Exchange Act of 1934, as amended. These statements relate to future events or future financial performance.  We have attempted to identify forward-looking statements by terminology including "anticipates," "believes," "expects," "can," "continue," "could," "estimates," "intends," "may," "plans," "potential," "predict," "should," or "will" or the negative of these terms or other comparable terminology.  These statements are only predictions…**

**Volynsky Supp. Decl., ¶12; Ex. 40, p. ii.**

**III.    Execution and Performance of the Agreement**

    **A.  The Payment Terms**

55. On March 8, 2018, Plaintiff and Super Crypto signed an "Asset Purchase Agreement" (the "Agreement") pursuant to which Super Crypto agreed to purchase from Plaintiff 1,100 Bitmain Antminer S9 model cryptocurrency machines and 1,100 power supply units (collectively, the

"Machines") for a total purchase price of $3,272,500.  Mandel Ex. HH; Magot Dep. (Mandel Ex. B) at 50; Tencer Decl. ¶ 3.

**Response:    Disputed to the extent that this statement implies that Super Crypto was absolutely obligated to purchase all 1,100 Machines under the Agreement.  *See* <u>Mandel Ex.</u>, HH.  Disputed that the cited Exhibit and deposition excerpts demonstrate that Plaintiff and Super Crypto "signed" the Agreement on March 8, 2018.  Otherwise, undisputed.**

56. The Agreement divided the payment of the purchase price as follows: (a) two deposit payments totaling $163,625 to be paid on March 9, 2018 and March 13, 2018 respectively and to be applied toward the final 600 of the 1,100 Machines; (b) a payment of $1,487,500 to be paid on or before March 23, 2018 to pay for the first 500 Machines; and (c) a payment of $1,621,375 to be paid on or before April 15, 2018 to cover the balance due on the remaining 600 Machines.  Mandel Ex. HH; Tencer Decl. ¶ 5.

**Response:    Disputed that this assertion states the complete payment terms under the Agreement.  Pursuant to Article 3 of the Agreement, in the event that Super Crypto failed to pay the $1,621,375 for the remaining 600 machines  referenced in subsection (c) of Ps SF, ¶56, on or before April 15, 2018, then the deposit of $163,625 would be forfeited and the remainder of the Agreement, with the exception of Articles 2(a)(i) (the provision concerning the Deposit) and 3, "shall be null and void and all parties shall be relieved of its further obligations herein."  *See* <u>Mandel</u>, Ex. HH, Article 3; <u>Tencer Decl.</u>, ¶18 (acknowledging the force and effect of Article 3).  Article 2(a)(iii) of the Agreement similarly provides that Super Crypto's failure to pay the $1,621,375 for the remaining 600 machines referenced in subsection (c) of Ps SF, ¶56, on or before April 15, 2018, would result in a forfeiture of the $163,625 deposit.  *See* <u>Mandel</u>, Ex. HH, §2(a)(iii).**

**Tencer and Kalfa each testified that, at the time Plaintiff _entered into_ the Agreement with Super Crypto, Plaintiff was well aware that Super Crypto was not absolutely obligated to pay the Remaining Amount.  _See_ <u>Kalfa Dep. (Volynsky Supp. Decl., Ex. 35)</u>, 112:6-21; <u>Tencer Dep. (Volynsky Supp. Decl., Ex. 34)</u>, 108:19-109:11. To that end, Tencer acknowledged that "if you went by this agreement and not [alleged] subsequent amendments," that he understood that, at the time that Plaintiff _entered into_ this Agreement, as regards the Remaining Machines, in the event that "Super Crypto paid [Plaintiff] the [Deposit] and then made no further payments on or before [the Expiration Date], [Plaintiff] would keep that [D]eposit and this [A]greement is null and void." <u>Tencer Dep. (Volynsky Supp. Decl., Ex. 34)</u>, 110:7-19.**

57.  Using funds advanced to it by DPW, Super Crypto made timely payments to Plaintiff of the deposit amounts totaling $163,625, but it was unable to meet any of the deadlines specified in the Agreement for the remaining payments.  Tencer Decl.¶ 6; Ault Dep. (Mandel Ex. A) at 77-79; Mandel Ex. H.

**Response:     Disputed as this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.**

**Further disputed to the extent that this assertion implies that Super Crypto had an absolute obligation to pay the Remaining Amount for the Remaining Machines or that Plaintiff was contractually obligated to pay the Remaining Amount after the Expiration Date. _See_ <u>Mandel</u>, Ex. HH, §3.    Furthermore, pursuant to Articles 2(a)(iii) and 3 of the Agreement, Plaintiff and Super Crypto agreed to fix Plaintiff's damages to a forfeiture of the Deposit, in the event that Super Crypto failed to pay the Remaining Amount on or before April 15, 2018. _Id._ In recognition of same, Plaintiff retained the Deposit and the Agreement**

was automatically deemed null and void, pursuant to its terms.  *Id.* (no provision to "invoke" Article 3);  **Magot Supp. Decl.**, ¶27.

Notwithstanding, undisputed that Super Crypto made a timely payment of the Deposit using funds that were advanced to it by DPW.  Undisputed that Super Crypto did not pay the Contracted-For Amount to Plaintiff, on or before March 23, 2018.  Undisputed that Super Crypto did not pay the Remaining Amount to Plaintiff on or before April 15, 2018.

### B.  The First 500 Machines

58. On March 22, 2018, Super Crypto and Plaintiff entered into an escrow agreement pursuant to which the payment of $1,487,500 that was due for the first 500 Machines would be paid into escrow and those 500 Machines would then be released to Super Crypto.  Magot Dep. (Mandel Ex. B) at 120-121; Ault Dep. (Mandel Ex. A) at 140-142; Mandel Ex. JJ.

**Response:**      Disputed as this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.   Otherwise, undisputed.

59. The escrow arrangement was implemented at Mr. Ault's request.  Ault Dep. (Mandel Ex. A) at 138-140; Magot Dep. (Mandel Ex. B) at 119-120.

**Response:**      Disputed as this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.  Further disputed that the cited deposition excerpts establish that "[t]he escrow agreement was implemented at Mr. Ault's request."  Magot's e-mail at Ex. 51 to the **Volynsky Supp. Decl.** indicates that it was Magot's idea and his request that Plaintiff and Super Crypto enter into an escrow agreement for the Contracted-For Machines.  *See id.* ("With that said, the only way I see of guaranteeing this would be to send the money to an escrow as we originally planned with the deposit."); *see*

45

*also* <u>Magot Supp. Decl.</u>, ¶56, Ex. 8.

In reviewing such e-mail during his deposition, Ault responded "That's absolutely correct" when asked "So is it your understanding that the reason an escrow account was done in connection with this transaction is because that's what you wanted done?" *See* <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, 140:2-5; *see also id.*, 126:12-15 (Ault's *guidance* was that Super Crypto needed an escrow and an out-clause). Such testimony does not establish hat the escrow arrangement was implemented at Ault's request.

Plaintiff's counsel sought fit to only question Ault about this e-mail that he was not a party to and not Magot, the party listed on the From: line. Notwithstanding, Magot's testimony that "Ault was expressing concern about making sure the machines would be properly released once the payment was made" also does not establish that "the escrow agreement was implemented at Mr. Ault's request." <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 119:18-23.

60. In a March 21, 2018 email to Mr. Tencer, Mr. Magot wrote: "*Our CEO* is still nervous over the transfer process," and Mr. Tencer thus agreed to using an escrow agent, stating "I believe *your CEO* will now be comfortable." (emphasis added). Mandel Ex. II, JJ; Magot Dep. (Mandel Ex. B) at 119-120.

**Response:** The Court should disregard this paragraph as violative of the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain *only one* factual assertion in each numbered paragraph." (emphasis added). *See Mayaguez, 2021 U.S. Dist. LEXIS 86634, at *19*. This assertion is further disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.

Notwithstanding, undisputed that Magot's e-mail filed at **Mandel**, Ex. II states that "Our CEO is still never over the transfer process between when we send the wire and get the machines." Undisputed that Tencer's e-mail, dated March 22, 2018, and filed at **Mandel**, Ex. JJ, states "I believe your CEO will now be comfortable."

Disputed that Tencer "agreed" to anything by this statement. The e-mail that precedes Tencer's response in the **Mandel**, Ex. JJ e-mail is an e-mail from Magot stating "I'm also working with the CFO and CEO of DPW on the payment details. I'll continue to update you as this develops." *See* **Mandel**, Ex. JJ, at DEFENDANTS_001919; *see* **Magot Dep. (Volynsky Supp. Decl., Ex. 32)**, 120:9-120:20 ("If I read my email below, I'm referencing Todd Ault, the CEO of DPW, so I imagine that's who Mr. Tencer is referencing as well.").

61. Mr. Magot testified at his deposition that both references to his CEO were to Mr. Ault, the CEO of DPW. Magot Dep. (Mandel Ex. B) at 119-120.

**Response:** Undisputed that Magot testified that his reference to "Our CEO" in the e-mail filed at **Mandel**, Ex. II referred to Ault, "in that context." **Magot Dep..**, 119:14-17. Disputed as to Magot's testimony regarding Tencer's reference to "your CEO" on the grounds that such testimony constitutes inadmissible hearsay and is further inadmissible as it requires Magot to speculate as to what Tencer meant. Notwithstanding, the e-mail that precedes Tencer's response in the Ex. JJ e-mail is an e-mail from Magot stating "I'm also working with the CFO and CEO of DPW on the payment details. I'll continue to update you as this develops." *See* Ex. JJ, at DEFENDANTS_001919; *see* **Magot Dep.**, 120:9-120:20 ("If I read my email below, I'm referencing Todd Ault, the CEO of DPW, so I imagine that's who Mr. Tencer is referencing as well.").

62. Although Article 2(a)(ii) of the Agreement required the payment for the first 500 Machines in the amount of $1,487,500 to be made on or before March 23, 2018, Super Crypto was unable to meet that schedule.  Tencer Decl. ¶ 6; Magot Dep. (Mandel Ex. B) at 53-55.

**Response:    Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.  Notwithstanding, undisputed that the operative Agreement in this action required that the payment for the first 500 Machines (*i.e.*, "Contracted-For Machines") in the amount of $1,487,500 (*i.e.*, "Contracted-For Amount") be made on or before March 23, 2018 and that Super Crypto did not pay the Contracted-For Amount, on or before March 23, 2018.  *See* <u>Mandel</u>, Ex. HH.**

63. Plaintiff worked with Defendants to provide flexibility on the timing of that payment and subsequent payment owed under the Agreement in an effort to allow Defendants to satisfy the contractual obligation to purchase the 1,100 Machines.  Magot Dep. (Mandel Ex. B) at 53-55, 73-74, 137, 144-146, 168, 195-196, 203-204; Ault Dep. (Mandel Ex. A) at 145-148, 165-167; Mandel Ex. SS, EEE, WWW, BBBB; Tencer Decl. ¶¶ 9, 15.

**Response:    Disputed. Plaintiff has cited to 21 full pages of deposition testimony that are replete with objectionable testimony based on, *inter alia*, hearsay, opinion testimony, speculation and testimony that is not based on the deponent's personal knowledge.  *See* <u>Preliminary Statement</u>.  Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.**

**Disputed to the extent that this statement implies that DPW was a party to the Agreement.  *See* <u>Mandel</u>, Ex. HH.  Disputed that Super Crypto had a "contractual obligation" such that it was absolutely obligated to purchase all 1,100 Machines.  *See* <u>Mandel</u>, Ex. HH, §§ 2(a)(iii) and 3.  Furthermore, this is a legal conclusion, not a fact.  For the reasons**

set forth in the Opposition, Super Crypto disputes that it had an absolute "contractual obligation" to purchase and pay the Remaining Amount for the Remaining Machines. *See id.*

The only absolute payment obligations that Super Crypto had under the Agreement were the payment of the Deposit and the Contracted-For Amount. *See id.*, §§2(a)(i), 2(a)(ii), 2(a)(iii), and 3. The Deposit and the Contracted-For Amount were paid to Plaintiff. Ds SF, ¶¶ 157-159; <u>Magot Supp. Decl.</u>, ¶22. Plaintiff has not asserted any claims against Super Crypto related to a purported breach of §2(a)(i) or §2(a)(ii) of the Agreement. *See, generally,* FAC. There is also no allegation in the Complaint that Article 3 was modified. *See id.* Nor is there an allegation that Article 3 was waived. *See id.*

Further disputed as Ault testified that he did not know what "worked out" means as "Willy [Tencer] agreed to take the payment on the first 500 because the contract effectively could be terminated after the 15th, I believe." <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, 177:4-10.

Further disputed that the cited deposition testimony or exhibits support the assertion contained in Ps SF, ¶63. Indeed, <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 74; 145:8-146:5; 146:18-146:22; and <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, 165-167, are replete with argumentative lines of questioning that should be summarily disregarded.

The cited e-mails similarly do not establish the definitive terms of any purported modifications to a payment schedule in the Agreement or an unequivocal and affirmative waiver of any of the Agreement's terms.

64. Once it became apparent that the March 23, 2018 payment for the first 500 Machines would not be made in a timely manner, Mr. Ault became directly involved in discussions with Plaintiff

concerning the timing of payments and effectively took over all management of the transaction on the part of Defendants.  Tencer Decl. ¶ 7; Mandel Ex. KK, RR, SS, TT, UU, AAA, WWW, XXX; Magot Dep. (Mandel Ex. B) at 124-125, 137-139, 142-143, 148-150; Ault Dep. (Mandel Ex. A) at 145-148, 164-165, 167-169.

**Response:      Disputed. Plaintiff has cited to 19 full pages of deposition testimony that are replete with objectionable testimony based on, *inter alia*, hearsay, opinion testimony, speculation and testimony that is not based on the deponent's personal knowledge.  *See* Preliminary Statement.  Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.**

**Additionally, the Court should also disregard this paragraph as violative of the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain *only one* factual assertion in each numbered paragraph."  (emphasis added).  *See Mayaguez S.A.*, 2021 U.S. Dist. LEXIS 86634, at \*19 (S.D.N.Y. Apr. 30, 2021).**

**Further disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.  Further disputed to the extent that this statement implies that DPW was a party to the Agreement.  *See* Mandel, Ex. HH.  Further disputed to the extent that this assertion implies that Super Crypto had a contractual obligation such that it was absolutely obligated to purchase all 1,100 Machines.  *See* Mandel, Ex. HH, §§ 2(a)(iii) and 3.**

**Undisputed that Ault had some direct communications with Tencer related to the timing of payments.  Disputed that the cited exhibits demonstrate that Ault "effectively took over all management of the transaction on the part of Defendants."   Such a statement is an opinion, not a fact that can be disputed or undisputed.**

65. Mr. Magot's communications with Plaintiff consistently made clear that Mr. Ault's input was required to provide any information on the anticipated timing of payments, and Defendants' internal communications confirm that Mr. Ault directed Mr. Magot's interactions with Plaintiff. Mandel Ex. YY, AAA, CCCC, GGGG, TTTT, UUUU; Magot Dep. (Mandel Ex. B) at 166-167, 169-171, 173-176, 178-179, 188-189, 199-201; Ault Dep. (Mandel Ex. A) at 190-191.

**Response:        Disputed. Plaintiff has cited to 18 full pages of deposition testimony, as well as six exhibits, without pincites, that are replete with objectionable testimony based on, *inter alia*, hearsay, opinion testimony, speculation and testimony that is not based on the deponent's personal knowledge. *See* <u>Preliminary Statement</u>. Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.**

**The Court should further disregard this paragraph as it blatantly violates the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain <u>*only one*</u> factual assertion in each numbered paragraph." (emphasis added); *see Mayaguez S.A.*, 2021 U.S. Dist. LEXIS 86634, at \*19.**

**Further disputed to the extent that that this statement implies that DPW was a party to the Agreement. <u>Mandel</u>, Ex. HH. Further disputed to the extent that this assertion implies that Super Crypto had an absolute obligation to pay the Remaining Amount for the Remaining Machines or that Plaintiff was contractually obligated to pay the Remaining Amount after the Expiration Date. *See id.*, §3. Further disputed to the extent that this statement implies that Super Crypto was contractually obligated to inform Plaintiff that it no longer was interested in the Remaining Machines. *See id.*, §3 and *generally* (no provision in the Agreement requiring Super Crypto to provide any notice to Plaintiff related to the**

Remaining Machines).

Further disputed that Magot's communications with Plaintiff "consistently made clear" that Ault's "input" was required to provide "*any*" (emphasis added) "information on the anticipated timing of payments."  On numerous occasions, Plaintiff's counsel engaged in an argumentative line of questioning regarding this point, and such objectionable testimony should be deemed inadmissible.  *See* <u>Magot Dep. (Volynsky Supp. Decl. Ex. 32)</u>, 176:4-178:7; <u>Mandel</u>, Ex. FFFF (Ex. 53 to Magot Dep.) and <u>Volynsky Supp. Decl.</u>, Ex. 50 (Ex. 52 to Magot Dep.; <u>Magot Dep.</u>, 174:19-175:3)) ; <u>Magot Dep. (Volynsky Supp. Decl. Ex. 32)</u>, 178:2-7 (asking Magot to speculate); 178:24-179:5; 188:10-189:5; 200:15-202:9.

Disputed that Defendants' internal communications "confirm that Mr. Ault directed Mr. Magot's interactions with Plaintiff."  The only "internal communication" cited by Plaintiff in this paragraph is contained at <u>Mandel</u>, Ex. UUUU, which is an e-mail that Magot forwarded from Plaintiff, noting, "FYI – Willy is expecting some sort of wire today.  If we aren't going to send one please let me know so I can manage him accordingly."  *See id.*  At his deposition, Magot was asked two questions about this e-mail:

> Q:    How do you know that Willy was expecting a wire?
>
> MR. MAGOT:   I think it says it in the next – the email below.
>
> Q:    And what did you mean by managing him?
>
> MR. MAGOT:    That I could provide information that was accurate.

*See* <u>Magot Dep. (Volynsky Supp. Decl. Ex. 32)</u>, 197:18-198:15.

Ault also testified that he did not recall having any discussions with Magot "about how he could manage Willy at that point."  *See* <u>Ault Dep. (Volynsky Supp. Decl. Ex. 33)</u>, 206:13-207:2.  Plaintiff does not even provide a cite to Ault's response to this forwarded e-

mail, let alone a response that would support the assertion contained in Ps SF, ¶65.

Notwithstanding, undisputed that Magot would seek input from Ault as to the anticipated timing of advances from DPW to Super Crypto.

66. Communications from Messrs. Magot and Ault to Plaintiff frequently made no distinction between DPW and Super Crypto as separate entities. Mandel Ex. NNN, VVVV, WWWW, XXXX, YYYY, ZZZZ (Ex. G to stipulation); Magot Dep. (Mandel Ex. B) at 221-222. Tencer Decl. ¶ 7.

**Response:** **Disputed. Tencer's Declaration, at ¶7, states in, full: "Communications from both Mr. Magot and Mr. Ault over the next several months frequently made no distinction between Super Crypto and DPW as separate entities** _in addressing whether funds were available and when payments would be made_**." (emphasis added).**

**Magot testified that he was transparent with Plaintiff, from inception, that Super Crypto was reliant on advances, whether from its parent company or otherwise. Magot Dep. (Volynsky Supp. Decl., Ex. 32), 105:20-107:5; 109:20-110:1.**

**Further disputed to the extent that this assertion implies that Plaintiff was unaware that DPW and Super Crypto were two separate entities.** _See_ **Mandel, Ex. HHHH, at DEFENDANTS_002796 (e-mail from Tencer asking "that the Parent Company sign a guarantee"); Ex. GGG, at DEFENDANTS_002901 (e-mail from Tencer stating "On Tuesday we had asked that you send us DWP (_sic_) guarantee and a firm Payment plan").**

**Additionally, on February 25, 2018, two days after Kalfa's initial contact with Magot through LinkedIn, Kalfa would circulate a draft asset purchase agreement between Plaintiff and Super Crypto. Volynsky 5/29 Decl., Ex. 16 (Ds Supp. SF, ¶238); Kalfa Dep. (Volynsky Supp. Decl., Ex. 35), 67:17-71:15. Kalfa testified that, as of February 25, 2018, based exclusively on the handful of LinkedIn messages between himself and Magot, he determined**

that Super Crypto and DPW were "one and the same." *Id.*, 67:17-71:15.  Kalfa would further concede that prior to entering to an agreement with Super Crypto, Magot never told him that DPW and Super Crypto were one and the same.  *Id.*,  71:18-23.

More than that, on June 18, 2018, Plaintiff's counsel would also transmit a demand letter in which it acknowledges that Super Crypto is a separate legal entity from DPW.  *See* Declaration of Robert B. Volynsky, dated May 29, 2023 ("Volynsky 5/29 Decl."), Ex. 20.  In light of the foregoing, the referenced e-mails which post-date such demand letter (*i.e.*, **Mandel**, Exs. NNN, WWWW, XXXX, and YYYY) should be disregarded on the further independent ground, that they are immaterial to Plaintiff's breach of contract claim, as alleged in the FAC.

**Mandel**, Ex. VVVV is an e-mail from Magot, dated April 3, 2018, in which Magot provides a link to an article and states "Todd asked that I share the press release below that we made this morning."  *See id.*  The article contained in that link references *both* DPW and SCM and contains a quote from Darren Magot as "CEO of SCM."  *See* Ex. VVVV, pp. 1-2 of the article appended thereto, titled "Bitcoin Mining Stocks that are Trending Right Now."

**Mandel**, Ex. **ZZZZ** is a joint stipulation regarding authenticity of Certain E-Mail Communications.

67.  On March 26, 2018, three days after the payment for the first 500 Machines was due under the Agreement, Mr. Magot emailed Mr. Tencer that "[t]he CEO of the parent company would like to share with you the details around the timing of the release from escrow."  Mandel Ex. KK; Magot Dep. (Mandel Ex. B) at 124-125.

**Response:**    Undisputed that Magot stated that "The CEO of the parent company *DPW* would like to share with you the details around the timing of the release from escrow" in the

e-mail appended at **Mandel**, Ex. KK (emphasis added).    **In the same e-mail chain, Magot**

**also commences an e-mail with "Hello Willy, I just spoke with the CEO of DPW Holdings…"**

***See id.*, at DEFENDANTS_001959 (E-mail from Magot, dated March 23, 2018, 5:06 PM).**

68. Mr. Magot testified that the purpose of having Mr. Ault convey the information was to be as transparent as possible in clarifying the timing of the advance DPW would be sending Super Crypto to complete the purchase.  Magot Dep. (Mandel Ex. B) at 124-125.

**Response:    Disputed as to that portion of the statement which states "to complete the purchase."  The statement is vague as to what "purchase" means and the cited excerpts from Magot's testimony make no reference to a "purchase."  Magot merely testified that he was involving Ault to be as transparent as possible.  Magot Dep. (Volynsky Supp. Decl., Ex. 32), 124:21-24.  Otherwise, undisputed that Magot so testified.**

69. Mr. Ault testified that he was likely talking to Mr. Tencer to go through with him when money would be available given that the March 23 payment called for in the Agreement had not been made.  Ault Dep. (Mandel Ex. A) at 145-146.

**Response:    Undisputed that Ault so testified.  The Tencer Declaration further clarifies that the March 26, 2018 telephone call between Ault and Tencer was circumscribed to the payment for the Contracted-For Machines.  *See* Tencer Decl., ¶8.**

70. Mr. Ault and Mr. Tencer spoke on March 26, 2018, and Mr. Ault provided assurances that some of the money that was due would be sent. Tencer Decl. ¶ 8; Ault Dep. (Mandel Ex. A) at 147-150; Mandel Ex. LL-NN.

**Response:    Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC. Otherwise, undisputed.**

71. On March 29, 2018, DPW wired $100,000 to Plaintiff toward the payment of the first 500 Machines.  Ault Dep. (Mandel Ex. A) at 151-153; Magot Dep. (Mandel Ex. B) at 131-134; Mandel Ex. OO; Tencer Decl. ¶ 8.

**Response:       Disputed that DPW wired $100,000 to Plaintiff on March 29, 2018.  Plaintiff alleges in the FAC that Sichenzia Ross Ference Kesner LLP ("SRFK") transmitted this payment to Plaintiff.  *See* FAC, ¶9; *see also* <u>Mandel</u>, Ex. WW, at BMS000556.  Otherwise, undisputed.**

72. After further communications between Mr. Ault and Mr. Tencer over the next two weeks, DPW eventually paid the remaining $1,387,500 that was owed on the first 500 Machines into escrow and the funds were released to Plaintiff on April 17, 2018, nearly a month after the payment was required under the Agreement and after the deadline had already passed for paying the balance due on the remaining 600 Machines.  Tencer Decl. ¶¶ 9-10; Ault Dep. (Mandel Ex. A) at 157-158, 167-169, 173-177; Magot Dep. (Mandel Ex. B) at 127, 161-162; Mandel Ex. RR- WW, ZZZ.

**Response:       Disputed. Plaintiff has cited to 13 full pages of deposition testimony, as well as seven exhibits, without pincites, that are replete with objectionable testimony based on, *inter alia*, hearsay, opinion testimony, speculation and testimony that is not based on the deponent's personal knowledge.  *See* <u>Preliminary Statement</u>.**

**The Court should also disregard this paragraph as it blatantly violates the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain *only one* factual assertion in each numbered paragraph." (emphasis added); *see Mayaguez S.A.*, 2021 U.S. Dist. LEXIS 86634, at \*19.**

**Further disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.**

Further disputed to the extent that this statement implies that DPW was a party to the Agreement.  *See* <u>Mandel</u>, Ex. HH.  Further disputed to the extent that this assertion implies that Super Crypto had a contractual obligation such that it was absolutely obligated to purchase all 1,100 Machines.  *See* <u>Mandel</u>, Ex. HH, §§ 2(a)(iii) and 3.

Indeed, pursuant to Article 3 of the Agreement, in the event that the Remaining Amount was not paid on or before the Expiration Date, the Deposit would be forfeited, and the Agreement would <u>automatically</u> be deemed null and void.  *See id.*, §3 and *generally* (no provision in the Agreement requiring Super Crypto to provide any notice to Plaintiff related to the Remaining Machines).  The Remaining Amount was not paid on or before the Expiration Date, the Deposit was forfeited, and Plaintiff continues to retain the Deposit. <u>Magot Supp. Decl.</u>, ¶¶24-27.

Further disputed as the cited deposition excerpts and exhibits do not support the assertion contained in Ps SF, ¶72.  *See, e.g.*, <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, 167:4-16 (responses to leading questions regarding Ault's present interpretation of an e-mail, not his understanding at the time).

Notwithstanding, undisputed that Ault and Tencer had communications during the two-week period commencing on March 29, 2018.  Undisputed that the remaining $1,387,500 for the Contracted-For Machines was released from SRFK's escrow account to Plaintiff, on or about April 17, 2018.  Undisputed that, pursuant to Article 2(a)(ii) of the Agreement, the Contracted-For Amount was required to be paid, on or before March 23, 2018.

73. Super Crypto took possession of the first 500 Machines.  Tencer Decl. ¶ 10.

**Response:**     Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.  Notwithstanding,

undisputed that Super Crypto took possession of the Contracted-For Machines after payment of the Contracted-For Amount.

### C. The Remaining 600 Machines

74. In the period leading up to the delayed payment on the first 500 Machines and continuing for months thereafter, Defendants repeatedly reiterated their desire to complete the transaction and obtain the remaining 600 Machines covered by the Agreement.  Ault Dep. (Mandel Ex. A) at 154-158, 162-163, 168-169, 179-180, 185-186, 203-209, 217-218, 221; Magot Dep. (Mandel Ex. B) at 135-136, 158-159, 167-176, 188-189, 199-201, 203, 205-206, 217, 221-222; Mandel Ex. PP, UU, YY, ZZ, DDD, EEE, FFF, MMM, NNN, CCCC, DDDD, EEEE, FFFF, GGGG, IIII, ZZZZ (Exhibits B, D, F, G, I to stipulation); Tencer Decl. ¶¶ 11, 19.

**Response:       Disputed. Plaintiff has cited to 48 full pages of deposition testimony, as well as fifteen exhibits, without pincites, that are replete with objectionable testimony based on,** *inter alia*, **hearsay, opinion testimony, speculation and testimony that is not based on the deponent's personal knowledge.** *See LG Capital Funding, LLC*, **2019 U.S. Dist. LEXIS 126991, at \*7 (E.D.N.Y. Jul 29, 2019),** *report and recommendation, adopted by* **2019 U.S. Dist. LEXIS 161701 (E.D.N.Y. Sep. 20, 2019) (noting that that frequent citations to "three or more pages of deposition transcripts" without pincites, "undermines the purpose of Local Rule 56.1 and forces the Court to unnecessarily sift through evidence.");** *see also Sch. For Language & Commun. Dev.* **2006 U.S. Dist. LEXIS 73297, fn. 1 (E.D.N.Y. Sept. 26, 2006) ("Rule 56.1 requires a party to provide pinpoint citations; this Court is not required to look for the proverbial 'needle in a haystack.'").**

**Further disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.   Further disputed**

to the extent that this statement implies that Super Crypto was required to pay the Remaining Amount for the Remaining Machines beyond the Expiration Date. *See* <u>Mandel</u>, Ex. HH.  Further disputed to the extent that that this assertion implies that DPW was a party to the Agreement. *See* <u>Mandel</u>, Ex. HH.

Further disputed that the allegation that Defendants "repeatedly reiterated their desire,"  without specifying a particular statement, is a legal conclusion, not a fact that can be disputed or undisputed. *See Tarazi v. Truehope, Inc.*, No. 13-CV-1024-LAK-JCF, 2015 U.S. Dist. LEXIS 180991, at *43-44 (S.D.N.Y. Jul. 1, 2015).  Indeed, Defendants cannot be tasked with sifting through 48 full pages of deposition testimony, as well as fifteen exhibits, to determine which particular statements Plaintiff is relying on.

75. Defendants did not at any time indicate to Plaintiff that they were no longer interested in the 600 Machines.  Tencer Decl. ¶ 11; Magot Dep. (Mandel Ex. B) at 172-173; Ault Dep. (Mandel Ex. A) at 155-156.

**Response:**      Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.  Disputed to the extent that that this statement implies that DPW was a party to the Agreement.  <u>Mandel</u>, Ex. HH. Further disputed to the extent that this assertion implies that Super Crypto had an absolute obligation to pay the Remaining Amount for the Remaining Machines or that Plaintiff was contractually obligated to pay the Remaining Amount after the Expiration Date. *See id.*, §3. Further disputed to the extent that this statement implies that Super Crypto was contractually obligated to inform Plaintiff that it no longer was interested in the Remaining Machines. *See id.*, §3 and *generally* (no provision in the Agreement requiring Super Crypto to provide any notice to Plaintiff related to the Remaining Machines).

Further disputed that the cited excerpts from Magot's testimony relate to any time period beyond May 1, 2018. *See* <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 172:21-173:6. Further disputed that the cited excerpts from Ault's testimony contain any colloquy as to whether or not Ault ever made such indication to Plaintiff. *See* <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33), 155-156</u>.

The Tencer Declaration, ¶11 refers to an alleged undisputed fact that is not material to the issues relating to the breach of contract claim, as alleged in the FAC.

76. Right after completing the payment for the first 500 Machines, Super Crypto entered into a new escrow agreement with Blockchain covering the remaining 600 Machines. Tencer Decl. ¶ 12; Magot Dep. (Mandel Ex. B) at 163-165; Ault Dep. (Mandel Ex. A) at 182-184; Mandel Ex. XX, AAAA.

**Response:**    Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.   Further disputed to the extent that this statement implies that Super Crypto was required to pay the Remaining Amount for the Remaining Machines beyond the Expiration Date. *See* <u>Mandel</u>, Ex. HH.

Further disputed that Super Crypto and Plaintiff "entered into a new escrow agreement" on the grounds that this is a legal conclusion, not a fact that can be disputed or undisputed. For the reasons set forth in the Opposition, the escrow agreement contained at Ex. XX (the "Ex. XX Escrow Agreement") is not a valid and enforceable agreement. The purported Ex. XX Escrow agreement, by its terms, does not provide a date certain by which the alleged $1,621,375 needs to be deposited into the escrow account. *See* Ex. XX. Furthermore, as no funds were ever deposited into the escrow account purportedly established under the Ex. XX Escrow Agreement (*see infra*, Ps SF, ¶78 and Ds Resp. ¶78), in

recognition that the Agreement had long expired and the Ex. XX Escrow Agreement was, therefore, deemed abandoned.

Further disputed as paragraph 12 of the Tencer Declaration does not establish that Tencer's reference to a "new escrow agreement" refers to the Ex. XX Agreement.

Further disputed as Plaintiff does not provide a pincite or subsection to Ex. XX to support this purported "undisputed fact."

Further disputed as Plaintiff's counsel engaged in improper leading questions with Tencer regarding the Ex. XX Agreement.  *See* <u>Tencer Dep. Volynsky Supp. Decl., Ex. 34</u>), 243:8-11 ("Q: Are you able to identify Exhibit B as a separate escrow agreement?  MR. VOLYNSKY: Objection.  MR. TENCER: Yes."); 243:15-244:7 (Plaintiff's counsel guiding Tencer to a provision rather than allowing Tencer to try to locate it himself).

Notwithstanding, undisputed that Magot testified that the signature contained at page DEFENDANTS__02243 of Ex. XX was his signature.

77. The escrow agreement provided that an escrow account was to be funded with the $1,621,375 amount remaining due on the 600 Machines under the Agreement, and the 600 Machines would be released to Super Crypto upon such payment.  Mandel Ex. XX; Ault Dep. (Mandel Ex. A) at 182-184; Tencer Decl. ¶ 12.

**Response:**    The Court should disregard this paragraph as violative of the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain _only one_ factual assertion in each numbered paragraph." (emphasis added).  *See Mayaguez S.A.*, 2021 U.S. Dist. LEXIS 86634, at *19.

Further disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.   Further disputed

to the extent that this statement implies that Super Crypto was required to pay the Remaining Amount for the Remaining Machines beyond the Expiration Date. *See* <u>Mandel</u>, **Ex. HH.**

Further disputed that Super Crypto and Plaintiff "entered into a new escrow agreement" on the grounds that this is a legal conclusion, not a fact that can be disputed or undisputed. For the reasons set forth in the Opposition, the escrow agreement contained at Ex. XX (the "Ex. XX Escrow Agreement") is not a valid and enforceable agreement. The purported Ex. XX Escrow agreement, by its terms, does not provide a date certain by which the alleged $1,621,375 needs to be deposited into the escrow account. *See* Ex. XX. Furthermore, as no funds were ever deposited into the escrow account purportedly established under the Ex. XX Escrow Agreement (*see infra*, Ps SF, ¶78 and Ds Resp. ¶78), in recognition that the Agreement had long expired and the Ex. XX Escrow Agreement was, therefore, deemed abandoned.

Further disputed as paragraph 12 of the Tencer Declaration does not establish that Tencer's reference to a "new escrow agreement" refers to the Ex. XX Agreement.

Further disputed as Plaintiff does not provide a pincite or subsection to Ex. XX to support this purported "undisputed fact."

Further disputed as Plaintiff's counsel engaged in improper leading questions with Tencer regarding the Ex. XX Agreement. *See* <u>Tencer Dep. (Volynsky Supp. Decl., Ex. 34)</u>, 243:8-11 ("Q: Are you able to identify Exhibit B as a separate escrow agreement? MR. VOLYNSKY: Objection. MR. TENCER: Yes."); 243:15-244:7 (Plaintiff's counsel guiding Tencer to a provision rather than allowing Tencer to try to locate it himself).

Further disputed as the cited excerpts from Ault's deposition do not support the

assertion contained in Ps SF, ¶77.  At <u>Ault Dep (Volynsky Supp. Decl., Ex. 33)</u>, 182-184, Ault testifies that he did not recall an escrow agreement with respect to the second 600 machines. *See id.*, 182:12-16; *see also id.*, 183:17-183:22; 184:2-185:5 (Ault testifying that he did not have a specific recollection as to what was wired with regard to the 600 machines).

78. Although Defendants never funded the escrow account, DPW made numerous payments to Blockchain over the next several months toward the purchase of the 600 Machines.  Tencer Decl. ¶ 13 & Ex. 1; Ault Dep. (Mandel Ex. A) at 197-198, 211-216; Magot Dep. (Mandel Ex. B) at 79-80, 183-184, 213; Mandel Ex. BBB, CCC, GGG-LLL, JJJJ.

**Response:       Disputed.  Plaintiff has cited to 13 full pages of deposition testimony, as well as nine exhibits, without pincites, that are replete with objectionable testimony based on, *inter alia*, hearsay, opinion testimony, speculation and testimony that is not based on the deponent's personal knowledge.  *See* <u>Preliminary Statement</u>.**

**Further disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.   Further disputed to the extent that this statement implies that Super Crypto was required to pay the Remaining Amount for the Remaining Machines beyond the Expiration Date.  *See* <u>Mandel</u>, Ex. HH.  Further disputed to the extent that this statement implies that DPW was a party to the Agreement or to the Ex. XX Agreement.  *See id.;* <u>Mandel</u>, Ex., XX; *supra*, ¶76 (no reference to DPW).**

**Further disputed that Super Crypto and Plaintiff "entered into a new escrow agreement" on the grounds that this is a legal conclusion, not a fact that can be disputed or undisputed.  For the reasons set forth in the Opposition, the escrow agreement contained at Ex. XX (the "Ex. XX Escrow Agreement") is not a valid and enforceable agreement.  The**

purported Ex. XX Escrow agreement, by its terms, does not provide a date certain by which the alleged $1,621,375 needs to be deposited into the escrow account.  *See* <u>Mandel</u>, Ex., XX.

Undisputed that no payments were made to the escrow account purportedly established under the Ex. XX Agreement.  *<u>Consequently</u>*, and for the reasons set forth in the Opposition, any such purported agreement is deemed abandoned.

Further undisputed that DPW made numerous direct payments to Plaintiff, after the Expiration Date, in connection with the ongoing negotiations between Super Crypto and Plaintiff related to a potential resolution regarding the Remaining Machines.  *See* <u>Tencer Dep. (Volynsky Supp. Decl., Ex. 34)</u>, 153:15-19; 173:17-22; <u>Magot Supp. Decl.</u>, Exs. 11, 12("In the meantime, please continue to show us good faith and send us wires to the best of your ability.").

Disputed, however, as to the admissibility of Ex. 1 to the Tencer Decl.  Plaintiff fails to lay a proper foundation regarding the admissibility of Ex. 1 to the Tencer Decl.  Ex. 1 is comprised of a summary that was created by Plaintiff after the commencement of this litigation (November 26, 2018) that contains alleged wire confirmations which purport to reflect documents related to Timberlane Wood Products, Inc., a non-party entity owned by Tencer.  *See* <u>Tencer Decl.</u>, Ex. 1 at BMS000554-BMS000571; <u>Tencer Dep. (Volynsky Supp. Decl., Ex. 34)</u>, 15:20-16:3.  Additionally, Plaintiff also does not cite to any admissible evidence demonstrating that the purported invoices were actually "issued."

The purported "summary" is also inconsistent with the cited e-mails.  Thus, at Ex. BBBB, Tencer sent an e-mail referencing a $50,0000.00 wire that was received on May 17, 2018, and asks, "Are you sending another wire to be applied as additional deposit today?"  *See* Ex. <u>Mandel</u>, BBBB, at DEFENDANTS_002691 (Tencer e-mail dated May 18, 2018, at

**9:07 AM).  The "purported" summary attached at Ex. 1 to the Tencer Declaration, however, makes no reference to a deposit of $50,000.00 on or about May 17, 2018.**

79. Defendants also made repeated promises to Plaintiff over a period of months that payment for the 600 Machines was forthcoming.  Tencer Decl. ¶ 14; Ault Dep. (Mandel Ex. A) at 162, 185-186, 203-206, 217-218, 221; Magot Dep. (Mandel Ex. B) at 166-176, 188-189, 199-201, 203, 205-206; Mandel Ex. YY, ZZ, DDD, FFF, MMM, CCCC, EEEE, GGGG, IIII.

**Response:    Disputed.  Plaintiff has cited to 19 full pages of deposition testimony, as well as nine exhibits, without pincites, that are replete with objectionable testimony based on, *inter alia*, hearsay, opinion testimony, speculation and testimony that is not based on the deponent's personal knowledge.  *See* <u>Preliminary Statement</u>.**

**Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.**

**Further disputed that the allegation that Defendants allegedly "made repeated promises," without specifying a particular statement, is a legal conclusion, not a fact that can be disputed or undisputed.  *See Tarazi*, 2015 U.S. Dist. LEXIS 180991, at \*43-44.  Indeed, Defendants cannot be tasked with sifting through 19 full pages of deposition testimony, as well as nine exhibits, to determine which particular statements Plaintiff claims are "promises."**

80. Mr. Ault described those promises at his deposition as "commitments" of the parent company:

> Those were commitments I made, yeah, on behalf of the parent to – I mean, we fund our subsidiary, so you know, the subsidiary made a commitment to buy something, and it was always our intention to fund the subsidiary, so they could complete their business model.  There's not a question about that.

Ault Dep. (Mandel Ex. A) at 162-163, 226.

**Response:**    **Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.**

**Further disputed that Ault was describing promises as this is a legal conclusion, not a fact that can be disputed or undisputed.** ***See*** **Response,** ***supra*****, ¶79 (which is incorporated by reference herein).**

**Further disputed as Ault was not asked about any** ***specific*** **"promises" in connection with the cited deposition excerpt.** ***See*** **<u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, 162:15-163:3. Thus,  without specifying a particular statement, this assertion constitutes a legal conclusion, not a fact that can be disputed or undisputed.** ***See Tarazi*****, 2015 U.S. Dist. LEXIS 180991, at \*43-44.**

81. Between May and August 2018, DPW paid Plaintiff more than $87,000 to be applied toward the purchase of the 600 Machines under the Agreement, in addition to another $32,000 applied toward storage charges of $300 a day that Defendants had agreed to pay to Plaintiff for storing the 600 Machines while the balance due remained unpaid.  Tencer Decl. ¶ 13 & Ex. 1; Ault Dep. (Mandel Ex. A) at 230-231; Magot Dep. (Mandel Ex. B) at 83, 217-220, 224-226; Mandel Ex. BBB, GGG-LLL, OOO, JJJJ, KKKK, MMMM, ZZZZ (Ex. O to stipulation).

**Response:**    **The Court should disregard this paragraph as it blatantly violates the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain** ***only one*** **factual assertion in each numbered paragraph."  (emphasis added);** *see Mayaguez S.A.***, 2021 U.S. Dist. LEXIS 86634, at \*19 (S.D.N.Y. Apr. 30, 2021).**

**Further disputed as Plaintiff has also cited to 10 full pages of deposition testimony, as well as an additional 12 exhibits, that are replete with objectionable testimony based on,** *inter*

*alia*, hearsay, opinion testimony, speculation and testimony that is not based on the deponent's personal knowledge. *See supra*, <u>Preliminary Statement</u>.

Disputed that there was a "balance due" for the 600 Machines between May and August 2018, as the Agreement had been deemed null and void and Super Crypto did not have a contractual obligation to pay the Remaining Amount. *See* <u>Mandel</u>, Ex. HH, §3. Disputed to the extent that this statement further implies that DPW was a party to the Agreement. *See* <u>Mandel</u>, Ex. HH, §3. Thus, disputed that payments were purportedly made between May and August 2018, "under the Agreement." *See id.*

Disputed that Defendants agreed to any specific allocation as to the use of the $87,000 and $32,000. Thus, in one instance, Tencer would seemingly unilaterally determine that a $50,000.00 payment constituted a deposit and not a payment towards the Remaining Machines. *See* <u>Mandel</u>, Ex. BBBB, at DEFENDANTS_002691 (Tencer e-mail dated May 18, 2018, at 9:07 AM) (referring to $50,000 wire on May 17, 2018, and questioning, "Are you sending another wire to be applied as additional deposit today?").

Disputed that Defendants had agreed to pay $300 a day to Plaintiff for storing the 600 Machines while the balance due remained unpaid. Rather, Ex. OOO is an e-mail from Tencer, dated July 12, 2018, stating "You have told me on numerous occasions that although there was a delay in your payment, you would reimburse us for the warehouse charges." *See* Ex. OOO. Ault also testified that "I did say I would reimburse him." <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, 231:3-4. Plaintiff, however, does not cite to any evidence establishing what the actual price that Plaintiff paid for storing the Remaining Machines is.

Disputed as to the admissibility of Ex. 1 to the Tencer Decl. Plaintiff fails to lay a proper foundation regarding the admissibility of Ex. 1 to the Tencer Decl. Ex. 1 is comprised

of a summary that was created by Plaintiff after the commencement of this litigation (November 26, 2018) that contains alleged wire confirmations which purport to reflect documents related to Timberlane Wood Products, Inc., a non-party entity owned by Tencer. *See* <u>Tencer Decl.</u>, Ex. 1 at BMS000554-BMS000571; <u>Tencer Dep. (Volynsky Supp. Decl., Ex. 34)</u>, 15:20-16:3. Additionally, Plaintiff also does not cite to any admissible evidence demonstrating that the purported invoices were actually "issued."

The purported "summary" is also inconsistent with the cited e-mails. Thus, at Ex. BBBB, Tencer sent an e-mail referencing a $50,0000.00 wire that was received on May 17, 2018, and asks, "Are you sending another wire to be applied as additional deposit today?" *See* <u>Mandel</u>, Ex. BBBB, at DEFENDANTS_002691 (Tencer e-mail dated May 18, 2018, at 9:07 AM). The "purported" summary attached at Ex. 1 to the Tencer Declaration, however, makes no reference to a deposit of $50,000.00 on or about May 17, 2018.

Notwithstanding, undisputed that DPW paid Plaintiff $119,500 between May 2018 and August 2018.

82. Defendants' purpose in making the payments to Plaintiff was to show Plaintiff their continuing intention to pay for the 600 Machines. Ault Dep. (Mandel Ex. A) at 215-216; Magot Dep (Mandel Ex. B) at 186-187, 210-211; Mandel Ex. LLL.

**Response:** Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.

Further disputed because the assertion relies on a singular exhibit – an e-mail from Ault, dated August 9, 2018, in which Ault states "Why would I be wiring you if I intended not to pay. Clearly I have been wiring." *See* <u>Mandel</u> Ex. LLL. In reviewing this email at his deposition, Ault testified that he was responding to threats of lawsuits from Plaintiff and

attempting to avoid litigation.  *See* <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, **215:16-24.**

Notwithstanding, Ault would further testify that, **"I think its fair to say that we tried to settle the matter and, when were past whatever dates were involved, we tried to settle the matter, and I conveyed to him that we wanted to get him paid."** <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, **179:19-22.**   From that statement, Plaintiff's counsel proceeded with a slew of improper, argumentative questions wherein he was seemingly testifying on behalf of his client.  *See id.*, **179:23-180:21.**

The portions of Magot's testimony contained at <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>,**186:22-187:12 and 211:13-18** should be disregarded by the Court as those portions are replete with argumentative questioning.  Notwithstanding, where Magot was permitted to actually testify as to his recollection, he stated that Super Crypto made a business decision to continue to try to work out a resolution with Plaintiff, as **"[i]t's a small community and [Super Crypto] wanted to maintain relationships."** *See id.*, **186:8-14.**

83. As Mr. Ault testified at his deposition, "[t]here would be no other reason to wire him than to show him our intentions to pay."  Ault Dep. (Mandel Ex. A) at 215-216.

**Response:  Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.  Notwithstanding, undisputed that Ault testified that, "[t]here would be no other reason to wire him than to show our intentions to pay."** *See* <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, **215:25-216:2. Disputed to the extent that this statement implies that either Defendant was obligated to pay any sums towards the Remaining Machines.** *See* <u>Mandel</u>, **Ex. HH.**

84. Mr. Magot agreed at his deposition that the intention in continuing to make payments was to show there was still a commitment to finalize the payment on the remaining 600 Machines.

Magot Dep. (Mandel Ex. B) at 186-187, 210-211.

**Response:**     **Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.  Further disputed as Magot was not asked what "the intention" was "in continuing to make payments."  Rather, Plaintiff's counsel asked Magot the following, objectionable, question: "Was it the intention, by continuing to make payments, however small, to show that there was still a commitment to finalize the payment on the remaining machines?"  *See* <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 211:13-18.**

**Similarly, at <u>Magot Dep.</u>, 186-187, Magot  was asked "And was your hope in sending the $50,000 toward the payment of the 600 machines to show Willy that you were still serious about purchasing them." *Id.*, 186:22-187:2.  This would be followed by another question that also improperly baked an implication into the argumentative question.  *Id.*, 187:8-12 ("Q: And you were also trying to show that you had the ability to raise funds to eventually pay for the full balance; correct?").**

85. Plaintiff agreed to work with Defendants in holding the Machines beyond the dates set in the Agreement so long as Defendants would honor their payment commitments within a reasonable time.  Tencer Decl. ¶ 15; Ault Dep. (Mandel Ex. A) at 165-167; Magot Dep. (Mandel Ex. B) at 144-146, 168, 203-205; Mandel Ex. SS, BBBB, HHHH.

**Response:**     **Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.  Further disputed to the extent that this statement implies that Super Crypto was required to pay the Remaining Amount for the Remaining Machines beyond the Expiration Date.  *See* <u>Mandel</u>, Ex. HH. Further disputed to the extent this statement implies that DPW was a party to the**

Agreement.  *See* Mandel, Ex. HH.  **Further disputed that Plaintiff had a contractual obligation to hold the Machines after the Expiration Date.**  *See id.*; *see also* Magot Dep. (Volynsky Supp. Decl., Ex.32), 51:19-25.  **Further disputed as the cited deposition excerpts and exhibits do not support this assertion.**

Ault testified that he believed that "[Tencer] was reasonable and tried to work with us for sure, yeah."  Ault Dep. (Volynsky Supp. Decl., Ex. 33), 166:25-167:2.

This purported "undisputed" material fact is seemingly culled from an excerpt contained in Ex. SS.  *See* Mandel, Ex. SS, at DEFENDANTS_002016 (e-mail from Tencer, dated Apr. 9, 2018, 5:22 AM).   Magot was asked point blank whether he agreed to operate under the alleged proposal contained in Ex. SS and rightfully responded, "Well, he's asking a question; right?"  *See* Magot Dep. (Volynsky Supp. Decl., Ex. 32), 144:16-145:14.  Plaintiff's counsel then proceeded to improperly testify on behalf of Plaintiff:

> Q:    Well, [Tencer is] saying he has no problem working with you and holding the equipment beyond the agreed-upon terms "as long as we know that you will honor your payment commitments within a reasonable time."
>         Did you ever communicate to [Tencer] that you were not willing or able to work with him under those conditions?
>
> MR. VOLYNSKY:   Objection; form.
>
> MR. MAGOT: Not that I recall.

*See id.*, 145:15-146:17.

Notwithstanding, over the course of SCM and Plaintiff's ongoing negotiations towards a potential resolution, there was never a new definitive payment arrangement that was reached.  *See* Tencer Dep. (Volynsky Supp. Decl., Ex. 34), 186:20-23 (noting that "[t]here was no [payment] schedule."); 188:3-189:4 (testifying that there was no concrete payment schedule); *see also* Mandel, Ex. ZZZZ at Ex. I, DEFENDANTS_002905 (e-mail

from Tencer noting that the parties still had not entered into a "payment arrangement.");
**Mandel**, Ex. GGG (plaintiff threatening litigation and requesting a "firm Payment plan" on
June 14, 2018);  **Volynsky 5/29 Decl.**, Ex. 20 (e-mail from Plaintiff's counsel demanding an
"enforceable payment plan by SCM guaranteed by DPW"); **Volynsky Supp. Decl.**, Ex. 49, at
DEFENDANTS_02599 (on May 11, 2018, Tencer requesting a commitment of a further
deposit);  **Magot Supp. Decl.**, Ex. 9 (on July 14, 2018, Tencer stating that: "Another week
has gone by with nothing *concrete*." (emphasis added)); *id.*, Ex. 10 (on July 16, 2018, Tencer
requesting "basic details" of a payment plan).

86. Defendants believed that Plaintiff was acting reasonably with respect to the arrangement
and continued to work with it on that basis.  Ault Dep. (Mandel Ex. A) at 165-167; Magot Dep.
(Ex. B) at 144-146, 195-196, 203-205; Mandel Ex. EEE.

**Response:**         This statement is vague and impossible to admit or dispute as it is impossible
for entities, such as Super Crypto and DPW, to "believe" something.  This statement is also
vague and impossible to admit or dispute as to the unspecified "arrangement."  Thus,
without identifying the "arrangement," Defendants cannot admit or deny the "basis" on
which they were allegedly "work[ing] with Plaintiff."  Further disputed that "Plaintiff was
acting reasonably," which is an opinion and a legal conclusion, not a fact which can be
disputed or undisputed.  *See also*, *supra*, Response, ¶85.

        Further disputed on the grounds that this alleged undisputed fact is not material to
the issues relating to the breach of contract claim, as alleged in the FAC.

87. Despite Defendants' many months of promises that payment for the remaining 600
Machines was forthcoming, Defendants made no further payments to Plaintiff after August 17,
2018.  Tencer Decl. ¶ 15 & Ex. 1; Ault Dep. (Mandel Ex. A) at 227-229; Magot Dep. (Mandel Ex.

B) at 223-226; Mandel Ex. LLLL, MMMM.

**Response:    Disputed** on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.

Further disputed that the allegation regarding "Defendants' many months of promises," without specifying a particular statement, is a legal conclusion, not a fact that can be disputed or undisputed. *See Tarazi*, 2015 U.S. Dist. LEXIS 180991, at *43-44.

Further disputed as Ex. LLLL appears to be a request from Magot to Tencer for an "outstanding balance" in response to Tencer's threat of "reactivating the file with out Attorney tomorrow." *See* <u>Mandel</u>, Ex. LLLL. <u>Mandel</u>, Ex. MMMM appears to be Tencer's response to that e-mail. *See id.*, Ex. MMMM. Neither e-mail supports the assertion contained in Ps SF, ¶87.

Further disputed as to the admissibility of Ex. 1 to the Tencer Decl. Plaintiff fails to lay a proper foundation regarding the admissibility of Ex. 1 to the Tencer Decl. Ex. 1 is comprised of a summary that was created by Plaintiff after the commencement of this litigation (November 26, 2018) that contains alleged wire confirmations which purport to reflect documents related to Timberlane Wood Products, Inc., a non-party entity owned by Tencer. *See* <u>Tencer Decl.</u>, Ex. 1 at BMS000554-BMS000571; <u>Tencer Dep. (Volynsky Supp.</u> <u>Decl., Ex. 34)</u>, 15:20-16:3. Additionally, Plaintiff also does not cite to any admissible evidence demonstrating that the purported invoices were actually "issued."

The purported "summary" is also inconsistent with the cited e-mails. Thus, at Ex. BBBB, Tencer sent an e-mail referencing a $50,0000.00 wire that was received on May 17, 2018, and asks, "Are you sending another wire to be applied as additional deposit today?" *See* <u>Mandel</u>, Ex. BBBB, at DEFENDANTS_002691 (Tencer e-mail dated May 18, 2018, at

**9:07 AM).  The "purported" summary attached at Ex. 1 to the Tencer Declaration, however, makes no reference to a deposit of $50,000.00 on or about May 17, 2018.**

**Undisputed that neither Defendant tendered payments to Plaintiff after August 17, 2018.**

88. In late October 2018, Plaintiff notified Defendants of Plaintiff's intention to resell the 600 Machines and to seek recovery of the difference between the resale price and the contract price, together with incidental damages and attorney's fees as provided in the Agreement.  Tencer Decl. ¶ 16 & Ex. 2; Magot Dep. (Mandel Ex. B) at 235; Mandel Ex. PPPP.

**Response:    Disputed as to the term "notified," which is a legal conclusion, and not a fact which can be disputed or undisputed.    Further disputed that Defendants were "notified" as Magot testified that he could not recall receiving the e-mail appended at <u>Mandel</u>, Ex. PPPP, on or about October 26, 2018.  *See* <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 235:6-8. Plaintiff also does not cite to any portion of Ault's deposition with regard to this assertion.**

**IV.    <u>Plaintiff's Resale of the 600 Machines</u>**

89. In November 2018, Plaintiff entered into an agreement with Backbone Hosting Solutions Inc. ("Backbone") pursuant to which Plaintiff resold the 600 Machines to Backbone for a total price of $189,840.00, including tax.  Tencer Decl. ¶ 17; Kalfa Dep. (Mandel Ex. C) at 181-196; Mandel Ex. QQQQ, RRRR.

**Response:    Plaintiff lacks knowledge and information as to whether Plaintiff paid the purported taxes that were allegedly collected from Backbone to the appropriate governmental agency, and, in that regard, disputes that the evidentiary record establishes that it did.  Otherwise, undisputed.**

90. By the time of the sale to Backbone, the market value of the Machines had dropped

substantially, and they could not be sold for anything close to the price set in the Agreement.  Kalfa

Dep. (Mandel Ex. C) at 185-186.

**Response:    Disputed to the extent this assertion implies that either Defendant was**

**obligated to pay the Remaining Amount to Plaintiff, as of November 2018.  *See* Mandel, Ex.**

**HH, §3 and *generally* (DPW not a party to the Agreement).**

     **Undisputed that the price of the Machines from Bitmain during a particular time**

**period represents the market value of the Machines during such period.  *See* Kalfa Dep.**

**(Volynsky Supp. Decl., Ex. 35), 185:3-12; Tencer Dep. (Volynsky Supp. Decl., Ex. 34), 117:15-**

**25.**

     **Further undisputed that Kalfa testified that the price per unit of Machines from**

**Bitmain, as of October 29, 2018, was "probably in the 3 to 500 range, probably something**

**like that."  Kalfa Dep. (Volynsky Supp. Decl., Ex. 35), 185:3-12.**

     **Further undisputed that, on April 17, 2018, Kalfa would also e-mail Tencer,**

**indicating that the same unit as the Machines was available from Bitmain website at a price**

**of $1,070 per unit.  *See* Volynsky 5/29 Decl., Ex. 22; Kalfa Dep. (Volynsky Supp. Decl., Ex.**

**35), 120:8-16; *see id.*, Tencer Dep., Ex. 34, 117:19-25 (testifying that the market value of the**

**Machines as of April 17, 2018 was "definitely" $1,070 per Machine).**

91. Super Crypto's CEO, Mr. Magot, had noted to Plaintiff about a month prior to the resale

that the listed price for the Machines on the Bitmain website had dropped to $411 per machine.

Magot Dep. (Mandel Ex. B) at 229; Mandel Ex. NNNN.

**Response:    The e-mail contained at Mandel Ex. NNNN is inadmissible as a statement**

**made during compromise negotiations.  *See* Fed. R. Ev. 408(a)(2).  Specifically, the first**

**sentence in Magot's e-mail references a draft settlement agreement, for Plaintiff's review.**

**Mandel Ex. NNNN, at DEFENDANTS_003911. As such, this assertion is inadmissible and should be disregarded.**

92. Mr. Magot, who closely followed the market for miners at least weekly as of 2018, testified at his deposition that he had no reason to believe the resale price obtained by Blockchain was unreasonable given marketplace conditions. Magot Dep. (Mandel Ex. B) at 235-237.

**Response:    Disputed to the extent that this statement implies that Plaintiff's resale of the Remaining Machines to Backbone was conducted in a commercially reasonable manner, pursuant to the New York Uniform Commercial Code ("NYUCC").    This is a legal conclusion, not a fact that can be disputed or undisputed.    Further disputed to the extent this assertion implies that Plaintiff resold the Remaining Machines to Backbone. *See supra*, Ds Resp., ¶89.**

**Further disputed as Magot testified that a resale price of approximately $316 per unit at or around October 26, 2018 "seems low." *See* Magot Dep. (Volynsky Supp. Decl., Ex. 32), 236:10-16. Unsatisfied with this response, Plaintiff's counsel resorted to argumentative questioning:**

> **Q:    It's not like you think the machines were worth anything close to what you had agreed to pay for them; right"**
>
> **MR. VOLYNSKY: Objection.**
>
> **MR. MANDEL: Right.**
>
> **Q:    Do you have any reason to believe that the resale price that Blockchain achieved on the sale of the machine was unreasonable given marketplace conditions?**
>
> **MR. VOLYNSKY: Objection; form.**
>
> **MR. MAGOT:    No.**

**Magot Dep., 236:24-237:4.**

IV.    **Defendants' After-the-Fact Attempt to Avoid Liability**

93. After the filing of this lawsuit, Defendants asserted for the first time that Super Crypto did not breach the Agreement based on Article 3 of the Agreement, which provides as follows:

> In the event [Super Crypto] fails to pay the Balance to [Plaintiff] on or before April 15, 2018, the Deposit funds shall be forfeited to [Plaintiff], and the remainder of this Agreement save and except for Article 2(a)(i) [dealing with the Deposit] and Article 3, shall be null and void and all Parties shall be relieved of its (sic) further obligations herein.

Mandel Ex. HH; Defendants' Pre-Motion Letter (ECF No. 107); Magot Dep. (Mandel Ex. B) at 48-49.

**Response:    Disputed.  Magot Dep., 48-49 is a colloquy wherein Magot: is asked whether Super Crypto currently has an obligation to Plaintiff; is asked whether he _believes_ "as [he] sit[s] here today," that Super Crypto does not owe any money to Plaintiff; what the basis for his belief is; and whether he ever expressed his view to anyone at Plaintiff that Super Crypto "had a contract with an out clause, and [it] lost [its] deposit."  Magot Dep. (Volynsky Supp. Decl., Ex. 32), 48:19-49:22.  Magot stated that he had imagined that he did express such view to Plaintiff, but ultimately, could not recall.  _See id._, 49:11-20.  Notwithstanding, Magot recalled having conversations with Tencer reminding him that he could resell the Remaining Machines to someone else.  _See id._, 146:10-17.**

94. At no time during the parties' course of dealings did Defendants ever indicate to Plaintiff either in writing or orally that that they intended to walk away from the purchase of the remaining 600 Machines pursuant to Article 3.  Tencer Decl. ¶ 18; Magot Dep. (Mandel Ex. B) at 66-67, 172-173; Ault Dep. (Mandel Ex. A) at 155-156.

**Response:    The Court should disregard this paragraph as violative of the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1**

Statement must contain _only one_ factual assertion in each numbered paragraph." (emphasis added). *See Mayaguez, 2021 U.S. Dist. LEXIS 86634, at \*19*. This assertion is further disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.

Further disputed to the extent that this statement implies that Super Crypto had an obligation under the Agreement to  invoke Article 3. As set forth more fully in the Opposition, the Agreement was automatically deemed null and void, pursuant to Article 3. Disputed to the extent that this assertion implies that Super Crypto was obligated to pay the Remaining Amount for the Remaining Machines after the Expiration Date. Mandel, Ex. HH. Disputed to the extent that this statement implies that DPW was a party to the Agreement.

Further disputed as the cited excerpts from Ault's testimony concern the time period during March 2018. *See* Ault Dep. (Volynsky Supp. Decl., Ex. 33), 155-156. The cited excerpts from Magot's testimony concern the time period between April 2018 – May 1, 2018. *See* Magot Dep. (Volynsky Supp. Decl., Ex. 32), 66-67, 172-173.

Remarkably, at Magot Dep., 172:2-173:15, Magot is asked questions about Mandel, Ex. ZZ (*See* Mandel, ¶55 (noting that Ex. ZZ represents Ex. 50 from the Magot Dep.). The e-mail chain at Mandel, Ex. ZZ demonstrates that, as of April 30, 2018, Tencer understood that Super Crypto and Plaintiff had not agreed to any definitive terms regarding a potential purchase of the Remaining Machines. *See* Mandel, Ex. ZZ, at DEFENDANTS_002378, Tencer E-mail, dated Apr. 30, 2018, at 7:09 AM ("It is unjust to request an extension of payment without giving us information on a new ship date.").

Magot would also testify that, during May 2018, he had discussions with Tencer,

**reminding Tencer that he was free to sell the Remaining Machines.** *See* **Magot Dep. (Volynsky Supp. Decl, Ex. 32), 184:22-185:10; 185:23-186:7;** *see also id.***, 146:10-17.**

**Furthermore, Plaintiff's internal communications, as of at least May 7, 2018, show Plaintiff's awareness that it needed to get a new written agreement that would require Super Crypto to "absolutely pay the full balance and pick up no later than 10- days from today."** *See* **Volynsky 5/29 Decl., ¶35, Ex. 19; Volynsky Supp. Decl., ¶237; Kalfa Dep. (Volynsky Supp. Decl., Ex. 35), 152:22-158:14. In the same e-mail, Kalfa goes on to acknowledge that, if Super Crypto and Plaintiff do not enter into a new agreement, then Plaintiff "just need[s] to wait and see."** *See id.*

95. Indeed, Mr. Ault could not recall even considering whether to invoke Article 3 as grounds for avoiding the purchase of the final 600 Machines; he "just remember[ed] wanting the machines" and being concerned that Plaintiff might sell the Machines to someone else after April 15, 2018. Ault Dep. (Mandel Ex. A) at 177-179.

**Response:** **The Court should disregard this paragraph as violative of the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain** _only one_ **factual assertion in each numbered paragraph." (emphasis added).** *See Mayaguez,* **2021 U.S. Dist. LEXIS 86634, at \*19. This assertion is further disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.**

**Further disputed to the extent that this statement implies that Super Crypto had a contractual obligation to pay the Remaining Amount for the Remaining Machines after the Expiration Date.** *See* **Mandel, Ex. HH. Disputed to the extent that this statement implies that Super Crypto had an obligation under the Agreement to invoke Article 3.** *See* **Mandel,**

Ex. HH.  As set forth more fully in the Opposition, the Agreement was <u>automatically</u> deemed

null and void, pursuant to Article 3.  Disputed to the extent that this statement implies that

DPW was a party to the Agreement.  *See* <u>Mandel</u>, Ex. HH

> Further disputed that Ault so testified:

> Q:    -- whether you as a company, either DPW or Super Crypto, considered on or around April 15th of 2018 saying to Mr. Tencer, you know what? You can have the deposit.  We're not interested in the remaining 600 machines.

> MR. VOLYNSKY:    Objection.  Form.

> MR. AULT:  I don't really recall whether we discussed whether we should consider telling them that or not.  I just remember wanting the machines.

<u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>, 179:7-15; *see also* <u>Magot Dep. (Volynsky Supp.</u>

<u>Decl., Ex. 32)</u>, 184:22-185:10.

96.  While Mr. Magot testified that internal consideration was given to walking away from the

purchase of the final 600 Machines as of the April 15, 2018 date set in Article 3, he "made the

business decision to try to continue purchasing equipment."  Magot Dep. (Mandel Ex. B) at 62-

63.

**Response:**    **Disputed on the grounds that this alleged undisputed fact is not material to the**

**issues relating to the breach of contract claim, as alleged in the FAC.  Further disputed to**

**the extent that this statement implies that Super Crypto had a contractual obligation to pay**

**the Remaining Amount for the Remaining Machines after the Expiration Date.  *See* <u>Mandel</u>,**

**Ex. HH.  Disputed to the extent that this statement implies that Super Crypto had an**

**obligation under the Agreement to invoke Article 3.  *See* <u>Mandel</u>, Ex. HH.  As set forth more**

**fully in the memorandum of law in opposition to the Motion, the Agreement was**

**<u>automatically</u> deemed null and void, pursuant to Article 3.  Disputed to the extent that this**

statement implies that DPW was a party to the Agreement.  *See* <u>Mandel</u>, Ex. HH.

Undisputed that Magot testified that he and his internal team made the "business decision to try to continue purchasing the equipment."  <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 62:23-63:2.  Magot noted further that Super Crypto was still trying to honor the relationship the best it could, as the cryptocurrency space was a small community and Super Crypto wanted to maintain relationships.  *See* <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 63:8-9; 186:11-14.

97. Mr. Magot closely followed pricing in the market for miners during 2018 and was aware that the value of the Machines on the open market had decreased since entering into the Agreement. Magot Dep. (Mandel Ex. B) at 59-61.

**Response:**    The Court should disregard this paragraph as violative of the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain <u>*only one*</u> factual assertion in each numbered paragraph."  (emphasis added).  *See Mayaguez, 2021 U.S. Dist. LEXIS 86634, at *19*.*   This assertion is further disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.

Further disputed to the extent that this statement concerns any time period aside from April 19, 2018, which was the date that Magot was asked about at <u>Magot Dep.</u>, 59-61.  *See* <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 59:1-14; 59:25-60:7.

Further disputed as Magot did not testify that he was "aware" that the value of the Machines "on the open market" had decreased between March 8, 2018 and April 19, 2018. *See* <u>Magot Dep.</u>, 59-61.

98. However, he also knew that the cryptocurrency market was volatile and "that the

fluctuations in this new market aren't predictable…."  Magot Dep. (Mandel Ex. B) at 63-64.

**Response:        Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.   Undisputed that this excerpt is contained within Magot's response at <u>Magot Dep.</u>, 63:8-14.  It is unclear why Plaintiff cites to <u>Magot Dep.</u>, 64.**

99. He remained hopeful that prices would increase again and made the assessment when the time came for invoking Article 3 that it was in the best interest of the company "to do whatever I could to keep the company running and buy equipment."  Magot Dep. (Mandel Ex. B) at 63-65.

**Response:        Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.  Further disputed as there is no provision in the Agreement that provides that Super Crypto needed to "invoke" Article 3.  _See_ <u>Mandel</u>, Ex. HH.  Rather, pursuant to the terms of Article 3, in the event that Super Crypto failed to pay the Remaining Amount on or before April 15, 2018, the Deposit would be forfeited and the Agreement would <u>automatically</u> be deemed null and void.  _See_ <u>Mandel</u>, Ex. HH, §3.**

**Further disputed as Magot was asked a leading question as to whether he "made an assessment as to whether to exercise what you're calling as an out; correct?"  <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 65:9-12.  Magot responded to that objectionable question by stating, generally, that, "I was still operating under my – as CEO to do whatever I could to keep the company running and buy equipment."  _Id._, 65:14-16.**

100.        Mr. Ault shared that assessment and also wanted to buy the Machines.  Ault Dep. (Mandel Ex. A) at 157, 177-178.

**Response:        The Court should disregard this paragraph as violative of the Local Civil**

Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain *only one* factual assertion in each numbered paragraph." (emphasis added). *See Mayaguez,* 2021 U.S. Dist. LEXIS 86634, at \*19. This assertion is further disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.

Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC. Further disputed as there is no provision in the Agreement that provides that Super Crypto needed to "invoke" Article 3. *See* Mandel, Ex. HH. Rather, pursuant to the terms of Article 3, in the event that Super Crypto failed to pay the Remaining Amount on or before April 15, 2018, the Deposit would be forfeited and the Agreement would automatically be deemed null and void. *See* Mandel, Ex. HH, §3.

Further disputed as the cited deposition excerpts do not establish that Ault "shared" an "assessment" of any kind.

Notwithstanding, undisputed that Ault testified that, prior to April 17, 2018, he "wanted to buy the machines." Ault Dep. (Volynsky Supp. Decl., Ex. 33), 177:22-178:16.

101.    Mr. Magot never altered his view over the next six months, as he remained focused during that entire period on trying to purchase the Machines from Plaintiff. Magot Dep. (Mandel Ex. B) at 67-68.

Response:    Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC. Disputed to the extent that this statement implies that Super Crypto was obligated to purchase the Remaining Machines after the Expiration Date. *See* Mandel, Ex. HH. Disputed that Magot

testified that he "never altered his view over the next six months."  Rather, Magot was asked:

> Q.    And did that view change at any point in the ensuing six months?
>
> MR. VOLYNSKY:   Objection.
>
> MR. MAGOT:       I stayed focused on trying to purchase the equipment from Willy.

**Magot Dep. (Volynsky Supp. Decl., Ex. 32), 68:6-10.**

102.    Although the value of the Machines continued to decline dramatically over this period, Defendants made a business decision that they still wanted them and remained optimistic that the market could turn around.  Magot Dep. (Mandel Ex. B) at 186, 204-05.

**Response:    The Court should disregard this paragraph as violative of the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain _only one_ factual assertion in each numbered paragraph."  (emphasis added).  _See Mayaguez,_ 2021 U.S. Dist. LEXIS 86634, at \*19.   This assertion is further disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.**

**Further disputed as Magot did not testify as to DPW's business decision(s).**

**The cited excerpts from Magot's deposition transcript are circumscribed to the following dates: May 18, 2018, June 4, 2018, and June 7, 2018.   _See_ Magot Dep. (Volynsky Supp. Decl., Ex. 32), 186:8-10; 204:2-3; 205:17-18.   Thus, it is unclear what time period Plaintiff is referring to in Ps SF, ¶102.**

**Undisputed that Magot testified that, as of May 18, 2018, Super Crypto made a business decision to still try to acquire the equipment, as "[i]t's a small community, and we wanted to maintain relationships.  And we were also optimistic that the market could turn**

around."  *See* <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 186:8-14; *see also id.*, 204:21-24

(noting that as of June 4, 2018, "[w]e were all clearly under water, and [Tencer] had no other

solution, so we agreed to try to work this out.").

103.    Defendants' concern was focused not on avoiding an obligation to purchase the

remaining 600 Machines, but on the possibility that Plaintiff might sell the Machines to someone

else.  Ault Dep. (Mandel Ex. A) at 177-178; Magot Dep. (Mandel Ex. B) at 73, 107-109, 144-147.

**Response:    The Court should disregard this paragraph as violative of the Local Civil**

**Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1**

**Statement must contain <u>*only one*</u> factual assertion in each numbered paragraph."  (emphasis**

**added).  *See Mayaguez,* 2021 U.S. Dist. LEXIS 86634, at \*19.**

**Further disputed to the extent that this statement implies that Super Crypto was**

**obligated to purchase the Remaining Machines after the Expiration Date.  *See* <u>Mandel</u>, Ex.**

**HH.  Further disputed to the extent that this statement implies that DPW was a party to the**

**Agreement.  *See* <u>Mandel</u>, Ex. HH.**

**Further disputed as Ault was asked whether he remembered being aware of the**

**existence of Article 3, prior to April 17, 2018.  <u>Ault Dep. (Volynsky Supp. Decl., Ex. 33)</u>,**

**177:22-24.  Ault responded that Magot made him aware that the Remaining Machines could**

**be resold on April 15, 2018 and the Deposit forfeited.  *Id.*, 178:2-5.  In that context, Ault**

**testified that he was concerned that Plaintiff "could keep our deposit and sell the machines**

**to somebody else."  *Id.*, 178:6-12.**

**Further disputed as there is no discussion in the cited deposition excerpts regarding**

**an "obligation" to purchase the Remaining Machines.  Further disputed that the statement**

**"Defendants' concern was focused not on avoiding an obligation to purchase the remaining**

600 Machines" is not material to the issues relating to the breach of contract claim, as alleged in the FAC.  Similarly disputed that the statement "Defendants' concern was focused" "on the possibility that Plaintiff might sell the Machines to someone else," is not material to the issues relating to the breach of contract claim, as alleged in the FAC.

104.    Had Defendants opted to rely on Article 3 to avoid purchasing the Machines, they would have communicated that decision to Plaintiff.  Magot Dep. (Mandel Ex. B) at 192-195.

**Response:**    Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.  Further disputed to the extent that this statement implies that Super Crypto had a an obligation to pay the Remaining Amount for, or otherwise purchase, the Remaining Machines after the Expiration Date.  *See* <u>Mandel Dep.</u>, Ex. HH.  Further disputed to the extent that this statement implies that Super Crypto had an obligation under the Agreement to  "invoke" Article 3.  *See* <u>Mandel Dep.</u>, Ex. HH.  As set forth more fully in the Opposition, the Agreement was <u>automatically</u> deemed null and void, pursuant to Article 3.  Further disputed to the extent that this statement implies that DPW was a party to the Agreement.  *See* <u>Mandel Dep.</u>, Ex. HH.  Further disputed as to DPW as Magot did not testify on behalf of DPW.

Further disputed as this misstates Magot's testimony.  Plaintiff's counsel improperly intertwined a self-serving legal conclusion into his improper and argumentative question:

> **Q:    I know.  But I'm saying – you know, you're telling me that you believed, as of [May 2018], you had the ability to just walk away and limit your losses to whatever the deposit was on the 600 machines.**
> **And I'm asking you: Did you understand that in order to have that option, you had to affirmatively communicate at some point a decision to Blockchain that you no longer wanted the machines?**
>
> **MR. VOLYNSKY:   Objection; form, calls for a legal conclusion.**
>
> **MR. MAGOT:        Yeah, I don't know.  I would have communicated**

**eventually, I imagine, if that decision was made.**

**Magot Dep. (Volynsky Supp. Decl., Ex. 32), 194:8-194:22**

105.    However, no such decision was ever made or is reflected in any of the parties' communications, all of which reiterated Defendants' goal of completing the purchase as Mr. Ault consistently worked to obtain the necessary funding.  Magot Dep. (Mandel Ex. B) at 194-195, 228, 231; Ault Dep. (Mandel Ex. A) at 157-158, 179-181, 186, 205-206, 211-212, 217-218.  *See also* paragraph 74 *supra* and citations therein.

**Response:  The Court should disregard this paragraph as violative of the Local Civil Rules and Your Honor's Individual Practices, ¶E(i), which provides that "[t]he 56.1 Statement must contain _only one_ factual assertion in each numbered paragraph."  (emphasis added). *See Mayaguez S.A.*, 2021 U.S. Dist. LEXIS 86634, at \*19.  Furthermore, incorporating the citations from paragraph 74, *supra*, Plaintiff has cited to 68 full pages of deposition testimony, as well as an additional 16 exhibits, without pincites, that are replete with objectionable testimony based on, *inter alia*, hearsay, opinion testimony, speculation and testimony that is not based on the deponent's personal knowledge.  *See* <u>Preliminary Statement</u>.  Further disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.**

**Further disputed on the grounds that Ps SF, ¶105 is duplicative of Ps SF, ¶94, and Ds Resp., ¶94 is therefore incorporated by reference herein.**

**Further disputed to the extent that this statement implies that Super Crypto had an obligation under the Agreement to  invoke Article 3.  As set forth more fully in the Opposition, the Agreement was <u>automatically</u> deemed null and void, pursuant to Article 3. Disputed to the extent that this assertion implies that Super Crypto was obligated to pay the**

Remaining Amount for, or otherwise purchase, the Remaining Machines after the Expiration Date. **Mandel**, Ex. HH. Further disputed to the extent that this statement implies that DPW was a party to the Agreement. *Id.*

Disputed as the referenced exhibits do not constitute "all" of the "parties' communications. *See generally*, **Mandel**, Exs., **Volynsky Decl.**, Exs.

Further disputed as the assertion that "all" of the "parties' communications" "reiterated Defendants' goal of completing the purchase as Mr. Ault consistently worked to obtain the necessary funding," without specifying particular statements, is a legal conclusion, not a fact that can be disputed or undisputed. *See Tarazi*, 2015 U.S. Dist. LEXIS 180991, at *43-44.*

106.    Super Crypto's internal communications to DPW consistently refer to an ongoing obligation to Plaintiff to pay for the final 600 Machines without any suggestion that the Agreement somehow permitted them to avoid that obligation. Magot Dep. (Mandel Ex. B) at 56-58, 70, 72, 75-79, 81-84, 159-161, 196-197, 233-234; Mandel Ex. X, Z, AA, CC, DD, EEE, PPP, QQQ, RRR, YYY, OOOO.

**Response:    Plaintiff has cited to 21 full pages of deposition testimony, as well as an additional 11 exhibits, without pincites, that are replete with objectionable testimony based on,** *inter alia***, hearsay, opinion testimony, speculation and testimony that is not based on the deponent's personal knowledge.** *See* **Preliminary Statement.    Further disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.**

Further disputed to the extent that this statement implies that Super Crypto had an obligation under the Agreement to  invoke Article 3.  As set forth more fully in the

Opposition, the Agreement was <u>automatically</u> deemed null and void, pursuant to Article 3. Disputed to the extent that this assertion implies that Super Crypto was obligated to pay the Remaining Amount for, or otherwise purchase, the Remaining Machines after the Expiration Date. <u>Mandel</u>, Ex. HH.  Further disputed to the extent that this statement implies that DPW was a party to the Agreement.  *Id.*

Further disputed as <u>Mandel</u>, Exs. X, Z, AA, CC, DD, PPP, QQQ, and RRR are comprised of e-mails from Magot to Ault providing a summary of potential opportunities and outstanding obligations.  Magot did not testify that his inclusion of Plaintiff in these periodic summaries referred to an "ongoing obligation" to Plaintiff.  Rather, Magot testified that "[m]y mindset is that I want to buy the equipment, and if I want to buy equipment, I need pay this to get the equipment from them."  <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 72:22-73:4; *see also id.*, 84:18-21; 57:4-58:12; 80:23-81:5 ("Yeah.  This shows what I'd like to pay.").

As regards <u>Mandel</u>, Ex. EEE, Magot testified that he did not know why he referenced the 4/30 date in that e-mail.  <u>Magot Dep. (Volynsky Supp. Decl., Ex. 32)</u>, 196:14-16.

<u>Mandel</u>, Exhibit YYY, is an e-mail dated April 15, 2018, wherein Ault confirms that a $100,000 wire was previously sent in connection with the Contracted-For Machines. <u>Mandel</u>, Exhibit OOOO is an e-mail that Magot forwarded from Tencer threatening litigation.  There is no reference in Exhibits YYYY and OOOO to an "ongoing obligation."

107.     Defendants never objected to any of Plaintiff's accountings of the amounts owed. Magot Dep. (Mandel Ex. B) at 217-220; Mandel Ex. KKKK.

**Response**:     **Disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.**

The alleged statement contained at **Mandel**, Ex. KKKK, is addressed to Super Crypto solely. *See* **Mandel**, Ex. KKKK, at DEFENDANTS_003649.  At **Magot Dep.**, 217-220, Magot testified that he could not recall whether he ever reviewed the document attached to the e-mail contained at **Mandel**, Ex. KKKK. *See* **Magot Dep. (Volynsky Supp. Decl., Ex. 32)**, 217:20-218:5.

Further disputed that "Defendants never objected" as Magot testified that he never objected, *in writing*, to the balance shown on DEFENDANTS_003649. *See* **Magot Dep. (Volynsky Supp. Decl., Ex. 32)**, 220:7-9.  When asked, as a follow-up, whether he ever "dispute it in any way," Magot responded, "Not that I can recall." *Id.*, 220:10-11.

108.    Mr. Magot acknowledged at this deposition believing that Super Crypto owed Plaintiff for the 600 Machines well after the date in Article 3, including as late as just a few weeks before Plaintiff eventually sold the Machines to another party.  Magot Dep. (Mandel Ex. B) at 56-58, 70, 72, 75-79, 81-84, 196-197.

**Response:**    Plaintiff has cited to 16 full pages of deposition testimony, that are replete with objectionable testimony based on, *inter alia*, hearsay, opinion testimony, speculation and testimony that is not based on the deponent's personal knowledge.  *See* **Preliminary Statement**.  Further disputed on the grounds that this alleged undisputed fact is not material to the issues relating to the breach of contract claim, as alleged in the FAC.

Further disputed that Plaintiff has established, through admissible evidence, that the Machines that it purportedly sold to Backbone were the Remaining Machines.  *See* **Kalfa Dep. (Volynsky Supp. Decl., Ex. 35)**, 196:10-23; **Tencer Dep. (Volynsky Supp. Decl., Ex. 34)**, 223:24-224:18.

Further disputed as Magot repeatedly testified that he did not believe that Super

Crypto was contractually obligated, under the Agreement, to pay Plaintiff the Remaining Amount after the Expiration Date. **Magot Dep. (Volynsky Supp. Decl., Ex. 32)**, 185:2-8; 72:22-73:4; 84:18-21; 57:4-58:12; 80:23-81:5 ("Yeah. This shows what I'd like to pay."). Indeed, at one point, Magot testified as follows:

> Q: Does Super Crypto currently have an obligation, to your understanding, to our client, Blockchain?
>
> MR. MAGOT: I don't believe so, but that's why we're here today.
>
> Q: So, as you sit here today, it's your belief that Super Crypto itself doesn't owe any money to Blockchain?
>
> MR. VOLYNSKY: Objection; asked and answered.
>
> MR. MANDEL: You can answer.
>
> MR. MAGOT: I don't believe so.
>
> Q: And what's the reason you believe that?
>
> MR. MAGOT: Because we had a contract with an out clause, and I lost my deposit.

*See* **Magot Dep. (Volynsky Supp. Decl., Ex. 32)**, 48:19-49:10.

Further disputed that the cited deposition excerpts demonstrate Magot's acknowledgement of a purported belief that Super Crypto was absolutely obligated to pay Plaintiff for the Remaining Machines after the Expiration Date. *Id.*, 57: 8-58:6 ("Yeah, the context of that is *if we want to buy them*, we owe that." (emphasis added)); 70:20-25 (testimony that Super Crypto issued an invoice for $1.6 million); 72:18-20 ("I wouldn't say it says we owe them. It shows that I wanted to buy equipment still."); 76:21-77:2 (Magot asked whether he was still looking for funding to pay Blockchain for the Remaining Machines, not whether he believed Super Crypto was obligated to); 81:2-5 ("Yeah. *This shows what I'd like to pay*." (emphasis added)); 82:2-16; 196:14-197:1 (argumentative and objectionable line of

questioning).

*         *         *

**DEFENDANTS' SUPPLEMENTAL STATEMENT
OF FACTS THAT PRECLUDE SUMMARY JUDGMENT**

229.    Prior to March 8, 2018, Tencer e-mailed Kalfa stating, "Joe, when you see his email, send the original agreement and Eacrow agreement to Shira and haver work on the changes as we discussed and hopefully Daren will confirm in his email.  Get her to send it to me ASAP. I'll review and if all is OK, i'll Send it off to Darren.  Ask her to let me know when I should expect a draft for review."  *See* Volynsky Supp. Decl., Ex. 52, at BMS 000975.

230.    Shira Kalfa was Plaintiff's attorney.   *See* Volynsky Supp. Decl., Ex. 35 (Kalfa Dep.), 100:23-101:12.

231.    Shira Kalfa provided revisions to drafts of the Agreement prior to Plaintiff and Super Crypto entering into the Agreement.  *See* Volynsky Supp. Decl., Ex. 53, at BMS 001063, BMS 001085-001093.

232.    Shira Kalfa's practice is focused on "corporate-commercial and private M&A law, including corporate reorganizations, mergers & acquisitions, business establishment such as incorporations, partnerships or JVAs, debt and equity funding, private placements, commercial financing, secured and unsecured lending and transactional law."  *See* Volynsky Supp. Decl., Ex. 45.

233.    As late as March 22, 2018, Shira Kalfa was communicating directly with Magot regarding revisions to an escrow agreement.  Volynsky Supp. Decl., Ex. 54.

234.    DPW's Form 10-K for the calendar year ended December 31, 2017 (the "DPW 2017 10-K"), which was filed with the Securities and Exchange Commission ("SEC"), on or about April 17, 2018,  lists "Super Crypto Mining, Inc., a Delaware corporation" as one of the

92

"Subsidiaries of the Registrant" at Exhibit 21 to the DPW 2017 10-K.   Volynsky Supp. Decl., ¶¶ 12-13, Ex. 41.

235.    The DPW 2017 10-K states that, "In January 2018, we formed Super Crypto Mining, Inc. ("**SCM**"), a wholly-owned subsidiary." Volynsky Supp. Decl., Ex. 40, p. 3 (emphasis in original).

236.    DPW's Form 10-K/A for the calendar year ended December 31, 2018, which was filed with the SEC, on or about October 16, 2019, discloses that Super Crypto generated revenue of $1,675,549 during the 2018 calendar year.   Volynsky Supp. Decl., Ex. 42, p. 49.

237.    Exhibit 19 from the Declaration of Robert B. Volynsky, dated May 29, 2023 ("Volynsky 5/29 Decl."), was also marked as Exhibit 17 at the Kalfa Deposition (as defined in the Volynsky 5/29 Decl.).  *See* Volynsky 5/29 Decl., Ex. 19;  Volynsky Supp. Decl., Ex. 35 (Kalfa Dep.), 152:22-153:20; Ex. 34 (Tencer Dep.), 141:19-142:10.

238.    Exhibit 16 from the Volynsky 5/29 Decl., was also marked as Exhibit 9 at the Kalfa Deposition (as defined in the Volynsky 5/29 Decl.).  *See* Volynsky 5/29 Decl., Ex. 16; Volynsky Supp. Decl., Ex. 35 (Kalfa Dep.), 67:17-68:24; Ex. 34 (Tencer Dep.), 65:8-66:3.

239.    Exhibit 21 from the Volynsky 5/29 Decl., was also marked as Exhibit 14 at the Kalfa Deposition (as defined in the Volynsky 5/29 Decl.).  *See* Volynsky 5/29 Decl., Ex. 21; Volynsky Supp. Decl., Ex. 35 (Kalfa Dep.), 121:25-122:14; Ex. 34 (Tencer Dep.), 118:19-119:5.

240.    Exhibit 22 from the Volynsky 5/29 Decl., was also marked as Exhibit 13 at the Kalfa Deposition (as defined in the Volynsky 5/29 Decl.).  *See* Volynsky 5/29 Decl., Ex. 22; Volynsky Supp. Decl., Ex. 35 (Kalfa Dep.), 119:4-120:4;  Ex. 34 (Tencer Dep.), 113:8-114:19.

241.     Exhibit 23 from the <u>Volynsky 5/29 Decl.</u>, was also marked as Exhibit 15 at the Kalfa Deposition (as defined in the <u>Volynsky 5/29 Decl.</u>).  *See* <u>Volynsky 5/29 Decl.</u>, Ex. 23; <u>Volynsky Supp. Decl.</u>, Ex. 35 (<u>Kalfa Dep.</u>), 131:2-21; Ex. 34 (<u>Tencer Dep.</u>), 122:1-123:20.

242.     Exhibit 29 from the <u>Volynsky 5/29 Decl.</u>, was also marked as Exhibit 33 at the Kalfa Deposition (as defined in the <u>Volynsky 5/29 Decl.</u>).  *See* <u>Volynsky 5/29 Decl.</u>, Ex. 33; <u>Volynsky Supp. Decl.</u>, Ex. 35 (<u>Kalfa Dep.</u>), 181:6-25; Ex. 34 (<u>Tencer Dep.</u>), 214:3-214:20.

243.     Exhibit 11 from the <u>Volynsky 5/29 Decl.</u>, was also marked as Exhibit 11 at the Kalfa Deposition (as defined in the <u>Volynsky 5/29 Decl.</u>).  *See* <u>Volynsky 5/29 Decl.</u>, Ex. 11; <u>Volynsky Supp. Decl.</u>, Ex. 35 (<u>Kalfa Dep.</u>), 106:7-20; Ex. 34 (<u>Tencer Dep.</u>), 77:16-78:8.

244.     Plaintiff did not seek to resell the Remaining Machines after the Expiration Date because of the declining market conditions and because Plaintiff had already long decided that it would cease its operations.  *See* Ds SF, ¶¶151-153; *see also* <u>Volynsky Supp. Decl.</u>, Ex. 35, <u>Kalfa Dep.</u>, 202:5-203:5; *id.*, Ex. 34, <u>Tencer Dep.</u>, 125:1-5 (no prospective purchasers as of April 20, 2018); 212:22-213:1; 213:17-21.

245.     Kalfa presently sits on the Board of Directors of several companies.  <u>Volynsky Supp. Decl.</u>, Ex. 35, <u>Kalfa Dep.</u>, 13:10-14:3.

246.     On or about March 16, 2020, Tencer, on behalf of MidCity Capital Ltd. ("MidCity"), entered into a Securities Purchase Agreement ("SPA"), with Slinger Bag Inc. (n/k/a Connexa Sports Technologies Inc.) ("Slinger Bag").  <u>Volynsky Supp. Decl.</u>, ¶10, Ex. 38; *id.*, Ex. 34, <u>Tencer Dep.</u>, 11:13-12:1.

247.     In connection with the SPA, on or about March 16, 2020, Slinger Bag issued a 12% Promissory Note to MidCity.  <u>Volynsky Supp. Decl.</u>, ¶9, Ex. 37; *id.*, Ex. 34, <u>Tencer Dep.</u>, 11:13-12:1.

248.    In connection with the SPA, on or about March 16, 2020, Slinger Bag and MidCity entered into a Warrant Agreement.  Volynsky Supp. Decl., ¶11, Ex. 39; *id.*, Ex. 34, Tencer Dep., 11:13-12:1.

249.    Kalfa testified that Super Crypto and Plaintiff extended the Expiration Date under the Agreement.  Kalfa Dep. (Volynsky Supp. Decl., Ex. 35), 141:2-7.

250.    Tencer also testified that Super Crypto and Plaintiff extended the Expiration Date under the Agreement.  Tencer Dep. (Volynsky Supp. Decl., Ex. 34), 162:16-163:23; 112:6-15.

251.    On or about June 18, 2018, Plaintiff's Counsel transmitted a demand letter, dated June 18, 2018, which stated that "Super Crypto is in default of $1,561,375 due on April 15." Volynsky 5/29 Decl., Ex. 20; *see also* Mandel, Ex. ZZZZ [DE 127-104] (last sentence of stipulation).

Dated: Carle Place, New York
   August 15, 2023

           Respectfully submitted,

           WELTZ KAKOS GERBI
           WOLINETZ VOLYNSKY LLP

           By: */s/ Robert Volynsky*
            Robert B. Volynsky
           1 Old Country Road, Suite 275
           Carle Place, New York 11514
           rvolynsky@weltz.law
           (212) 202-3178
           *Attorneys for Defendants*