UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
.............................................................................X

BLOCKCHAIN MINING SUPPLY AND
SERVICES LTD.,                                          Case No. 18-CV-11099-ALC

                    Plaintiff,

         -against-                                      **ORAL ARGUMENT REQUESTED**

SUPER CRYPTO MINING, INC. (N/K/A DIGITAL
FARMS, INC. and DPW HOLDINGS, INC.
(N/K/A AULT AULLIANCE, INC.),

                    Defendants.
.............................................................................X


### DEFENDANTS' MEMORANDUM OF LAW IN
### OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT


**[PUBLIC – REDACTED]**


WELTZ KAKOS GERBI WOLINETZ VOLYNSKY LLP
1 Old Country Road, Suite 275
Carle Place, New York 11514
Tel. (516) 320-6945 | Direct: (212) 202-3178

*Attorneys for Defendants Super
Crypto Mining, Inc.(n/k/a Digital Farms, Inc.) and
DPW Holdings, Inc.(n/k/a Ault Alliance, Inc.)*


<u>On the Brief:</u>
Robert B. Volynsky, Esq. (RV-7076)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES... ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 5

ARGUMENT ........................................................................................................................... 5

I.   Legal Standard – Summary Judgment ............................................................................. 5

II.  Legal Standard – Breach of Contract .............................................................................. 6

III. Plaintiff Has Neither Identified the Specific Provision That Was Allegedly
     Breached Nor the Date of Such Alleged Breach ............................................................ 6

IV. The Expired Agreement Could Neither Be Modified, Nor Its Provisions Waived ......... 7

V.  Plaintiff Cannot Establish a Definitive Modification or an Unequivocal Waiver ........... 8

     a.  The Alleged Modification Is Too Indefinite ............................................................ 9

     b.  Plaintiff's Deposition Testimony and Documentary Evidence Belie Plaintiff's
         Whole Cloth Arguments ........................................................................................ 10

     c.  Plaintiff's Convoluted Arguments Entirely Ignore Article 2(a)(iii) ..................... 11

     d.  The Parties' Post-Expiration Conduct Did Not Modify the Expired Agreement ... 12

     e.  The Parties' Post-Expiration Conduct Did Not Unequivocally Waive Article 3 ... 14

VI. Plaintiff Has Not Established That It Resold the Remaining Machines in a Commercially
     Reasonable Manner .................................................................................................... 16

VII. Plaintiff Cannot Establish a Definitive Modification or an Unequivocal Waiver ......... 17

VIII. Plaintiff Does Not Come Close to Establishing Alter-Ego Under Delaware Law ......... 18

     a.  SCM and DPW Did Not Operate as a Single Economic Entity .......................... 19

         (1) SCM Was Adequately Capitalized for the Corporate Undertaking ................ 19

         (2) SCM and DPW Observed Corporate Formalities ......................................... 21

             i.    SCM Operated Independently From DPW .......................................... 21

*ii.*      DPW Did Not Control SCM's Allocation of Funds ....................................... 24

*(3)* There Is No Instance of Siphoning in the Evidentiary Record .................................. 25

b. Plaintiff Does Not Establish an Overall Element of Injustice or Unfairness.................... 26

CONCLUSION.................................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Akzona, Inc. v. E. I. Du Pont de Nemours & Co.,*
    607 F. Supp. 227 (D. Del. 1984) ...............................................................22, 27-28

*Allison v. Clos-Ette Too, LLC,*
    No. 14-CV-1618-LAK-JCF, 2014 U.S. Dist. LEXIS 143517
    (S.D.N.Y. Sep. 12, 2014)...................................................................................22

*Am. Centennial Ins. Co. v. Aseguradora Interacciones S.A.,*
    96-4062-JFK, 2000 U.S. Dist. LEXIS 13978 (S.D.N.Y. Sep. 26, 2000) ..........................14

*Apex Oil Co. v. Belcher Co. of New York, Inc.,*
    855 F.2d 997 (2d Cir. 1988) ..............................................................................16

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC,*
    364 F. Supp. 3d 291 (S.D.N.Y. 2019) ................................................................26

*Bentivoglio v. Event Cardio Grp., Inc.,*
    No. 18-CV-2040-PKC, 2019 U.S. Dist. LEXIS 206381
    (S.D.N.Y. Nov. 27, 2019)..................................................................................19

*Borghese Trademarks, Inc. v. Borghese,*
    2013 U.S. Dist. LEXIS 39827 (S.D.N.Y. Jan. 14, 2013) ....................................14

*Bottitta v. Bottitta,*
    194 A.D.2d 510 (2d Dep't 1993)........................................................................ 8

*Bristol-Myers Squibb Co v. Aurobindo Pharma USA Inc.,*
    No. 17-374-LPS, 2018 U.S. Dist. LEXIS 179154
    (D. Del. Oct. 18, 2018) .....................................................................................18

*British Marine PLC v. Avanti Shipping & Charting, Ltd.,*
    No. 13-CV-839-BMC, 2014 U.S. Dist. LEXIS 76390
    (E.D.N.Y. Jun. 3, 2014)....................................................................................18

*Brown v. GE Capital Corp., Inc.* (*In re Foxmeyer Corp.*),
    290 B.R. 229 (Bankr. Del. 2003).......................................................................22

*Charity Folks, Inc. v. Kim,*
    757 F. Supp. 2d 378 (S.D.N.Y. 2010) ...............................................................19

*Cliffstar Corp. v. Alpine Foods, LLC,*
    No. 09-CV-00690-AM, 2012 U.S. Dist. LEXIS 187360
    (W.D.N.Y. Jul. 18, 2012) .................................................................................. 8

**Cases**                                                                                     **Page(s)**

*Cohen v. Schroeder*,
    248 F. Supp. 3d 511 (S.D.N.Y. 2017) ......................................................21, 26

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
    976 F.3d 239 (2d Cir. 2020) ...............................................................10

*CT Chems, Inc. v. Vinmax Impex, Inc.*,
    81 N.Y.2d 174 (1993).........................................................................9

*D2 Mark LLC v. OREI VI Invs.*,
    No. 652259/2020, 2020 N.Y. Misc. LEXIS 2978
    (Sup. Ct. N.Y. Cty. Jun. 23, 2020) ..................................................17

*Dallas Aero., Inc. v. CIS Air Corp.*,
    352 F.3d 775 (2d Cir. 2003)..............................................................1

*De Sole v. Knoedler Gallery, LLC*,
    139 F. Supp. 3d 618 (S.D.N.Y. 2015) ...................................24, 25, 26

*Doberstein v. G-P Indus.*,
    No. 9995-VCP, 2015 Del. Ch. LEXIS 275 (Del. Ch. Oct. 30, 2015)................18

*EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*,
    No. 3184, 2008 Del. Ch. LEXIS 127 (Del. Ch. Sep. 2, 2008) ....................19, 20

*Enzo Biochem, Inc. v. Amersham PLC*,
    981 F. Supp. 2d 217 (S.D.N.Y. 2013) ................................................7

*First Am. Commercial Bancorp, inc. v. Saatchi & Saatchi Rowland, Inc.*,
    55 A.D.3d 1264 (4th Dep't 2008).......................................................7

*Fletcher v. Atex, Inc.*,
    68 F.3d 1451 (2d Cir. 1995) ........................................................18, 26

*Gans v. Wilbee Corp.*,
    199 A.D. 564 (1st Dep't 2021)..........................................................15

*George A. Fuller Co. v. Alexander & Reed, Esqs.*,
    760 F. Supp. 381 (S.D.N.Y. 1991) ....................................................7

*Grosso v. AT&T Pension Ben. Plan*,
    No. 18-CV-6448-LGS, 2022 U.S. Dist. LEXIS 120222
    (S.D.N.Y. Jul. 7, 2022).....................................................................7

**Cases**                                                                                                    **Page(s)**

*Hidden Brook Air, Inc. v. Thabet Aviation Int'l, Inc.*, 2
    41 F. Supp. 2d 246 (S.D.N.Y. 2002) .................................................................15

*In re P3 Health Grp. Holdings, LLC*,
    No. 2021-0518-JTL, 2022 Del. Ch. LEXIS 325 (Del. Ch. Nov. 9, 2022) .......................29

*Ira v. Unified Capital Partners 3 LLC*,
    2022 WL 3359759 (S.D.N.Y. Aug. 15, 2022)..................................................................9

*Jericho Grp., Ltd. v. Midtown Dev., L.P.*,
    32 A.D.3d 294 (1st Dep't 2006) ....................................................................................9

*John St. Leasehold LLC v. FDIC*,
    95-CV-10174-JGK, 1998 U.S. Dist. LEXIS 11041
    (S.D.N.Y. Jul. 20, 1998) ..............................................................................................13

*Kamco Supply Corp. v. On the Right Track, LLC*,
    149 A.D.3d 275 (2d Dep't 2017)....................................................................................8

*Kirschner v. CIHLP LLC*,
    No. 15-CV-8189-RA, 2017 U.S. Dist. LEXIS 162719
    (S.D.N.Y. Sep. 30, 2017).........................................................................................26-27

*LC Footwear, LLC v. LC Licensing, Inc.*,
    No. 651907/2010, 2011 N.Y. Misc. LEXIS 6972
    (Sup. Ct. N.Y. Cty. Nov. 15, 2011) ..............................................................................16

*LDIR, LLC v. DB Structrued Prods, Inc.*,
    172 A.D.3d 1 (1st Dep't 2019) .....................................................................................12

*Lim v. Radish Media Inc.*,
    No. 22-1610, 2023 U.S. App. LEXIS 5706 (2d Cir. Mar. 10, 2023) .................................7

*Marvel Characters v. Simon*,
    310 F.3d 280 (2d Cir. 2002) ......................................................................................5-6

*Maxus Liquidating Trust v. YPF S.A. (In re Maxus Energy Corp.)*,
    641 B.R. 467 (Bankr. D. Del. 2022).........................................................................18, 24

*Mellen & Jayne, Inc. v. AIM Promotions, Inc.*
    33 A.D.3d 676 (2d Dep't 2006)....................................................................................10

*Midland Interior Inc v. Burleigh*,
    2006 Del. Ch. LEXIS 220 (Del. Ch. Dec. 19, 2006).......................................................20

**Cases**                                                                                       **Page(s)**

*Mobil Oil Corp. v. Linear Films, Inc.*,
 718 F. Supp. 260 (D. Del. 1989) ...............................................................28

*Nat'l Gear & Pitson, Inc. v. Cummins Power Sys., LLC*,
 975 F. Supp. 2d 392 (S.D.N.Y. 2013) ........................................................29

*Negrete v. Citibank, N.A.*,
 187 F. Supp. 3d 454 (S.D.N.Y. 2016) .......................................................... 7

*NetJets Aviation, Inc. v. LHC Communs., LLC*,
 537 F.3d 168 (2d Cir. 2008)..........................................................24, 25, 26

*New York Packaging II LLC v. Intco Med. Indus., Inc.*,
 No. 21-CV-04388-DG-SIL, 2023 U.S. Dist. LEXIS 667
 (E.D.N.Y. Jan. 3, 2023) .........................................................................17

*Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.*
*(In re BH S&B Holdings LLC)*,
 420 B.R. 112 (Bankr. S.D.N.Y. 2009) ........................................................19

*Oriental Commercial & Shipping Co. v. Rosseel, N.V.*,
 769 F. Supp. 514 (S.D.N.Y. 1991) .............................................................. 6

*Overton v. Art Fin. Partners LLC*,
 166 F. Supp.3d 688 (S.D.N.Y. 2016).........................................................18

*Pauley Petroleum Inc. v. Continental Oil Co.*,
 43 Del. Ch. 366 (Del. Ch. 1967)...............................................................24

*PC Com v. Proteon, Inc.*,
 946 F. Supp. 1125 (S.D.N.Y. 1996) ..........................................................15

*Pfrmf Inv. Holdings v. Interpublic Grp. Of Cos.*,
 No. 11-CV-6008-CM, 2012 U.S. Dist. LEXIS 96981
 (S.D.N.Y. Jul. 10, 2012) ...................................................................10, 15

*Reliable Automatic Sprinkler Co. v. Sunbelt Grp. L.P.*,
 472 F. Supp. 3d 64 (S.D.N.Y. 2000).........................................................12

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
 60 A.D.3d 61 (1st Dep't 2008) .................................................................30

*Roche Diagnostics GmbH v. Enzo Biochem, Inc.*,
 992 F. Supp. 2d 213 (S.D.N.Y. 2013) .......................................................... 7

**Cases**                                                                                                          **Page(s)**

*Schloss v. Danka Bus. Sys. PLC*,
    99-CV-0817-DC, 2000 U.S. Dist. LEXIS 2909
    (S.D.N.Y. Mar. 15, 2000) ................................................................................. 8, 16

*Sheerin v. Tutor Perini Corp.*,
    No. 1:18-CV-7952-ALC-SLC, 2022 U.S. Dist. LEXIS 60965
    (S.D.N.Y. Mar. 31, 2022) ..................................................................................... 6

*Shulkin v. Dealy*,
    504 N.Y.S.2d 342 (Sup. Ct. N.Y. Cty. Apr. 23, 1986) ................................... 11-12

*Soroof Trading Dev. Co. Ltd. v. GE Microgen Inc.*,
    No. 10-CV-01391-LGS, 2013 Dist. LEXIS 156081
    (S.D.N.Y. Oct. 30, 2013) .................................................................................... 21

*Southwick Clothing LLC v. GFT (USA) Corp.*,
    No. 99-CV-10452-GBD, 2004 U.S. Dist. LEXIS 25336
    (S.D.N.Y. Dec. 13, 2004) .................................................................................... 17

*Strategic Capital Dev. Grp., Ltd. v. Sigma-Tau Pharm., Inc.*,
    97-CV-2339-RPP, 1998 U.S. Dist. LEXIS 593
    (S.D.N.Y. Jan. 22, 1998) ................................................................................. 8, 16

*Supply Chain Prods., LLC v. NCR Corp.*,
    No. 19-CV-11376-ALC-JLC, 2023 U.S. Dist. LEXIS 55683
    (S.D.N.Y. Mar. 30, 2023) ............................................................................ 6, 9, 10

*Tese-Milner v. TPAC, LLC*,
    313 B.R. 46 (Bankr. S.D.N.Y. 2004) .................................................................. 30

*Trevino v. Merscorp, Inc.*,
    583 F. Supp. 521 (D. Del. 2008) ........................................................... 19, 22, 27

*Two Guys from Harrison-NY Inc. v. S.F.R. Realty Associates*,
    63 N.Y.2d 396 (1984) ......................................................................................... 12

*Verdantus Advisors, LLC v. Parker Infrastructure Partners, LLC*,
    No. 2020-0194-KSJM, 2022 Del. Ch. LEXIS 50
    (Del. Ch. Mar. 2, 2022) ........................................................... 18, 19, 25-26

*Wechsler v. Hunt Health Sys.*,
    186 F. Supp. 2d 402 (S.D.N.Y. 2002) ................................................................ 10

*Wenger Constr. Co., Inc. v. City of Long Beach*,
    152 A.D.3d 726 (2d Dep't 2017) ......................................................................... 11

**<u>Cases</u>**                                                                                    **<u>Page(s)</u>**

*Wenske v. Blue Bell Creameries, Inc.*,
    2018 Del. Ch. LEXIS 530 (Del. Ch. Nov. 13, 218) ...........................................................24

**<u>Rules</u>**                                                                                    **<u>Page(s)</u>**

NYUCC 2-718 ............................................................................................................................12

Defendants Super Crypto Mining, Inc. (n/k/a Digital Farms, Inc.) ("Super Crypto" or "SCM") and DPW Holdings, Inc. (n/k/a Ault Alliance, Inc.) ("DPW" and with "SCM" collectively, "Defendants") hereby submit this memorandum of law in opposition ("Opposition") to Plaintiff Blockchain Mining Supply and Services Ltd.'s ("Plaintiff") motion for summary judgment ("Motion" or "Ps Motion").

## PRELIMINARY STATEMENT

In its First Amended Complaint ("FAC"), Plaintiff alleges, without identifying a particular provision or date of breach, that SCM purportedly breached the asset purchase agreement, dated March 8, 2018 ("Effective Date") and entered into by and between SCM and Plaintiff ("Agreement"), by failing to pay Plaintiff for the Remaining Machines (defined below).[1]  *See* FAC, ¶75.  The FAC makes no mention of any modifications to, or waivers of, the Agreement's terms.

It is beyond dispute that the Agreement plainly and unambiguously provides for two distinct transactions related to the purchase and sale of 1,100 Bitmain Antminer S9 model cryptocurrency mining machines and 1,100 power supply units ("Machines") – one mandatory and one discretionary – and SCM satisfied its obligations (its **sole** obligations) as to both.

Thus, the Agreement makes plain that SCM's only **absolute** obligations were to pay an initial deposit of $163,625 ("Deposit"), as well as $1,487,500 ("Contracted-For Amount") for the first 500 Machines ("Contracted-For Machines").  In stark contrast, as to the remaining 600 ("Remaining Machines"), Article 3 of the Agreement unequivocally provides that in the event that SCM does not pay the remaining $1,621,375 ("Remaining Amount") for the Remaining Machines by April 15, 2018 ("Expiration Date"), the Deposit would be forfeited and the balance of the

---

[1] A true and correct copy of the Agreement is attached to the Declaration of Robert B. Volynsky, dated May 29, 2023 ("Volynsky 5/29 Decl."), at Ex. 11, and to the accompanying Supplemental Declaration of Robert B. Volynsky, dated August 12, 2023 ("VSD"), at Ex. 36.

Agreement would be deemed null and void, with each party being "relieved of its further obligations."  Article 3 was bargained-for by SCM and Plaintiff and Plaintiff acknowledged that the inclusion of such provision was intended to accommodate SCM's disclosed "cash flow" issues.

It is similarly undisputed that: (i) the Agreement expressly provides that all modifications and waivers thereunder must be evidenced by a signed writing; (ii) there is no provision in the Agreement requiring either party to "invoke" or "exercise" Article 3; (iii) the Remaining Amount was not paid on or before the Expiration Date; (iv) the Deposit was forfeited; and (v) Plaintiff and SCM did not execute any written modifications or waivers.

Unfortunately, the market value of the Remaining Machines had dwindled to $1,070 per Machine by the Expiration Date.  This was a risk that Plaintiff knowingly bore when it entered into the Agreement and Plaintiff now grasps at straws to recover that which the parties intentionally carved out in comprehensive provisions in the Agreement.

Faced with these incontrovertible facts, Plaintiff literally throws the kitchen sink at the Court, by citing to ***308 full pages*** of deposition testimony and ***105 exhibits***, ***<u>without pincites</u>***, and unabashedly asserts that this unsystematic encyclopedia shows, ***as a matter of law***, that, ***after the Expiration Date***, and to ***SCM's great detriment***: (i) SCM and Plaintiff purportedly modified the payment schedule for the Remaining Amount, without specifying the definitive terms of any such modification; or (ii) SCM knowingly and unequivocally waived the protections under Article 3 through its words and conduct, again, without specifying any new alleged due date for the Remaining Amount, and notwithstanding that the Agreement required any waiver to be in a signed writing to be enforceable.

However, these arguments necessarily fail because an expired agreement can neither be modified nor its provisions waived.  This is both a factual and legal impossibility.  As Plaintiff

exclusively relies on post-Expiration Date communications to manufacture its new claim, the Court's inquiry should end here, and summary judgment should be granted in Defendants' favor.

Aside from this insurmountable hurdle, the alleged "payment schedule modifications" are also too indefinite to be enforceable. Plaintiff does not identify the precise terms of the alleged "modification," or the specific statements that it relies upon to establish a modification. Nor does Plaintiff meet its heavy burden to establish an unequivocal waiver of Article 3's safeguards.

The deficiencies do not end there. Article 2(a)(iii), like its counterpart in Article 3, also fixes Plaintiff's liquidated damages to a forfeiture of the Deposit if the Remaining Amount is not paid on or before the Expiration Date. Yet, the Motion purposefully fails to mention Article 2(a)(iii), as Plaintiff seemingly attempts to avoid having to contest the well-settled principle that an interpretation of an agreement that would render any of its terms meaningless is disfavored.

Plaintiff also fails to establish: (i) that Defendants agreed to pay Plaintiff $300 per day for "storage charges," or, more detrimentally, this Court's jurisdiction over such arrangement; or (ii) that its purported resale of the Remaining Machines was conducted in a commercially reasonable manner. As such, Plaintiff's breach of contract claim must fail.

Separately, Plaintiff's "evidence" also does not establish that SCM is the alter-ego of DPW. Thus, SCM's Chief Executive Officer, Darren Magot ("Magot"), was not an officer, director, or employee of DPW during the relevant time period. SCM was set up for a separate and distinct purpose from that of DPW's, and, throughout its existence, had: its own bylaws; its own Board of Directors  and ███████████████████████████████████████████ ██████ ; its own balance sheets; its own insurance policy (██████████████████████ ████████████████████████ ); its own websites (www.supercryptomining.com and www.digitalfarmsinc.com); maintained its own accounts; and entered into its own agreements with

various crypto specific vendors. SCM was also sufficiently capitalized for the corporate undertaking with Plaintiff, *to wit*, SCM fulfilled its ***sole*** obligations under the Agreement.

The evidentiary record further shows that, throughout its existence, SCM generated its own revenues from cryptocurrency miners and that any such proceeds were "***always*** used to pay SCM's bills." To that end, SCM also had assets (namely cryptocurrency miners) when it ceased its operations in 2020 – miners that would thereafter be sold, with the proceeds thereof deposited into an escrow account for SCM's benefit.

From an operational standpoint, SCM did not need to seek approval from DPW prior to engaging vendors or entering into its own agreements. Thus, SCM did not need to seek approval from DPW prior to entering into the Agreement (and, indeed, it did not). Rather, Magot testified that SCM would, from time to time, seek advances from DPW and DPW would then advance funds to SCM, ***without any conditions on the usage of such funds***.

The record evidence also establishes that Plaintiff's principals, Yonah "Joe" Kalfa ("Kalfa") and William Tencer ("Tencer"), two sophisticated individuals who had long decided that Plaintiff would cease further operations and were desperate to fire sale the Machines, unilaterally determined that SCM was a "division" of DPW ***before*** Plaintiff had any contact with SCM.

Thus, Magot and Tencer would spend one week negotiating the terms of the Agreement, during which time Magot was exceptionally transparent that SCM was reliant on securing financing, whether through its parent company or otherwise. Consequently, the Agreement was structured with a mandatory purchase for the Contracted-For Machines and a discretionary purchase for the Remaining Machines. Neither Kalfa nor Tencer communicated with anyone from DPW prior to entering into the Agreement and, on June 18, 2018, their counsel would send an intemperate demand letter to Defendants wherein it expressly acknowledged that SCM and DPW

4

were two separate entities.  Consequently, Plaintiff's claim that Magot and Milton C. Ault, III ("Ault") purportedly made no distinction between the two entities in their communications with Tencer, must fall on deaf ears.

The totality of these circumstances simply does not support a finding that DPW and SCM operated as a single economic entity or that SCM is a "sham entity that exists for no other purpose than as a vehicle for fraud."  As such, and for the reasons set forth below, the Court should deny the Motion, in its entirety, and grant Defendants' motion for partial summary judgment ("Defendants' Motion"), in its entirety.

## STATEMENT OF FACTS

Defendants incorporate herein by reference: their Rule 56.1 Statement of Facts, dated May 30, 2023 ("Ds SF"); their Response to Plaintiff's Rule 56.1 Statement of Facts ("Ds Resp."); their Supplemental Statement of Material Facts that Preclude Summary Judgment ("Ds Supp. SF"); and the accompanying Supplemental Declaration of Darren Magot, dated August 12, 2023, and the exhibits attached thereto ("Magot Supp. Decl.").

## ARGUMENT[2]

### I.  Legal Standard – Summary Judgment

In deciding a summary judgment motion, the Court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *See Dallas Aero., Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  "Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party."  *See Marvel Characters v. Simon*,

---

[2] For the reasons set forth in Ds Resp., Defendants respectfully request that Plaintiff's Rule 56.1 Statement of Facts ("Ps SF") be disregard or stricken.  Plaintiff improperly cites to ***308 full pages*** of deposition testimony and 105 exhibits, ***without pincites***.  The most egregious examples of this pernicious practice are Ps SF, ¶¶8, 23-25, 63-65, 72, 74, 78-79, 105-106, 108, which paragraphs, at minimum, should be disregarded.

310 F.3d 280, 286 (2d Cir. 2002). "Courts may not assess credibility, nor may they decide between conflicting versions of events, because those matters are reserved for the jury." *See Supply Chain Prods., LLC v. NCR Corp.*, No. 19-CV-11376-ALC-JLC, 2023 U.S. Dist. LEXIS 55683, at *11 (S.D.N.Y. Mar. 30, 2023) (Carter, J.)). Furthermore, where, as here, "both sides move for summary judgment, neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *See id.*, at *12-13.

## II.  <u>Legal Standard – Breach of Contract</u>

A party asserting a breach of contract claim must establish: "(1) the formation of a contract *as to its scope and terms*; (2) performance by plaintiff; (3) *defendant's failure to perform*; and (4) resulting damage." *Id.*, at *15 (emphasis added). On a summary judgment motion, the Court must initially determine "whether the contract is unambiguous with respect to the question disputed by the parties." *See Sheerin v. Tutor Perini Corp.*, No. 18-CV-7952-ALC-SLC, 2022 U.S. Dist. LEXIS 60965, at *16 (S.D.N.Y. Mar. 31, 2022) (Carter, J.). The Court's role is to "ascertain the intention of the parties *at the time they entered into the contract. If that intent is discernible from the plain meaning of the language of the contract, there is no need to look further." Id.* (emphasis added). "[W]here the language of a contract is itself unambiguous, neither the intention of the parties nor the possibly unintended and unfortunate consequences of enforcing the agreement according to its terms offers a basis for modifying those terms." *See Oriental Commercial & Shipping Co. v. Rosseel, N.V.*, 769 F. Supp. 514, 517 (S.D.N.Y. 1991).

## III.  <u>Plaintiff Has Neither Identified the Specific Provision That Was Allegedly Breached Nor the Date of Such Alleged Breach</u>[3]

Initially, the FAC does not identify the *specific provision* that SCM allegedly breached or

---

[3] Although styled under different headings, Plaintiff's modification arguments are identical to its waiver arguments, *to wit*, Plaintiff asserts the SCM and Plaintiff allegedly *modified* the Agreement to *waive* Article 3.

***when*** any such breach occurred.  *See* <u>FAC</u>, ¶75 (generally alleging that "SCM breached the Agreement by failing to pay Plaintiff for the remaining 600 Machines.").[4]  These glaring omissions are particularly disconcerting, where, as here, Plaintiff improperly asserts eleventh-hour arguments that the Agreement was purportedly modified and/or waived.  *See  Enzo Biochem, Inc. v. Amersham PLC*, 981 F. Supp. 2d 217, 224 (S.D.N.Y. 2013) ("A plaintiff may not pivot from its stated claims to new ones at the summary judgment stage simply because it inserted a few vague catch-all phrases into its pleadings."); *Roche Diagnostics*, 992 F. Supp. 2d at 219 ("[A] party may not amend its pleadings in its briefing papers."); *Grosso v. AT&T Pension Ben. Plan*, No. 18-CV-6448-LGS, 2022 U.S. Dist. LEXIS 120222, at *9 (S.D.N.Y. Jul. 7, 2022) ("Plaintiffs may not raise new arguments -- or claims -- for the first time [at] summary judgment.").

Accordingly, the Court should deny the Motion, in its entirety.

**IV.        The Expired Agreement Could Neither**
**            <u>Be Modified, Nor Its Provisions Waived</u>**

Beyond these incurable deficiencies, Plaintiff's novel claims of "modification" and "waiver" are also entirely predicated upon "Defendants' [alleged] post-April 15 writings and conduct."  *See* <u>Motion</u>, p.10.  The import of this concession cannot be overstated.

By its terms, the Agreement was ***automatically*** deemed null and void when SCM did not pay the Remaining Amount on or before the Expiration Date, there is no provision in the

---

[4] *See Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 220 (S.D.N.Y. 2013) *citing First Am. Commercial Bancorp, inc. v. Saatchi & Saatchi Rowland, Inc.*, 55 A.D.3d 1264 (4th Dep't 2008) ("[A] party may not simply allege a general breach of contract and, later on, sort out the specific breach that it intends to litigate."); *Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 468 (S.D.N.Y. 2016) (dismissing breach of contract claim because complaint did not specify the particular clause that was allegedly breached); *Lim v. Radish Media Inc.*, No. 22-1610, 2023 U.S. App. LEXIS 5706, at *4 (2d Cir. Mar. 10, 2023) (upholding dismissal of breach of contract claim and noting that the plaintiff "fail[ed] to provide factual allegations concerning the ***date or manner of breach***", alleging only that he "demanded payment of his equity interest" on "several occasions." (emphasis added)).

Agreement that requires either party to "invoke" or exercise an option with regard to Article 3.[5] *See* Agreement, §3; Ds SF, ¶¶171-172; *see also* Magot Supp. Decl., ¶¶24-25.

As it is undisputed that the Agreement had already expired, Plaintiff's breach of contract claim must also be dismissed on the additional ground that "***an expired contract*** cannot be modified or its provisions waived unless a new contract is created." *Schloss v. Danka Bus. Sys. PLC*, 99-CV-0817-DC, 2000 U.S. Dist. LEXIS 2909, at \*12-13 (S.D.N.Y. Mar. 15, 2000) (emphasis added); *Strategic Capital Dev. Grp., Ltd. v. Sigma-Tau Pharm., Inc.*, 97-CV-2339-RPP, 1998 U.S. Dist. LEXIS 593, at \*3 (S.D.N.Y. Jan. 22, 1998) (noting that a modification "***must occur during the contract period. All of the cases cited by plaintiff involve modifications made during, rather than subsequent to, the original contract period***." (emphasis added)).[6] *See id.*

Accordingly, the Court should deny the Motion, in its entirety.

## V. Plaintiff Cannot Establish a Definitive Modification or an Unequivocal Waiver

Assuming, *arguendo*, that the expired Agreement could have somehow been modified or its provisions waived (which it could not (*see supra*, §IV)), Plaintiff has not set forth any writing, signed by SCM, that dispenses with the bargained-for protections under Article 3. *See* Agreement, §13(e) ("No revision or modification of [the] Agreement shall be effective unless in writing and

---

[5] Plaintiff erroneously posits that SCM was required to "invoke" Article 3 to avail itself of the protections that it bargained-for thereunder. *See* Motion, pp.2, 8, 11, 16, 18. Article 3, however, "does not give either party the option of terminating the Agreement – instead, "***termination is automatic.***" *See Cliffstar Corp. v. Alpine Foods, LLC*, No. 09-CV-00690-AM, 2012 U.S. Dist. LEXIS 187360, at \*19 (W.D.N.Y. Jul. 18, 2012), *adopted by*, 2013 U.S. Dist. LEXIS 45913 (emphasis added) (distinguishing between automatic provisions and provisions that explicitly require a notice to cure). There is no provision in the Agreement that requires SCM to notify Plaintiff of its purported "invocation" of Article 3, and Plaintiff does not cite to any such provision (none exists) to support this proposition. *See Bottitta v. Bottitta*, 194 A.D.2d 510, 513 (2d Dep't 1993) ("A court may not write into a contract, conditions that the parties did not insert by adding or excising terms under the guise of construction, nor may it construe the language in such a way as would distort the contract's apparent meaning.").

[6] Not surprisingly, Plaintiff does not cite to any cases that involve a ***post-expiration*** modification or waiver, and, for good reason, as such an occurrence is both factually and legally impossible. *See, e.g., Kamco Supply Corp. v. On the Right Track, LLC*, 149 A.D.3d 275, 279 (2d Dep't 2017) (cited in Ps Motion) (the purported "waiver" occurred prior to the contract's termination).

executed by authorized representatives of both parties."); §13(d) ("Any waiver must be in writing and signed by the Party to be charged with.").  This additional fact further warrants dismissal of Plaintiff's breach of contract claim.[7]

(a)      <u>The Alleged Modification Is Too Indefinite</u>

Additionally, Plaintiff also fails to identify the conclusive terms of its alleged modification (*e.g.*, a specific payment schedule or definitive deadline), as well as the precise statements which purportedly demonstrate a meeting of the minds regarding any such terms. *See Supply Chain Prods., LLC*, 2023 U.S. Dist. LEXIS 55683, at *18 ("NCR does not even outline what the new terms of this alleged modification to the Agreement purportedly were and how the alleged new terms modify the payment schedule set forth in the written Agreement.").

Instead, Plaintiff resorts to vague, conclusory, and self-serving pronouncements that: (i) "[T]he parties modified the Agreement by mutually signed writings confirming the continued validity and effect of the Agreement notwithstanding Article 3" (<u>Motion</u>, p.11); (ii) "The parties exchanged numerous mutually signed writings for months ***after the April 15 date*** in Article 3 by which they clearly manifested their intent to maintain the Agreement in full force and effect."  (*Id*., p.13 (emphasis added)); and (iii) "These emails leave no room for doubt that the parties agreed in writing to complete the transaction with respect to the final 600 Machines."[8]  *Id*.

---

[7] Plaintiff's dual citations to *CT Chems, Inc. v. Vinmax Impex, Inc.*, 81 N.Y.2d 174, 179 (1993) and to *Ira v. Unified Capital Partners 3 LLC* are puzzling. <u>Motion</u>, pp.11-12, 15.  The *CT Chems* Court held that the unambiguous payment provisions contained in the underlying agreement controlled over the alleged oral modification claimed by the defendants therein.  *See CT Chems, Inc.*, 81 N.Y.2d, at 179-180.  *Ira* is based on Delaware law and Plaintiff does not cite to any case(s) that stands for the same proposition, under New York law.

[8] The Motion also emphasizes an e-mail which purportedly states that "SCM will honor our obligation to finalize the purchase of the last 600 machines." <u>Motion</u>, p.13.  However, in response to that e-mail, Tencer seemingly proposes a counteroffer, that he would immediately follow-up with another e-mail inquiring, "Where's your reply????." <u>Mandel</u>, Ex. IIII [DE 127-87], at DEFENDANTS_002824-DEFENDANTS_002825; *see Jericho Grp., Ltd. v. Midtown Dev., L.P.*, 32 A.D.3d 294, 299 (1st Dep't 2006) ("[A] counteroffer constitutes a rejection of an offer as a matter of law. Rejection by counteroffer extinguishes the offer and renders any subsequent acceptance thereof inoperative." (Internal citations omitted)).

Such hazy assertions, however, do not adequately define the contours of a purported modification or waiver. *See Wechsler v. Hunt Health Sys.*, 186 F. Supp. 2d 402, 411 (S.D.N.Y. 2002) (purported subsequent modification and alleged performance insufficient to establish modification, because "[even] if the Court were to consider defendants' new argument concerning subsequent oral modification, the Court finds as a threshold matter that defendant has failed to define adequately the contours of such modification."); *Supply Chain Prods., LLC*, 2023 U.S. Dist. LEXIS 55683, at *18 *citing Mellen & Jayne, Inc.*, 33 A.D.3d 676 (2d Dep't 2006) ("The doctrine of definiteness means that a court cannot enforce a contract unless it can determine what the parties agreed to do."). Nor are they sufficient to establish a waiver of such a critical provision. *See Pfrmf Inv. Holdings v. Interpublic Grp. Of Cos.*, No. 11-CV-6008-CM, 2012 U.S. Dist. LEXIS 96981, at *27 (S.D.N.Y. Jul. 10, 2012) ("[W]aiver will not be inferred where the condition allegedly waived is central to the bargain that gave rise to the right purportedly waived.").

Accordingly, the Court should deny the Motion, in its entirety.

> (b)    *Plaintiff's Deposition Testimony and Documentary Evidence Belie Plaintiff's Whole Cloth Arguments*

Plaintiff's futile arguments that Article 3 was supposedly excised (either by modification or waiver) are also entirely at odds with its principals' testimony. Thus, Tencer and Kalfa each testified that the parties purportedly agreed to "extend" the due date under Article 3 (although they could not identify a definitive extension date), as opposed to striking that provision, as Plaintiff *now* insists.[9] VSD, Ex. 34, Tencer Dep., 162:16-163:23 (testifying that, as of July 3, 2018, the

---

[9] In a similar vein, any such "extension" to the Expiration Date would, on its face, simply mean that the April 15th deadline would be extended to a new unspecified *expiration date*, at which time the Agreement would be deemed null and void, as opposed to creating a windfall for Plaintiff. *See Supply Chain Prods., LLC*, 2023 U.S. Dist. LEXIS 55683, at *23 *citing Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 976 F.3d 239, 248 (2d Cir. 2020) ("[W]e may not… read additional requirements into unambiguous text in search of such an obligation.").

10

date in Article 3 was purportedly extended); 112:6-15; *id.*, Ex. 35, <u>Kalfa Dep.</u>, 141:2-7; *c.f.* Ds Supp. SF, ¶251 (Plaintiff's counsel referencing April 15, 2018 as the default date).

Additionally, on May 7, 2018, Kalfa would suggest to Tencer that Plaintiff and SCM enter into "a new written agreement" with "more forceful terms" that SCM "will absolutely pay the full balance" for the Remaining Machines. *See* <u>Volynsky 5/29 Decl.</u>, Ex. 19. Such an e-mail would be nonsensical had Plaintiff truly believed that SCM was already absolutely obligated to pay for the Remaining Machines under the terms of the Agreement. *See id.*; <u>Volynsky 5/29 Decl.</u>, Ex.21, at BMS000707 (Kalfa expressing concern regarding SCM's "actual commitment beyond the [D]eposit."); *see also* <u>VSD</u>, Ex. 35, <u>Kalfa Dep.</u>, 121:25-123:12 (Kalfa acknowledging that the value of the Machines "was going down" as of April 4, 2018).

SCM, however, was not so obligated, and, to be certain, Magot testified that it was his understanding that, after the Expiration Date, the Deposit was forfeited and Plaintiff was free to resell the Remaining Machines. <u>VSD</u>, Ex. 32, <u>Magot Dep.</u>, 48:24-49:10; 185:2-8; Ds Resp., ¶94. Indeed, this is precisely what occurred, and Plaintiff cannot now seek a reformation of the Agreement to avoid this bargained-for result. Ds SF,¶¶143-146, 164; <u>Magot Supp. Decl.</u>,¶¶18-21.

    *(c)*   <u>*Plaintiff's Convoluted Arguments Entirely Ignore Article 2(a)(iii)*</u>

Plaintiff has also remained so focused on avoiding Article 3's consequences, that it seemingly overlooked Article 2(a)(iii), which similarly provides that the bargained-for remedy for SCM's failure to pay the Remaining Amount by the Expiration Date is a forfeiture of the Deposit. *See* <u>Agreement</u>, §2(a)(iii); *Wenger Constr. Co., Inc.*, 152 A.D.3d at 728 ("A valid contractual provision for liquidated damages controls the rights of the parties in the event of a breach, notwithstanding that the stipulated sum may be less than the actual damages allegedly sustained by the injured party."); *see also Shulkin v. Dealy*, 504 N.Y.S.2d 342, 344 (Sup. Ct. N.Y. Cty. Apr.

23, 1986) (analyzing NYUCC 2-718(1) and finding that forfeiture of the deposit was the proper measure of damages, despite actual damages being larger); *LDIR, LLC v. DB Structrued Prods, Inc.*, 172 A.D.3d 1, 5 (1st Dep't 2019) *citing Two Guys from Harrison-NY v. S.F.R. Realty Assoc.*, 63 N.Y.2d 396 (1984) ("Importantly, '[i]n construing a contract, one of the court's goals is to avoid an interpretation that would leave contractual clauses meaningless.'").

Plaintiff has retained the Deposit, and neither party seemingly disputes that liquidated damages were fixed in the Agreement. As such, the Court should deny the Motion, in its entirety.

 (d) *The Parties' Post-Expiration Conduct Did Not Modify the Expired Agreement*

Plaintiff's arguments concerning the parties' alleged after-the-fact conduct also fall flat.[10]

Thus, Plaintiff first decrees that its unilateral decision to "forbear" from reselling the Remaining Machines somehow demonstrates an enforceable modification to the Agreement. *See* Motion, p.14; *supra*, §V (arguments regarding Agreement, §§13(e)-13(h)). Plaintiff, however, does not cite to any communications (there are none) where Plaintiff makes such an affirmative representation and/or where either Defendant purportedly "agreed" to such alleged "forbearance."

To the contrary, Tencer and Kalfa both testified that the reason Plaintiff did not seek to resell the Remaining Machines was due to the declining market conditions and because Plaintiff had already long decided that it would cease its operations. *See* Ds Supp. SF, ¶244. Consequently, Plaintiff made the business decision to try to work something out with SCM and such choice cannot now be conflated into a restrictive covenant that simply never existed. VSD, Ex. 34, Tencer Dep., 173:2-22; 188:24-189:4; Ds SF, ¶¶200-204, 207. Consistent with such testimony, Magot

---

[10] Plaintiff's reliance on *Reliable Automatic Sprinkler Co. v. Sunbelt Grp. L.P.*, 472 F. Supp. 3d 64 (S.D.N.Y. 2000) (Motion, p. 15) is puzzling. In *Reliable*, this Court ultimately found that the parties' course of conduct could not serve to modify the initial agreement, as that agreement contained a no oral modification provision, similar to Article 13(e) of the Agreement. *See id.*, at 76 ("The Initial Sales Agreement is thus the controlling Agreement… [and] despite Sunbelt's puzzling behavior, Reliable must live with the consequences of its oversight.").

acknowledged that Plaintiff was free to resell the Remaining Machines at any time after the Expiration Date.  *See* VSD, Ex. 32, Magot Dep., 146:10-17; 204:21-205:3; *see also* Ds Resp., ¶¶209, 211-212.

Plaintiff also contends that SCM's alleged belated payment of the remaining balance of the Contracted-For Machines ("Contracted-For Remaining Balance") is somehow proof positive that the parties "unquestionably modified the timing of payments set forth in the Agreement."[11] Motion, p.11.  This meritless argument fails for two reasons.

*First*, Article 2(a)(ii) of the Agreement, unlike its counterparts in Articles 2(a)(iii) and 3, does not contain a provision fixing liquidated damages.  *See* Agreement, §§2(a)(ii), 2(a)(iii), 3. Thus, the Contracted-For Amount was paid, in full, and Plaintiff has not asserted any claims based on this alleged belated payment, rendering this diversionary point immaterial.

*Second*, Plaintiff does not provide any ***specific*** details regarding the alleged modified payment schedule as to the Remaining Machines.  Rather, Plaintiff repeatedly touts that "Plaintiff agreed to work with Defendants in holding the Machines beyond the dates set in the Agreement so long as Defendants would honor their payments commitments within a reasonable time." Motion, pp.7-8, 13; *see also John St. Leasehold LLC v. FDIC*, 95-CV-10174-JGK, 1998 U.S. Dist. LEXIS 11041, at *11 (S.D.N.Y. Jul. 20, 1998) ("Even if the parties believe that they are bound, if the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract.").  Stated differently, Plaintiff effectively acknowledges that, after the Expiration Date, Plaintiff and SCM never had a

---

[11] Although not authoritative for this Opposition, the Expiration Date fell on a Sunday, and the escrow agent seemingly confirmed receipt of the Contracted-For Remaining Balance on April 16, 2018.  *See* Declaration of Richard Mandel, dated May 30, 2023 ("Mandel"), Ex. VV [DE 127-48].  Such e-mail, however, does not establish, as a matter of law, that SCM failed to pay the Contracted-For Remaining Balance, on or before the Expiration Date.

meeting of the minds as to any new definitive payment terms for the Remaining Machines. *See* Ds Resp., ¶¶85 (last paragraph of Response), 94.

Furthermore, Plaintiff's reliance on the <u>Mandel</u>, Ex. XX Escrow Agreement [DE 127-50] is similarly unavailing. <u>Motion</u>, pp.11-12; *see* Ds Resp., ¶¶76-77. Thus, the purported Ex. XX Escrow Agreement, on its face, does not provide a date certain by which the funds are required to be deposited with the escrow agent (*see* <u>Mandel</u>, Ex. XX), and, in any event, it is undisputed that no monies were paid to the escrow account that was purportedly established under the Ex. XX Escrow Agreement. Ds Resp, ¶78. Instead, amidst the parties' subsequent discussions regarding a potential resolution, Plaintiff would instruct that all wires to be sent directly to Plaintiff, in clear recognition that the Ex. XX Escrow Agreement is unenforceable, as the underlying Agreement had long expired.[12] *See id*, ¶¶78, 85 (last paragraph); *George A. Fuller Co. v. Alexander & Reed, Esqs.*, 760 F. Supp. 381, 387 (S.D.N.Y. 1991) ("An escrow agreement may be mutually abandoned by the parties to it… [A]bandonment need not be marked with formality equal to that used in establishing the escrow.'"). Accordingly, the Court should deny the Motion, in its entirety.

> (e)    *The Parties' Post-Expiration Conduct Did Not Unequivocally Waive Article 3*

New York courts do not lightly presume a waiver and, instead, require that the waiver "be unmistakably manifested," and not inferred by a doubtful or equivocal act. *Borghese Trademarks, Inc. v. Borghese*, 2013 U.S. Dist. LEXIS 39827, at *36-38 (S.D.N.Y. Jan. 14, 2013) (internal quotations and citations omitted); *Am. Centennial Ins. Co. v. Aseguradora Interacciones S.A.*, 96-4062-JFK, 2000 U.S. Dist. LEXIS 13978, at *14 (S.D.N.Y. Sep. 26, 2000) (waiver must be "clear, unmistakable and ***without ambiguity***" (citations omitted) (emphasis added)). This is especially true, where, as here, the purported waiver concerns a critical provision that was deliberately

---

[12] Tellingly, Plaintiff does not reference this purported Ex. XX Escrow Agreement in the FAC, despite underscoring the escrow agreement related to the Contracted-For Machines in the FAC. *See* <u>FAC</u>, ¶9.

bargained-for.  *See Pfrmf Inv. Holdings*, 2012 U.S. Dist. LEXIS 96981, at *27 ("[W]aiver will not

be inferred where the condition allegedly waived is central to the bargain that gave rise to the right

purportedly waived.").  Furthermore, since the Agreement contains a no-waiver clause, Plaintiff's

burden is subject to a "heightened standard."  *See* Agreement, §13(d); *Gans v. Wilbee Corp.*, 199

A.D. 564, 565 (1st Dep't 2021); *PC Com v. Proteon, Inc.*, 946 F. Supp. 1125, 1134 (S.D.N.Y.

1996) (noting that Courts disfavor granting summary judgment where the proponent of the waiver

fails to establish an unequivocal written waiver in the face a no-waiver clause).

Failing to recognize its heavy burden, Plaintiff curiously rehashes its deficient

"modification" arguments as "waiver" arguments to self-servingly conclude that SCM allegedly

"'made the business decision' not to invoke Article 3 and walk away from the transaction, but 'to

try to continue purchasing equipment,'" and cites to Magot Dep., 62-65, 186 for support.  *See*

Motion, p.16.  Plaintiff's arguments here can quickly be dispensed with.[13]

Thus, Plaintiff's citations to the Magot Dep. (which are replete with objectionable

questioning) do not contain any testimony establishing that SCM knowingly and voluntarily

agreed to contractually obligate itself to that which the parties purposefully omitted from the

Agreement.  *See* Ds Resp, ¶¶ 82, 84, 96, 102.  That SCM may have been motivated to reach some

common ground with Plaintiff to preserve a potential business relationship in a niche space is not,

---

[13] Plaintiff bizarrely relies on *Hidden Brook Air, Inc. v. Thabet Aviation Int'l, Inc.*, 241 F. Supp. 2d 246 (S.D.N.Y. 2002) to support its argument that an "attempted oral modification" "operated, as a matter of law, as a waiver of" the contractual closing date. Motion, p.15.  *Hidden Brook* is distinguishable and actually undermines Plaintiff's argument. In *Hidden Brook*, the parties did not dispute that they agreed to an oral modification, ***prior to the expiration of the agreement,*** to move the closing date. *See id.*, at 258, 268 (on 6/21, the parties agreed to extend the closing date from 6/22 to 6/25).  ***No such conclusive bilateral agreement exists here, and the alleged "conduct" which Plaintiff relies upon <u>after</u> the Expiration Date.***

***Moreover***, *Hidden Brook* goes on to provide that a "party seeking to fix a new time to perform under an agreement must provide a notice that is 'clear distinct and unequivocal; fix a reasonable time within which to act; and inform the other party that failure to perform by the date will be considered a default.'" *See id.*, at 270.  No such explicit and unambiguous notice exists here ***<u>because the expired Agreement was neither modified, nor its provisions waived.</u>***

on its own, tantamount to a waiver. *See Schloss v. Danka Bus. Sys. PLC*, No. 00-7403, 2000 U.S. App. LEXIS 29317, at *6 (2d Cir. 2000) ("We also agree with the District Court's assessment that because the contractual obligation had expired, any continuing obligation of Danka's to assist with a trade would arise only from the creation of a new contract."); *see also supra*, fn. 5 (neither party required to "invoke" Article 3).

Additionally, the smattering of payments in the face of Plaintiff's threats of litigation are also in line with keeping everyone at the bargaining table. *See* Ds SF, ¶¶212-215; <u>Magot Supp. Decl.</u>, ¶¶28, 33; *LC Footwear, LLC v. LC Licensing, Inc.*, No. 651907/2010, 2011 N.Y. Misc. LEXIS 6972, at *13 (Sup. Ct. N.Y. Cty. Nov. 15, 2011) ("[T]he obligation to 'work cooperatively' is too vague and indefinite to be enforceable as a matter of law."); *Strategic Capital Dev. Group*, 1998 U.S. Dist. LEXIS 593, at *3 ("Plaintiff's continued provision of services and Sigma-Tau's continued monthly payments" after the expiration of the underlying contract did not serve as a waiver of the termination provision); *Schloss*, 2000 U.S. App. LEXIS 29317, at *6 (post-expiration conduct cannot support a claim of modification or waiver of an expired contract).

Accordingly, the Court should deny the Motion, in its entirety.[14]

**VI.      Plaintiff Has Not Established That It Resold the<br>Remaining Machines in a Commercially Reasonable Manner**

Plaintiff's arguments also fail as to its purported resale under NYUCC 2-706(2). As set forth above, Plaintiff has not affirmatively stated the date of SCM's purported breach – a critical metric in determining whether or not Plaintiff's alleged hurried resale to Kalfa's colleague was commercially reasonable. *See Apex Oil Co. v. Belcher Co. of New York, Inc.*, 855 F.2d 997, 1006 (2d Cir. 1988) ("*Unless the resale is made at or about the time when performance was due it will*

---

[14] Tellingly, Plaintiff chose not to ask Magot (SCM's 30(b)(6) witness), point blank, whether SCM "waived" Article 3 during his deposition, opting instead to resort to tortuous arguments, in its Motion. *See* Ds SF, ¶191.

be of slight probative value, especially if the goods are of a kind which fluctuate rapidly in value."
(emphasis in original)); *see also D2 Mark LLC v. OREI VI Invs.*, No. 652259/2020, 2020 N.Y.
Misc. LEXIS 2978, at *12 (Sup. Ct. N.Y. Cty. Jun. 23, 2020) ("Whether a sale was commercially
reasonable is, like other questions about 'reasonableness', a fact-intensive inquiry.").

## VII.        There Was No Modification or New Agreement for $300/Day "Storage Charges"

Plaintiff further straddles the fence as to its purported "storage charges" by asserting, ***for
the first time***, that the parties either modified the Agreement to include storage costs or entered
into a new agreement, limited to storage costs.  *See* Motion, pp.18-19.

As to the former, Plaintiff's argument necessarily fails for the reasons set forth above (*see
supra*, §§IV (expired agreement cannot be modified); V (indefinite terms)), as well as Article 13(e)
of the Agreement and the Statute of Frauds, both of which require that any such modification(s)
be in a writing, signed by Plaintiff and SCM.  *See New York Packaging II LLC v. Intco Med. Indus.,
Inc.*, No. 21-CV-04388-DG-SIL, 2023 U.S. Dist. LEXIS 667, at *9-10 (E.D.N.Y. Jan. 3, 2023).

As to the latter, Plaintiff is "precluded from now alleging the existence of written and oral
binding contracts" that it failed to raise in the FAC.  *See Southwick Clothing LLC v. GFT (USA)
Corp.*, No. 99-CV-10452-GBD, 2004 U.S. Dist. LEXIS 25336, at *20-21 (S.D.N.Y. Dec. 13,
2004) (dismissing claim where plaintiff had knowledge of another agreement but failed to allege
its existence in the Complaint).  Plaintiff similarly fails to establish: (i) that Plaintiff and SCM
reached a definitive agreement as to "$300 per day" for "storage costs" (Ds Resp., ¶81); or (ii) this
Court's jurisdiction over any such ***new*** and ***separate*** agreement between two non-New York

domiciliaries concerning the storage of the Remaining Machines in Canada.  Ds SF, ¶¶109, 111-12, 223-224; Ds Resp., ¶¶1-3.  As such, the Court should deny the Motion, in its entirety.[15]

## VIII.     Plaintiff Does Not Come Close to Establishing Alter-Ego Under Delaware Law[16]

"Veil piercing is a tough thing to plead and a tougher thing to get, and for good reason." *Verdantus Advisors, LLC v. Parker Infrastructure Partners, LLC*, No. 2020-0194-KSJM, 2022 Del. Ch. LEXIS 50, at *3-4 (Del. Ch. Mar. 2, 2022); *Overton v. Art Fin. Partners LLC*, 166 F. Supp.3d 688 (S.D.N.Y. 2016) (analyzing Delaware law) ("Piercing the corporate veil is a fact-intensive inquiry.").  To prevail on an alter-ego theory of parent liability for the acts of its subsidiaries, Delaware law requires that the plaintiff establish "(1) that the parent and the subsidiary 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness… [is] present.'" *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) (citations omitted).  Critically, "[c]ausation between the alleged alter ego conduct and the harm caused as a result of that conduct is required."  *See Maxus Liquidating Trust v. YPF S.A. (In re Maxus Energy Corp.)*, 641 B.R. 467, 505 (Bankr. D. Del. 2022); *see also Doberstein v. G-P Indus.*, No. 9995-VCP, 2015 Del. Ch. LEXIS 275, at *13-14 (Del. Ch. Oct. 30, 2015) (noting that a "nexus" must be alleged between the alleged "wrongful acts" and the purported "manipulation of [the] corporate form").  Plaintiff must establish its claim by "***clear and convincing evidence.***"  *See Bristol-Myers Squibb Co v. Aurobindo Pharma USA Inc.*, No. 17-374-LPS, 2018 U.S. Dist. LEXIS 179154, at *10 (D. Del. Oct. 18, 2018) (emphasis added).

---

[15] As to Plaintiff's arguments regarding attorneys' fees and costs, Defendants submit that, for the myriad of reasons set forth herein, Plaintiff is not entitled to a recovery of its attorneys' fees and costs.

[16] Should the Court find that issues of fact exist that preclude summary judgment on the breach of contract claim in Plaintiff's favor, then the Court should also deny the Motion as to Plaintiff's "alter-ego" theories, because such a determination, absent a finding of primary liability, would be tantamount to an advisory opinion. *See British Marine PLC v. Avanti Shipping & Charting, Ltd.*, No. 13-CV-839-BMC, 2014 U.S. Dist. LEXIS 76390, at *18 (E.D.N.Y. Jun. 3, 2014); *see also Charity Folks, Inc. v. Kim*, 757 F. Supp. 2d 378, 380 (S.D.N.Y. 2010).

(a)    *SCM and DPW Did Not Operate as a Single Economic Entity*

"Operating as a 'single [economic] entity' requires a showing of the parent entity's 'complete domination and control' to such an extent that the subsidiary entity 'no longer has legal or independent significance of its own.'" *Bentivoglio v. Event Cardio Grp., Inc.*, No. 18-CV-2040-PKC, 2019 U.S. Dist. LEXIS 206381, at *15 (S.D.N.Y. Nov. 27, 2019).  Courts consider the following factors in determining whether to pierce a subsidiary's veil to reach the parent company:

> (1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominate shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a façade for the dominant shareholder.

*See Verdantus Advisors,* 2022 Del. Ch. LEXIS 50, at *4; *see also EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, No. 3184, 2008 Del. Ch. LEXIS 127, at *49 (Del. Ch. Sep. 2, 2008) (noting that no single factor is dispositive in analyzing a veil-piercing claim).[17]

(1)    *SCM Was Adequately Capitalized for the Corporate Undertaking*

"Undercapitalization is rarely sufficient to pierce the corporate veil, because otherwise the veil of every insolvent subsidiary or failed start-up corporation could be pierced." *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112, 136 (Bankr. S.D.N.Y. 2009) (analyzing Delaware law) (internal quotations and citation omitted). The Court's inquiry as to capitalization and solvency is "most relevant for the inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business." *Id. citing Trevino v. Merscorp, Inc.*, 583 F. Supp. 521, 530 (D. Del. 2008).

---

[17] Plaintiff omits the "siphoning" element from its recitation of the relevant factors in the Motion. Motion, p.20.  This is particularly unsettling as each of the cases that the Motion relies upon involve rampant instances of funds being transferred ***from*** the alleged controlled entity ***to*** the purported controller – ***a circumstance which is not present here.***

Here, it is undisputed that SCM was adequately capitalized for the corporate undertaking that it absolutely obligated itself to. Plaintiff does not seem to dispute (and cannot) that, *as of the date that it executed the Agreement*, it understood that the only payments that it may receive under the Agreement were the Deposit and the Contracted-For Amount. Ds SF, ¶¶167-170 . **SCM paid those amounts (i.e., $1,651,125) to Plaintiff.** Ds SF, ¶¶157, 159.

Ignoring this inconvenient fact, Plaintiff opts for a smokescreen argument that SCM's bank account was "███████████████████████████████████████████ ████████." *See* Motion, p.23. SCM, however, only had a bank account for a three-month period in 2018, due to extenuating circumstances (*see* Ds Resp., ¶12), and, more significantly, SCM was also generating revenue from its miners, which amounts would not be reflected in its bank statements. *See* VSD, Ex. 32, Magot Dep., 33:18-34:8; 39:21-40:3 Ds Supp. SF, ¶239 (SCM generated revenues of $1,657,549 in 2018); Magot Supp. Decl., ¶46. **Incredibly, it was during this discrete (complained-of) period, that Plaintiff was paid the $1,651,125 (i.e., the Contracted-For Amount and Deposit) referenced above.** Ds SF, ¶¶157, 159; *see* Ds Resp., ¶¶ 57, 71-72.

Additionally, Plaintiff's bald assertion that SCM had no cash or other currency on hand when it ceased operations (Motion, p.23) similarly ignores the fact that: (i) at that time, SCM **had assets** (namely, cryptocurrency mining machines), that would eventually be sold to two third-parties; and (ii) Magot recalled that SCM had one potential outstanding obligation to SMS, which, as of the date of the Magot Dep., SMS had previously "dropped." *See* Ds Resp., ¶22. Thus, as of the date of the Magot Dep., SCM did not have any unresolved outstanding obligations. [18] *Id.*

---

[18] Plaintiff cites to the "facts" section from the *Midland Interior Inc v. Burleigh* (Motion, p.23) opinion, which section makes no reference to "insolvency." Notwithstanding, the **opinion** in *Midland Interior Inc.* notes that "mere insolvency is **not enough** to allow piercing of the corporate veil." *Id.*, 2006 Del. Ch. LEXIS 220, at \*14 (Del. Ch. Dec. 19, 2006) (emphasis added). Similarly, *Soroof Trading Dev. Co.* involved a limited liability company that had been formally dissolved under Delaware law, and, in a later decision in that case, this Court noted that **it could not**

Plaintiff utterly fails to meet its heavy burden here as it does not even make a meaningful attempt to demonstrate that the "'capitalizations' of similarly situated start-up companies 'exceeded' that of [SCM]" or that SCM was destined for "financial failure." *See Cohen v. Schroeder*, 248 F. Supp. 3d 511, 521 (S.D.N.Y. 2017) ("Cohen has not pointed to any evidence that Skoop's capitalization 'was so minimal as to prove that it was a sham entity.'"); *EBG Holdings LLC*, 2008 Del. Ch. LEXIS 127, at *53 ("There is no evidence, for example, that capitalizations of similar firms exceeded that of VG 109."). Ironically, the only evidence of same, in this record, is Tencer's testimony that Plaintiff was initially capitalized with an interest-free loan from one of his other entities and that Plaintiff ceased operations immediately after entering into the Agreement, due to declining market conditions. Ds SF, ¶¶ 151-154; <u>VSD</u>, Ex. 34, <u>Tencer Decl.</u>, 46:15-47:11; *see also* Ds SF, ¶¶200-201, 204-206; <u>Volynsky 5/29 Decl.</u>, Ex.22. As Kalfa notes, the sale to SCM was the "biggest miracle ever" as Plaintiff "got in and got out" "literally in the perfect window." Ds SF, ¶¶200, 205. Thus, Defendants submit that any such issues concerning adequate capitalization (if any) must be reserved for the trier of fact.[19]

### (2)    *SCM and DPW Observed Corporate Formalities*

#### i.    *SCM Operated Independently From DPW*

Throughout its existence, SCM also had: its own bylaws (Ds Resp., ¶5 (last paragraph)); its own Board of Directors ███████████████████████████████████ ██████████████ (*id.*); its own balance sheet (*id.*); its own insurance policy █████████████ ███████████████████████████ (*id.*); its own websites (www.supercryptomining.com and

---

*grant summary judgment on the alter-ego based claims.* *See Soroof Trading Dev. Co. Ltd. v. GE Microgen Inc.*, No. 10-CV-01391-LGS, 2013 Dist. LEXIS 156081, at *34 (S.D.N.Y. Oct. 30, 2013).

[19] Plaintiff also misconstrues Ault's testimony by asserting that "Ault acknowledged that, without DPW's continued financial support, SCM would not exist." <u>Motion</u>, p.23. That was not Ault's testimony. *See* Ds Resp., ¶7.

www.digitalfarmsinc.com) (*id.*); its own accounts, assets, and revenue stream (*id.*); maintained its

own bank account for as long as it could (*id.*); and entered into its own agreements with various

crypto specific vendors. *Id.; see also* VSD, Ex. 32, Magot Dep., 34:21-39:5 (colloquy about the

relationship between SCM and various of its crypto specific vendors); Mandel, Ex. E [127-5]

(SCM's Certificate of Incorporation). Critically, SCM was established for a separate and distinct

purpose from that of DPW's – to purchase cryptocurrency miners and to mine cryptocurrency. Ds

Resp., ¶¶2-3; *see Allison v. Clos-Ette Too, LLC*, No. 14-CV-1618-LAK-JCF, 2014 U.S. Dist.

LEXIS 143517, at *17 (S.D.N.Y. Sep. 12, 2014) (analyzing Delaware law) (alter-ego claims

dismissed where the two companies had "two different functions, different websites, and different

clienteles," despite sharing office space, phone numbers, employees, and bank accounts); *Trevino*,

583 F. Supp. at 530 (entity created for "legitimate purpose" undermines veil-piercing claims).

Furthermore, SCM's Chief Executive Officer, Magot, was not an officer, director, or

employee of DPW during the relevant time period. *See* Magot Supp. Decl., ¶42; *Brown v. GE

Capital Corp.*, *Inc.* (*In re Foxmeyer Corp.*), 290 B.R. 229, 245 (Bankr. Del. 2003) (parent and

subsidiary did not operate as a single economic entity despite sharing "officers, directors, and

personnel…[and] us[ing] common office space, addresses, and telephone numbers.").

DPW's public disclosures (including the Press Release) also make clear that "Super Crypto

Mining, Inc." is its subsidiary, and not a "division." *See* Ds Supp. SF, ¶¶234-235; Mandel, Ex.

SSSS [DE 127-97] (sub-heading explicitly states "Super Crypto Mining, Inc."); *Akzona, Inc. v. E.

I. Du Pont de Nemours & Co.,* 607 F. Supp. 227, 237 (D. Del. 1984) (corporate identifiers such as

"ltd." in annual report are sufficient to indicate separate corporate status for alter-ego claims).

From an operational standpoint, SCM, alone, would make decisions regarding its day-to-

day operations, as well as how it would allocate its own revenue, capital, and other funds that were

22

advanced to it.  *See* Ds Resp., ¶¶ 23, 39; <u>VSD</u>, Ex. 33, <u>Ault Dep.</u>, 59:3-21; 114:15-19.  Thus, SCM did not need to seek DPW's approval prior to entering into the Agreement.  *See* Ds Resp., ¶39.

Notwithstanding, Magot did testify that he would not feel comfortable entering into any agreement, including, but not limited to, the Agreement, until he was able to reach some degree of clarity regarding the available financing to SCM, whether intercompany or through a third-party.  *See* <u>VSD</u>, Ex. 32, <u>Magot Dep.</u>, 112:14-114:7.  ***This*** responsible assessment by a company's CEO is not tantamount to a showing that DPW "***controlled***" SCM's finances.

Magot was also exceptionally transparent with Plaintiff as to this point and even stated to Plaintiff, prior to entering into the Agreement, that he would understand if Plaintiff decided to part ways due to the uncertainties surrounding SCM's efforts to secure financing.  *See* <u>Mandel</u>, Ex. UUU [DE 127-73] ("I'm hoping we can work this out but considering the chain of events I'll understand if you prefer to pass on this opportunity and sell the machines to others.  If so, please consider us for the next delivery."); *see also* Ds Resp., ¶¶39, 48, 66.

To that end, Tencer would acknowledge same in a March 6, 2018 e-mail to Magot wherein Tencer proposes a payment structure to "***accommodate [SCM's] cash flow***" ("E-mail Proposal").  Ds SF, ¶¶145-146, 164-166; *see also* Ds Resp., ¶39.[20]  ***That*** E-mail Proposal would then form part of Article 3 of a new draft of the Agreement that would be circulated on March 7, 2018 (<u>Magot Supp. Decl.</u>, ¶¶19-20, Ex. 2), which provision would then be revised again at least once before the Agreement was fully executed by SCM and Plaintiff, on March 8, 2018.  *See* Ds Resp., ¶¶39, 47, 50, 55; <u>Magot Supp. Decl.</u>, ¶¶19-20; <u>VSD</u>, Ex. 34, <u>Tencer Dep.</u>, 82:10-22 (Tencer acknowledging that his assertion regarding DPW's purported "control of the negotiations" was circumscribed to discussions about financing).

---

[20] By this time, Plaintiff had already engaged experienced counsel (namely, Shira Kalfa, a corporate attorney) to review and revise drafts of the Agreement.  *See* Ds Supp. SF, ¶¶229-233.

ii.    *DPW Did Not Control SCM's Allocation of Funds*

DPW also ***did not*** "determine which of SCM's many creditors would be paid and when."

*See* Motion, p.25; Ds Resp., ¶¶23-24.  The "evidence" that Plaintiff cites to here is a consortium

of e-mails: (i) from Magot to Ault providing a summary of potential opportunities (which included

the amounts that Plaintiff was demanding from SCM (*see* Ds Resp., ¶27)) and outstanding

obligations; and (ii) e-mails from Ault allocating a blanket amount to advance to SCM, ***without***

***any conditions or restrictions on the use of such advanced funds***.  *See* Ds Resp., ¶¶23-24, 27.

This is fatal to Plaintiff's efforts to pierce SCM's corporate veil.  *See Wenske v. Blue Bell*

*Creameries, Inc.*, 2018 Del. Ch. LEXIS 530, at fn. 44 (Del. Ch. Nov. 13, 218) *citing Pauley*

*Petroleum Inc. v. Continental Oil Co.*, 43 Del. Ch. 366 (Del. Ch. 1967) (wholly owned subsidiary

which was financed by parent and contained common members of directors with parent, retained

adequate indicia of independence to justify a sperate corporate existence).

Similarly, Plaintiff fails to substantiate, through admissible evidence, how the nonexistence

of a "formal loan agreement" between DPW and SCM concerning unrelated funds that DPW

advanced to SCM resulted in a harm that ***caused*** Plaintiff's injury.[21]  More pointedly, Plaintiff

fails to establish how the existence of a "formal loan agreement" between SCM and DPW would

have ensured that SCM would have paid Plaintiff the ***contested*** Remining Amount, ***that SCM was***

***never contractually required to pay***.  *See Maxus Liquidating Tr.*, 641 B.R., at 504 ("There must

be a causal connection between the damages alleged and the abuse of the corporate form.").

Plaintiff's citations to *De Sole* and *NetJets* (*see* Motion, p.21) regarding this point are

inapposite and frankly, only further reinforce Defendants' stance.  Thus, the alleged "controlled"

entity in those cases had mischaracterized the intercompany receivables on its balance sheets as

---

[21] Plaintiff does not even make the threshold showing that the advances constituted "loans."  *See* Ds Resp., ¶¶16-18.

assets (as opposed to liabilities) and the parties there were also engaged in widespread siphoning of funds *from* the alleged controlled entity *to* the purported controller (facts that are not present here (*see infra.*, §VIII(a)(3)).  *See NetJets*, 537 F.3d at 182; *De Sole*, 139 F. Supp. 3d., at 667. Notwithstanding, the *De Sole* Court *still* found that "summary judgment is not appropriate on the question of whether 8-31 and Knoedler operated as a single economic entity."  *See De Sole*, 139 F. Supp. 3d, at 669; *see also infra*, fn. 22 (distinguishing *De Sole, NetJets, A.V.E.L.A., Inc.*).

     In stark contrast to the parties in *De Sole* and *NetJets*, SCM recorded the advances on its balance sheet as ██████████████████████████████████████████ ████████████.  *See* Ds Resp., ¶20; <u>Mandel</u>, Ex. G [DE 127-7] ██████████████████ ████████████ *see also Fletcher*, 68 F.3d, at 1459 (analyzing Delaware law) (centralized cash management system between a parent company and subsidiaries, absent siphoning, does not support a veil-piercing claim).  Additionally, both Ault and Magot also testified that the repayment terms for the advances would be worked out in the end – not that they would be nonexistent in perpetuity.  <u>VSD</u>, Ex. 33, <u>Ault Dep.</u>, 69:4-24 (Ault further clarifying that this could mean a "loan," "equity," "convertible," or "money towards a future transaction."); *id.*, Ex. 32, <u>Magot Dep.</u>, 150:10-15 (questioning limited to advanced funds for Contracted-For Machines).

        *(3)    There Is No Instance of Siphoning in the Evidentiary Record*

     Plaintiff entirely shies away from the "siphoning element" in its Motion, and, for good reason – there is no evidence of *any* assets being siphoned *from* SCM *to* DPW in the record.  *See Doberstein*, 2015 Del. Ch. LEXIS 275, at *14 (fraudulent statements regarding financial viability by the company's owner were insufficient to sustain alter-ego claim, absent a showing that the company's owner siphoned funds from the entity); *Verdantus Advisors, LLC*, 2022 Del. Ch. LEXIS 50, at *4 (allegations that entity lacked reserves and was unable to pay its obligations were

insufficient to sustain alter-ego claim, as such allegations do not "suggest that Verdantus funneled monies up to Phillips in an effort to avoid payment on a possible future judgment.").

To the contrary, Magot testified that SCM would derive its revenue from mining cryptocurrency and that such amounts were "***always*** used to pay bills, so there was no extra balance on hand." *See* <u>VSD</u>, Ex. 32, <u>Magot Dep.</u>, 44:21-45:7 (emphasis added); Ds Resp., ¶26. Additionally, after ceasing its operations, SCM would liquidate its cryptocurrency mining machines and deposit the proceeds thereof into an escrow account for SCM's benefit. Ds Resp., ¶22. Magot also confirmed that SCM never paid dividends to DPW. *Id.*, ¶21. Plaintiff, therefore, cannot (and does not) assert that DPW siphoned funds from SCM, which is fatal to its veil-piercing claim. *See Fletcher*, 68 F.3d at 1461 (analyzing Delaware law) (summary judgment in favor of parent company on alter-ego claims where "[t]here is no indication that Kodak sought to defraud creditors and consumers or to siphon funds from its subsidiary.").

Accordingly, the Court should deny the Motion, in its entirety.[22]

*(b)*     <u>*Plaintiff Does Not Establish an Overall Element of Injustice or Unfairness*</u>

Plaintiff also fails to establish an "overall element of injustice or unfairness" in the use of SCM's corporate form. Such a showing requires an "abuse of the corporate form" that resulted in an "injustice 'on a third party.'" *See Cohen*, 248 F. Supp. 3d at 523. The "claimed injustice must consist of more than merely the tort or breach of contract that is the basis of the plaintiff's lawsuit."

---

[22] The authorities relied upon by Plaintiff are distinguishable as none of Plaintiff's cases involve a parent-subsidiary relationship, most involve inferences which favor the ***non-movant*** plaintiff, and all involve the use of the controlled entity as a personal piggy bank or as a means to shield assets. *Cf. A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291 (S.D.N.Y. 2019) (owner of AVELA instructed third-parties to make checks payable to IPL and there was "no suggestion that IPL has any independent existence outside its role to receive payments for Valencia."); *NetJets Aviation, Inc. v. LHC Communs., LLC*, 537 F.3d 168 (2d Cir. 2008) (*de novo* review of summary judgment motion that dismissed alter ego claims. The Court reversed, finding that material issues of fact existed related to the individual owners' commingling of personal and business funds, ***when viewed in a light most favorable to the non-moving party***); *De Sole v. Knoedlger Gallery, LLC*, 139 F. Supp. 3d 618 (S.D.N.Y. 2015) (similar analysis to *Net Jets* where the movant was the defendant and there were rampant instances of funds being siphoned and masked as distributions— notwithstanding, the *De Sole* Court ***ultimately held that it could not grant summary judgment***).

*Kirschner v. CIHLP LLC*, No. 15-CV-8189-RA, 2017 U.S. Dist. LEXIS 162719, at *11-12 (S.D.N.Y. Sep. 30, 2017); *see also, id.*, at *19 (noting that a "showing that the corporation is a sham and exists for no other purpose than as a vehicle for fraud" is required); *Trevino*, 583 F. Supp. 2d 521, 530 (D. Del. 2008) ("[T]he possibility that a plaintiff may have difficulty enforcing a judgment is not an injustice warranting piercing the corporate veil").

Here, Plaintiff was never misled to believe that SCM and DPW are one and the same. Rather, Kalfa testified that he unilaterally determined that SCM was a "division" of DPW long before he even reached out to Magot.  *See* Ds Resp., ¶¶47, 66; <u>VSD</u>, Ex.34, <u>Kalfa Dep.</u>, 48:1-20; 67:17-71:15; 71:18-23 (Kalfa testifying that Magot never told him that DPW and SCM are one and the same).  Kalfa would double down on this absurd assertion during his deposition by also testifying that, as of February 25, 2018 (*i.e.*, after exchanging six LinkedIn Messages with Magot), he had already understood DPW and SCM to be one and the same.[23]  *See* <u>Mandel</u>, Ex. SSS [DE 127-71]; <u>VSD</u>, Ex. 34, <u>Kalfa Dep.</u>, 69:4-71:15; Ds Resp., ¶66 (fourth paragraph).  That Kalfa, who serves as an officer of a publicly traded company and who also sits on the board of various other companies, made this baseless determination, on his own, after reviewing DPW's public filings, should not serve as a basis to shift the blame towards Magot and Ault.[24]  Ds SF, ¶¶121-122, 128-131; Ds Supp. SF, ¶245; *Akzona, Inc.*, 607 F. Supp., at 237 (references to "division" unpersuasive

---

[23] Kalfa also noted feeling more "familiar" with DPW because he is located in Israel and he recalled reading one of DPW's press releases "surrounding them having acquired an Israeli power start-up."  *See id.*, 58:1-21.

[24] Kalfa testified that he would have browsed DPW's quarterly and yearly financials, prior to the execution of the Agreement and would have "browsed, you know, see revenue, assets or whatnot, you know."  Ds SF, ¶131.   In this regard, DPW's Form 10-Q, for the quarterly period ended September 30, 2017 and filed on November 20, 2017 with the U.S. Securities and Exchange Commission ("SEC"), disclosed, *inter alia*: total revenue $6,670,000.00, for the nine-month period ended as of September 30, 2017; an accumulated deficit of $17,212,000.00, as of September 30, 2017; and negative working capital of $4,174,000.00, as of September 30, 2017.  *Id.*, ¶¶132-136; <u>Volynsky 5/29 Decl.</u>, Ex. 15; *see also* <u>VSD</u>, ¶¶15-16, Exs. 43-44 (Kalfa e-mailing a press release to Tencer that highlighted portions of DPW's Form 10-K filing, within hours of its release).  ***It is thus unclear which of these figures Kalfa purportedly relied upon when he deliberated whether or not to solicit a multi-million dollar purchase from DPW's recently incorporated subsidiary, SCM.***

because "[t]he choice of words of a foreign layman untutored in the subtleties of American corporate law is of little independent significance in establishing [alter-ego.]").

Regarding Tencer, the documentary evidence confirms that he first corresponded with Magot on March 1, 2018, one week prior to the Agreement's effective date. *See* Ds Resp., ¶47. During that one-week period, Magot and Tencer would exchange numerous drafts of the Agreement (*see* <u>Magot Supp. Decl.</u>, Exs. 1-2); Magot would repeatedly inform Tencer that he needed to secure financing from the parent company; Tencer would learn of SCM's "cash flow" problems (Ds SF, ¶145); and Tencer would transmit the E-Mail Proposal, which was comprised of a mandatory purchase for the Contracted-For Machines, as well as a discretionary purchase for the Remaining Machines. *Id.*, ¶¶145-146, 164-165; <u>Agreement</u>, §§ 2(a)(i), 2(a)(ii), 2(a)(iii), 3. Tencer did not speak with anyone from DPW prior to executing the Agreement and would also acknowledge that Magot never told him that DPW would be responsible for any payments under the Agreement. *See* Ds Resp., ¶47; <u>VSD</u>, Ex. 34, <u>Tencer Dep.</u>, 64:2-65:4. Thus, Plaintiff did not ask DPW to be a party to, or guarantor of, the Agreement. *See* <u>VSD</u>, Ex. 34, <u>Tencer Dep.</u>, 81:8-15; *see also* <u>Volynsky 5/29 Decl.</u>, Ex. 13, RFA No. 14.[25]

Against this backdrop, Plaintiff cannot seriously contend that it was somehow duped into believing that DPW would, *inter alia*, be absolutely obligated to pay for the Remaining Machines, which the underlying Agreement did not even mandate a purchase of. *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 269 n.11 (D. Del. 1989) ("[C]ases where the corporate veil is pierced invariably involve some degree of ***reliance*** by plaintiff, contributing to the fraud or accenting the

---

[25] Despite his attempts to downplay his stock market expertise during his deposition, Tencer is not an unsophisticated party. *See* <u>VSD</u>, Ex. 34, <u>Tencer Dep.</u>, 175:8-18. According to filings made by Slinger Bag, Inc. (n/k/a Connexa Sports Technologies Inc.) ("Slinger Bag") with the SEC, Tencer, through his company MidCity Capital Ltd. ("MidCity"), entered into a Securities Purchase Agreement ("SPA"), a $500,000.00 12% Promissory Note, and Warrant Agreement ("WA") with Slinger Bag, another publicly traded company. Ds Supp. SF, ¶¶246-248 (signature blocks for MidCity on SPA and WA list Tencer); *see also id.*, Ex. 34 <u>Tencer Dep.</u>, 11:13-12:1.

injustice." (emphasis in original)); *In re P3 Health Grp. Holdings, LLC*, No. 2021-0518-JTL, 2022 Del. Ch. LEXIS 325, at *5 (Del. Ch. Nov. 9, 2022) (noting that a party cannot seek to "reap the benefits of protections [from a parent entity] that it did not obtain at the bargaining table.").

Moreover, at the time that Plaintiff entered into the Agreement, it understood that, by April 16, 2018, it may receive ***only*** $1,651,125 (which it did receive) and be left with the Remaining Machines. Ds SF, ¶¶167-168; *see also* Ds Resp., ¶56; *Nat'l Gear & Pitson, Inc. v. Cummins Power Sys., LLC*, 975 F. Supp. 2d 392, 407 (S.D.N.Y. 2013) (analyzing Delaware law) (no "injustice" where the plaintiff was not deceived at the time it entered into the agreement). Unfortunately, due to the disappointing market conditions, by that time, the market value of the Remaining Machines had spiraled down to $1,070 per Remaining Machine. Ds SF, ¶¶200-204.[26]

Notwithstanding, Plaintiff and SCM each had separate motivations to try to find some common ground, *to wit*, Plaintiff needed to unload the Remaining Machines and SCM (not knowing that Plaintiff ceased its operations) wanted to maintain a relationship in this niche space. Ds SF, ¶¶209-211. Throughout the following months, Magot remained transparent about SCM's financial challenges amidst SCM and Plaintiff's ongoing deliberations. *See* Magot Supp. Decl., Ex. 10; VSD, Ex. 48; *id.*, Ex. 34, Tencer Dep., 169:12-25; *see also supra, generally*. Notwithstanding, Tencer did not pivot because the cryptocurrency market had already declined and "if I were to try to sell the machines [as of July 16, 2018], the amount we would get would be so small, ***we'll try to take our chances and work it out with the original customer***." *See* VSD, Ex. 34, Tencer Dep., 173:17-22 (emphasis added); 188:3-23; *see also* Ds SF ¶¶207-208.

Although the parties were unable to negotiate new terms (indeed, none are alleged), Plaintiff was paid an additional $119,500.00 during this discrete period (Ds Resp., ¶81), and the

---

[26] The parties seem to agree that the price listed by Bitmain for the Machines during a particular period represents the market value of such Machines during such period. *See* Ds Resp., ¶90; *see also* Ds SF, ¶¶200-204.

parties' e-mail communications further establish that Tencer would persistently encourage SCM to "continue to show us good-faith and send us wires to the best of your ability," as the parties attempted to work collaboratively towards a resolution.  *See* <u>Magot Supp. Decl.</u>, Ex. 12; <u>VSD</u>, Ex. 34, <u>Tencer Dep.</u>, 153:15-19 ("ongoing negotiations"); Ds SF, ¶¶207-212; Ds Resp., ¶78.

In a nutshell, Plaintiff's argument is effectively that DPW should have allocated more funds to SCM to ensure that Plaintiff was paid that which it was never entitled to under the Agreement.[27]  *See Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 60 A.D.3d 61, 69 (1st Dep't 2008) ("To ask this Court to ignore those limitations and conditions is merely an attempt to obtain through litigation a result that RSPC was not able to achieve during negotiations.").  ***This***, however, is neither a misuse of the corporate form nor an "injustice" sufficient to pierce SCM's corporate veil ***on a breach of contract claim***.  *See Tese-Milner v. TPAC, LLC*, 313 B.R. 46, 71 (Bankr. S.D.N.Y. 2004) (noting that allegations that the debtor entity "received a substantial cash infusion from TPAC," without allegations of siphoning, were insufficient to support a claim for veil-piercing under Delaware law).[28]  As such, the Court should deny the Motion, in its entirety.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court deny the Motion, in its entirety, and grant Defendants' Motion, in its entirety.

*          *          *

---

[27] This is particularly dubious in light of Tencer's testimony that he allegedly does not know who owns SCM.  *See* Ds Resp., ¶47 *citing* <u>Tencer Dep.</u>, 99:10-14 (last sentence).  This begs the question as to how Tencer could have believed that SCM and DPW are purportedly one and the same, without knowing that DPW is the sole stockholder of SCM.

[28] Plaintiff's "mountain out of a molehill" argument regarding a ***singular*** e-mail in which Magot allegedly refers to Ault as "*our* CEO," well after the Effective Date (<u>Motion</u>, p.25), is discussed in Ds Resp., ¶¶ 60-61.  Notwithstanding, Magot's e-mail to Tencer ***on the following day***, makes clear that his prior e-mail was nothing more than a scrivener's error.  <u>Magot Supp. Decl.</u>, Ex. 8.  It is disingenuous for Plaintiff to put so much emphasis on this isolated communication when Plaintiff, itself, mistakenly referred to Kalfa as its "President" in its initial draft of the Agreement.  <u>VSD</u>, Ex. 34, <u>Tencer Dep.</u>, 71:1-7; 65:8-25; *id.*, Ex. 35, <u>Kalfa Dep.</u>, 67:17-68:24; <u>Volynsky 5/29 Decl.</u>, Ex. 16, at DEFENDANTS_000955; Ds Supp. SF, ¶238.

Dated:  Carle Place, New York
        August 15, 2023

                        Respectfully submitted,

                        WELTZ KAKOS GERBI
                        WOLINETZ VOLYNSKY LLP

                        By:_____*/s/ Robert Volynsky*_____
                             Robert B. Volynsky
                        1 Old Country Road, Suite 275
                        Carle Place, New York 11514
                        rvolynsky@weltz.law
                        (212) 202-3178

                        *Attorneys for Defendants*