**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

BLOCKCHAIN MINING SUPPLY AND
SERVICES LTD.,

      Plaintiff,

         –against–

SUPER CRYPTO MINING, INC. n/k/a
DIGITAL FARMS, INC. and DPW
HOLDINGS, INC. n/k/a AULT ALLIANCE,
INC.,

      Defendants.

---

Civil Action No. 1:18-cv-11099-ALC

 

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

 

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel (rsm@cll.com)
Dasha Chestukhin (dxc@cll.com)
114 West 47th Street
New York, New York 10036
(212) 790-9200

*Attorneys for Plaintiff Blockchain Mining Supply &*
*Services Ltd.*

## <u>TABLE OF CONTENTS</u>

Table of Authorities ............................................................................................................ ii

Preliminary Statement ........................................................................................................ 1

Argument ............................................................................................................................ 3

    I.    Defendants' Motion for Summary Judgment on Plaintiff's Breach of Contract Claim Must Be Denied Because the Undisputed Facts Shows That the Parties Modified the Agreement to Remove Article 3 or Defendants Otherwise Waived That Provision ......... 3

        A.    The Parties Modified the Agreement to Strike Article 3 ....................................... 3

        B.    Defendants Waived Article 3 ............................................................................... 11

    II.    The Court Can Exercise Personal Jurisdiction  over DPW as to All Plaintiff's Claims... 15

    III.    Plaintiff Is Entitled to Expectation Damages on Its Promissory Estoppel Claims ........... 18

Conclusion ......................................................................................................................... 20

31592/000/4383470

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*,
  578 F. Supp. 3d 467 (S.D.N.Y. 2022)..................................................................10

*Andrews v. Sotheby Int'l Realty, Inc.*,
  No. 12 Civ. ....................................................................................................9

*Aybar v. Aybar*,
  169 A.D.3d 137, 93 N.Y.S.3d 159 (2d Dep't 2019) ............................................15

*Charles Schwab Corp. v. Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018)..............................................................................17

*Chen v. Dunkin' Brands, Inc.*,
  954 F.3d 492 (2d Cir. 2020)........................................................................15, 16

*Chloe v. Queen Bee of Beverly Hills, LLC*,
  616 F.3d 158 (2d Cir. 2010)............................................................................18

*Clifford R. Gray, Inc. v. LeChase Constr. Servs., LLC*,
  51 A.D.3d 1169 (3d Dep't 2008) ......................................................................18

*Cyberchron Corp. v. Calldata Sys. Dev.*,
  47 F.3d 39 (2d Cir. 1995) ...............................................................................19

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014)......................................................................................15

*In re Fosamax Prods. Liab. Litig.*,
  707 F.3d 189 (2d Cir. 2013).............................................................................7

*g., Ion Audio, LLC v. Bed, Bath & Beyond, Inc.*,
  2019 WL 1494398 (S.D.N.Y. Apr. 2, 2019)........................................................8

*GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*,
  667 F. Supp. 2d 308 (S.D.N.Y. 2009)...............................................................17

*Geneva Pharms. Tech. Corp. v. Barr Labs.*,
  2003 WL 1345136 (S.D.N.Y. Mar. 19, 2003) ....................................................19

*Hanly v. Powell Goldstein, L.L.P.*,
  290 F. App'x 435 (2d Cir. 2008) ......................................................................16

31592/000/4383470

*Hargrave v. Oki Nursery, Inc.*,
   646 F.2d 716 (2d Cir. 1980)..................................................................16

*Hayes v. N.Y.C. Dep't of Corr.*,
   84 F.3d 614 (2d Cir. 1996)......................................................................7

*JoySuds, LLC v. N.V. Labs, Inc.*,
   2023 WL 2744537 (S.D.N.Y. Mar. 31, 2023) .......................................11

*Kaga Inv. S.A. v. Simonsen*,
   2013 NY Slip Op 33296(U) (Sup. Ct. N.Y. Cty. 2013)........................18

*Kamco Supply Corp. v. On the Right Track, LLC*,
   149 A.D.3d 275 (2d Dep't 2017) ....................................................11, 13

*Karan v. Sutton East Assocs.-88*,
   256 A.D.2d 29 (1st Dep't 1998) ..............................................................8

*Kreutter v. McFadden Oil Corp.*,
   71 N.Y.2d 460, 522 N.E.2d 40 (1988)..................................................18

*In re Lebenthal Holdings, LLC*,
   2019 WL 6379779 (Bankr. S.D.N.Y. Nov. 27, 2019) .............................8

*Macaluso v. Macaluso*,
   2008 WL 620750(Sup. Ct. Suffolk Cty. Feb. 5, 2008)..........................10

*Mallory v. Norfolk S. Ry. Co.*,
   143 S. Ct. 2028 (2023)......................................................................15, 16

*Marine Midland Bank, N.A. v. Miller*,
   664 F.2d 899 (2d Cir. 1981)...................................................................17

*Mellen & Jayne, Inc. v. AIM Promotions, Inc.*,
   33 A.D.3d 676 (2d Dep't 2006) ...............................................................8

*Merex A.G. v. Fairchild Weston Sys.*,
   29 F.3d 821 (2d Cir. 1994)......................................................................18

*Morrison v. Buffalo Bd. of Educ.*,
   741 Fed. App'x 827 (2d Cir. 2018).........................................................11

*N. Fork Partners Inv. Holdings, LLC v. Bracken*,
   2020 WL 6899486 (S.D.N.Y. Nov. 23, 2020)........................................16

*Ripple's of Clearview, Inc. v. Le Havre Assocs.*,
   88 A.D.2d 120, 452 N.Y.S.2d 447 (2d Dep't 1982)...............................19

31592/000/4383470

*Roche Diagnostic GmbH v. Enzo Biochem, Inc.*,
   992 F. Supp. 2d 213 (S.D.N.Y. 2013)........................................................9

*Schloss v. Danka Bus. Sys. PLC*,
   2000 WL 282791 (S.D.N.Y. Mar. 16, 2000) ............................................8

*Skinner v. Switzer*,
   562 U.S. 521 (2011)..................................................................................9

*Storm LLC v. Telenor Mobile Communs. AS*,
   2006 WL 3735657 (S.D.N.Y. Dec. 15, 2006) ........................................17

*Supply Chain Prods., LLC v. NCR Corp.*,
   2023 WL 2712503 (S.D.N.Y. Mar. 30, 2023) .........................................10

*Symphony Fabrics Corp. v. Podell Indus.*,
   1996 WL 497011 (S.D.N.Y. Aug. 30, 1996)......................................10, 13

*Union Mut. Fire Ins. Co. v. Tejada*,
   2023 WL 137758 (S.D.N.Y. Jan. 9, 2023) ...............................................7

*Wallace v. 600 Partners Co.*,
   205 A.D.2d 202 (1st Dep't 1994), *aff'd*, 86 N.Y.2d 543 (1995) ............10

*Watts v. Columbia Artists Mgmt. Inc.*,
   188 A.D.2d 799 (3rd Dep't 1992)..............................................................9

*Wechsler v. Hunt Health Sys.*,
   186 F. Supp. 2d 402 (S.D.N.Y. 2002)......................................................10

**Statutes**

N.Y. Bus. Corp. Law § 1301 ......................................................................15

N.Y. U.C.C. § 2-209(4)................................................................................11

N.Y. U.C.C. § 2-309(1)................................................................................10

## PRELIMINARY STATEMENT

Although Defendants' motion accuses Plaintiff of seeking to rewrite the parties' contract, it is Defendants who seek to rewrite history by completely ignoring the parties' actual course of performance and dealings under their agreement. Defendants' entire motion exists in a Cinderella-like fairy tale in which the parties' contract disappeared at the stroke of midnight on April 15, 2018. However, in real life, the parties recognized well before April 15 that the original timetable set in the Agreement was not feasible and they modified the Agreement accordingly to accommodate Defendants' continuing intent to buy all 1,100 Machines.

Defendants cannot seriously dispute that the parties agreed to alter the terms of the original Agreement, which called for Defendants to have paid for the first 500 Machines completely by March 23, 2018 and the final 600 Machines by April 15, 2018. As of April 15, 2018, when Defendants now insist that the obligation to buy the last 600 Machines became "null and void" pursuant to Article 3, Defendants had still not even completed payment for *any* Machines, including the first 500 for which payment had been due more than three weeks earlier. The undisputed evidence shows that the parties were in regular communication between March 23, 2018 and April 17, 2018 when Defendants finally made the required payment for the first 500 Machines. During those communications, including two emails from DPW's CEO, Mr. Ault, on April 10, 2018, Defendants unequivocally indicated that they were about to make the overdue payment on the first 500 Machines and would then complete the transaction on the second 600 Machines within the next ten days (notably after April 15, 2018). Plaintiff for its part indicated its willingness to work with Defendants and hold the Machines beyond the dates set in the Agreement so long as payment was forthcoming within a reasonable time frame.

Significantly, at no time in the parties' dealings leading up to April 15, 2018 and

continuing thereafter did Defendants indicate that their transaction was limited to the first 500 Machines. To the contrary, as their witnesses acknowledged at their depositions, they wanted to acquire *all* the Machines throughout the entire course of the parties' dealings, and they expressly told Plaintiff that at all relevant times. Unfortunately, while Defendants made payments of almost $90,000 toward the purchase of the final 600 Machines over the next several months, while repeatedly promising that the remainder would be paid soon, they could not come up with the required funds to complete the transaction. Under these circumstances, as Defendants' own contemporaneous documents acknowledged, they remain liable for the balance due to Plaintiff on the final 600 Machines. The parties' written communications confirming Defendants' intention to complete the transaction for all 1,100 Machines necessarily served to remove Article 3 from the Agreement, or Defendants otherwise waived the right to invoke that provision by making plain their commitment to buy the full batch of Machines rather than simply accepting the loss of their deposit on the last 600 Machines and moving on.

The other aspects of Defendants' motion also fail. Under the Supreme Court's recent decision upholding the constitutionality of predicating corporate registration to do business in a state on submission to general jurisdiction there, DPW is properly subject to general jurisdiction over any claims in New York based on having registered to do business here. In any event, personal jurisdiction is also proper based on the doctrine of pendent personal jurisdiction, Super Crypto's status as a "mere department" of DPW and DPW's own minimum contacts with New York in seeking to raise funds here to pay its debt to Plaintiff. Finally, Plaintiff's damages on its alternative promissory estoppel claim can include expectation damages where the theory is being used as a consideration substitute rather than as a means to circumvent the statute of frauds.

31592/000/4383470

## ARGUMENT

I.     **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S BREACH OF CONTRACT CLAIM MUST BE DENIED BECAUSE THE UNDISPUTED FACTS SHOWS THAT THE PARTIES MODIFIED THE AGREEMENT TO REMOVE ARTICLE 3 OR DEFENDANTS OTHERWISE WAIVED THAT PROVISION**

Defendants contend that they did not breach the Agreement by failing to pay for the final

600 Machines because the Agreement was "null and void" as of April 15, 2018 pursuant to

Article 3. However, as set forth in Plaintiff's own summary judgment motion (ECF No. 125),

the undisputed facts show that the parties modified the Agreement to remove, or Defendants

otherwise waived the right to invoke, Article 3 through unequivocal words and actions making

clear the parties' intention to complete the sale of the final 600 Machines. Accordingly, it is

Plaintiff, not Defendants, that is entitled to summary judgment on the breach of contract claim.[1]

A.     **The Parties Modified the Agreement to Strike Article 3**

Defendants' argument that the Agreement had already expired as of April 15, 2018

ignores the undisputed evidence showing that the parties had modified the timetable set in the

original Agreement before that date in order to accommodate Defendants' cash flow issues and

continuing intent to purchase all 1,100 Machines. As originally written, Super Crypto was

required to have completed payment for the first 500 Machines by March 23, 2018 and the final

600 Machines by April 15, 2018. Mandel Moving Decl. Ex. HH; Tencer Decl. ¶ 5. However, as

of April 15, 2018, Super Crypto had yet to complete payment for *any* of the Machines. Tencer

Decl. ¶¶ 6-10. Thus, if Defendants' position that the original Agreement reflected the full scope

of applicable terms were correct, Super Crypto had already breached the contract before the

---

[1]Although Plaintiff contends it is entitled to summary judgment on Count I, the parties' course of performance at a minimum raises disputed issues of fact requiring denial of Defendants' motion.

3

April 15, 2018 date ever arrived.

Recognizing that Super Crypto would be unable to comply with the Agreement's original payment schedule, the parties had numerous communications (both oral and written) between March 23, 2018 and April 15, 2018 in which Plaintiff worked with Defendants to provide flexibility on the payment plan so that Defendants could purchase the 500 Machines for which payment was already overdue *and* the final 600 Machines for which payment was quickly coming due. *See* Pl. Moving 56.1 St. ¶¶ 62-72. Not once in those communications, or indeed in any communications over the ensuing seven months, did Defendants ever suggest that they were no longer interested in buying the final 600 Machines. Tencer Decl. ¶ 11. To the contrary, the parties' contemporaneous communications consistently reflect that as the April 15, 2018 date approached, Defendants were intent on purchasing *both* batches of Machines as soon as feasible and not on voiding the Agreement for the last 600 Machines:

> March 30 (Darren Magot): "I am told that I will have more money to send next week. *I do not yet know if it will be enough to purchase just the first 500 or the total 1,100. I'm hoping for one transaction* but will be able to share more early next week. (Mandel Moving Decl. Ex. PP (emphasis added)).

> April 6 (Todd Ault): "I do have conditional approval from our bank… *This will allow us to pay the first 1.3 million+ that's owed*…. It's a $10 million line of credit and I expect things to flow a little easier now. (Mandel Moving Decl. Ex. RR (emphasis added)).

> April 10 (Todd Ault): "Here is the closing date. This Friday the 13th. *Then about 5 days later the balance.* (Mandel Moving Decl. Ex. TT (emphasis added)).

> April 10 (Todd Ault): "Here is the plans. SRFK the law firm will get a $1.3 Plus Million Wire Friday the 13th…. *A week later the following Friday we close on the last 600 repeating the same exercise.* (Mandel Moving Decl. Ex. UU (emphasis added)).

*See also* Plaintiff Response 56.1 St. ¶ 175.

Nor did Defendants' position change after April 15. Just four days after Defendants claim their obligation to buy the final 600 Machines had been rendered "null and void," Super

Crypto signed an escrow agreement with Plaintiff, reiterating both parties' desire to complete the purchase and sale of the final 600 Machines pursuant to the Agreement by having the balance owed held by an escrow agent.  *See* Mandel Moving Decl. Ex. XX, AAAA.  Defendants then repeatedly confirmed their intention to complete that transaction over a period of months while also making partial payments toward that obligation.  *See* Plaintiff Moving SJ Brief at 13; Plaintiff Moving 56.1 St. ¶ 78-79.

Defendants' communications and actions both before and after April 15 are completely incompatible with Article 3 and unequivocally confirm that such provision was eliminated when the parties modified the Agreement to replace the original payment terms.  Defendants' repeated assurances of an ongoing commitment to purchase the final 600 Machines cannot plausibly be squared with such an obligation having been rendered "null and void."  Moreover, Article 3's supposed limitation of Defendants' exposure to their initial deposits is equally inapplicable, as Defendants concededly made more than $87,000 in additional payments toward the purchase of the Machines in the months after April 15.  Every piece of contemporaneous objective evidence shows that the parties modified the Agreement so that it would remain in full force and effect with respect to the final 600 Machines.

Ignoring this entire evidentiary record, Defendants' motion papers now claim that they never wanted to commit to the purchase of all 1,100 Machines.[2]  However, both Defendants' witnesses testified to the exact opposite at their depositions:

> Q.     Did you have any thought in your mind as of March 30th, 2018, about possibly not going forward with the second 600 machines?

---

[2] In fact, Defendants determined before Super Crypto signed the Agreement that they were comfortable with the financial commitment to purchase all 1,100 Machines, and DPW's 10-K filing for the 2017 fiscal year indicated that DPW intended to fund Super Crypto's purchase of 1,100 miners from Plaintiff through the proceeds of a DPW stock offering.  *See* Plaintiff Response 56.1 St. ¶ 143.

A.     No, I never thought of not doing all the machines.

*     *     *

Q.     And do you recall ever expressing the sentiment to Mr. Tencer that it's not if but it's when you'll buy the machines?

A.     Yeah, I always told him we'd buy them.

*     *     *

Q.     But isn't it fair to say that between April 15th and the time the sale of the machines was made by Blockchain, that you consistently told Willy you wanted the machines?

A.     I consistently told him that we wanted the machines.

Ault Dep. (Mandel Moving Decl. Ex. A) at 155, 158, 180; *see also id*. at 155-156 ("I never contemplated not doing the transaction that I can recall."), 157 ("It's always our intention to take delivery of the machines."); Magot Dep. (Mandel Moving Decl. Ex. B) at 135 ("Yeah, I wanted all the machines at this time" [March 30, 2018], 171 (confirming that as of April 30, 2018, Super Crypto wanted the 600 Machines ASAP after closing the April month).

In fact, Super Crypto's CEO, Mr. Magot, acknowledged that he made a clear decision as of the April 15 date that it was in the best interest of the company to move forward with purchasing the 600 Machines, notwithstanding the market decline that Defendants now emphasize:

Q.     And was anybody suggesting that you should walk away from the last 600 machines?

*     *     *

A.     Yeah.  I would say at that time we made the business decision to try to continue purchasing equipment.

Q.     And if the value of the machines had declined as of April 15, 2018, why would you want to go forward and still purchase them at the price shown in the Asset Purchase Agreement with Blockchain?

6

> A.     We were still trying to honor the relationship as best we could, and it was hard to predict how quickly it would drop.  You know, I would say that the fluctuations in this new market aren't predictable, so we were hopeful that they would increase again and they weren't too far out of whack at that point.

*     *     *

> Q.     And when the time came for what you're referring to as an out, as of April 15, 2018, you made an assessment as to whether to exercise what you're calling an out; correct?

> A.     I was still operating under my – as a CEO to do whatever I could to keep the company running and buy equipment.

> Q.     Well, that's the assessment you made as the CEO; correct?

> A.     Yes.

> Q.     That it was in the best interest of the company to do whatever it could to keep acquiring machinery; correct?

> A.     Yes.

Magot Dep. (Mandel Moving Decl. Ex. B) at 62-63, 65.  Defendants cannot now create an issue of fact (let alone obtain summary judgment themselves) by submitting a contradictory declaration from Mr. Magot claiming that Defendants were seeking to avoid a commitment to buy all 1,100 Machines.  *See Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."); *Union Mut. Fire Ins. Co. v. Tejada*, 2023 WL 137758, at *13 (S.D.N.Y. Jan. 9, 2023) ("The 'sham affidavit' or 'sham issue of fact' doctrine 'prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony.'") (quoting *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013)).

Given Defendants' admissions, their focus on the unambiguous language of Article 3

7

(Defendants' Moving SJ Brief at 11-12) is beside the point.  Plaintiff does not seek to advance some alternative interpretation of Article 3's language; it simply contends that the parties modified the Agreement to permit the completion of the transaction both sides desired with respect to the remaining 600 Machines.  The constant flow of emails exchange by the parties both leading up to and continuing after April 15, 2018 easily satisfy the Agreement's requirement of a written modification.  *See, e.g.*, *Ion Audio, LLC v. Bed, Bath & Beyond, Inc.*, 2019 WL 1494398, at *3 (S.D.N.Y. Apr. 2, 2019) (holding that one email exchange sufficient to modify written agreement with no-oral-modification clause where both parties' "emails were plainly in writing, and each email concluded with a signature block, containing the typed name and title of the representative from" both parties); *see also In re Lebenthal Holdings, LLC*, 2019 WL 6379779, at *8 (Bankr. S.D.N.Y. Nov. 27, 2019).  These emails unequivocally confirm the parties' intention that the Agreement was to remain in full force and effect, and Defendants' internal communications acknowledging the obligation to pay for the 600 Machines provide further proof of such intent.  *See* Plaintiff Moving 56.1 St. ¶ 106.

The cases relied on by Defendants concerning "expired contracts" (*see* Defendants' Moving SJ Brief at 15-16) are likewise inapposite because the Agreement never expired here.[3] Once Defendants failed to make the required payment by March 23, 2023, the parties modified the Agreement to accommodate both Defendants' delayed payment on the first 500 Machines

---

[3] For example, in *Schloss v. Danka Bus. Sys. PLC*, 2000 WL 282791 (S.D.N.Y. Mar. 16, 2000), once the status of the shares in question changed from a "Registrable Security" under the relevant definition, the provision requiring defendant's cooperation no longer applied.  *Id*. at * 10-11.  In any event, unlike here, plaintiffs failed to satisfy their own obligations by providing the requisite 24-hour notice.  *Id.*  *Mellen & Jayne, Inc. v. AIM Promotions, Inc.*, 33 A.D.3d 676 (2d Dep't 2006) does not even involve an expired contract, but rather one that, unlike here, failed to specify the requisite obligation.  And the summary order in *Karan v. Sutton East Assocs.-88*, 256 A.D.2d 29 (1st Dep't 1998) provides no information from which it is even possible to tell what the specific terms were, what relevant provision was asserted or any other key facts involved.

and stated intent to purchase the final 600 Machines.  Plaintiff Response 56.1 St. ¶ 175; Plaintiff

Moving 56.1 St. ¶¶ 62-63, 74.  The parties' decision to complete the transaction for all 1,100

Machines for the purchase price set in the Agreement[4] necessarily rendered Article 3 superfluous

by ensuring the Agreement would remain in full force and effect after April 15, 2018.[5]

Nor can Defendants defeat the amendment by contending it was insufficiently definite.[6]

*See* Defendants' Moving SJ Brief at 16-17.  As Plaintiff expressed in an April 9, 2018 email (and

would reiterate throughout its dealings with Defendants):

> Our position is that we have no problem to work with you and hold the equipment
> beyond our agreed upon terms, as long as we know that you will honor your payment
> commitments within a reasonable time.

Mandel Moving Decl. Ex. SS; Tencer Decl. ¶¶ 9, 15.  Defendants agreed to move forward with

the transaction on that basis.  Plaintiff Moving 56.1 St. ¶ 63.  The setting of a "reasonable time"

for completion of the purchase matches precisely what the law imposes in the absence of a

---

[4] *See* Magot Dep. (Mandel Moving SJ Ex. B) at 67-68.

[5] Moreover, even if the contract expired, under New York law, the parties' conduct after the expiration of a contract in accordance with the terms of the written contract can establish a contract implied in fact with substantially the same terms and conditions.  *Andrews v. Sotheby Int'l Realty, Inc.*, No. 12 Civ. 8824 (RA) (S.DN.Y. Feb. 18, 2014); *see also Watts v. Columbia Artists Mgmt. Inc.*, 188 A.D.2d 799, 801 (3rd Dep't 1992) ("[T]he parties' conduct after the expiration of the written contract … in accordance with the terms of the written contract clearly establish a contract implied in fact with substantially the same terms and conditions as embodied in the expired written contract….").

[6] Defendants' suggestion that the claim is inadequately alleged in the First Amended Complaint (Defendants' Moving SJ Brief at 12) is also misplaced.  Because the Federal Rules require only a "short and plain" statement of a claim, not an exposition of plaintiff's legal argument, a complaint need not pin plaintiff's claim to a precise legal theory.  *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).  Plaintiff's pleading satisfies the notice pleading requirements by setting forth the requisite factual allegations supporting Plaintiff's claimed amendment.  *See* Plaintiff Response 56.1 St. ¶ 180.  Moreover, unlike in *Roche Diagnostic GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213 (S.D.N.Y. 2013), where plaintiff sought for the first time on summary judgment to invoke a never previously specified breach, Plaintiff here has consistently alleged that Defendants breached by failing to pay the balance owed for the final 600 Machines covered by the Agreement.

definitive agreed date and adequately delineates Defendants' payment obligation.[7]  *See* N.Y.

U.C.C. § 2-309(1) ("The time for … delivery or any other action under a contract if not provided

in this Article or agreed upon shall be a reasonable time."); *Alessi Equip., Inc. v. Am. Piledriving*

*Equip., Inc.*, 578 F. Supp. 3d 467, 495 (S.D.N.Y. 2022); *Symphony Fabrics Corp. v. Podell*

*Indus.*, 1996 WL 497011, at *7 (S.D.N.Y. Aug. 30, 1996) ("In light of the waiver of the

contractual provision that stated the time for delivery, and the failure by the parties to establish a

new time for delivery, the UCC provides that 'the time for shipment or delivery shall be a

reasonable time.'") (quoting UCC § 2-309(1)).

Defendants clearly breached the obligation to consummate the purchase within a

reasonable time when, after making more than $87,000 in additional payments designed to show

their continuing intention to pay for the 600 Machines, they ceased making any further payments

for more than two months.  Plaintiff Moving 56.1 St. ¶¶ 81-87.  Defendants now apparently

claim that any amendment would have only extended the date at which time the Agreement

would become null and void.  Defendants' Moving SJ Brief at 16.  However, in committing to

the purchase of the final 600 Machines, Defendants necessarily removed any prior conditional

element to their payment obligation.  And quite obviously, as Defendants continued to pay

---

[7] The cases relied on by Defendants are readily distinguishable.  *Wallace v. 600 Partners Co.*, 205 A.D.2d 202 (1st Dep't 1994), *aff'd*, 86 N.Y.2d 543 (1995), and *Macaluso v. Macaluso*, 2008 WL 620750 (Sup. Ct. Suffolk Cty. Feb. 5, 2008), involving, respectively, attempts to alter the meaning of an unambiguous contract and to set aside a settlement agreement for mistake, have no bearing on the issue here of whether a contract has been amended by sufficiently clear terms.  Unlike in *Wechsler v. Hunt Health Sys.*, 186 F. Supp. 2d 402 (S.D.N.Y. 2002), the amendment here is clearly delineated in confirming a definitive obligation to pay a defined sum for equipment, and the defendants' partial performance is unequivocally referable to the amendment given Defendants' admissions that there would be no other reason to pay than to show their intention to perform.  Plaintiff Moving 56.1 St. ¶¶ 82-84.  Similarly, contrary to *Supply Chain Prods., LLC v. NCR Corp.*, 2023 WL 2712503 (S.D.N.Y. Mar. 30, 2023), the emails here unequivocally confirm Defendants' intent to complete the purchase at issue, and such communications were the only vehicle through which the payment deadlines were modified (as opposed to the more formal amendment process followed in *Supply Chain*).

additional sums toward satisfying that obligation, it becomes impossible to claim that their exposure was somehow limited to their initial deposit.

In essence, Defendants' position suggests that they were permitted to make whatever payments they felt like making over whatever period they chose, while retaining the freedom at any time simply to abandon the transaction. There is no evidence that the parties ever agreed to such an arrangement or that Defendants themselves ever thought that was what their contract with Plaintiff meant at any time prior to this litigation. To the contrary, as Defendants' internal documentation shows and as Mr. Magot conceded at his deposition, Defendants understood throughout the parties' dealings that they owed Plaintiff the balance due on the 600 Machines. Plaintiff Moving 56.1 St. ¶¶ 106, 108. This Court should reject Defendants' convenient attempt to now claim otherwise, and grant Plaintiff summary judgment on its breach of contract claim.

## B.    Defendants Waived Article 3

Even if the parties' email communications were deemed insufficient to constitute a written modification under the Agreement, the parties' communications and conduct plainly evince an attempt to modify the original terms sufficient to establish a waiver of Article 3. *See* N.Y. U.C.C. § 2-209(4); Plaintiff Moving SJ Brief at 14-18. A non-waiver clause does not preclude a party from waiving another contractual term through its course of performance. *See, e.g.*, *Morrison v. Buffalo Bd. of Educ.*, 741 Fed. App'x 827, 830 (2d Cir. 2018); *JoySuds, LLC v. N.V. Labs, Inc.*, 2023 WL 2744537, at *9 (S.D.N.Y. Mar. 31, 2023); *Kamco Supply Corp. v. On the Right Track, LLC*, 149 A.D.3d 275, 281 (2d Dep't 2017). Defendants' repeated acknowledgement of an obligation to purchase the final 600 Machines, coupled with their partial performance through continued payments, manifested their intention to waive Article 3 and the no-waiver clause as a matter of law (and certainly at a minimum raise a disputed issue defeating

11

Defendants' motion).

On April 10, 2018, with Defendants already in default of their obligation three weeks earlier to complete payment for the first 500 Machines and with the April 15, 2018 deadline for purchasing the final 600 Machines fast approaching, DPW's CEO, Todd Ault, sent two emails to Plaintiff within a half-hour of each other both indicating Defendants' intention to pay for all 1,100 Machines within the next ten days. Mandel Moving Decl. Ex. TT, UU. Those emails followed an email from Plaintiff confirming its willingness to hold the Machines for Defendants beyond the dates in the Agreement so long as payment was made within a reasonable time. Mandel Moving Decl. Ex. SS.

Needless to say, if Defendants' goal were to limit their losses on the final 600 Machines to the prior deposits by relying on their obligation as to those Machines becoming "null and void" in five days, they would not have sent emails referencing a post-April 15 closing on the last 600 Machines. For all Defendants' insistence in their papers that moving forward with a purchase of the last 600 Machines at this time would have been senseless given market conditions, the contemporaneous documentation leaves no doubt that Defendants made exactly such a decision. And Defendants' own deposition testimony confirms that as well. *See* pp. 5-7, *supra*. Defendants still wanted the 600 Machines, were still willing to pay the agreed price for them set in the Agreement and never at any time demonstrated an intent to walk away from the purchase. To the contrary, the only real concern Defendants had was the possibility that Plaintiff might sell the Machines to someone else. Ault Dep. (Mandel Moving Decl. Ex. A) at 177-179; Magot Dep. (Mandel Moving Decl. Ex. B) at 73, 107-109, 144-147.

Accordingly, immediately after making the overdue payment for the first 500 Machines on April 16, 2018, Super Crypto entered into an escrow agreement with Plaintiff covering the

final 600 Machines, an action that is completely incompatible with a "null and void" obligation to buy those Machines. Plaintiff Moving 56.1 St. ¶¶ 76-77. Although Defendants never funded the escrow account as intended, DPW paid over $87,000 toward the balance due between May and August 2018. *Id*. ¶ 78. Once again, such actions were patently incompatible with an expired obligation pursuant to Article 3. *See*, *e.g.*, *Symphony Fabrics Corp. v. Podell Indus., Inc.*, 1996 WL 497011, at *6 (S.D.N.Y. Aug. 30, 1996); *Kamco*, 149 A.D.3d at 284.

And Defendants' repeated promises that payment was forthcoming (Plaintiff Moving 56.1 St. ¶ 79) and express acknowledgement of an ongoing contractual obligation (*see*, *e.g.*, Mandel Ex. HHHH: "I'm emailing to make it clear that SCM will honor our obligation to finalize the purchase of the last 600 machines."), also provide overwhelming evidence that Defendants knowingly waived Article 3. Indeed, Mr. Magot admitted as much at his deposition. While Defendants disingenuously hide behind Mr. Magot's failure to use the legal wording "waiver," the substance of his testimony makes plain that he considered and rejected the notion of invoking Article 3 in favor of continuing to buy the Machines. *See* Magot Dep. (Mandel SJ Moving Ex. B) at 62-65, 194-195; pp. 6-7, *supra*.

Defendants' attempts to avoid this devastating evidentiary record are unavailing. They claim that Plaintiff has not stated the "specific portions of Article 3" that were waived (Defendants' Moving SJ Brief at 18), but Plaintiff has clearly explained that the entire provision was waived by Defendants' deliberate decision to commit to the purchase of the final 600 Machines. Defendants also claim that Article 3 was a "liquidated damages provision" that "would be rendered meaningless if Super Crypto's obligation to pay the Remaining Amount was absolute." Defendants' Moving SJ Brief at 18. However, Defendants fail to recognize that it was their own decision to forge ahead with the purchase of the Machines as being in their best

13

interest that rendered the obligation to pay the balance due "absolute."  And it was likewise their own decision to continue making payments toward that balance that rendered the notion of Article 3 as a "liquidated damage" provision "meaningless."

If Defendants truly wanted Article 3 to cap their "damages" for failing to buy the 600 Machines, then they would have simply told Plaintiff as the April 15 date approached that they were only completing payment for the first 500 machines and had no further interest in the remaining Machines.  They of course did no such thing.  And if they really viewed Article 3 as a means of limiting their damages, they certainly wouldn't have made numerous additional payments that only served to increase their "damages" beyond the amount in Article 3 since Defendants apparently recognize that those payments are also not refundable.[8]

The reality is that the only relevance Defendants assigned Article 3 was that it set a deadline by which they needed to come up with the money to buy the final 600 Machines they wanted or risk losing them.  They did everything they could to extend that deadline by paying whatever money they could to keep the transaction alive as long as possible.  Although their papers now accuse Plaintiff of seeking an unwarranted windfall, their contemporaneous communications repeatedly acknowledged Plaintiff's reasonableness in attempting to accommodate them while flatly acknowledging the contractual obligation they now deride as "bogus."  *See* Plaintiff Moving 56.1 St. ¶ 86, 106; Defendants' Moving SJ Brief at 1.  The Court should reject as a matter of law Defendants' after-the-fact reliance on a contractual provision they knowingly waived in pursuit of business interests that proved to be ill conceived.

---

[8] In a similar vein, Defendants' argument that Article 2(a)(iii) would continue even if Article 3 was waived is a non-sequitur.  The fact that Article 2(a)(iii) rendered the deposit non-refundable does not limit their damages to that amount for failing to fulfill their obligation to complete the transaction.  Both the deposits and the additional payments made reduce the total amount Defendants owe for their breach.  Thus, Plaintiff has retained those amounts while continuing to seek the full payment to which it is entitled.

II.    **THE COURT CAN EXERCISE PERSONAL JURISDICTION OVER DPW AS TO ALL PLAINTIFF'S CLAIMS**

Defendants challenge this Court's ability to assert personal jurisdiction over DPW as to Plaintiff's promissory estoppel claim on the sole ground that this claim allegedly lacks a sufficient nexus to New York. Defendants' Moving SJ Brief at 19-20. However, the Supreme Court's recent decision in *Mallory v. Norfolk S. Ry. Co.*, 143 S. Ct. 2028 (2023), renders that argument futile by subjecting DPW to general jurisdiction here. Moreover, the Court may also exercise personal jurisdiction over DPW under multiple other bases.

First, in light of the Supreme Court's decision in *Mallory*, this Court may exercise personal jurisdiction over DPW in connection with *any* claims because DPW consented to general jurisdiction in New York when it registered to do business here. In 2019, under its then-name of Ault Global Holdings, Inc., DPW registered to do business in New York under N.Y. Bus. Corp. Law § 1301. Mandel SJ Opp. Decl. Ex. 7 (showing DPW Holdings, Inc. as previous corporate name). "Prior to 2014, New York courts interpreted the act of registering under BCL § 1301(a) as consent to general jurisdiction in the state." *Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 498 (2d Cir. 2020) (citing *Aybar v. Aybar*, 169 A.D.3d 137, 151, 93 N.Y.S.3d 159, 169 (2d Dep't 2019)). Then, in 2014, the Second Circuit concluded that exercising general jurisdiction solely based on consent-by-registration was no longer constitutional in light of the Supreme Court's 2014 decision in *Daimler AG v. Bauman*, 571 U.S. 117 (2014), where the Supreme Court held that general jurisdiction could be exercised over a non-consenting non-domiciliary corporation only in those states where it was essentially at home (paradigmatically, the state of its incorporation and of its principal place of business). *Chen*, 954 F.3d at 499.

However, the Supreme Court's *Mallory* decision now confirms that a statute predicating corporate registration on consent to general jurisdiction is constitutionally sound, meaning that

15

*Daimler* does not proscribe general jurisdiction predicated solely upon consent-by-registration. *Mallory*, 143 S. Ct. at 2039.  As the Second Circuit has acknowledged, "New York's business registration statute has historically been interpreted as *conditioning* registration under BCL § 1301(a) on consent to general jurisdiction in the state."  *Chen*, 954 F.3d at 498 (questioning whether this interpretation survived *Daimler*) (emphasis in original).  Because *Daimler* is no longer an obstacle, the Court should follow the historical interpretation of New York's business registration statute and exercise general jurisdiction over DPW as to all claims in this action.

Second, as the Court correctly concluded in its order denying Defendants' motion to dismiss (ECF No. 92 at 5-9), the Court has specific personal jurisdiction over DPW in connection with the breach of contract claim.  Defendants apparently concede this, as they do not argue that the Court lacks personal jurisdiction over DPW as to this claim.  The Second Circuit has long held that, where a court already has personal jurisdiction over a defendant as to one claim, it can exercise pendent personal jurisdiction over all other claims that arise from the same nucleus of operative fact.  *See Hanly v. Powell Goldstein, L.L.P.*, 290 F. App'x 435, 438 (2d Cir. 2008) (holding irrelevant whether substantial nexus with New York existed as to one claim, since it was "based on the same factual predicate" as other claims on which defendant already subject to personal jurisdiction); *Hargrave v. Oki Nursery, Inc.*, 646 F.2d 716, 719 (2d Cir. 1980) ("The district court, having acquired personal jurisdiction over defendant [as to the first claim], has power to determine all of the claims asserted in the complaint," where these were based on "essentially the same facts").  The doctrine of pendent personal jurisdiction remains applicable where both the anchor claim (here, breach of contract) and pendent claim (promissory estoppel) are state law claims.  *N. Fork Partners Inv. Holdings, LLC v. Bracken*, 2020 WL 6899486, at *12

16

(S.D.N.Y. Nov. 23, 2020).[9]  Because Plaintiff's breach of contract claim and promissory estoppel claim are alternative claims arising out of the same transaction and facts, the Court should exercise personal jurisdiction over DPW as to the latter claim where personal jurisdiction is not disputed as to the former claim.

The Court can also exercise personal jurisdiction over DPW under a mere department theory, which the Court did not reach when ruling on Defendants' motion to dismiss.  ECF No. 92 at 9 n.2.  Defendants do not challenge the Court's jurisdiction over Super Crypto as to the promissory estoppel claim and, because Super Crypto is a mere department of DPW, the Court can exercise jurisdiction over DPW as to that claim as well.  Under the mere department theory, "jurisdiction will [] be found where the [parent] company has a *subsidiary that is amenable to jurisdiction* and is found to be *a 'mere department' of the corporate parent.*'" *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 318 (S.D.N.Y. 2009) (emphases added). "Establishing the exercise of personal jurisdiction over an alleged alter ego [under the mere department theory] requires application of a *less stringent standard* than that necessary to pierce the corporate veil for purposes of liability."  *Storm LLC v. Telenor Mobile Communs. AS*, 2006 WL 3735657, at *13 n.8 (S.D.N.Y. Dec. 15, 2006) (citing *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)) (emphasis added).  As set out at length in Plaintiff's moving brief, Super Crypto is the alter ego for liability purposes.  Plaintiff Moving SJ Brief at 19-25.  Therefore, Super Crypto is necessarily a "mere department" of DPW for jurisdictional purposes.

Finally, the Court has jurisdiction over DPW under New York's long-arm statute because

---

[9] Defendants' own cited case confirms this, as the Second Circuit, upon reversing the district court's determination that it lacked personal jurisdiction, remanded with instructions that the court consider whether to exercise pendent personal jurisdiction. *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 88, 90 (2d Cir. 2018).

17

DPW transacted business relating to Plaintiff's claims in New York.  In particular, Ault, as DPW's CEO, traveled to New York multiple times to obtain funding to pay the amounts owed to Plaintiff.  *See, e.g.*, Mandel Moving Decl. Ex. AAA, LLL, TTTT.  "[S]ection 302 'is a "single act statute" and proof of one transaction in New York is sufficient to invoke jurisdiction …."  *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010) (quoting *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 522 N.E.2d 40, 43 (1988)).  Traveling to New York to raise funds in connection with the sued-over transaction weighs in favor of finding personal jurisdiction over a defendant involved in that transaction.  *See Kaga Inv. S.A. v. Simonsen*, 2013 NY Slip Op 33296(U), ¶ 8 (Sup. Ct. N.Y. Cty. 2013).

## III.    PLAINTIFF IS ENTITLED TO EXPECTATION DAMAGES ON ITS PROMISSORY ESTOPPEL CLAIMS

Defendants' claim that, in New York, "the remedy for a promissory estoppel claim *must* be" limited to reliance damages (Defendants' Moving SJ Brief at 21 (emphasis added)), is predicated on an incomplete understanding of the relevant law.  "The modern doctrine of promissory estoppel may be invoked in two situations.  First, and most traditionally, the doctrine allows for the enforcement of a promise in the absence of bargained-for consideration.…  This is known as the theory of detrimental reliance."  *Merex A.G. v. Fairchild Weston Sys.*, 29 F.3d 821, 824 (2d Cir. 1994).  Second, promissory estoppel may be used to circumvent the Statute of Frauds.  *Id.*  Because "[t]he doctrine of promissory estoppel may be asserted in a variety of different contexts, … the measure of damages to be obtained may differ as well, depending on the factual underpinnings supporting the doctrine."  *Clifford R. Gray, Inc. v. LeChase Constr. Servs., LLC*, 51 A.D.3d 1169, 1171 (3d Dep't 2008).

Where, as here, a plaintiff uses promissory estoppel as a substitute for consideration, it essentially sues for contract (or expectation) damages.  *See Merex*, 29 F.3d at 825.  The

18

Restatement (Second) of Contracts elaborates that a promise made without consideration but inducing reasonable reliance by the promisee is binding as "a contract, and full-scale enforcement by normal remedies is often appropriate." *Restatement (Second) of Contracts* § 90 cmt. b. That is because, when "using reliance as a consideration substitute, courts are acting defensively in support of contract rights." *Geneva Pharms. Tech. Corp. v. Barr Labs.*, 2003 WL 1345136, at *4 (S.D.N.Y. Mar. 19, 2003).

In addressing the parties' purported amendment of the Agreement, Defendants call it "mindboggling" that Super Crypto would amend the Agreement, "for no consideration and to its extreme detriment," to strike Article 3. Defendants' Moving SJ Brief at 14. If the Court accepts Defendants' argument, the Court should use the doctrine of promissory estoppel as a consideration substitute and award Plaintiff its full expectation damages.

"The elements of promissory estoppel are: a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance." *Ripple's of Clearview, Inc. v. Le Havre Assocs.*, 88 A.D.2d 120, 122, 452 N.Y.S.2d 447, 449 (2d Dep't 1982); *see also Cyberchron Corp. v. Calldata Sys. Dev.*, 47 F.3d 39, 46 (2d Cir. 1995) ("*Ripple's* … states the New York rule regarding" promissory estoppel). Here, Defendants' repeated promises that they would honor their contractual obligations and pay Plaintiff the full amount contemplated by the Agreement were clear and unambiguous and, indeed, not even contested by Defendants' own witnesses. *See, e.g.*, Plaintiff Moving SJ Brief at 13; Plaintiff Moving 56.1 St. ¶ 78-79. Plaintiff reasonably relied on such direct promises and such reliance was more than foreseeable: Plaintiff repeatedly informed Defendants that it was, in fact, relying on these promises in forbearing from

reselling the Machines.[10]  Finally, Plaintiff was injured in an easily quantifiable amount: the difference between the amount that Defendants promised to pay, less payments made toward that amount by Defendants, and the resale price.  Given that promissory estoppel serves here as a consideration substitute, it makes perfect sense that Plaintiff's damages under this theory would be equal to its contractual damages.

## CONCLUSION

For the foregoing reasons and those previously set forth in Plaintiff's moving brief, the Court should deny Defendants' motion for summary judgment and grant Plaintiff summary judgment on its breach of contract claim against both Defendants.

Dated: August 15, 2023

COWAN, LIEBOWITZ & LATMAN, P.C.
Attorneys for Plaintiff

By: _____

Richard S. Mandel (rsm@cll.com)
Dasha Chestukhin (dxc@cll.com)
114 West 47th Street
New York, New York 10036
(212) 790-9200

---

[10] Defendants' arguments concerning the putative unavailability of third-party buyers (*see*, *e.g.*, Defendants' Moving SJ Brief at 25) miss the point: Plaintiff never searched for other buyers because Defendants constantly assured Plaintiff that they still wanted the 600 Machines, a refrain continued in the depositions of Defendants' witnesses.  *See*, *e.g.*, Ault Dep. (Mandel Moving Decl. Ex. A) at 155-156, 158, 180; Magot Dep. (Mandel Moving Decl. Ex. B) at 135. Plaintiff, therefore, to its extreme detriment, forbore from reselling these Machines as the market value of such miners dropped precipitously.  Once Plaintiff decided that its continued reliance on Defendants' promises was no longer reasonable because Defendants had ceased making payments, Plaintiff immediately began searching for and quickly located a purchaser. Defendants' chastisement of Plaintiff for reasonably relying on Defendants' promises is the height of cynicism.