# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

<table>
<tr>
<td>

BLOCKCHAIN MINING SUPPLY AND
SERVICES LTD.,

     Plaintiff,

        –against–

SUPER CRYPTO MINING, INC. n/k/a
DIGITAL FARMS, INC. and DPW
HOLDINGS, INC. n/k/a AULT ALLIANCE,
INC.,

     Defendants.

</td>
<td>

Civil Action No. 1:18-cv-11099-ALC

</td>
</tr>
</table>

## PLAINTIFF'S RESPONSE TO DEFENDANTS'
## LOCAL RULE 56.1 STATEMENT OF FACTS

109.    On or about November 29, 2017, Plaintiff Blockchain Mining Supply and Services

Ltd. ("Plaintiff" or "Blockchain") was incorporated in Ontario, Canada as an Ontario Business

Corporation.[1] *See* FAC, ¶2; Volynsky Decl., Ex. 30.

Response:  Admitted.

110.    During its short existence, Plaintiff would only have two principals – William

Tencer and Yonah "Joe" Kalfa.  *See* Volynsky Decl., Ex. 7 (Tencer Tr., 40:20-41:13; 43:23-44:4).

Response:  Admitted.

111.    Super Crypto is a Delaware corporation, with its principal place of business located

in Nevada.  *See* Declaration of Darren Magot, dated May 29, 2023 (hereinafter, "Magot Decl."),

---

[1] A true and correct copy of the First Amended Complaint ("FAC") is attached to the accompanying Declaration of
Robert B. Volynsky, dated May 30, 2023 (hereinafter, "Volynsky Decl.") at Ex.1.  References to deposition transcripts
shall be referred to herein as "Deponent's Surname, Tr."

at ¶4.

Response:  Admitted.

112.    DPW is a Delaware corporation with its principal place of business located in

Nevada.  *See* Declaration of William B. Horne, dated May 24, 2023 (hereinafter, "Horne Decl."),

at ¶4.

Response:  Admitted.

113.    At the time that Plaintiff commenced this lawsuit, DPW's principal place of

business was in California and it did not have any offices located in New York.  *See id.*, at ¶¶4-5.

Response:  Admitted.

**Plaintiff's Business Model**

114.    Plaintiff's business purpose was to purchase Antminer cryptocurrency machines

from a supplier and then resell the Antminer cryptocurrency machines.  *See* Volynsky Decl., Ex.

7 (Tencer Tr., 47:24-48:20).

Response:  Admitted.

115.    Plaintiff did not sell Antminer cryptocurrency machines prior to November 29,

2017, its date of incorporation.  *See id.* (Tencer Tr., 49:16-20).

Response:  Plaintiff disputes the factual statement set forth in paragraph 115.  Although

Mr. Tencer testified that Plaintiff started selling Antminer machines after its incorporation, its

first contract for the sale of Antminer machines is dated as of November 27, 2017, which is

technically two days before Plaintiff's incorporation.  Mandel SJ Opp. Decl. Ex. 1; Volynsky

Decl. Ex. 30.

116.    Plaintiff also never obtained a reseller's license or a bit license.  *See id.* (Tencer Tr.,

49:4-11).

Response:  Plaintiff disputes the materiality of the factual statement set forth in paragraph 116, but it does not dispute the statement.

117.    In its ordinary course of business, Plaintiff would generally first place a purchase order with its overseas supplier, Bitmain Ltd. ("Bitmain"), for cryptocurrency machines and, thereafter attempt to locate a potential customer for the resale of such cryptocurrency machines, prior to Bitmain's shipment of the cryptocurrency machines to Plaintiff.  *See* Volynsky Decl., Ex. 8 (Kalfa Tr., 33:21-35:5).

Response:  Admitted.

118.    Plaintiff had a short window to sell any such cryptocurrency machines to as it would only reach out to potential purchasers when it knew that the cryptocurrency machines were about to ship from Bitmain.  *See id.* (Kalfa Tr., 34:20-35:5).

Response:  Admitted.

119.    Indeed, Kalfa testified that he would need to "sort of make a decision really at the last minute or try to find a customer in that short window when good are about to ship."  *See id.* (Kalfa Tr., 35:3-5).

Response:  Admitted.

**Plaintiff Solicits Super Crypto**

120.    On February 23, 2018, Yonah Kalfa, a principal of Plaintiff, sent a message to Darren Magot, Chief Executive Officer of Super Crypto, on LinkedIn (the "February 23rd Message"), soliciting a potential sale of 1,100 Bitmain Antminer S9 Machines and 1,100 PSUs (collectively, the "Machines").  *See* Volynsky Decl., Ex. 12.

Response:  Admitted.

121.    Kalfa presently serves as an officer of a publicly traded company.  See <u>Volynsky</u> <u>Decl.</u>, Ex. 8 (<u>Kalfa Tr.</u>, 50:24-51:1).

<u>Response</u>:  Admitted.

122.    Kalfa testified he has familiarity reviewing, *inter alia*, quarterly and yearly financial statements filed with the Securities and Exchange Commission.  *See id.* (<u>Kalfa Tr.</u>, 51:7-53:6).

<u>Response</u>:  Plaintiff disputes the factual statement set forth in paragraph 122.  Mr. Kalfa testified that he was "familiar with the term 'form 8-k.'"  He never testified that he had familiarity with reviewing such statements or 10-Q statements.  Kalfa Dep. (Volynsky Decl. Ex. 8) at 52:17-19.

123.    The February 23rd Message was the initial contact that Plaintiff had with either Defendant.  *See id.* (<u>Kalfa Tr.</u>, 44:12-21); Ex. 9 (<u>Magot Tr.</u>, 85:14-24); Ex. 13 (RFA Nos. 1-11).

<u>Response</u>:  Admitted.

124.    Prior to transmitting the February 23rd Message, Plaintiff had already placed an order for the Machines with Bitmain and had received a notice of shipment for the Machines from Bitmain.  *See* <u>Volynsky Decl.</u>, Ex. 8 (<u>Kalfa Tr.</u>, 39:20-41:3).

<u>Response</u>:  Admitted.

125.    As far as Plaintiff was concerned, Plaintiff needed to pay Bitmain, in full, for the Machines irrespective of whether Plaintiff had located a potential customer to resell the Machines to.  *See id.* (<u>Kalfa Tr.</u>, 41:13-43:10).

<u>Response</u>:  Plaintiff disputes the factual statement set forth in paragraph 125.  Mr. Kalfa testified that he could not recall whether Plaintiff would have been able to cancel the order once it received notice from Bitman that the goods were ready to ship.  However, he recognized that if Plaintiff did not take the goods, it would probably have ended its relationship with Bitmain and

prevented it from buying from Bitmain in the future.  Thus, if Plaintiff wanted to continue its business of reselling Bitmain's machines, it would need to pay Bitmain for them.  Kalfa Dep. (Volynsky Decl. Ex. 8) at 41:10-24.

126.    Plaintiff had reached out to other prospective purchasers for the Machines prior to transmitting the February 23rd Message.  *See id.* (Kalfa Tr., 46:25-47:13).

Response:  Plaintiff disputes that it had reached out to other prospective purchasers prior to sending the February 23rd Message.  Mr. Kalfa's testimony was that he likely reached out to other prospective purchasers "at or around" the time of the February 23rd Message, not necessarily before it.  Kalfa Dep. at (Volynsky Decl. Ex. 8) 46:25-47:13.

127.    Kalfa would scour the internet in an attempt to locate a potential purchaser for the Machines.  *See id.* (Kalfa Tr., 38:13-20).

Response:  Plaintiff disputes the characterization in paragraph 127 that Mr. Kalfa "would scour the internet," but admits that in response to getting notification from Bitmain, he likely conducted Google searches in order to locate new potential customers.  Kalfa Dep. (Volynsky Decl. Ex. 8) at 38:7-39:1.

128.    Kalfa first learned about Super Crypto by reading a press release titled "DPW Holdings' Subsidiary, Super Crypto Mining to Launch Cloud Mining" (the "Press Release"), that he had located prior to the February 23rd Message.  *See id.* (Kalfa Tr., 38:12-20; 47:18-20; 48:21-49:10); Volynsky Decl., Ex. 14.

Response:  Admitted.

129.    From there, Kalfa would browse through DPW's public filings and conduct "due diligence" on DPW.  *See* Volynsky Decl., Ex. 8 (Kalfa Tr., 51:7-52:5).

Response:  Plaintiff admits that Mr. Kalfa's best recollection was that after reading the DPW press release, he "probably … would have browsed" their public filings as part of his "due diligence," although he could not testify with certainty now as to what he viewed at the time. Kalfa Dep. (Volynsky Decl. Ex. 8) at 51:7-52:5.

130.    Kalfa testified that as part of his due diligence of DPW he "probably would have" reviewed DPW's Form 10-Q filing.  *See id.* (Kalfa Tr., 53:4-53:8).

Response:  Plaintiff admits that Mr. Kalfa testified that he "probably would have" reviewed DPW's Form 10-Q filing, but he also qualified that testimony by saying "I don't know" and "I can't say for certain."  Kalfa Dep. (Volynsky Decl. Ex. 8) at 53:4-8.

131.    As regards DPW's quarterly and yearly financials, Mr. Kalfa testified that he "definitely wouldn't have read it in detail, but [he] would have browsed, you know, see revenue, assets or whatnot, you know."  *See id.* (Kalfa Tr., 53:10-16).

Response:  Plaintiff admits that Mr. Kalfa testified as quoted in paragraph 131 above, while also qualifying such testimony as to whether he reviewed DPW's form 10-K's by responding: "Again, I'm not certain, but it's very possible."  Kalfa Dep. (Volynsky Decl. Ex. 8) at 53:9-16.

132.    DPW's Form 10-Q filing with the Securities Exchange Commission, for the quarterly period ended September 30, 2017 (the "2017 Q3 10-Q"), identifies the total revenue for the three-month period ended as of September 30, 2017, as $3,220,000.00.  *See* Volynsky Decl., Ex. 15; Horne Decl., ¶8.

Response:  Admitted.

133.    The 2017 Q3 10-Q identifies the total revenue for the nine-month period ended as of September 30, 2017, as $6,670,000.00.  *See* Volynsky Decl., Ex. 15, at p. 5.

Response:  Admitted.

134.    The 2017 Q3 10-Q states that as of September 30, 2017, DPW had cash and cash equivalents of $314,000.  *See id.*, at p. 6.

Response:  Admitted.

135.    The 2017 Q3 10-Q states that as of September 30, 2017, DPW had an accumulated deficit of $17,212,000.00.  *See id.*

Response:  Plaintiff admits the factual statement set forth in paragraph 135, but states that the 2017 Q3 10-Q also showed that DPW had a positive book value of $7,462,000.  Volynsky Decl. Ex. 15.

136.    The 2017 Q3 10-Q states that as of September 30, 2017, DPW had a negative working capital of $4,174,000. *See id.*

Response:  Plaintiff admits the factual statement set forth in paragraph 135, but states that the 2017 Q3 10-Q also showed that DPW had a positive book value of $7,462,000.  Volynsky Decl. Ex. 15.

137.    On February 24, 2018, Magot would inform Kalfa that he was interested in purchasing the Machines, but needed to wait until the following Tuesday to confirm all financing. *See id.*, Ex. 12.

Response:  Admitted.

138.    On February 25, 2018, Mr. Kalfa e-mailed Mr. Magot (the "February 25th E-mail") a draft of an Asset Purchase Agreement (the "2/25 Draft APA" (DEFENDANTS_000941-DEFENDANTS_000949)) and a draft on Escrow Agreement (the "2/26 Draft Escrow" (DEFENDANTS_000950-DEFENDANTS_000957)).  *See id.*, Ex. 16.

Response:  Admitted.

139.    On or about February 26, 2018, Kalfa would message Magot informing him that he could discount the price for the Machines to $2,975 USD per Machine.  *See id.*, Ex. 15.

Response:  Admitted.

**Super Crypto and Plaintiff's Pre-Agreement Negotiations**

140.    Kalfa testified that he offered this discount to Magot because he needed to "finalize a customer" and was "trying to incentive him to close the deal."  *See id.*, Ex. 8 (Kalfa Tr., 66:10-17).

Response:  Admitted.

141.    The 2/25 Draft APA would have required Super Crypto to purchase all of the Machines notwithstanding the volatility in the cryptocurrency market.  *See id.*, Ex. 16.

Response:  Plaintiff admits that the 2/25 Draft APA was for the purchase of all 1,100 Machines that Mr. Kalfa originally offered Mr. Magot and that Mr. Magot confirmed he was interested in purchasing, but otherwise denies the characterization that the volatility in the cryptocurrency market was relevant to the structuring of the 2/25 Draft APA or the final contract.  All parties always understood the volatility inherent in this kind of transaction, which was nevertheless consistently based on the fact that Defendants wanted all 1,100 Machines.  *See* Magot Dep. (Mandel Moving Decl. Ex. B) at 63-65, 135-136, 158-159, 167-176, 188-189, 199-201, 203, 205-206, 217, 221-222; Ault Dep. (Mandel Moving Decl. Ex. A) at 154-158, 162-163, 168-169, 177-180, 185-186, 203-209, 217-218, 221.

142.    This was unacceptable to Super Crypto, and Super Crypto made this very clear to Tencer prior to the execution of the Agreement.  *See* Volynsky Decl., Ex. 9 (Magot Tr., 51:5-25; 53:17-23); Magot Decl., ¶9.

Response:  Plaintiff disputes the factual statement contained in paragraph 142.

Defendants determined before Super Crypto signed the Agreement that they were comfortable

with the financial commitment to purchase all 1,100 Machines.  Magot Dep. (Mandel Moving

Decl. Ex. B) at 97-98, 109, 115-116; Ault Dep. (Mandel Moving Decl. Ex. A) at 126-128;

Mandel Moving Decl. Ex. FF, GG, VVV.  DPW's 10-K filing for the 2017 fiscal year indicated

that DPW intended to fund Super Crypto's purchase of 1,100 miners through the proceeds of a

DPW stock offering.  Mandel Moving Decl. Ex. QQ at F-64; Ault Dep. (Mandel Moving Decl.

Ex. A) at 159-160.  Defendants repeatedly acknowledged at their deposition that they

consistently wanted to obtain all 1,100 Machines throughout the transaction with Plaintiff.  *See*,

*e.g.*, Ault Dep. (Mandel Moving Decl. Ex. A) at 155:9-10 ("No, I never thought of not doing all

the machines."); 155:25-156:2 ("I never contemplated not doing the transaction that I can

recall."), 157:16-17 ("It's always our intention to take delivery of the machines."), 158:17-21

("Q.  And do you recall ever expressing the sentiment to Mr. Tencer that it's not if but it's when

you'll buy these machines?  A.  Yeah, I always told him we'd buy them."), 180:10-11 ("I

consistently told him that we wanted the machines."); Magot Dep. (Mandel Moving Decl. Ex. B)

at 135:24-25 ("Yeah, I wanted all the machines at this time."), 171:2-15 ("I do want the

machines ASAP….") (quoting Mandel Moving Decl. Ex. DDDD); Mandel Moving Decl. Ex.

FFF ("I'm emailing to make it clear that [Super Crypto] will honor our obligation to finalize the

purchase of the last 600 machines.").

143.    Indeed, Super Crypto did not want to commit itself to purchasing **all** 1,100

Machines due to the volatile cryptocurrency market, as well as the uncertainties surrounding its

ability (as a nascent company) to obtain the necessary financing for **all** 1,100 Machines.  *See* Magot

Decl., ¶10; *see also* Volynsky Decl., Ex. 9 (Magot Tr., 51:19-25).

<u>Response</u>:  Plaintiff disputes the factual statement contained in paragraph 143.

Defendants determined before Super Crypto signed the Agreement that they were comfortable

with the financial commitment to purchase all 1,100 Machines.  Magot Dep. (Mandel Moving SJ

Ex. B) at 97-98, 109, 115-116; Ault Dep. (Mandel Moving Decl. Ex. A) at 126-128; Mandel

Moving SJ Ex. FF, GG, VVV.  DPW's 10-K filing for the 2017 fiscal year indicated that DPW

intended to fund Super Crypto's purchase of 1,100 miners from Plaintiff through the proceeds of

a DPW stock offering.  Mandel Moving Decl. Ex. QQ at F-64; Ault Dep. (Mandel Moving Decl.

Ex. A) at 159-160.  Defendants repeatedly acknowledged at their deposition that they

consistently wanted to obtain all 1,100 Machines throughout the transaction with Plaintiff.  *See*,

*e.g.*, Ault Dep. (Mandel Moving Decl. Ex. A) at 155:9-10 ("No, I never thought of not doing all

the machines."); 155:25-156:2 ("I never contemplated not doing the transaction that I can

recall."), 157:16-17 ("It's always our intention to take delivery of the machines."), 158:17-21

("Q.  And do you recall ever expressing the sentiment to Mr. Tencer that it's not if but it's when

you'll buy these machines?  A.  Yeah, I always told him we'd buy them."), 180:10-11 ("I

consistently told him that we wanted the machines."); Magot Dep. (Mandel Moving Decl. Ex. B)

at 135:24-25 ("Yeah, I wanted all the machines at this time."), 171:9-10 ("I do want the

machines ASAP…."), Mandel Moving Decl. Ex. FFF ("I'm emailing to make it clear that [Super

Crypto] will honor our obligation to finalize the purchase of the last 600 machines.").

144.    Super Crypto felt comfortable that it would be able to obtain the requisite financing

to pay for some of the Machines and informed Plaintiff of this limitation.  *See* <u>Magot Decl.</u>, ¶11.

<u>Response</u>:  Plaintiff disputes the statement contained in paragraph 144.  Defendants

determined before Super Crypto signed the Agreement that they were comfortable with the

financial commitment to purchase all 1,100 Machines.  Magot Dep. (Mandel Moving Decl. Ex.

B) at 97-98, 109, 115-116; Ault Dep. (Mandel Moving Decl. Ex. A) at 126-128; Mandel Moving Decl. Ex. FF, GG, VVV.  DPW's 10-K filing for the 2017 fiscal year indicated that DPW intended to fund Super Crypto's purchase of 1,100 miners from Plaintiff through the proceeds of a DPW stock offering.  Mandel Moving Decl. Ex. QQ at F-64; Ault Dep. (Mandel Moving Decl. Ex. A) at 159-160.  The parties' communications reflect that Defendants' only concern with respect to financing was the timing of when they would be able to complete the purchase.  *See*, *e.g.*, Volynsky Decl. Ex. 17; Ault Dep. (Mandel Moving Decl. Ex. A) at 155-158.

145.     To address Super Crypto's stated concerns, on March 6, 2018, Tencer e-mailed (the "March 6th E-mail") a proposal to Mr. Magot "to try and accommodate Super Crypto's cash flow." *See* Volynsky Decl., Ex. 17.

Response:  Plaintiff admits that Tencer sent the March 6th E-mail to Mr. Magot in order to address Defendants' cash flow issues concerning the timing on when they would be able to obtain financing, but otherwise disputes that Super Crypto's "stated concerns" related to the volatility of the cryptocurrency market or any desire to avoid committing to purchase all 1,100 Machines.  *See* responses to paragraphs 142-144 *supra*.

146.     Specifically, in the March 6th E-mail, Tencer proposed that Super Crypto: (i) pay a deposit of $163,625.00 by March 8, 2018; (ii) pay $1,487,500.00 for 500 Machines on March 16, 2018 or March 23, 2018; (iii) the $163,625.00 deposit would then be applied to the remaining 600 machines, and Super Crypto would pay the balance of $1,621,375.00 in April; and (iv) if the $1,621,375.00 was not paid, the $163,625.00 deposit would be non-refundable (collectively, the "E-mail Proposal").  *See id.*

Response:  Admitted.

**Plaintiff and Super Crypto Enter into the Agreement**

147.    On or about March 8, 2018 (the "Effective Date"), Plaintiff and Super Crypto entered into the Asset Purchase Agreement, dated March 8, 2018 (the "Agreement"), a true and correct copy of which was produced by Plaintiff in this action at BMS000002-BMS000009.  *See* Magot Decl., ¶5; *See* Volynsky Decl., Ex. 11; FAC, ¶15.

Response:  Admitted.

148.    The only parties to the Asset Purchase Agreement are Plaintiff and Super Crypto. *See* Volynsky Decl., Ex. 11, at "Preamble" and "Signature Block."

Response:  Plaintiff admits that Plaintiff and Super Crypto are the only parties named in the Agreement, but it maintains that DPW is liable as an alter ego of Super Crypto.  *See* Plaintiff Moving SJ Brief (ECF No. 125) at 19-25.

149.    Prior to the Effective Date of the Agreement, Plaintiff had not communicated with anyone from DPW.  *See id.*, Ex. 13 (RFAs No. 1-11).

Response:  Plaintiff admits that prior to the Effective Date of the Agreement, it had not communicated directly with anyone from DPW, but states that Mr. Magot referenced DPW's support for the transaction so that Plaintiff would take comfort from the parent's involvement, and as a result, Plaintiff understood from the outset that Super Crypto was part of a much bigger public company that was funding the deal.  Mandel Moving Decl. Ex. EE; Magot Dep. (Mandel Moving Decl. Ex. B) at 94-95; Ault Dep. (Mandel Moving Decl. Ex. A) at 124-125; Tencer Decl. ¶ 4.

150.    Plaintiff did not negotiate any of the Agreement's terms with DPW.  *See id.*

Response:  Plaintiff admits that it did not negotiate the original terms of the Agreement directly with DPW, but states that Super Crypto would not enter into the Agreement without

DPW's approval of the transaction and its terms, which was obtained.  Mandel Moving Decl. Ex. EE, TTT, UUU, VVV; Tencer Decl. ¶ 4; Magot Dep. (Mandel Moving Decl. Ex. B) at 90, 93-95, 109, 111-116.

151.    The transaction between Super Crypto and Plaintiff, which forms the basis of this litigation, was the last active business that was conducted by Plaintiff.  *See* Volynsky Decl., Exs. 7 (Tencer Tr., 53:1-3) and 8 (Kalfa Tr., 31:18-25).

Response:  Admitted.

152.    Indeed, Plaintiff did not purchase anymore Antminers after March 2018 because "there was no market for it anymore."  *See* Volynsky Decl., Ex. 7 (Tencer Tr., 50:11-18).

Response:  Admitted.

153.    Tencer would further elaborate that "[t]here was no demand for the machines.  As far as we were concerned, being the reseller, we would not be able to buy and sell and make a profit."  *See id.* (Tencer Tr., 51:1-4).

Response:  Admitted.

154.    Thus, during its short-lived existence, Plaintiff sold cryptocurrency mining machines to no more than five customers.  *See id.* (Tencer Tr., 52:1-5).

Response:  Admitted.

**The Unambiguous Terms of the Agreement Provide**
**For a Discretionary Purchase of the Remaining Machines**

155.    The Agreement defines "Assets" as 1,100 Bitmain Antminer S9 model miners and 1,100 PSUs (collectively, the "Machines").  *See* Volynsky Decl., Ex. 11, §1(b).

Response:  Admitted.

156.    Pursuant to Article 2(a)(i) of the Agreement, Super Crypto was required to pay a deposit totaling $163,625.00 USD  (the "Deposit") to Plaintiff.  *See id.*, §2(a)(i).

Response:  Admitted.

157.    By payments made on March 9 and 13, 2018, Super Crypto paid the Deposit to Plaintiff.  FAC, ¶17; Magot Decl., ¶14.

Response:  Admitted.

158.    Pursuant to Article 2(a)(ii) of the Agreement, Super Crypto was required to pay $1,487,500.00 (the "Contracted-For Amount") to Plaintiff for 500 Bitmain Antminer S9 model miners and 500 PSUs (collectively, the "Contracted-For Machines").  See Volynsky Decl., Ex. 11, §2(a)(ii).

Response:  Plaintiff admits that Article 2(a)(ii) of the Agreement required Super Crypto to pay $1,487,500 for the first 500 Machines on or before March 23, 2018.  Volynsky Decl. Ex. 11 §2(a)(ii).

159.    Plaintiff received payment of the total Contracted-For Amount and thereafter released the Contracted-For Machines from Plaintiff's storage facility.  See FAC, ¶¶17-18; see also Volynsky Decl., Ex. 3, ¶¶17-18.

Response:  Plaintiff admits that it received belated payment of the full $1,487,500 for the first 500 Machines on or around April 17, 2018 and thereafter released those machines as of that time.  Tencer Decl. ¶¶ 9-10.

160.    As of the Effective Date, Super Crypto did not have an absolute obligation to pay the $1,621,375 (the "Remaining Amount") referenced in Article 2(a)(iii) of the Agreement.  See Volynsky Decl., Ex. 11, §§2(a)(iii) and 3.

Response:  Plaintiff states that paragraph 160 calls for a legal conclusion to which no response is required under Local Civil Rule 56.1.  To the extent any response is required, Plaintiff admits that as of the Effective Date, the obligation to pay the Remaining Amount

referenced in Article 2(a)(iii) of the Agreement was subject to Article 3 of the Agreement. Volynsky Decl. Ex. 11, §§2(a)(iii) and 3.

161.    Pursuant to Article 2(a)(iii), in the event that Super Crypto did not pay the Remaining Amount to Plaintiff on or before April 15, 2018, the Deposit would be deemed non-refundable. *See id.*, §2(a)(iii).

Response:  Plaintiff admits that Article 2(a)(iii) of the Agreement states that if the payment for the final 600 Machines is not paid on or before April 15, 2018, the Deposit would be non refundable.  Volynsky Decl. Ex. 11 §2(a)(iii).

162.    Pursuant to Article 3 of the Agreement, in the event that Super Crypto did not pay the Remaining Amount to Plaintiff for the remaining 600 Bitmain Antminer S9 model miners and 600 PSUs (collectively, the "Remaining Machines"), on or before April 15, 2018 (the "Expiration Date"), the Deposit would be forfeited to Plaintiff, and the remainder of the Agreement, with the exception of Article 2(a)(i) and Article 3, "shall be null and void and all parties shall be relieved of its further obligations" under the Agreement. *See id.*, §3.

Response:  Plaintiff admits that Article 3 of the Agreement states that "[i]n the event Purchaser fails to pay the Balance to Vendor on or before April 15, 2018, the Deposit funds shall be forfeited to the Vendor, and the remainder of this Agreement save and except for Article 2(a)(i) and Article 3, shall be null and void and all parties shall be relieved of its further obligations herein."  Volynsky Decl. Ex. 11 §3.

163.    The provisions contained in Article 3 of the Agreement were not contained in the 2/26 Draft APA. *Compare* Ex. 9 2/25 Draft APA *with* Volynsky Decl., Ex. 11, §3.

Response:  Admitted.

164.    Articles 2(a)(i), 2(a)(ii), 2(a)(iii), and 3 of the Agreement reflect the terms of the Proposal. *Compare id.*, §§ 2(a)(i), 2(a)(ii), 2(a)(iii) and 3 *with* Volynsky Decl., Ex. 17.

Response:  Plaintiff states that it is unclear what is meant by the term "Proposal," which is not defined in Defendants' Rule 56.1 Statement.  To the extent that "Proposal" is intended to reference the defined term "E-mail Proposal," Plaintiff admits that Articles 2(a)(i), 2(a)(ii) and 2(a)(iii) reflect some of the terms of the E-mail Proposal, although the dates in the E-mail Proposal vary from those included in the Agreement.  There is no reference in the E-mail Proposal to the provisions contained in Article 3 of the Agreement.  *See* Volynsky Decl. Ex. 17, Volynsky Decl. Ex. 11 §§ 2(a)(i), 2(a)(ii), 2(a)(iii) and 3.

165.    Tencer, who authored the e-mail containing the Proposal, testified that, pursuant to the terms of the Agreement, as written, as of April 15, 2018, Super Crypto could forfeit the Deposit to Plaintiff and the Agreement would thereafter be deemed null and void.  *See* Volynsky Decl., Ex. 7 (Tencer Tr., 110:7-111:8).

Response:  Plaintiff states that it is unclear what is meant by the term "Proposal," which is not defined in Defendants' Rule 56.1 Statement.  To the extent that "Proposal" is intended to reference the defined term "E-mail Proposal," Plaintiff admits that Tencer testified that the original terms of the Agreement as written provided that if Super Crypto paid the Deposit and made no further payments before April 15, 2018, Plaintiff would keep the deposit and the Agreement would be null and void, but notes that he also testified that "this agreement changed many times in regards to dates of when payments were due and so on that both parties had agreed to."  Tencer Dep. (Volynsky Decl. Ex. 7) at 110:7-19.

166.    For good measure, Kalfa also testified that he presumed that Plaintiff inserted Article 3 in the Agreement and that "My understanding is there was to be – my memory served

me that there was a deposit that they were to give, and if they wouldn't take the machines, it would

be nonrefundable, yes." *See* <u>Volynsky Decl.</u>, Ex. 8 (<u>Kalfa Tr.</u>, 105:21-25; 113:15-18).

    <u>Response</u>:  Plaintiff admits that Kalfa testified as quoted above, but qualified his testimony

to make clear that his "understanding is that [Defendants are] committing to take all the goods.

Their penalty would be that they would lose their deposit … but … then we would follow through,

as we did, filing suit."  Kalfa Dep. (Volynsky Decl. Ex. 8) at 112:17-24.  Kalfa further testified as

follows:

    Q.  And would Super Crypto have any further obligation to purchase those 600 machines?

    A.  Yes. I mean, I don't think there's a void of their obligation to take the machines,

    meaning they'd be in breach which is why there's a deposit, you know, in the agreement.

Kalfa Dep. (Volynsky Decl. Ex. 8) at 113:7-14.

    167.    Thus, as of the Effective Date when Plaintiff entered into the Agreement, Plaintiff

understood that there was a potential risk that its only recourse with respect to the Remaining

Machines would be a forfeiture of the Deposit.  *See* <u>Volynsky Decl.</u>, Ex. 7 (<u>Tencer Tr.</u>, 110:20-

111:18) and Ex. 8 (<u>Kalfa Tr.</u>, 112:6-13).

    <u>Response</u>:  Plaintiff admits that Mr. Tencer testified that he understood that if there were

no further amendments to the Agreement as originally written, there was a possibility Plaintiff

would only receive the Deposit without further obligations on Super Crypto's part.  Mr. Kalfa's

understanding, according to his testimony, was that that Plaintiff may have only received the

Deposit and a payment for the first 500 Machines, but then Super Crypto would be in breach of

the Agreement for failing to take the final 600 Machines.  Tencer Dep. (Volynsky Decl. Ex. 7) at

110:20-111:8; Kalfa Dep. (Volynsky Decl. Ex. 8) at 112:6-113:14.

168.    Plaintiff also understood, as of the Effective Date, that, as of April 16, 2018, it could be stuck with the Remaining Machines.  *See id.*

Response:  Plaintiff admits that Mr. Tencer testified that he understood that if there were no further amendments to the Agreement as originally written, there was a possibility Plaintiff would only receive the Deposit without further obligations on Super Crypto's part.  Mr. Kalfa's understanding, according to his testimony, was that that Plaintiff may have only received the Deposit and a payment for the first 500 Machines, but then Super Crypto would be in breach of the Agreement for failing to take the final 600 Machines.  Tencer Dep. (Volynsky Decl. Ex. 7) at 110:20-111:8; Kalfa Dep. (Volynsky Decl. Ex. 8) at 112:6-113:14.

169.    There was volatility in the resale price of the Machines.  *See* Volynsky Decl., Ex. 7 (Tencer Tr., 55:15-19).

Response:  Admitted.

170.    The price of Bitcoin at any particular time impacted the resale price of the Machines.  *See id.* (Tencer Tr., 54:25-55:14).

Response:  Admitted.

171.    Super Crypto did not pay the Remaining Amount to Plaintiff, on or before April 15, 2018.  *See* Magot Decl., ¶15.

Response:  Plaintiff admits that as of April 15, 2018, Super Crypto had only paid the Deposit and $100,000 of the $1,487,500 that had been due for the first 500 Machines since March 23, 2018, and no other amounts, including the bulk of the balance due on the first 500 Machines and the full Remaining Amount for the final 600 Machines.  Tencer Decl. ¶¶ 6-10.

172.    Super Crypto did not make a partial payment of the Remaining Amount to Plaintiff, on or before April 15, 2018.  *See id.*

Response:  Admitted.

173.    Plaintiff had every right to sell the Remaining Machines to another party as of April 16, 2018.  *See* Volynsky Decl., Ex. 11, §3 and Ex. 9 (Magot Tr., 107:14-18).

Response:  Plaintiff states that paragraph 173 calls for a legal conclusion to which no response is required under Local Civil Rule 56.1.  To the extent any response is required, Plaintiff states that under the original terms of the Agreement, Plaintiff would have had the right to sell the final 600 Machines to another party as of April 16, 2018, but as Mr. Tencer testified at his deposition, the Agreement "changed many times in regards to dates of when payments were due and so on that both parties had agreed to."  Tencer Dep. (Volynsky Decl. Ex. 7) at 110:7-19; *see also* Plaintiff Moving SJ Brief (ECF No. 125) at 10-18.  As of April 16, 2018, the parties had already modified any required payment dates, including both the March 23, 2018 date for payment of the first 500 Machines and the April 15, 2018 date for payment of the final 600 Machines, with Defendants also clearly indicating their intention to complete the transaction for all 1,100 Machines pursuant to the Agreement.  Tencer Decl. ¶¶ 8-11; Magot Dep. (Mandel Moving Decl. Ex. B) at 53-55, 135-137, 158-159; Ault Dep. (Mandel Moving Decl. Ex. A) at 154-158, 168-169; Mandel Moving Decl. Ex. KK, PP, RR, SS, TT, UU.

**The Agreement Was Neither Amended Nor Its Provisions Waived**

174.    Pursuant to Article 13(e) of the Agreement, no revision or modification of the Agreement could be effective unless in writing and executed by authorized representatives of Plaintiff and Super Crypto.  *See* Volynsky Decl., Ex. 11, §13(e).

Response:  Plaintiff admits that Article 13(e) of the Agreement provides: "No revision or modification of this Agreement shall be effective unless in writing and executed by authorized representative of both parties."  Volynksy Decl., Ex. 11, § 13(e).

175.    Super Crypto and Plaintiff did not amend Article 3 of the Agreement prior to April 15, 2018.  *See* Volynsky Decl., Ex. 7 (Tencer Tr., 112:16-243).

Response:  Plaintiff disputes the statement contained in paragraph 175.  The April 15, 2018 date contained in both Article 2(a)(iii) and Article 3 was the original outside date set in the Agreement for Super Crypto to have completed payment for the final 600 Machines following having completed payment for the first 500 Machines by March 23, 2018.  Volynsky Decl. Ex. 11, § 2(a)(ii), 3.  As of April 15, 2018, Super Crypto had yet to even make the payment for the first 500 Machines that had been due for more than three weeks.  Tencer Decl. ¶¶ 6-10.  The parties' communications and actions make plain that they modified the timing of payments prior to April 15, 2018, with Defendants also plainly indicating in those and all subsequent communications their intention and desire to complete the transaction for all 1,100 Machines pursuant to the Agreement rather than invoking any right under Article 3 to limit the transaction to just the first 500 Machines.  Magot Dep. (Mandel Moving Decl. Ex. B) at 53-55, 135-137, 158-159, 167-176, 199-201, 203, 205-206, 217; Ault Dep. (Mandel Moving Decl. Ex. A) at 145-148, 154-155, 168-169, 179-180, 185-186; Tencer Decl. ¶¶ 8-11; Mandel Moving Decl. Ex. KK, PP, RR, SS, TT, UU, YY, ZZ, FFF, NNN, BBBB, CCCC, DDDD, EEEE. FFFF, GGGG, IIII.

176.    In fact, Super Crypto and Plaintiff never executed a written modification of the Agreement.  *See id.* (Tencer Tr., 112:16-243).

Response:  Plaintiff disputes the statement contained in paragraph 176.  The parties' email exchanges served to execute and effect written modifications to the Agreement.  Tencer Dep. (Volynsky Decl. Ex. 7) at 112:16-24; *see also* response to paragraphs 173 and 175 *supra*; Plaintiff Moving SJ Brief (ECF No. 125) at 12-14.

177.    Stated differently, Super Crypto and Plaintiff never executed a written modification of the Agreement in accordance with Article 13(e) of the Agreement. *See id.*

Response:  Plaintiff states that paragraph 177 calls for a legal conclusion to which no response is required under Local Civil Rule 56.1.  To the extent any response is required, Plaintiff disputes the statement.  The parties effected written modifications to the Agreement that comply with Article 13(e) through email exchanges.  Tencer Dep. (Volynsky Decl. Ex. 7) at 112:16-24; *see also* response to paragraphs 173 and 175 *supra*; Plaintiff's Moving SJ Brief (ECF No. 125) at 12-14.

178.    At no point did Plaintiff and Super Crypto ever modify the Agreement to extend the Expiration Date in accordance with Article 13(e) of the Agreement.  *See* Magot Decl., ¶¶24-25.

Response:  Plaintiff disputes the statement contained in paragraph 178.  The parties' email exchanges clearly modified the April 15, 2018 deadline set for completion of the payment for all 1,100 Machines (and carried forward in Article 3 of the Agreement) while also indicating Defendants' intention and desire to complete the transaction for all 1,100 Machines pursuant to the Agreement rather than invoking any right under Article 3 to limit the transaction to just the first 500 Machines. Magot Dep. (Mandel Moving Decl. Ex. B) at 53-55, 135-137, 158-159, 167-176, 199-201, 203, 205-206, 217; Ault Dep. (Mandel Moving Decl. Ex. A) at 145-148, 154-155, 168-169, 179-180, 185-186; Tencer Decl. ¶¶ 8-11; Mandel Moving Decl. Ex. KK, PP, RR, SS, TT, UU, YY, ZZ, FFF, NNN, BBBB, CCCC, DDDD, EEEE. FFFF, GGGG, IIII.

179.    At no point did Plaintiff and Super Crypto ever waive the protections under Article 3 in accordance with Article 13(d) of the Agreement.  *See* Magot Decl., ¶¶26-28.

Response:  Plaintiff states that paragraph 179 calls for a legal conclusion to which no response is required under Local Civil Rule 56.1.  To the extent any response is required, Plaintiff disputes the statement contained in paragraph 179.  The parties' course of performance makes plain that Defendants waived Article 3 by deciding to move forward with the purchase of the final 600 Machines.  Ault Dep. (Mandel Moving Decl. Ex. A) at 154-158, 162-163, 168-169, 179-180, 185-186, 203-209, 217-218, 221; Magot Dep. (Mandel Moving Decl. Ex. B) at 135-136, 158-159, 167-176, 188-189, 199-201, 203, 205-206, 217, 221-222; Mandel Moving Decl. Ex. PP, UU, YY, ZZ, DDD, EEE, FFF, MMM, NNN, CCCC, DDDD, EEEE, FFFF, GGGG, IIII, ZZZZ (Exhibits B, D, F, G, I to stipulation); Tencer Decl. ¶¶ 11, 19; *see* Plaintiff Moving 56.1 St. (ECF No. 126) ¶¶ 74-84; Plaintiff Moving SJ Brief at 14-18.  The parties' email exchanges are sufficient to satisfy Article 13(d) of the Agreement, and in any event, a non-waiver clause does not preclude a party from waiving another contractual term through course of performance.  *See* Plaintiff Moving SJ Brief at 16-17.

180.    There are no references in the FAC to any amendments to the Agreement.  *See* Volynsky Decl., ¶7.

Response:  Plaintiff states that paragraph 180 does not contain a material statement of fact for which a response is required under Local Civil Rule 56.1.   To the extent any response is required, Plaintiff states that while the FAC does not use the term "amendment," it adequately sets forth the requisite factual allegations supporting Plaintiff's claimed amendments.  *See*, *e.g.*, FAC ¶¶ 18 (timing of payment on first 500 Machines inconsistent with written terms of Agreement); 21 ("Defendants repeatedly informed Plaintiff of their continuing intention to purchase the remaining Machines, gave Plaintiff repeated assurances that they would pay the full balance, and DPW made a series of payments to Plaintiff for the Machines."); 24 ("Throughout

the months of April to October 2018, Defendants continued to assure Plaintiff that their payment for the remaining 600 Machines was imminent, to induce Plaintiff to maintain the Machines in storage for eventual delivery to them."); 25-47 (detailing repeated promises to honor contractual obligation to pay for the final 600 Machines and partial payments made).  Moreover, Mr. Tencer testified at his deposition that there were amendments to the Agreement by email.  Tencer Dep. (Volynsky Decl. Ex. 7) at 112:16-24.

181.    There are no references in the FAC to an alleged extension of the April 15, 2018, date contained in Article 3 of the Agreement.  *See id.*, ¶9.

Response:  Plaintiff states that paragraph 181 does not contain a material statement of fact for which a response is required under Local Civil Rule 56.1.   To the extent any response is required, Plaintiff states that the FAC alleges that the payments for the first 500 Machines were not completed until April 17, 2018, a date *after* the April 15, 2018 date set in Article 3 (and Articles 2(a)(i) and (ii) for completing payment on the first 500 Machines and last 600 Machines respectively), thereby necessarily reflecting extensions of the dates in the original Agreement. *See* FAC ¶ 18.  The Complaint also details numerous promises of payment and partial payments *after* April 15, 2018, again necessarily reflecting extensions of the date set in the original Agreement.  *See* FAC ¶¶ 25-47.

182.    To the contrary, on May 7, 2018, Kalfa would e-mail Tencer asking whether Plaintiff and Super Crypto could enter into "a new written agreement" with "more forceful terms" that Super Crypto "will absolutely pay the full balance" for the Remaining Machines.  *See id.*, Ex. 19.

Response:  Plaintiff disputes the materiality of the statement contained in paragraph 182, but admits that Mr. Kalfa sent the referenced May 7, 2018 email to Mr. Tencer containing the quoted language.

183.    In fact, to date, Plaintiff has not identified a post-April 15, 2018, date to which Article 3 was supposedly extended to, despite asserting in its pre-motion conference letter that Super Crypto and Plaintiff purportedly modified this date.  *See id.*, ¶19 and Ex. 5, at pp. 2-3.

Response:  Plaintiff states that paragraph 183 does not contain a material statement of fact for which a response is required under Local Civil Rule 56.1.   To the extent any response is required, Plaintiff states that it agreed to work with Defendants to provide flexibility on the timing of the overdue payments so long as Defendants would make such payments within a reasonable time and satisfy their stated intention to complete the purchase of the final 600 Machines.  Tencer Decl. ¶ 15; Ault Dep. (Mandel Moving Decl. Ex. A) at 165-167; Magot Dep. (Mandel Moving Decl. Ex. B) at 144-146, 168, 203-205; Mandel Moving Decl. Ex. SS, BBBB, HHHH.

184.    Notwithstanding this assertion, in an e-mail dated June 18, 2018 (the "June 18th E-mail"), Plaintiff's counsel noted that Super Crypto purportedly "defaulted" under the Agreement on April 15, 2018, and not on some other date.  *See id.*, Ex. 20.

Response:  Plaintiff admits that its counsel sent the June 18th E-mail indicating that Super Crypto was in default on a payment due under the Agreement on April 15, 2018.

185.    Pursuant to Article 13(d) of the Agreement, Plaintiff and Super Crypto agreed that "[t]he failure of a Party to insist upon strict adherence to any term of this Agreement on one or more occasions shall neither be considered a waiver nor deprive that Party of any right thereafter

to insist upon strict adherence to that term or any other term of this Agreement." *See id.*, Ex. 11, §13(d).

Response:  Plaintiff admits that Article 13(d) of the Agreement provides that "[t]he failure of a Party to insist upon strict adherence to any term of this Agreement on one or more occasions shall neither be considered a waiver nor deprive that Party of any right thereafter to insist upon strict adherence to that term or any other term of this Agreement."  Volynsky Decl., Ex. 11, § 13(d).

186.    There are no references in the FAC to any waiver of Article 3 of the Agreement. *See id.*, ¶8.

Response:  Plaintiff states that paragraph 186 does not contain a material statement of fact for which a response is required under Local Civil Rule 56.1.  To the extent any response is required, Plaintiff states that the FAC alleges detailed facts showing that Defendants chose to move forward with the purchase of the final 600 Machines in a manner that was patently incompatible with the continued applicability of Article 3 of the Agreement.  *See* FAC ¶¶ 18, 20-21, 24-47.

187.    Super Crypto also never stated to Plaintiff, in writing, that it was waiving Article 3 of the Agreement.  *See* Magot Decl., ¶¶26-27.

Response:  Plaintiff admits that Super Crypto never expressly stated in writing that it was waiving Article 3 of the Agreement, but states that Super Crypto and DPW made numerous statements in writing both prior to and after April 15, 2018 that were patently incompatible with Article 3 by confirming Defendants' intention to complete the transaction with respect to the purchase of the final 600 Machines pursuant to the Agreement.  *See* Mandel Moving Decl. Ex.

PP, UU, YY, ZZ, DDD, EEE, FFF, MMM, NNN, CCCC, DDDD, EEEE, FFFF, GGGG, IIII, ZZZZ (Exhibits B, D, F, G, I to stipulation).

188.    Thus, as set forth in Article 13(d) of the Agreement, "[a]ny waiver must be in writing and signed by the Party to be charged therewith."  *See* Volynsky Decl., Ex. 11, §13(d).

Response: Plaintiff admits that Article 13(d) of the Agreement provides that "[a]ny waiver must be in writing and signed by the Party to be charged therewith."

189.    Consequently, Super Crypto did not waive Article 3 of the Agreement prior to the Expiration Date.  *See* Magot Decl., ¶¶26-27.

Response:  Plaintiff states that paragraph 189 calls for a legal conclusion to which no response is required under Local Civil Rule 56.1.  To the extent any response is required, Plaintiff disputes the statement.  Prior to April 15, 2018, Defendants made numerous statements in writing that were patently incompatible with Article 3 by confirming their intention to complete the transaction with respect to the purchase of the final 600 Machines pursuant to the Agreement.  Magot Dep. (Mandel Moving Decl. Ex. B) at 53-55, 135-137, 158-159; Ault Dep. (Mandel Moving Decl. Ex. A) at 154-158, 168-169; Mandel Moving Decl. Ex. KK, PP, RR, SS, TT, UU.  The parties' email exchanges are sufficient to satisfy Article 13(d) of the Agreement, and in any event, a non-waiver clause such as Article 13(d) does not preclude a party from waiving another contractual term through course of performance.  *See* Plaintiff Moving SJ Brief at 16-17.

190.    In fact, Super Crypto never waived Article 3 of the Agreement.  *See id.*

Response:  Plaintiff states that paragraph 190 calls for a legal conclusion to which no response is required under Local Civil Rule 56.1.  To the extent any response is required, Plaintiff disputes the statement.  The parties' course of performance makes plain that Defendants

waived Article 3 by deciding to move forward with the purchase of the final 600 Machines.  Ault Dep. (Mandel Moving Decl. Ex. A) at 154-158, 162-163, 168-169, 179-180, 185-186, 203-209, 217-218, 221; Magot Dep. (Mandel Moving Decl. Ex. B) at 135-136, 158-159, 167-176, 188-189, 199-201, 203, 205-206, 217, 221-222; Mandel Moving Decl. Ex. PP, UU, YY, ZZ, DDD, EEE, FFF, MMM, NNN, CCCC, DDDD, EEEE, FFFF, GGGG, IIII, ZZZZ (Exhibits B, D, F, G, I to stipulation); Tencer Decl. ¶¶ 11, 19; *see* Plaintiff Moving 56.1 St. (ECF No. 126) ¶¶ 74-84; Plaintiff Moving SJ Brief at 14-18.  The parties' email exchanges are sufficient to satisfy Article 13(d) of the Agreement, and in any event, a non-waiver clause does not preclude a party from waiving another contractual term through course of performance.  *See* Plaintiff Moving SJ Brief at 16-17.

191.    Plaintiff's counsel also never asked Magot (Super Crypto's 30(b)(6) witness) point blank, during his deposition, whether Super Crypto ever "waived" Article 3.  *See* <u>Volynsky Decl.</u>, Ex. 9 (index does not contain any iteration of "waive").

<u>Response</u>:  Plaintiff states that paragraph 191 does not contain a material statement of fact for which a response is required under Local Civil Rule 56.1.  To the extent any response is required, Plaintiff states that while its counsel did not directly ask Mr. Magot for a legal conclusion as to whether he waived Article 3, Plaintiff's counsel elicited testimony from Mr. Magot as to Super Crypto's conscious decision not to invoke Article 3 because "he made the business decision to try to continue purchasing equipment."  Magot Dep. (Mandel Moving Decl. Ex. B) at 62-63.  Mr. Magot also testified that had he opted to rely on Article 3 to avoid purchasing the Machines, he would have communicated that decision to Plaintiff, but no such decision was ever made.  Magot Dep. (Mandel Moving Decl. Ex. B) at 192-195.  Furthermore, both Messrs. Ault and Magot testified at length at their depositions about a course of

performance that was patently incompatible with the Article 3 by confirming an intention to move forward with the purchase of the final 600 Machines.  Ault Dep. (Mandel Moving Decl. Ex. A) at 154-158, 162-163, 168-169, 179-180, 185-186, 203-209, 217-218, 221; Magot Dep. (Mandel Moving Decl. Ex. B) at 135-136, 158-159, 167-176, 188-189, 199-201, 203, 205-206, 217, 221-222.

192.    As such, as of April 16, 2018, the Deposit was forfeited.  *See* <u>Volynsky Decl.</u>, Ex. 11, §3.

<u>Response</u>:  Plaintiff admits that under the original terms of the Agreement, the Deposit was forfeited as of Super Crypto's failure to pay for the final 600 Machines by April 15, 2018, and that in any event, the Deposit and any subsequent partial payments were necessarily lost because Super Crypto breached the Agreement by failing to complete payment within any reasonable time frame.  Volynsky Decl. Ex. 11 §3; *see* Plaintiff's Moving SJ Brief (ECF No. 125) at 9-10.

193.    Plaintiff has never returned the Deposit to Super Crypto.  *See* <u>Volynsky Decl.</u>, Ex. 8 (<u>Kalfa Tr.</u>, 112:17-21).

<u>Response</u>:  Admitted.

194.    To this day, Plaintiff has retained the Deposit.  *See id.*; *see also* <u>Magot Decl.</u>, ¶17.

<u>Response</u>:  Admitted.

**At the time that the Agreement Expired, Plaintiff
Had Long Abandoned its Business and the Fair Market
<u>Value of the Machines Had Precipitously Declined</u>**

195.    As of April 16, 2018, Super Crypto was not required to pay the Remaining Amount and consummate a purchase of the Remaining Machines.  *See* <u>Volynsky Decl.</u>, Ex. 8 (<u>Kalfa Tr.</u>, 112:17-21).

<u>Response</u>:  Plaintiff states that paragraph 195 calls for a legal conclusion to which no response is required under Local Civil Rule 56.1.  To the extent any response is required, Plaintiff states that as of April 16, 2018, the parties had already modified any required payment dates, with Defendants also clearly indicating their intention to complete the transaction for all 1,100 Machines pursuant to the Agreement.  Tencer Decl. ¶¶ 8-11; Magot Dep. (Mandel Moving Decl. Ex. B) at 53-55, 135-137, 158-159; Ault Dep. (Mandel Moving Decl. Ex. A) at 154-158, 168-169; Mandel Moving Decl. Ex. KK, PP, RR, SS, TT, UU.

196.   Had Plaintiff been able to sell the Remaining Machines on April 16, 2018 (which it was contractually permitted to do) for a higher price than the contract price, Plaintiff would have undoubtedly retained the Deposit and proceeded to sell the Machines at such premium.  *See id.*, at 43:3-8; *see also* Ex. 7 (<u>Tencer Tr.</u>, 126:12-16).

<u>Response</u>:  Plaintiff states that paragraph 196 sets forth a hypothetical set of facts, which calls for improper speculation as to what it would have done had different circumstances occurred.  It is not possible, nor necessary, for Plaintiff to respond to such statement, which does not contain a material statement of fact, but requires Plaintiff to make predictions that have no factual foundation.  To the extent any further response is required, Plaintiff states as of April 16, 2018, the parties had already modified any required payment dates, with Defendants also clearly indicating their intention to complete the transaction for all 1,100 Machines pursuant to the Agreement.  *See* response to paragraph 195 *supra*.

197.   Tencer testified that, with respect to Plaintiff's transaction with Super Crypto, "we timed the market just perfectly to buy the machines and sell them at the top of the market, and then we're out.  We weren't planning on doing this business anymore."  *See id.*, Ex. 7 (<u>Tencer Tr.</u>, 126:12-16).

Response:  Plaintiff disputes the materiality of the statement contained in paragraph 197, but admits that Tencer testified as indicated in such paragraph.

198.    Thus, on April 4, 2018, Kalfa would e-mail Tencer noting that he was "still super uncomfortable, given that Bitmain still has the much cheaper machines available, and Leo just told me in next few days pricing will be going down another 10%.  We may just need to hold our breath and hope for the best." *See id.*, Ex. 21.

Response:  Plaintiff disputes the materiality of the statement contained in paragraph 198, but admits that Kalfa sent Tencer an email on April 4, 2018 containing the quoted language. Plaintiff further notes that as of April 4, 2018, Super Crypto had yet even to make the required payment for the first 500 Machines that had been due as of March 23, 2018, and accordingly Plaintiff was understandably uncomfortable about whether it would be able to collect its money. Tencer Dep. (Mandel SJ Opp. Decl. Ex. 2) at 120:5-11; Kalfa Dep. (Volynsky Decl. Ex. 8) at 123:4-12; Tencer Decl. ¶¶ 6-10.

199.    "Leo" was an individual that worked at Bitmain.  *See* Volynsky Decl.,  Ex. 8 (Kalfa Tr., 122:25-123:3).

Response:  Admitted.

200.    More than that, on April 17, 2018, Kalfa would send another e-mail (the "April 17th E-mail") to Tencer referencing the "biggest miracle ever!"  *See id.*, Ex. 22.

Response:  Plaintiff disputes the materiality of the statement contained in paragraph 200, but admits that Kalfa sent the April 17th E-mail referencing the "biggest miracle ever!" concerning Super Crypto finally satisfying its contractual obligation to buy the first 500 Machines.  Volynsky Decl. Ex. 22.

201.    Specifically, in the April 17th E-mail, Mr. Kalfa states that "They can buy this same item now for $1,070 now from Bitmain, that we sold them for $2,975!!! Here is a link in case you think im nuts HAAA." *See id.*

Response:  Admitted.

202.    Kalfa testified that the "same item" in the April 17th E-mail referred to the Machines. *See id.*, Ex. 8 (Kalfa Tr., 120:8-16).

Response:  Admitted.

203.    Tencer testified that the fair market value of the Machines as of April 17, 2018, was $1,070 per Machine. *See id.*, Ex. 7 (Tencer Tr., 117:19-25).

Response:  Admitted.

204.    Tencer also testified that the reference to the $1,070 price point in the April 17th E-mail meant that "the market had gone down for type of equipment, the demand has gone down, the price to buy the equipment went down." *See id.* (Tencer Tr., 117:15-18).

Response:  Admitted.

205.    In that same vein, on April 20, 2018, Kalfa would e-mail Tencer again stating that Plaintiff "got in and out" on the Machines "literally in the perfect window." *See id.*, Ex. 15.

Response:  Plaintiff disputes the materiality of the statement contained in paragraph 205, but admits that Kalfa sent an email to Tencer on April 20, 2018 containing the quoted language.

206.    Indeed, the market price for the Machines as of April 20, 2018, was less than what Plaintiff had paid for the Machines when it purchased them from Bitmain. *See* Volynsky Decl., Ex. 8 (Kalfa Tr., 133:14-20).

Response:  Admitted.

207.    More than that, Plaintiff also acknowledged that it was not actively seeking other purchasers for the Machines in July 2018, because, if it were to try to sell the Machines then, the amount that it could potentially sell the Machines for would be so small that it made the business decision to try to work out a resolution with Super Crypto.  *See* <u>Volynsky Decl.</u>, Ex. 7 (<u>Tencer Tr.</u>, 173:18-22).

<u>Response</u>:  Plaintiff disputes that the potential re-sale price was the primary reason that it was not actively seeking purchasers for the Machines in July 2018, as it was only referenced as an additional consideration in the partial excerpt quoted in paragraph 207 above.  The primary reason advanced by Mr. Tencer directly before such testimony for why Plaintiff wasn't attempting to re-sell the Machines at that time was as follows: "Because we were constantly working with them and adjusting the terms.  And, you know, every other day or every other week, we would you get a small wire, and they kept dragging us on.  If you read the correspondence, you'll see, you know, we want the machines.  Work with us."  Mr. Tencer also testified earlier that Plaintiff "didn't look for a buyer until we knew 100 percent that the bill wouldn't be paid."  Tencer Dep. (Volynsky Decl. Ex. 7; Mandel SJ Opp. Decl. Ex. 2) at 173:7-13, 165:21-166:1.

208.    Instead, "[i]t was [Plaintiff's] decision to try to cooperate with [Super Crypto] for as long, as long as possible until ***we decided that there is no hope.***" (emphasis added).  *See id.* (<u>Tencer Tr.</u>, 165:5-8).

<u>Response</u>:  Plaintiff disputes that the above quoted testimony was offered as an explanation for why Plaintiff did not actively seek other purchasers.  The testimony in question was offered in response to a question as to why Plaintiff did not commence suit in July 2018, with Mr. Tencer

also testifying that "[a] lawsuit is the last thing that any businessman wants."  Tencer Dep. (Volynsky Decl. Ex. 7; Mandel SJ Opp. Decl. Ex. 2) at 164:8-165:8.

209.    Upon the expiration of the Agreement, Super Crypto and Plaintiff, cognizant that there was no longer an Agreement, would engage in numerous back-and-forth negotiations to potentially work out some sort of new arrangement.  *See* Magot Decl., ¶¶18-19.

Response:  Plaintiff disputes that the parties were cognizant that there was no longer an Agreement as they continued to adjust the payment schedule in an effort to accommodate Defendants' cash flow issues.  To the contrary, Mr. Magot's internal communications consistently referred to an ongoing obligation on Super Crypto's part to pay for the final 600 Machines well after April 15, 2018, and he acknowledged at this deposition holding that view as late as just a few weeks before Plaintiff eventually sold the Machines to another party.  Mandel Moving Decl. Ex. X, Z, AA, CC, DD, EEE, PPP, QQQ, RRR, YYY, OOOO; Magot Dep. (Mandel Moving Decl. Ex. B) at 56-58, 70, 72, 75-79, 81-84, 159-161, 196-197, 233-234.

210.    Plaintiff never expressed its desire to exit the cryptocurrency space to Super Crypto. *See* Magot Decl., ¶20.

Response:  Plaintiff disputes the materiality of the statement contained in paragraph 210, but admits that it never expressed its desire to exit the cryptocurrency space to Super Crypto.

211.    In fact, as far as Magot was concerned, the cryptocurrency space was "a small community, and we wanted to maintain relationships.  And we were also, again, optimistic that the market could turn around."  *See* Volynsky Decl., Ex. 9 (Magot Tr., 186:12-14).

Response:  Plaintiff admits that Mr. Magot testified in the manner quoted above, and further states that Mr. Magot testified that rather than seeking to invoke Article 3 to walk away from the purchase of the final 600 Machines, he "made the business decision to try to continue

purchasing equipment" because that was in the best interest of the company.  Magot Dep.

(Mandel Moving Decl. Ex.) at 62-65.

212.    Notwithstanding, over the course of Super Crypto and Plaintiff's ultimately
fruitless negotiations, Plaintiff would routinely hurl threats of commencing legal action.  *See*
Magot Decl., ¶18.

Response:  Plaintiff admits that over the course of the many months during which
Defendants failed to keep their repeated promises of imminent payment for the final 600
Machines, Plaintiff threatened commencing legal action.  Ault Dep. (Mandel Moving Decl. Ex.
A) at 162-163, 205-206; Volynsky Decl. Ex. 24, 25, 26.

213.    For example, on May 14, 2018, Tencer would e-mail Magot initimating that
Blockchain may soon "have to start with lawyers, which is in neither of our interests."  *See*
Volynsky Decl., Ex. 24 (BMS000202).

Response:  Plaintiff admits that Mr. Tencer sent an email to Mr. Magot on May 14, 2018
indicating that "[t]he last thing I want to do is declare you in default of your contractual
obligation and have to start with lawyers, which is in neither of our interests."  Volynsky Decl.
Ex. 24.

214.    Similarly, on June 14, 2018, Tencer would send an e-mail stating that Blockchain
had retained Ronald Meister, Esq., from Plaintiff's counsel's firm and that Plaintiff has already
incurred legal fees.  *See id.*, Ex. 25 (DEFENDANTS_002901).

Response:  Admitted.

215.    On July 3, 2018, Ronald Meister would send an e-mail to Henry Nisser and
Thomas Rose intimating that Plaintiff would be commencing legal action if "full payment" was
not made by the close of business on July 5, 2018.  *See id.*, Ex. 26 (BMS000282).

Response:  Plaintiff admits that on July 3, 2018, Ronald Meister sent an email to Henry Nisser and Thomas Rose indicating that if full payment was not made by the close of business on July 5, Plaintiff would "take appropriate action seeking to dispose of the equipment and holding Super Crypto and DPW responsible for all damages incurred."  Volynsky Decl. Ex. 26.

**There is No Nexus in this Forum for Plaintiff's Claims**

216.    DPW initiated the following payments to Plaintiff, by wire transfer, on or about the corresponding date referenced below, from a U.S. Bank banking account (account number ending in 9499), held in the name of DPW (or its former name, Digital Power Corporation) (Volynsky Decl., Ex. 18, Interrogatory No. 9):

| DATE | AMOUNT |
|---|---|
| May 17, 2018 | $50,000.00 |
| May 25, 2018 | $5,000.00 |
| June 12, 2018 | $5,000.00 |
| July 17, 2018 | $1,000.00 |
| July 18, 2018 | $1,000.00 |
| July 19, 2018 | $5,000.00 |
| July 20, 2018 | $7,500.00 |
| July 23, 2018 | $5,000.00 |
| July 25, 2018 | $10,000.00 |
| July 27, 2018 | $10,000.00 |
| July 31, 2018 | $5,000.00 |
| August 1, 2018 | $5,000.00 |
| August 6, 2018 | $5,000.00 |

| August 17, 2018 | $5,000.00 |
|---|---|

Response:  Plaintiff admits that Plaintiff received payments from DPW through wires listing U.S. Bank as the "Ordering Institution" in amounts within $35 of those listed in the above table, within 1-5 days of the corresponding dates listed in the above table.  See Mandel Moving Decl. Ex. WW.  Additionally, DPW, acting through a law firm located in New York, initiated a payment for $100,000 on or around March 29, 2018 and another payment for $1,387,500 on or around April 17, 2018. See Ault Dep. (Mandel Moving Decl. Ex. A) at 153:9-17, 174:6-175:11; Mandel Moving Decl. Ex. WW.  The March 29, 2018, payment, per a wire confirmation sent by Mr. Magot to Mr. Tencer by email on March 28, 2018, lists "DPW - Disbursement" in the "Special Instructions" field, Mandel Moving Decl. Ex. OO, which Mr. Ault agreed showed that the funds from this payment came from DPW.  Ault Dep. (Mandel Moving Decl. Ex. A) at 153:9-17.  Mr. Magot confirmed that the funds for the April 17, 2018 payment also originated from DPW.  Magot Dep. (Mandel Moving Decl. Ex. B) at 162:18-24.

217.    The $5,000 payment referenced in paragraph 12 of the FAC was wired from a U.S. Bank account, held in the name of DPW.  See FAC, ¶12; Volynsky Decl., Exs. 31 (BMS000318-BMS000319) and 27 (BMS000563).

Response:   Plaintiff admits that the $5,000 payment referenced in Paragraph 12 of the FAC was wired from a U.S. Bank account held in the name of Ault & Company, Inc., while "DPW Holdings - SCM" is listed as the Originator Name, with the Originator State/Country listed as "Unknown Country."  Mandel SJ Opp. Decl. Ex. 3.

218.    Neither Defendant has ever wired any funds to Plaintiff from a JPMorgan Chase Bank, NA banking account.  See Volynsky Decl., Exs. 31 and 10 (Ault Tr., 174:2-5 ("MR.

MANDEL: And I can represent to you that Exhibit 65 are documents that were produced by Blockchain showing the various confirmation on any payments that were made in connection with this transaction.")); *see also* <u>Horne Decl.</u>, ¶7.

    <u>Response</u>:  Admitted.

    219.    In fact, none of the alleged payments that were made to Plaintiff by Defendants originated from a New York based banking account.  *See* <u>Volynsky Decl.</u>, Exs. 31 and 10 (<u>Ault Tr.</u>, 174:2-5).

    <u>Response</u>: Admitted.

    220.    Nor were such payments received by Plaintiff in a New York based banking account.  *See id.*

    <u>Response</u>:  Admitted.

    221.    Ault did not send a series of text messages to Plaintiff on May 3, 2018, indicating that he was in New York, New York, as alleged in Paragraph 10 of the FAC.  *See* FAC, ¶10; <u>Volynsky Decl.</u>, Exs. 28 and 7 (<u>Tencer Tr.</u>, 233:23-25).

    <u>Response</u>: Denied.  On May 2, 2018, Mr. Ault's assistant, Mariah Corbett, wrote to Mr. Tencer to schedule a call between Mr. Tencer and Mr. Ault on May 3, 2018.  Mandel SJ Opp. Decl. Ex. 4.  In doing so, Ms. Corbett indicated to Mr. Tencer that Mr. Ault and she were "in New York."  *Id.*  Messrs. Ault and Tencer then corresponded regarding a call time while Mr. Ault was in New York.  *Id.*  Later on May 3, around 3:45 PM, Mr. Ault emailed Mr. Tencer, apparently to provide Mr. Tencer with Mr. Ault's telephone number.  Mandel SJ Opp. Decl. Ex. 5.  On May 3, beginning at 4:51 PM, Mr. Tencer and Mr. Ault exchanged a number of text messages in which Mr. Ault, who was still in New York, represented that "I am seriously with

my banker." Later in the evening of May 3, Mr. Ault and Mr. Tencer exchanged the following

text messages:

      Mr. Ault at 6:56 PM: I am at dinner with the lender

      Mr. Ault at 6:57 PM: I will text you when done

      Mr. Ault at 6:57 PM: I promise will wrap up by Friday

      Mr. Tencer at 7:02 PM: Ok. Which Friday?

      Let's talk anyway.

      Call me when you can.

      The wine is on me.

      Mr. Ault at 7:07 PM:



      Mr. Ault at 7:07 PM: So you don't think I am nuts

Mandel SJ Opp. Decl. Ex. 6 at BMS 001340-1341.

      As such, Mr. Ault did, in fact, send a series of text messages to Mr. Tencer on May 3,

2018, that, when viewed in the context of Mr. Ault's email and phone conversations with Mr.

Tencer on the same date, clearly indicated that Mr. Ault was "meeting with a lender in New York, New York, to obtain funds to pay the amounts owed to Plaintiff under the Asset Purchase Agreement, even going so far as to send Plaintiff's president a photograph of the dinner he was having with the lender to prove to Plaintiff that he was in New York." FAC ¶ 10.

222.    The photograph referenced in paragraph 10 of the FAC was that of Ault's former assistant, and not a lender in New York. *See* FAC, ¶10; Volynsky Decl., Ex. 10 (Ault Tr., 188:25-189:15).

Response:  Although Plaintiff admits that Mr. Ault indicated that the woman most clearly visible in the photograph referenced in paragraph 10 of the FAC (and reproduced in Plaintiff's Response to paragraph 221 of Defendants' Rule 56.1 Statement, *supra*) is Ms. Corbett, Mr. Ault's former assistant, Plaintiff notes that Mr. Ault's own contemporaneous text messages to Mr. Tender indicate that this photograph was taken during "dinner with the lender" and that he sent this photograph to Mr. Tencer as proof of that dinner so that Mr. Tencer would not "think [Mr. Ault is] nuts." Mandel SJ Opp. Decl. Ex. 6 at BMS 001340-1341.

223.    The Machines are not and were never in New York. *See* Magot Decl., ¶¶29-31.

Response:  Admitted.

224.    To that end, the storage facility where the Machines were stored was also not located in New York. *See id.*

Response:  Admitted.

225.    Neither DPW, the alleged promisor, nor Plaintiff, the alleged promisee, are New York domiciliaries. *See* Magot Decl., ¶32; Horne Decl., ¶4; FAC, ¶2.

Response:  Plaintiff admits that it is not a New York domiciliary and further admits that DPW is neither incorporated nor headquartered in New York. However, DPW is registered to do

business in New York, Mandel SJ Opp. Decl. Ex. 7, which is sufficient to subject it to general jurisdiction in New York. *See Mallory v. Norfolk Southern Railway Co.*, 600 U. S. __ (2023); *Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 498 (2d Cir. 2020).

226.    On or about October 29, 2018, Kalfa messaged a former colleague of his from Backbone Hosting Solutions, Inc. ("Backbone") and would offer, without provocation, a six-month payment plan for the purchase of the Remaining Machines. *See* <u>Volynsky Decl.</u>, Exs. 29 and 8 (<u>Kalfa Tr.</u>, 181:14-182:15; 184:2-6).

<u>Response</u>:  Plaintiff admits that on or about October 29, 2018, Kalfa messaged an individual from Backbone, an entity to which Plaintiff had previously sold miners, and offered to sell 600 miners for the same price as Bitmain, but with a six-month payment plan as an incentive since Kalfa knew that Backbone was already buying from Bitmain.  Kalfa Dep. (Volynsky Decl. Ex. 8) at 181:14-182:15, 184:2-6, 184:12-185:2; Volynsky Decl. Ex. 29.

227.    Plaintiff would not reach out to or seek out any other purchasers for the Remaining Machines, despite acknowledging that the same model as the Remaining Machines was listed on Bitmain for somewhere between $300 to $500 during that time. *See id.*, Ex. 8 (<u>Kalfa Tr.</u>, 184:7-11; 185:6-12).

<u>Response</u>:  Plaintiff admits that Mr. Kalfa could not recall having reached out to other potential purchasers of the 600 Machines at this stage, and that he thought the Bitmain price at the time was "probably in the 3 to 500 range, probably something like that."  However, Backbone indicated to Mr. Kalfa that it was buying miners in Canada for $280.  Kalfa Dep. (Volynsky Decl. Ex. 8; Mandel SJ Opp. Decl. Ex. 8) at 184:7-11, 185:3-12-186:6; Volynsky Decl. Ex. 29.

228.    Prior to Plaintiff's sale of the Remaining Machines to Backbone (the Backbone Sale"), Plaintiff neither informed Super Crypto of the sale price nor the payment plan that it had agreed to in connection with the Backbone Sale.  *See* <u>Magot Decl.</u>, ¶23.

<u>Response</u>:  Plaintiff disputes the materiality of the statement contained in paragraph 228, but admits that it did not inform Super Crypto of the sale price nor the payment plan that it had agreed to with Backbone prior to the sale.


Dated:  August 15, 2023                          COWAN, LIEBOWITZ & LATMAN, P.C.
                                                 Attorneys for Plaintiff


                                                 By:_____
                                                       Richard S. Mandel (rsm@cll.com)
                                                       Dasha Chestukhin (dxc@cll.com)
                                                 114 West 47th Street
                                                 New York, New York 10036
                                                 (212) 790-9200