**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLOCKCHAIN MINING SUPPLY AND SERVICES LTD., <br><br> Plaintiff, <br><br> –against– <br><br> SUPER CRYPTO MINING, INC. n/k/a DIGITAL FARMS, INC. and DPW HOLDINGS, INC. n/k/a AULT ALLIANCE, INC., <br><br> Defendants. | Civil Action No. 1:18-cv-11099-ALC |

**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel (rsm@cll.com)
Dasha Chestukhin (dxc@cll.com)
114 West 47th Street
New York, New York 10036
(212) 790-9200

*Attorneys for Plaintiff Blockchain Mining Supply &
Services Ltd.*

31592/000/4425682

TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... ii

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT ........................................................................................................ 2

I.     PLAINTIFF HAS ESTABLISHED ITS BREACH OF CONTRACT CLAIM AS A
MATTER OF LAW .................................................................................... 2

    A.    The Parties Amended the Original Agreement to Remove Article 3 ................... 2

    B.    Defendants Waived Article 3 ................................................................ 4

    C.    The Reasonableness of the Resale Price is Undisputed ........................................ 5

    D.    Defendants' Agreement to Pay Storage Costs is Also Undisputed ....................... 6

II.    SUPER CRYPTO IS AN ALTER EGO OF DPW, PERMITTING PIERCING OF THE
CORPORATE VEIL AS A MATTER OF LAW ................................................. 6

    A.    DPW and Super Crypto Operated as a Single Economic Entity .......................... 7

        1.    Super Crypto's Undercapitalization Shows It Was Set Up for Financial
Failure ............................................................................. 8

        2.    DPW and Super Crypto Failed to Observe Corporate Formalities with One
Another ............................................................................ 9

        3.    DPW Treated Super Crypto as a Façade ................................................. 11

        4.    The Lack of Siphoning From Super Crypto Is Irrelevant ........................ 12

    B.    DPW and Super Crypto Abused the Corporate Form to Perpetrate an Injustice .. 13

CONCLUSION ..................................................................................................... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.V.E.L.A. Inc. v. Estate of Marilyn Monroe, LLC,*
    364 F. Supp. 3d 291 (S.D.N.Y. 2019) ........................................................................... 7, 12

*Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.,*
    578 F. Supp. 3d 467 (S.D.N.Y. 2022) ................................................................................ 3

*Apex Oil Co. v. Belcher Co. of New York, Inc.,*
    855 F.2d 997 (2d Cir. 1988) ............................................................................................. 6

*In re BH S&B Holdings LLC,*
    420 B.R. 112 (Bankr. S.D.N.Y. 2009) .............................................................................. 8

*De Sole v. Knoedler Gallery, LLC,*
    139 F. Supp. 3d 618 (S.D.N.Y. 2015) ......................................................................... 10, 11

*Fletcher v. Atex, Inc.,*
    68 F.3d 1451 (2d Cir. 1995) ......................................................................................... 6, 12

*Ion Audio, LLC v. Bed, Bath & Beyond, Inc.,*
    2019 WL 1494398 (S.D.N.Y. Apr. 2, 2019) ..................................................................... 3

*Irwin & Leighton, Inc. v. W.M. Anderson Co.,*
    532 A.2d 983 (Del. Ch. 1987) .......................................................................................... 7

*Leber Assocs., LLC v. Entm't Grp. Fund, Inc.,*
    2003 U.S. Dist. LEXIS 13009, 2003 WL 21750211 (S.D.N.Y. July 22, 2003) ................................. 12

*Mobil Oil Corp. v. Linear Films, Inc.,*
    718 F. Supp. 260 (D. Del. 1989) ..................................................................................... 13

*Mohegan Lake Motors, Inc. v. Maoli,*
    559 F. Supp. 3d 323 (S.D.N.Y. 2021) ............................................................................. 13

*NetJets Aviation, Inc. v. LHC Communs., LLC,*
    537 F.3d 168 (2d Cir. 2008) .................................................................................... *passim*

*Rosensaft v. Ashton Tech. Grp., Inc.,*
    1998 WL 101959 (S.D.N.Y. Mar. 5, 1998) ...................................................................... 6

*Star Funding, Inc. v. Vault Minerals, LLC,*
    2018 WL 1581685 (S.D.N.Y. Mar. 28, 2018) .................................................................. 5

*Symphony Fabrics Corp. v. Podell Indus.,*
    1996 WL 497011 (S.D.N.Y. Aug. 30, 1996) .................................................................... 3

31592/000/4425682

*Tesoro Petroleum Corp. v. Holborn Oil Co.*,
   145 Misc.2d 715, 547 N.Y.S.2d 1012 (Sup. Ct. N.Y. Cty. 1989) ........................... 6

*Trs. of Arden v. Unity Constr. Co.*,
   2000 WL 130627 (Del. Ch. Jan. 26, 2000) ...................................................... 9

**Statutes**

N.Y. U.C.C. § 2-209(4) ................................................................................. 4

N.Y. U.C.C. § 2-706 ................................................................................. 5, 6

U.C.C. § 2-309(1) ..................................................................................... 3

iii

## PRELIMINARY STATEMENT

Unable to rebut the overwhelming evidence establishing Plaintiff's breach of contract claim as a matter of law, Defendants urge the Court simply to disregard it.  While Defendants would understandably prefer to avoid the long-documented history of their unequivocal commitment to move forward with the purchase of the final 600 Machines, there is no basis for ignoring Plaintiff's Rule 56.1 Statement or the critical evidence summarized therein.  The fact that there is a large volume of evidence substantiating Plaintiff's claim does not somehow allow the Court to ignore it, however convenient that approach might be for Defendants.

When Defendants actually attempt to address the merits, they fail to raise any basis for avoiding summary judgment.  As set forth in Plaintiff's moving and opposition briefs, the parties plainly modified their original agreement to accommodate Defendants' cash flow issues and stated continuing intent to purchase *all* 1,100 Machines by agreeing to allow the purchase of the final 600 Machines to be completed within a reasonable time frame.  Such an arrangement matches precisely what the U.C.C. imposes in the absence of a definitive agreed date, and thus belies Defendants' contention that the parties' amendment was too indefinite to enforce.  The parties' emails confirming the foregoing terms satisfies the contractual requirement of a signed writing, and even if they didn't, the attempted modification supported by actions patently inconsistent with the parties' original agreement establishes a waiver as a matter of law.

The undisputed evidence also establishes that Super Crypto is an alter ego of DPW, its parent company, rendering DPW equally liable for Super Crypto's breach.  Indeed, this Court has already credited much of that evidence developed during jurisdictional discovery in holding that Plaintiff had "established that Super Crypto and DPW operated as a single economic entity." The same result follows on this motion where additional discovery has only reinforced the fact

that DPW exercised complete domination and control over Super Crypto. Woefully undercapitalized from the outset, Super Crypto had no ability to meet its obligations without DPW's support. By determining which of Super Crypto's many creditors would be paid and how and when they would be paid, DPW retained the ability to choose which of Super Crypto's overextended obligations Defendants would elect to meet. Such a situation presents precisely the kind of unfairness or injustice the law requires for imposition of alter ego liability.

## ARGUMENT

### I.    PLAINTIFF HAS ESTABLISHED ITS BREACH OF CONTRACT CLAIM AS A MATTER OF LAW

Defendants' various arguments for avoiding liability on Plaintiff's breach of contract claim have been fully addressed in Plaintiff's prior submissions on this motion. They are all devoid of merit.

#### A.    The Parties Amended the Original Agreement to Remove Article 3

Defendants contend that the specifics of the alleged breach are unclear. However, as detailed in Plaintiff's moving and opposition papers, Defendants breached the Agreement by failing to pay the balance set forth in the Agreement for the final 600 Machines ($1,621,375) within a reasonable time after committing to completion of the transaction. Pl. SJ Moving Br. at 10; Pl. SJ Opp. Br. at 9-10. Where Defendants had ceased making any further payments to reduce that balance for more than two months, they were clearly in breach at the time Plaintiff chose to re-sell the 600 Machines. *See* Pl. Moving 56.1 St. ¶¶ 81-87.

Defendants' claim that the Agreement had expired before any amendment occurred is at odds with the undisputed evidence showing that the parties had modified the timetable set in the original Agreement well before April 15, 2018 in order to accommodate Defendants' cash flow issues *and* its clearly stated intent to complete the purchase of all 1,100 Machines. *See* Pl. S.J.

2

Opp. Br. at 3-4, 8-9; Pl. Response 56.1 St. ¶ 175; Pl. Moving 56.1 St. ¶¶ 62-63, 74.  With

Defendants already in default of their obligation on the first 500 Machines, the parties' email

exchanges in the days leading up to April 15, 2018 clearly confirmed Defendants' intent to

promptly complete the purchase of all 1,100 Machines and Plaintiff's agreement to hold those

Machines beyond the dates in the contract to permit payment to be completed within a

reasonable time.  Mandel Moving Decl. Ex. PP, RR, SS, TT, UU.

      The parties' emails satisfy the contractual requirement of a written modification.  *See*,

*e.g.*, *Ion Audio, LLC v. Bed, Bath & Beyond, Inc.*, 2019 WL 1494398, at *3 (S.D.N.Y. Apr. 2,

2019).  Contrary to Defendants' contention, they are also sufficiently definite to constitute a

binding agreement.  Indeed, the setting of a reasonable time frame for completion of payment

perfectly mirrors the term imposed by the U.C.C. in the absence of a definitive agreed time for

completion of any action under a sales contract. U.C.C. § 2-309(1); *see also Alessi Equip., Inc. v.*

*Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 495 (S.D.N.Y. 2022); *Symphony Fabrics*

*Corp. v. Podell Indus.*, 1996 WL 497011, at *7 (S.D.N.Y. Aug. 30, 1996).

      Nor can Defendants avoid the effect of the amendment by claiming that it would have

merely postponed the date by which the Agreement would have become "null and void."  Such

an interpretation would effectively obligate Plaintiff to continue holding the 600 Machines for

Defendants indefinitely, while leaving Defendants free to pay whatever amounts they might

choose to, on whatever schedule they elected, without any accompanying obligation to complete

the purchase.  Nothing in the deposition testimony of Messrs. Tencer and Kalfa, which was

focused solely on the adjustment of the payment obligation date, supports such an illogical

reading.  *See* Plaintiff Response to Defendants' Supplemental 56.1 Facts ¶¶ 249-250.

      Moreover, as Defendants continued making additional payments toward the amount due

on the final 600 Machines, it becomes incongruous for them to claim that their exposure was somehow still limited to the initial deposits set forth in paragraph 2(a)(iii) of the Agreement. Such a position is refuted by Defendants' own recognition that their additional payments totaling almost $90,000 were also forfeited. In this respect, Defendants' attempt to turn paragraph 2(a)(iii) of the Agreement into a liquidated damages provision capping the amount of Plaintiff's recovery is without any basis. The non-refundable deposits, as well as the additional amounts paid, were all properly retained by Plaintiff as partial payments toward the full payment obligation that Defendants unequivocally acknowledged but failed to satisfy.

### B.    Defendants Waived Article 3

Defendants characterize Plaintiff's waiver argument as a "curious[] rehash[ing]" of its modification position. Def. SJ Opp. Br. at 15. However, the language of N.Y. U.C.C. § 2-209(4) directly explains the rationale for Plaintiff's alternative argument by making clear that "an attempt at modification" that does not satisfy the requirements of a signed writing "can operate as a waiver." Thus, even assuming that the relevant email exchanges relied on by Plaintiff fail to establish a written modification, they can still serve, along with the other conduct unequivocally acknowledging Defendants' intention to purchase the final 600 Machines, to waive Article 3.

Defendants seek to brush aside the compelling evidence that they waived Article 3 as an attempt to appease Plaintiff and avoid litigation. But the record shows that Defendants clearly manifested their intention to complete the purchase of the final 600 Machines at a time when they could simply have refused to buy them without any fear of litigation. Thus, on April 10, 2018, five days before they would otherwise have been relieved of any obligation to buy the final 600 Machines under Article 3, Mr. Ault, DPW's CEO, sent two emails in response to Plaintiff's expressed willingness to hold all 1,100 Machines beyond the contractual dates if payment were

4

completed within a reasonable time. Those emails unequivocally indicated that Defendants would complete the purchase of the final 600 Machines within the next ten days (notably after April 15, 2018). Mandel Moving Decl. Ex. TT, UU.

Defendants made those communications for only one reason – they still wanted the final 600 Machines and did not want Plaintiff to sell them to someone else. Both of Defendants' principals acknowledged at their deposition that they wanted *all* 1,100 Machines at *all* times throughout their dealings with Plaintiff, both before and after April 15, 2018. *See*, *e.g.*, Ault Dep. (Mandel Moving Ex. A) at 155-158, 180; Magot Dep. (Mandel Moving Ex. B) at 135, 171. That is also what they consistently told Plaintiff, as reflected in more than six months' worth of communications. It is difficult to conceive of how Defendants could possibly have made any clearer their decision to complete the transaction rather than simply take the first 500 Machines and forfeit the deposit on the rest. Accordingly, this Court should find that they waived Article 3 as a matter of law. *See* Pl. SJ Moving Br. at 14-18 (citing cases).

### C.    The Reasonableness of the Resale Price is Undisputed

Although Defendants purport to dispute the reasonableness of Plaintiff's resale of the 600 Machines under N.Y. U.C.C. § 2-706(2), Super Crypto's CEO, Mr. Magot, who closely followed the market at least weekly as of 2018, testified that he had no reason to believe the resale price obtained by Plaintiff was unreasonable given marketplace conditions. Magot Dep. (Mandel Moving Ex. B) at 235-237. Indeed, he had noted the substantial market decline to Plaintiff just a month prior to the resale. Mandel Moving Ex. NNNN. "A resale need not be at the highest price possible to meet the standard of commercial reasonableness." *Star Funding, Inc. v. Vault Minerals, LLC*, 2018 WL 1581685, at *2 (S.D.N.Y. Mar. 28, 2018).

Moreover, Defendants' characterization of the transaction as a "hurried resale" (Def. SJ Opp. Br. at 16) is belied by the many months in which Plaintiff waited for Defendants to follow

through on their repeated promises of payment.  Following two months without any additional

payments, Plaintiff acted in a commercially reasonable manner by re-selling the Machines

without further delay and seeking to recover the difference between the contract price and resale

price.  *See*, *e.g.*, *Rosensaft v. Ashton Tech. Grp., Inc.*, 1998 WL 101959, at *1-2 (S.D.N.Y. Mar.

5, 1998); *Tesoro Petroleum Corp. v. Holborn Oil Co.*, 145 Misc.2d 715, 723, 547 N.Y.S.2d

1012, 1017 (Sup. Ct. N.Y. Cty. 1989); *see also* N.Y. U.C.C. § 2-706 cmt. 5 (UCC "merely

clarifies the common law rule that the time for resale is a reasonable time after the buyer's

breach").[1]

### D.    Defendants' Agreement to Pay Storage Costs is Also Undisputed

There is likewise no dispute that Defendants agreed to pay for storage once they were

unable to make payment and take delivery of the final 600 Machines.  *See* Ault Dep. (Mandel

Moving Ex. A) at 230-231, Magot Dep. (Mandel Moving Ex. B) at 83, 224-226.  Accordingly,

Plaintiff is entitled to summary judgment on the storage charges as well.  *See* Pl. SJ Moving Br.

at 18-19 (citing cases).

## II.    SUPER CRYPTO IS AN ALTER EGO OF DPW, PERMITTING PIERCING OF THE CORPORATE VEIL AS A MATTER OF LAW

As set forth in Plaintiff's moving brief (ECF No. 125 at 19-25), Plaintiff has proven that

Super Crypto is an alter ego of DPW.  The parties agree on the operative legal standard for

prevailing on an alter ego theory under Delaware law.  *See* Def. SJ Opp. Br. at 18 (Plaintiff

required to show that (1) DPW and Super Crypto operated as a single economic entity and (2) an

overall element of unfairness or injustice is present) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d

---

[1]Defendants' reliance on *Apex Oil Co. v. Belcher Co. of New York, Inc.*, 855 F.2d 997 (2d Cir. 1988) is misplaced.  There, plaintiff sought to recover based on a later resale than the one involving the goods identified to the contract.  *Id*. at 1007.  There is no dispute here that Plaintiff resold the same 600 Machines to be purchased by Defendants.

6

1451, 1457 (2d Cir. 1995)).

At its core, veil piercing is an equitable theory and therefore requires the Court to take a holistic view of the relevant facts. *See NetJets Aviation, Inc. v. LHC Communs., LLC*, 537 F.3d 168, 176 (2d Cir. 2008). Although courts often enumerate factors that can be considered in deciding whether to pierce a corporate veil, this analysis "'cannot be reduced to a single formula that is neither over- nor under-inclusive.'" *Id.* at 177 (quoting *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 989 (Del. Ch. 1987)). The undisputed facts here show that Super Crypto "simply functioned as a facade fort the dominant shareholder," thereby supporting a finding of alter ego as a matter of law. *See A.V.E.L.A. Inc. v. Estate of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 318 (S.D.N.Y. 2019).

## A.    DPW and Super Crypto Operated as a Single Economic Entity

After the parties completed limited jurisdictional discovery regarding alter ego status as well as personal jurisdiction (*see* ECF No. 56 at 2), Defendants moved to dismiss Plaintiff's alter ego theory. *See* ECF Nos. 73, 75 at 13-22. In denying Defendants' motion based, in part, on the documents uncovered during jurisdictional discovery, this Court concluded that "Plaintiff established that Super Crypto and DPW operated as a single economic entity" (ECF No. 92 at 6). The Court's conclusion was based on the following evidence, all of which remains equally applicable on this motion:

- "Plaintiff established that Super Crypto was not adequately capitalized for the contract because their debts outweighed their assets, and they received 'loans' from DPW that they were not obligated to pay back." *Id.* at 6.

- "Plaintiff also established that Super Crypto was never solvent because their balance sheets showed negative balances in 2018, its first year of existence, through 2020, its last year of existence. Moreover, Super Crypto maintained its own bank account for only a short while, after which it appears that DPW assumed full control of Super Crypto's finances. Indeed, all payments made pursuant to the agreement were either directly remitted by DPW or with DPW's

7

funds, with DPW depositing those funds into Super Crypto's account shortly before Super Crypto made its payments." *Id.* at 6-7.

- "[Plaintiff] has demonstrated that Ault, and DPW, was the final decision maker for the negotiations and deals under the agreement. Communications from Super Crypto show that Ault provided the final sign offs on payments, facilitated the wire payments, and directed Super Crypto's interactions with Blockchain." *Id.* at 7.

Indeed, full discovery has not only corroborated the Court's conclusions, but has revealed additional evidence proving that Super Crypto was a puppet of DPW, with no viable existence.

### 1. Super Crypto's Undercapitalization Shows It Was Set Up for Financial Failure

Although Plaintiff's opening brief explained why Super Crypto was inadequately capitalized (ECF No. 125 at 23), Defendants disingenuously claim that "it is undisputed that [Super Crypto] was adequately capitalized for the corporate undertaking that it absolutely obligated itself to." Def. SJ Opp. Br. at 20. Initial undercapitalization is important to the alter ego analysis because it can show whether a subsidiary was set up for an improper purpose. *In re BH S&B Holdings LLC*, 420 B.R. 112, 136 (Bankr. S.D.N.Y. 2009).[2] In *BH S&B*, upon which Defendants rely, the plaintiff conceded that the entity whose veil was to be pierced had been established for a legitimate business purpose. *Id.* Here, by contrast, Super Crypto was set up for the improper purpose of acting as DPW's facade, so DPW could engage in the volatile cryptocurrency market while hiding behind a judgment-proof subsidiary. Defendants concede that Super Crypto's short-lived bank account ██████████████████████████████████ ████████████████████████████████████████████████—even as Super Crypto took on ████████████ in obligations. Pl. Moving 56.1 St. ¶¶ 12-15, 26-29.

---

[2] As addressed below, however, "the plaintiff need *not* prove that the corporation was created with fraud or unfairness in mind. *It is sufficient to prove that it was so used.*" *NetJets*, 537 F.3d at 177 (emphases added).

8

Defendants argue that Super Crypto was adequately capitalized because, *inter alia*, it generated revenues from cryptocurrency mining operations.  Def. Opp. Br. at 20.  However, this ignores that, despite such revenues, ███████████████████████████████████████████

███.  Mandel Reply Decl. Ex. CCCCC.  Moreover, Mr. Magot acknowledged that Super Crypto's mining revenues would never have been anywhere near enough to cover the kind of obligation undertaken in the Agreement, let alone the other obligations taken on by Super Crypto.  Magot Dep. (Mandel Reply Ex. DDDDD) at 110:24-111:13. As Mr. Ault explained, Super Crypto would not exist at all if it did not have a "supportive" parent company providing capital to finance its ongoing operations. Ault Dep. (Mandel Reply Ex. EEEEE) at 65:19-67:3. That is because Super Crypto was never intended to function as a real company, but a mere facade for DPW, which was responsible for propping it up.[3]

## 2.    DPW and Super Crypto Failed to Observe Corporate Formalities with One Another

A crucial question when assessing whether corporate formalities were observed is whether the parent and subsidiary "'failed to follow legal formalities *when contracting with one another*,'" which would be "'tantamount to declaring that they are indeed one in the same.'" *NetJets*, 537 F.3d at 178 (quoting *Trs. of Arden v. Unity Constr. Co.*, 2000 WL 130627, at *3 (Del. Ch. Jan. 26, 2000)) (emphasis in original).  DPW and Super Crypto followed no such formalities.  Mr. Ault described the money given by DPW to Super Crypto as both "advances" and "loans," showing that DPW provided funds to Super Crypto casually and informally.  Ault Dep. (Mandel Moving Ex. A) 68:11-70:3. Certainly DPW and Super Crypto never entered into

---

[3] Defendants' insinuation that Plaintiff was undercapitalized (Def. SJ Opp. Br. at 21) is a red herring that has no impact on whether Super Crypto was DPW's alter ego.  Nor are the situations comparable, as there is no evidence that Plaintiff was unable to meet any of its obligations.

any loan agreements or other formalized arrangements. *Id*.; Magot Dep. (Mandel Moving Ex. B) 150:5-151:21. Even though DPW provided the over-$1.5 million that was paid to Plaintiff alone (to say nothing of Super Crypto's other vendors), DPW's relationship with Super Crypto was sufficiently permeable that the parties did not bother with any formal agreement, written or otherwise.

Contrary to Defendants' assertion, Plaintiff does not claim that the lack of a formal loan agreement between DPW and Super Crypto per se caused Plaintiff's injury. Def. SJ Opp. Br. at 24. However, the lack of any formal arrangement concerning the millions flowing from DPW to Super Crypto is compelling evidence that the two operated as alter egos. Defendants' statement that the "repayment terms … would be worked out *in the end*" (*id*. at 25 (emphasis added)) is self-serving where DPW and Super Crypto admittedly never took any steps to formalize or even discuss repayment terms. Under Defendants' reasoning, DPW and Super Crypto should be deemed to have an arm's-length agreement based solely on their (post facto) stated intent to formalize it. Under the Second Circuit's reasoning in *NetJets*, Defendants' failure to follow legal formalities where DPW was "lending" Super Crypto millions of dollars is tantamount to a declaration that they are one and the same. *See NetJets*, 537 F.3d at 178; *De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 667 (S.D.N.Y. 2015).

Further, as laid out in Plaintiff's moving brief, there was significant overlap between the officers and directors of DPW and Super Crypto, and the entities shared the same address. Pl. SJ Moving Br. at 22; Pl. Moving 56.1 St. ¶¶ 30-33. The fact that Mr. Magot himself was not a DPW employee, director or officer during the relevant time period (Def. SJ Opp. Br. at 22) does not change the outcome, especially since it was Mr. Ault who was the ultimate decisionmaker for DPW and Super Crypto. *See, e.g.*, Pl. Moving 56.1 St. ¶¶ 48-54, 62-70. Indeed, Mr. Magot

10

himself referred to Mr. Ault as "*our* CEO." Mandel Moving Ex. II (emphasis added). There does not have to be perfect overlap between parent and subsidiary to find veil piercing. *See, e.g.*, *De Sole*, 139 F. Supp. 3d at 666 (significant overlap in personnel sufficient to weigh in favor of alter ego finding).

### 3. DPW Treated Super Crypto as a Façade

The documentary evidence overwhelmingly establishes that DPW was effectively running Super Crypto. DPW was Super Crypto's dominant funding source and Super Crypto had to get DPW's blessing to proceed with the Agreement. Defendants' claim that Mr. Magot handled some day-to-day operations of Super Crypto (Def. SJ Opp. Br. at 22-23) ignores the fact that DPW was Super Crypto's primary source of funds and therefore the ultimate arbiter of whether Super Crypto would have the money to enter into a given transaction. Mr. Ault acknowledged that, as CEO of DPW, he would personally "determine what amount of funding to make available to Super Crypto." Ault Dep. (Mandel Moving Ex. A) 84:4-12. Mr. Magot's self-serving claim that Super Crypto decided what to purchase and when is refuted by his concessions that DPW decided whether to make funds available for a particular purchase and that he did, in fact, get DPW's approval to enter into the Agreement. Magot Dep. (Mandel Reply Ex. DDDDD) at 88:6-89:12; Magot Dep. (Mandel Moving Ex. B) at 93:14-94:10. Confirming DPW's dominance is the fact that all payments to Plaintiff were funded by DPW. Mandel Moving Ex. H.

Defendants argue that DPW could not have dominated Super Crypto because DPW allegedly allocated funds to Super Crypto without specifying exactly how to spend such funds. Def. SJ Opp. Br. at 24. However, the evidence makes clear that DPW was, in fact, intimately involved in the decisions of whom to pay what and when. *See, e.g.*, Mandel Moving Exs. J-DD. Mr. Magot would write to Mr. Ault with requests for funds—almost always coupled with a list of

11

Super Crypto's then-outstanding obligations—and Mr. Ault would instruct DPW's comptroller to wire funds.  In conjunction with one of Mr. Magot's many emailed requests to DPW for funds, he explicitly stated that Mr. Ault was asking him to provide an updated list so Mr. Ault "can then direct us on how much can be wired today and to whom."  Mandel Moving Ex. AA.  Not only did DPW fund all payments to Plaintiff, but it *directly* wired all funds sent to Plaintiff after April 17, 2018.  Mandel Moving Ex. WW.   There can be no doubt that DPW was in charge.

### 4.      The Lack of Siphoning From Super Crypto Is Irrelevant

Defendants devote a full page to Plaintiff's purported failure to show that DPW siphoned funds from Super Crypto, claiming this is "fatal to [Plaintiff's] veil-piercing claim."  Opp. Br. at 26 (citing *Fletcher*, 68 F.3d at 1461).  This is inaccurate.  In *Fletcher*, the court affirmed a summary judgment decision against plaintiffs because they had speculatively asserted (but failed to prove) that one defendant siphoned funds from its subsidiary.  Here, Plaintiff never claimed that DPW had siphoned funds from Super Crypto.  Instead, as Plaintiff has made clear, all Super Crypto's funds were already DPW's; DPW could not siphon money from itself.

Further, the list of *NetJets* factors "is not exhaustive" and the court "may consider other relevant allegations."  *Leber Assocs., LLC v. Entm't Grp. Fund, Inc.*, 2003 U.S. Dist. LEXIS 13009, 2003 WL 21750211, at *14 (S.D.N.Y. July 22, 2003).  Defendants' suggestion that alter ego liability cannot attach without proof of all the *NetJets* factors "overlooks the fact that the most relevant factor in the *NetJets* inquiry is whether the entity simply functioned as a facade for the dominant shareholder."  *A.V.E.L.A.,* 364 F. Supp. 3d at 318.  In *A.V.E.L.A.*, the Court called out only three facts but nevertheless found that alter ego status existed as a matter of law.  *Id.* Here, the evidence is overwhelming that Super Crypto was DPW's alter ego.

**B.      DPW and Super Crypto Abused the Corporate Form to Perpetrate an Injustice**

Plaintiff has established that there was "overall element of injustice or unfairness," which is satisfied where the corporation was used to engage in conduct that was inequitable or an unfair trade practice. *NetJets*, 537 F.3d at 177. Though the injustice here forms a basis for Plaintiff's causes of action, "[c]ourts routinely pierce the corporate veil where there is a nexus between the domination and the injustice …. so long as the corporate form is used to perpetrate the injustice." *Mohegan Lake Motors, Inc. v. Maoli*, 559 F. Supp. 3d 323, 341 (S.D.N.Y. 2021). Moreover, in determining whether unfairness exists, a court can take "into account relevant evidence that is also pertinent to the question of whether the two entities in question functioned as one." *NetJets*, 537 F.3d at 183. Even if Super Crypto was not initially formed to perpetuate an injustice, it is sufficient that it was so used. *NetJets*, 537 F.3d at 177.

Defendants argue that they could not have perpetrated an injustice because "Plaintiff was never misled to believe that [Super Crypto] are one and the same." Def. SJ Opp. Br. at 27. However, veil piercing does not require fraud or active deception, merely inequity. *See, e.g.*, *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989) (veil can be pierced "when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration[s] … are involved") (alterations in original; quotations and citations omitted).

In any case, from the outset, Super Crypto referred to the support of its corporate parent DPW so Plaintiff could take comfort that Super Crypto was part of a bigger public company. Pl. Moving 56.1 St. ¶¶ 39-47. Super Crypto also made clear that DPW needed to be comfortable with the parties' Agreement before it could be finalized and funded by DPW, while contemporaneous public filings showed that DPW intended to fund the Agreement through a DPW stock offering. Pl. Moving 56.1 St. ¶¶ 48-54. Likewise, after the Agreement was signed,

13

Mr. Magot treated DPW and Super Crypto as one entity, once sharing a press release about DPW's approval to raise funds to make sure Plaintiff saw "*our* announcement today where *we* got approval to raise $23.50 million and *we* have begun that process to repay all outstanding debts." Mandel Moving Ex. NNN (emphasis added). These are merely examples of the numerous times when Defendants conflated Super Crypto and DPW.

To the extent that, prior to contacting Mr. Magot, Mr. Kalfa determined that Super Crypto was merely a division of DPW (*see* Def. SJ Opp. Br. at 27), this is relevant only insofar as this determination was constantly and consistently confirmed by both Super Crypto and DPW themselves by word and deed. Pl. Moving 56.1 St. ¶¶ 39-51. Nor is it relevant that Mr. Tencer did not directly speak with someone from DPW prior to signing the Agreement (*see* Def. SJ Opp. Br. at 28), since Super Crypto always made clear that its ability to enter into the Agreement expressly hinged on DPW's approval and financing. Pl. Moving 56.1 St. ¶¶ 42-46.

Defendants also claim that they could not have perpetrated an injustice because, "at the time that Plaintiff entered into the Agreement, it understood that, by April 16, 2018, it may receive only $1,651,125 … and be left with the Remaining Machines." Def. SJ Opp. Br. at 29. Plaintiff does not dispute that the Agreement's original terms could have led to such a result. However, due to Defendants' persistent insistence that they still (always) intended to purchase the remaining 600 Machines, the parties amended the Agreement to strike Article 3 or else Defendants waived their right to enforce Article 3. Pl. Moving 56.1 St. ¶¶ 79-80, 85-88; Pl. Moving SJ Br. at 9-18.

Defendants' self-serving arguments highlight the unjust and unfair way in which they have acted. For months leading up to and after April 15, 2018, Defendants repeatedly told Plaintiff that they still wanted the last 600 Machines, assuring Plaintiff that DPW was actively

pursuing funding to pay the full amount contemplated by the Agreement. However, once

Plaintiff brought this lawsuit to recover the unpaid balance, Defendants suddenly began to insist

on the sanctity of the corporate form separating Super Crypto from DPW. Such cynical

manipulation of corporate formalities to allow Defendants to determine which of Super Crypto's

obligations would be recognized is exactly the sort of injustice that veil piercing is intended to

remedy. Accordingly, DPW should be held liable for Super Crypto's breach as a matter of law.

## **CONCLUSION**

For the foregoing reasons and those previously set forth in Plaintiff's moving and

opposition briefs, the Court should grant Plaintiff's motion for summary judgment.


Dated: September 12, 2023                    **COWAN, LIEBOWITZ & LATMAN, P.C.**
                                             Attorneys for Plaintiff

                                             By: _____

                                                 Richard S. Mandel (rsm@cll.com)
                                                 Dasha Chestukhin (dxc@cll.com)
                                             114 West 47th Street
                                             New York, New York 10036
                                             (212) 790-9200

15

31592/000/4425682